# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BAILEY TOOL & MANUFACTURING** | § | **Case No. 16-30503-bjh11** |
| **COMPANY, et al.** | § | **Chapter 11** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |
| | § | |
| **BAILEY TOOL & MANUFACTURING** | § | |
| **COMPANY, HUNT HINGES, INC., and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Adv. No. 16-03025-bjh** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| Defendant. | § | |

## DEBTORS' BRIEF IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT

Melissa S. Hayward
  Texas Bar No. 24044908
  MHayward@FranklinHayward.com
Julian P. Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
**FRANKLIN HAYWARD LLP**
10501 North Central Expy., Suite 106
Dallas, Texas 75231
(972) 755-7100 (*tel.*)
(972) 755-7110 (*facsimile*)

*COUNSEL FOR THE DEBTORS*

## TABLE OF CONTENTS

I.     SUMMARY ........................................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................................ 2

III.   SUMMARY JUDGMENT STANDARD ........................................................................... 6

IV.    ARGUMENT AND AUTHORITIES .............................................................................. 7

    A.   THE FACTORING AGREEMENT IS NULL UNDER LOUISIANA LAW. ...... 8

    B.   REPUBLIC DID NOT PURCHASE ALL OF THE DEBTORS' ACCOUNTS
       RECEIVABLE INTO PERPETUTIY. ................................................................ 11

    C.   THE FACTORING AGREEMENT TERMINATED NO LATER THAN
       DECEMBER 3, 2015. ......................................................................................... 13

    D.   REPUBLIC VIOLATED AND CONTINUES TO VIOLATE THE
       AUTOMATIC STAY. ........................................................................................ 17

    E.   REPUBLIC MUST IMMEDIATELY TURN OVER THE SURPLUS FUNDS
       AND THE PROCEEDS OF THE UNASSIGNED INVOICES ........................... 19

    F.   REPUBLIC CONVERTED THE PROCEEDS OF THE UNASSIGNED
       INVOICES. ......................................................................................................... 20

    G.   REPUBLIC COMMITTED THEFT OF THE UNASSIGNED INVOICES. ...... 20

    H.   THE FACTORING AGREEMENT CONSTITUTED A FRAUDULENT
       TRANSFER. ........................................................................................................ 21

V.     PRAYER ........................................................................................................................ 24

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 249, 250, 255 (1986) ................................... 7

*Begier v. I.R.S.*, 496 U.S. 53, 58-59 (1990) ............................................................................. 22

*Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005) ................................. 18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).............................................. 7

*Conoco, Inc. v. Amarillo Nat. Bank.*, 950 S.W.2d 790, 796 (Tex. App.—Amarillo 1997).......... 20

*Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992) ..................................... 24

*Morton v. Kievit (In re Vallecito Gas, LLC)*, 440 B.R. 358, 457 (Bankr. N.D. Tex. 2010) ......... 17

*Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 488, 489 (N.D. Tex. 1999)........... 18, 19

*Occidental Chem. Corp. v. Elliott Turbomachinery Co.*, 84 F.3d 172, 177 (5th Cir. 1996) ......... 8

*Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121
  (5th Cir. 1994) .................................................................................................................. 23

*Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr. S.D. Fla.
  1991)................................................................................................................................ 23

*Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992)
  ......................................................................................................................................... 22

*Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir.1988) ..................... 7

*Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003)............................................ 7

**Statutes**

11 U.S.C. § 101(32)(A)........................................................................................................... 22

11 U.S.C. § 101(54)(D)........................................................................................................... 22

11 U.S.C. § 541(a)(1).............................................................................................................. 17

11 U.S.C. § 548(a)(1)(B)(ii)(II) .............................................................................................. 23

11 U.S.C. § 550(a)(1).............................................................................................................. 24

11 U.S.C. §§ 363; 542(a); & 1107 .......................................................................................... 19

**Other Authorities**

5 Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2012) ......................................................... 24

Fed. R. Civ. P. 56(e) ................................................................................................................. 7

LA. CIV. CODE ANN ART. 2049 ................................................................................................ 12

LA. CIV. CODE ANN. ART. 2034 ............................................................................................. 10

LA. CIV. CODE ANN. ART. 2045 ............................................................................................. 11

LA. CIV. CODE ANN. ART. 2046 ............................................................................................. 11

LA. CIV. CODE ANN. ART. 2049 ............................................................................................. 14

LA. CIV. CODE ANN. ART. 2050 ............................................................................................. 14

LA. CIV. CODE ANN. ART. 2053 ............................................................................................. 14

LA. CIV. CODE ANN. ART. 2057 ............................................................................................. 14

La. Civ. Code. Ann. Art. 2004 ................................................................................................. 8

Tex. Civ. Prac. & Rem. Code § 134.002(2) ........................................................................... 20

Tex. Civ. Prac. & Rem. Code § 134.003(a) ........................................................................... 20

Tex. Penal Code § 31.03(a) .................................................................................................... 20

Tex. Penal Code § 31.03(b)(1) ............................................................................................... 20

Tex. Penal Code § 313.01(4) .................................................................................................. 20

Bailey Tool & Manufacturing Company ("Bailey"), Hunt Hinges, Inc. ("Hunt"), and Cafarelli Metals, Inc. ("Cafarelli," and, collectively with Bailey and Hunt, the "Debtors"), the debtors and debtors-in-possession in the above-styled and numbered bankruptcy case, file this brief in support of their *Debtors' Motion for Partial Summary Judgment* (the "Motion"), respectfully stating as follows:

## I.    SUMMARY

1.    For the reasons stated herein, the Debtors request partial summary judgment on the following elements/subparts of their causes of action:

a)    Count 1:  Violation of the Automatic Stay / Contempt of Court.

    i.    Republic's refusal to turn over the funds constitutes an ongoing, willful violation of the automatic stay; and

    ii.    Mr. Brown's February 10 email constituted a willful violation of the automatic stay;

b)    Count 2:  Turnover of Property of the Estate.

    i.    Republic must turn over the funds or some portion thereof immediately.

c)    Count 3:  Declaratory Relief.

    i.    Under the Factoring Agreement, the Debtors did not sell and Republic did not purchase all the Debtors' accounts into perpetuity;

    ii.    Under the Factoring Agreement, the Debtors only sold and Republic only purchased those accounts that the Debtor submitted to Republic on assignment schedules;

    iii.    The Debtors did not submit the Unassigned Invoices to Republic on assignment schedules;

    iv.    Republic did not purchase the Unassigned Invoices nor the proceeds thereof;

    v.    Republic collected the Unassigned Invoices and is currently holding the proceeds thereof;

vi.     The proceeds of the Unassigned Invoices are property of the Debtors' estates;

vii.    A general release is not a prerequisite to termination of the Factoring Agreement under ¶¶ 8.2 and or 8.3 of the Factoring Agreement;

viii.   The general release requirement in ¶ 8.1 of the Factoring Agreement is null under LA. CIV. CODE ANN. ART. 2004;

ix.     The Factoring Agreement is null under LA. CIV. CODE ANN. ART. 2004 and LA. CIV. CODE ANN. ART. 2034;

x.      The funds held by Republic or some portion thereof are property of the Debtors' bankruptcy estates; and

d)      Count 4:  Conversion;

e)      Count 5:  Texas Theft Liability Act;

f)      Count 7:  Fraudulent Transfer under 11 U.S.C. §§ 544, 548, and 550 and TEX. BUS. & COMM. CODE §§ 24.001 *et seq.*.

## II.     <u>FACTUAL BACKGROUND</u>

2.      On February 1, 2016 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>"), commencing their respective bankruptcy cases.[1] The Court entered an order authorizing joint administration of the bankruptcy cases on February 5, 2016.  The Debtors continue to operate and manage their businesses as "debtors in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the chapter 11 cases pursuant to section 1104 of the Bankruptcy Code.

3.      On or about February 27, 2015, the Debtors each entered into an *Agreement for Purchase and Sale* (the "<u>Factoring Agreement</u>") with Republic Business Credit, LLC

---

[1]     Bailey Shelter LP ("<u>BSLP</u>") also filed a voluntary petition on the same date, and its bankruptcy case is being jointly administered along with the other Debtors' bankruptcy cases.

("Republic").[2]  At the time, the value of the Debtors' assets if sold in in a prudent manner was less than the Debtors' total debt.[3]

  4.    The Factoring Agreement contains, *inter alia*, the following relevant provisions:

- "The Invoices related to all Accounts shall set forth the Lockbox Address as the sole address for payment *whether or not such Accounts have been purchased*."[4]

- "*Upon Seller's submission of an Assignment Schedule*, Purchaser shall be deemed to have purchased *the Accounts set forth therein* unless Purchaser provides written notice of its intent not to purchase such Accounts."[5]

- "Seller shall pay and Purchaser shall be entitled to receive the Purchase Fees, which Purchase Fees shall be due *at the time of purchase of the Accounts*."[6]

- "'Accounts Purchased' shall mean all Accounts *that are offered for sale to Purchaser* regardless of whether an Advance is made against such Account."[7]

- "'Assignment Schedule' shall mean the form of cover page that shall be used by Seller *to offer Purchaser Accounts for sale*."[8]

  5.    The Factoring Agreement also contains a provision that states, "[a]ny notice of termination by Seller, however, and notwithstanding payment in full of all Obligations by Seller, is conditioned on Seller's execution and delivery, to Purchaser, of a general release in a form satisfactory to Purchaser."[9]  Melissa Baines, Republic's risk manager, testified unequivocally at a hearing on February 29, 2016, that the release provision is standard and "never negotiated,"

---

[2]     Appx., 263 - 300.

[3]     Affidavit of John Buttles, Appx. 1.

[4]     Purchase Provisions, ¶ 1.4 (emphasis added), Appx. 265.

[5]     Purchase Provisions, ¶ 2 (emphasis added), Appx. 265.

[6]     Purchase Provisions, ¶ 3 (emphasis added), Appx. 265.

[7]     Annex A, Purchase Agreement Definitions (emphasis added), Appx. 273.

[8]     *Id.* (emphasis added).

[9]     Factoring Agreement Purchase Provisions ¶ 8.1, Appx. 269.

---

and Republic would not have entered into the Factoring Agreement without the release provision.[10]

6.      Under the Factoring Agreement, the Debtors would sell accounts to Republic by listing invoices on an assignment schedule in a form provided by Republic and uploading the schedule to Republic's online portal.[11]  Republic's portal is also capable of generating collection reports that show which of the Debtors' invoices Republic has collected.[12]  If the column in the collection reports labeled "Purchased" is blank for a particular invoice, it means that the Debtors never submitted such invoice to Republic on an assignment schedule, but Republic nevertheless collected such invoice.[13]  According to the collection reports, the invoices that Republic collected but that the Debtors did not assign totaled $251,567.36 (collectively, the "Unassigned Invoices").[14]

7.      The Factoring Agreement provides that, "[i]n the event that … there is an Event of Default under this Purchase Agreement *that results in an early termination of the Agreement* by either Seller or Purchaser, Seller shall pay Purchaser the Termination Fee, which Termination Fee shall be in addition to any other fees due to Purchaser hereunder."[15] The initial term of the Factoring Agreement was originally supposed to end, at the earliest, on or about February 26, 2016.[16]  On October 2, 2015, however, Republic paid itself a termination fee in the amount of

---

[10]      Tr. 142:9-143-4, Appx. 152 - 153.

[11]      *See* Tr. 120:23-121:8, Appx. 130 - 131; Purchase Provisions, ¶ 2 (emphasis added), Appx. 265.   An example assignment schedule is located at Appx. 329.

[12]      Collection reports for each of the Debtors from September 12, 2015 through October 26, 2016, are attached at Appx. 1079 – 1140.  A summary of the collection reports is attached at Appx. 1047 - 1069.

[13]      Tr. 125:6-20, 127:25 – 128:4, 182:5-15; Appx. 135, 137 - 138, 192.

[14]      The Unassigned Invoices are located at Appx. 341 - 426 and are summarized at Appx. 1070 - 1073.

[15]      Purchase Provisions ¶ 8.3, Appx. 269 (emphasis added).

[16]      *See* Agreement for Purchase and Sale, definition of "Term" and date of execution, Appx. 263 – 264; Annex A definition of "Effective Date," Appx. 273.

$75,000.00 out of the proceeds of the Debtors' accounts.[17]

8.      The Factoring Agreement also provides that "[t]he failure of Seller to submit Accounts during the Term of this Purchase Agreement shall be considered a termination of this Purchase Agreement by Seller."[18]  A submission on November 5, 2015—more than three months before the end of the Factoring Agreement's original anticipated term—was the last time that the Debtors submitted an assignment schedule to Republic.[19]  It is undisputed that the Debtors have not submitted any invoices to Republic since then.

9.      On November 20, 2015, Ms. Baines sent an email to John Buttles, Bailey's CEO, stating as follows:

> With the posting of today's collections, the amounts due as of today to RBC from the companies under the Purchase Agreements have been collected. Upon full execution of the attached General Release Agreement, but not before the Date of the General Release Agreement (Monday, November 23, 2015), the Obligation due and owing to RBC will be considered satisfied.
>
> * * *
>
> The consolidated wire amount due to the companies, effective November 23, 2015, will be $152,064.03.  * * *[20]

Attached to this email was a four-page general release agreement for each of the Debtors to sign.[21]  The release is broad in scope, releasing liability for both gross and intentional fault.[22]  In addition to the $152,064.03 it was holding, Republic has since collected an additional

---

[17]      Affidavit of John Buttles, Appx. 1; Reserve Activity Report and Client Activity Report, Appx. 330 - 332.

[18]      Purchase Provisions ¶ 8.2, Appx. 269.

[19]      Tr. 133:20-24, Appx. 143.

[20]      Appx. 246.

[21]      Appx. 247 - 258.

[22]      *See id.*

---

$155,738.75 from the Debtors' customers, totaling $307,802.78 (the "Surplus Funds").[23]

10.     On December 3, 2015, Melissa Hayward, counsel for the Debtors, sent a letter to Laurie A. Martin Montplaisir, counsel for Republic, in which Ms. Hayward made it clear that the Debtors considered the Factoring Agreement to be terminated and in which she demanded the immediate return of all funds Republic was wrongfully withholding.[24]  The letter unequivocally stated that, "Additionally, as necessary, this letter shall constitute notice under ¶ 8.1 of the *Purchase Provisions to Agreement for Purchase and Sale – Standard Provisions* of Bailey's cancellation of the *Agreement for Purchase and Sale*."[25]

11.     On February 2, 2016, Ms. Hayward sent a second letter to Ms. Montplaisir.[26]  In the February 2 letter, Ms. Hayward advised Republic of the Debtors' bankruptcy filing and demanded turnover of all funds Republic was holding that it collected from the Debtors' accounts.  Republic did not comply with the demand.  On February 10, 2016, ten days into the Debtors' bankruptcy case, S. Joseph Brown ("Brown"), another of Republic's attorneys, sent an email to Sheryl Toby, counsel for Trelleborg Automotive USA, Inc. ("Trelleborg"), one of the Debtors' customers.[27]  In the email, Brown, on behalf of Republic, demanded that Trelleborg not pay the Debtors, but instead pay Republic, and asserted a right to setoff, among other things.[28]

## III.      SUMMARY JUDGMENT STANDARD

12.     Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, and other matters presented

---

[23]     *See* Collection Report Summary, Appx. 1074 - 1078; and Collection Reports; 1079 - 1140.

[24]     Appx. 301.

[25]     *Id.*

[26]     Appx 311.

[27]     Appx. 333 - 334.

[28]     *Id.*

to the court show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.[29]  On a summary judgment motion, the inference to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.[30]  The movant bears the initial burden of articulating the basis for its motion and identifying evidence which shows that there is no genuine issue of material fact.[31]

13.     Once the movant has met its burden, the respondent must demonstrate that there are genuine fact issues warranting a trial.[32]  In opposing summary judgment, the respondent may not rely on allegations in its pleadings; instead, it must set forth sufficient evidence supporting a factual dispute to require a fact finder to resolve the parties' differing versions of the truth at trial.[33]  Should the respondent fail to make a showing on an element for which it bears the burden of proof, the movant is entitled to judgment as a matter of law.[34]  A factual dispute bars summary judgment only when the disputed fact is determinative under governing law.[35]

## IV.     ARGUMENT AND AUTHORITIES

14.     The Debtors' entitlement to summary judgment stems largely from 3 overarching legal conclusions that derive from the undisputed facts: (A) the Factoring Agreement is null under Louisiana Law; even if the Factoring Agreement is not null, (B) the Debtors did not sell and Republic did not purchase all of the Debtors' accounts into perpetuity; Republic only purchased accounts submitted via an assignment schedule; and (C) the Factoring Agreement

---

[29]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1122 (5th Cir.1988).

[30]     *Anderson*, 477 U.S. at 255.

[31]     *Celotex*, 477 U.S. at 322.

[32]     Fed. R. Civ. P. 56(e); *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003).

[33]     *Anderson*, 477 U.S. at 248-249.

[34]     *Celotex*, 477 U.S. at 322.

[35]     *Anderson*, 477 U.S. at 250.

terminated no later than December 3, 2015.  Based on these conclusions, (D) Republic willfully

violated and continues willfully to violate the automatic stay; and (E) Republic must

immediately turn over the proceeds of the Unassigned Invoices.  There is also no genuine issue

of material fact that Republic (F) committed conversion and (G) violated the Texas Theft

Liability Act with respect to the Unassigned Invoices.  To the extent Republic is correct, and it

purchased all the Debtors' accounts into perpetuity, then (H) the Factoring Agreement

constituted a fraudulent transfer.

## A.     THE FACTORING AGREEMENT IS NULL UNDER LOUISIANA LAW.

15.     Article 2004 of the Louisiana Civil Code provides that "[a]ny clause is null that,

in advance, excludes or limits the liability of one party for intentional or gross fault that causes

damage to the other party."[36]  The Fifth Circuit has construed article 2004 as follows:

> We find that article 2004 stands as a legislative pronouncement of
> public policy which parties to a contract cannot ignore.  Gross fault
> or gross negligence is so closely akin to intentional fault and fraud
> that it would disrupt the social order to allow parties to contract in
> advance to limit liability for gross fault.
>
> * * *
>
> Thus, any contractual clause which operates to limit a plaintiff's
> right to redress a violation for gross fault violates Louisiana public
> policy.  Contractual provisions excluding gross fault may therefore
> convert an otherwise valid contractual provision into an invalid
> one.[37]

The Fifth Circuit also observed that, "[t]he statutory construction articles in the Louisiana Civil

Code provide that 'Persons may not by their juridical acts derogate from laws enacted for the

protection of the public interest.  Any act in derogation of such laws is an absolute nullity.'"[38]

---

[36]     La. Civ. Code. Ann. Art. 2004.

[37]     *Occidental Chem. Corp. v. Elliott Turbomachinery Co.*, 84 F.3d 172, 177 (5th Cir. 1996).

[38]     *Id.* at 176.

16.    In *Occidental*, the Fifth Circuit considered a contract that limited damages to warranty claims and required such claims to be brought within one year.[39]  Normally, Louisiana law provides a warranty period of ten years.[40]  The Court held that "[t]he warranty clause in Elliott's contract has the effect of limiting its liability for gross fault because without the clause Occidental would have over eight more years to bring an action for Elliott's breach."[41]  "Consequently, Elliott's warranty provision is void because it impermissibly operates in a manner that limits actions for gross negligence."[42]

17.    The purportedly mandatory general release clause in paragraph 8.1 of the Factoring Agreement has the same effect.  According to the Factoring Agreement (at least as interpreted by Republic), notwithstanding payment in full, if the Debtors wish to terminate the Factoring Agreement, they must execute a general release.[43]  If they do not, then the factoring agreement automatically renews into perpetuity,[44] the Debtors remain obligated to sell all of their accounts to Republic,[45] and Republic has no obligation to release the proceeds of those accounts, whether by advance or otherwise.[46]  The form of general release Republic has attempted to require the Debtors to sign is broad and sweeping, and it unquestionably releases damages caused by gross or intentional fault.[47]  Thus, by prospectively requiring the Debtor to execute

---

[39]    *Id.* at 173.

[40]    *Id.* at 178.

[41]    *Id.*

[42]    *Id.*

[43]    Purchase Provisions ¶ 8.1, Appx. 269.

[44]    *Id.*

[45]    Purchase Provisions ¶¶ 1.1 – 1.2, Appx. 265.

[46]    *Compare* Purchase Provisions ¶ 2, Appx. 265, *with* Purchase Provisions ¶ 4, Appx. 266, *and* Purchase Agreement Definitions, "Obligation," Appx. 274.

[47]    *E.g.*, Appx. 249, providing as follows:

this release as a condition to terminating the Factoring Agreement, paragraph 8.1 has the effect

of limiting Republic's liability for gross and intentional fault.  Accordingly, the clause is void, in

the words of the Fifth Circuit, or an absolute nullity, in the words of Louisiana Law.

18.     Another provision of Louisiana Law, article 2034, provides that "[n]ullity of a

provision does not render the whole contract null unless, from the nature of the provision or the

intention of the parties, it can be presumed that the contract would not have been made without

the null provision."[48]  Republic's representative, Melissa Baines, testified unequivocally that the

mandatory release provision is standard and "never negotiated," and Republic would not have

---

8. RELEASE. EACH OF CLIENT AND ITS AFFILIATES, SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, AGENTS, SUCCESSORS AND ASSIGNS (COLLECTIVELY THE "CLIENT AFFILIATED PARTIES" AND EACH A "CLIENT AFFILIATED PARTY") HEREBY ACKNOWLEDGES THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED AGAINST RBC OR ITS AFFILIATES OR ANY OF THEIR RESPECTIVE MEMBERS, MANAGERS, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, ATTORNEYS, SUCCESSORS OR ASSIGNS (COLLECTIVELY THE "RBC AFFILIATED PARTIES" AND EACH A "RBC AFFILIATED PARTY") IN ANY MATTER, INCLUDING BUT NOT LIMITED TO SEEKING AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE. EACH CLIENT AFFILIATED PARTY HEREBY OLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES THE RBC AFFILIATED PARTIES FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, AND LIABILITIES WHATSOEVER, KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT, OR CONDITIONAL, AT LAW OR IN EQUITY, THAT THE CLIENT AFFILIATED PARTIES OR ANY ONE OF THEM MAY NOW OR HEREAFTER HAVE AGAINST ANY RBC AFFILIATED PARTY, IF ANY, AND IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO THOSE ARISING FROM THE OBLIGATIONS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THIS GENERAL RELEASE, THE FACILITY DOCUMENTS OR ANY OTHER DOCUMENT OR AGREEMENTS, OR NEGOTIATION FOR AND EXECUTION OF THIS GENERAL RELEASE. EACH CLIENT AFFILIATED PARTY HEREBY COVENANTS AND AGREES NEVER TO INSTITUTE ANY ACTION OR SUIT AT LAW OR IN EQUITY, NOR INSTITUTE, PROSECUTE, OR IN ANY WAY AID IN THE INSTITUTION OR PROSECUTION OF ANY CLAIM, ACTION OR CAUSE OF ACTION, RIGHTS TO RECOVER DEBTS OR DEMANDS OF ANY NATURE AGAINST A RBC AFFILIATED PARTY, OUT OF OR RELATED TO SUCH RBC AFFILIATE PARTY'S ACTIONS, OMISSIONS, STATEMENTS, REQUESTS OR DEMANDS.

[48]   LA. CIV. CODE ANN. ART. 2034.

entered into the Factoring Agreement without the release provision.[49]   Because the release

provision is null, and because Republic would not have entered into the Factoring Agreement

without it, the Factoring Agreement itself is likewise null as a matter of Louisiana law.

Accordingly, the Court should enter summary judgment on the following requests for declaratory

relief:

    i.      The general release requirement in ¶ 8.1 of the Factoring Agreement is
null under LA. CIV. CODE ANN. ART. 2004; and

   ii.      The Factoring Agreement is null under LA. CIV. CODE ANN. ART. 2004 and
LA. CIV. CODE ANN. ART. 2034.

## B.   REPUBLIC DID NOT PURCHASE ALL OF THE DEBTORS' ACCOUNTS RECEIVABLE INTO PERPETUTIY.

19.   Republic has maintained throughout this adversary and the Debtors' bankruptcy

cases that it purchased all of the Debtors' accounts receivable into perpetuity under the Factoring

Agreement.   "Interpretation of a contract is the determination of the common intent of the

parties."[50]   "When the words of a contract are clear and explicit and lead to no absurd

consequences, no further interpretation may be made in search of the parties' intent."[51]   The

Factoring Agreement is clear with respect to the manner in which the Debtors sold and Republic

purchased accounts.

20.   The following provisions of the Factoring Agreement, among others, directly

contradict Republic's argument that it purchased all the Debtors' accounts:

- "The Invoices related to all Accounts shall set forth the Lockbox Address as
the sole address for payment *whether or not such Accounts have been*

---

[49]    Tr. 142:9-143-4, Appx. 152 - 153.

[50]    LA. CIV. CODE ANN. ART. 2045.

[51]    LA. CIV. CODE ANN. ART. 2046.

*purchased.*"[52]

- "*Upon Seller's submission of an Assignment Schedule*, Purchaser shall be deemed to have purchased the Accounts set forth therein unless Purchaser provides written notice of its intent not to purchase such Accounts."[53]

- "Seller shall pay and Purchaser shall be entitled to receive the Purchase Fees, which Purchase Fees shall be due *at the time of purchase of the Accounts.*"[54]

- "'Accounts Purchased' shall mean all Accounts *that are offered for sale to Purchaser* regardless of whether an Advance is made against such Account."[55]

- "'Assignment Schedule' shall mean the form of cover page that shall be used by Seller *to offer Purchaser Accounts for sale.*"[56]

Each of these provisions contemplates that the sale and purchase of accounts will be ongoing throughout the term of the Factoring Agreement.  And such sales and purchases were to occur each time one of the Debtors submitted an assignment schedule to Republic.

21.     Even if the Factoring Agreement were not clear in isolation, "[a] provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."[57]   If Republic really purchased all of the Debtors' accounts into perpetuity, all of the italicized language quoted directly above would be meaningless.  Such language only has meaning if the sale of accounts was ongoing.  If the Court were then to look beyond the four corners of the Factoring Agreement, it would see that the form of Assignment Schedule provided that "Seller represents and warrants that the foregoing accounts *offered for sale* to [Republic] *by this Assignment Schedule* are each *being offered*

---

[52]     Purchase provisions, ¶ 1.4 (emphasis added), Appx 265.

[53]     Purchase Provisions, ¶ 2 (emphasis added), Appx 265.

[54]     Purchase Provisions, ¶ 3 (emphasis added), Appx 265.

[55]     Annex A, Purchase Agreement Definitions (emphasis added), Appx 273.

[56]     *Id.* (emphasis added).

[57]     LA. CIV. CODE ANN. ART. 2049.

pursuant to and in accordance with the terms of the [Factoring Agreement]."[58]   And the collection reports from Republic's online portal contains a column labeled "Purchased," which contains a date for pre-Nov. 5 invoices and a blank space for post-Nov. 5 invoices.  All of this evidence directly contradicts Republic's argument that it purchased all accounts of the Debtors, into perpetuity, at the inception of the Factoring Agreement.

22.     Instead, the evidence conclusively establishes that the Debtors only sold and Republic only purchased accounts that the Debtors submitted to Republic on assignment schedules.  The evidence also conclusively establishes that the Debtors never submitted any of the Unassigned Invoices to Republic on an assignment schedule.  Finally, the evidence conclusively establishes that Republic collected and is currently holding the proceeds of the Unassigned Invoices.  Accordingly, the Court should grant summary judgment on the following requests for declaratory relief:

i.      Under the Factoring Agreement, the Debtors did not sell and Republic did not purchase all the Debtors' accounts into perpetuity;

ii.     Under the Factoring Agreement, the Debtors only sold and Republic only purchased those accounts that the Debtor submitted to Republic on assignment schedules;

iii.    The Debtors did not submit the Unassigned Invoices to Republic on assignment schedules;

iv.     Republic did not purchase the Unassigned Invoices nor the proceeds thereof; and

v.      Republic collected the Unassigned Invoices and is currently holding the proceeds thereof.

## C.    THE FACTORING AGREEMENT TERMINATED NO LATER THAN DECEMBER 3, 2015.

23.     Even if the evidence does not conclusively establish that the entire Factoring

---

[58]     Example Assignment Schedule, Appx. 329.

Agreement is null under article 2034 of the Louisiana Civil Code, as discussed above, there is no question that the provision purportedly requiring the Debtors to execute a general release in order to terminate the Factoring Agreement is null under article 2004.  But even aside from the nullity of that provision, section 8 of the Factoring Agreement, titled "Term and Termination," is susceptible to multiple interpretations.  "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."[59] "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."[60]  "In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation."[61]  Finally, "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, *the conduct of the parties before and after the formation of the contract*, and of other contracts of a like nature between the same parties."[62]

24.     The obligation in question is whether the Debtor was obligated to execute a general release in order for the Factoring Agreement to terminate, regardless of the manner of termination.  And the answer must be "no."  Section 8 of the Factoring Agreement has five paragraphs.  Only one of them, paragraph 8.1, mentions the release.  And it merely provides that a *notice* of termination, as opposed to a termination itself, is conditioned upon Republic receiving a general release.  This language is consistent with the first sentence of paragraph 8.3, which requires a notice of termination to be in writing.  But paragraph 8.1's language is not consistent with paragraph 8.2, which simply states that "[t]he failure of Seller to submit

---

[59]     LA. CIV. CODE ANN. ART. 2049.

[60]     LA. CIV. CODE ANN. ART. 2050.

[61]     LA. CIV. CODE ANN. ART. 2057.

[62]     LA. CIV. CODE ANN. ART. 2053 (emphasis added).

Accounts during the term of this Purchase Agreement shall be considered a termination [as opposed to a *notice* of termination] of this Purchase Agreement by Seller." Nor is it consistent with paragraph 8.4, which gives Republic the option to terminate the Factoring Agreement under certain circumstances with or without notice. It would not make sense for Republic's decision to terminate to be conditioned on the Debtors executing a release.

25.     In this case, the best evidence of whether the Debtor was obligated to execute a general release regardless of the manner of termination is the parties' conduct—specifically, the best evidence is Republic's conduct. On or about October 2, 2015, Republic paid itself a termination fee in the amount of $75,000.00 out of the proceeds of the Debtors' accounts.[63] The termination fee is due under two independent circumstances: (i) "[i]n the event that Purchaser agrees to grant [a written] request for early termination" or (ii) if "there is an Event of Default under the Purchase Agreement that results in an early termination of this Agreement by either Seller or Purchaser …."[64] Either way, the Factoring Agreement is clear that Republic is not entitled to collect the termination fee until the Factoring Agreement has been terminated. If the Factoring Agreement had not terminated, then Republic would not have been entitled to collect the termination fee. Accordingly, the Factoring Agreement terminated no later than October 2, 2015.

26.     Alternatively, to the extent the Court determines there is a genuine issue of material fact as to whether the Factoring Agreement terminated on October 2, there is no genuine issue of material fact that the Debtors last submitted accounts to Republic on November 5, 2015. Under paragraph 8.2 of the Factoring Agreement, "[t]he failure of Seller to submit Accounts

---

[63]     Affidavit of John Buttles, Appx. 1 - 5; Reserve Activity Report and Client Activity Report, Appx. 330 - 332.

[64]     Purchase Provisions ¶ 8.3, Appx. 269.

during the term of this Purchase Agreement shall be considered a termination of this Purchase Agreement by Seller."[65]   Unlike paragraph 8.1, paragraph 8.2 does not contemplate a release. Even if it did, the release provision is null under article 2004 of the Louisiana Civil Code. Accordingly, the Factoring Agreement terminated no later than November 5, 2015.

27.     In any event, given that the release requirement is null, the Factoring Agreement terminated no later than December 3, 2015, when Melissa Hayward, counsel for the Debtors, sent a letter to Laurie A. Martin Montplaisir, counsel for Republic, in which Ms. Hayward made it clear that the Debtors considered the Factoring Agreement to be terminated and in which she demanded the immediate return of all funds Republic was wrongfully withholding.[66]   The letter unequivocally stated that, "Additionally, as necessary, this letter shall constitute notice under ¶ 8.1 of the *Purchase Provisions to Agreement for Purchase and Sale – Standard Provisions* of Bailey's cancellation of the *Agreement for Purchase and Sale*."[67]   Accordingly, to the extent the Court determines there is a genuine issue of material fact as to whether the Factoring Agreement terminated on October 2 or November 5, 2015, there is no genuine issue of material fact that the Factoring Agreement terminated no later than December 3, 2015.   In any event, the Court should enter summary judgment on the following declaration:

  i.     A general release is not a prerequisite to termination of the Factoring Agreement under ¶¶ 8.2 and or 8.3 of the Factoring Agreement;

---

[65]    Appx. 269.

[66]    Appx. 301 - 302.

[67]    *Id.*

## D.   REPUBLIC VIOLATED AND CONTINUES TO VIOLATE THE AUTOMATIC STAY.

28.   Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held[.]"[68] Because the Debtors never sold and Republic never purchased the Unassigned Invoices, such accounts and the proceeds thereof are property of the Debtors' estates, regardless of the fact that such funds are in Republic's possession.

29.   Furthermore, property in which a debtor has a contingent, reversionary interest constitutes property of the estate.[69]   Even if Republic is correct that signing a general release is a precondition to terminating the Factoring Agreement, Republic is eventually obligated to turn over "Available Funds" to the Debtors on request, subject to Republic's right to maintain a "Reserve."[70]   In fact, Republic offered to turn over all the funds its was holding if the Debtors signed the release,[71] and Republic has not since disputed that it would turn over a significant amount of money to the Debtors but for the release.[72]   Accordingly, even if Republic is entitled to the release, the Debtors have a contingent, reversionary interest in their accounts, and the accounts therefore constituted property of the estate on the Petition Date.

30.   Section 362(a)(3) stays the act of any entity to "obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).   "Numerous cases have held that a creditor's continued retention of estate

---

[68]      11 U.S.C. § 541(a)(1).

[69]      *Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358 (Bankr. N.D. Tex. 2011); *Morton v. Kievit (In re Vallecito Gas, LLC)*, 440 B.R. 457 (Bankr. N.D. Tex. 2010).

[70]      Purchase Provisions ¶ 2, Appx. 265.

[71]      Appx. 246.

[72]      Tr. 183:13 – 16, Appx. 193.

---

property after notice of a bankruptcy filing constitutes an 'exercise of control' over property of the estate in violation of the automatic stay."[73]  By withholding funds that rightfully belong to the Debtors—funds that are, in fact, property of the estate[74]—Republic is plainly and unequivocally violating the automatic stay.  Republic is exercising control over the Debtors' funds, the proceeds of the Unassigned Invoices, which is forbidden by the automatic stay.

31.    Republic's actions in exerting control over property of the estate cannot be justified, and if Republic continues to exercise wrongful control over the funds, the Debtors' ability to operate their businesses and successfully reorganize will continue to be impeded. The Debtors have already lost several long-term customers due to Republic's wrongful actions, and Republic's actions will continue to cause considerable, irreparable harm to the Debtors. Accordingly, the Court should enter summary judgment on the following requests for declaratory relief:

     i.    The proceeds of the Unassigned Invoices are property of the Debtors' estates;

     ii.    The funds held by Republic or some portion thereof are property of the Debtors' bankruptcy estates.

With respect to the second declaration, the Debtors specifically request for the Court to declare that the Surplus Funds are property of the Debtors' estates.  The Debtors also request a ruling from the Court that Republic has violated and continues to violate the automatic stay by holding the Surplus Funds and proceeds of the Unassigned Invoices and by causing the Debtors' customers not to pay the Debtors.

---

[73]    *Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 488 (N.D. Tex. 1999) (collecting cases).

[74]    Even if it were not completely clear that the funds are property of the estate, exercising control over property as to which there is a legitimate dispute over ownership also violates the automatic stay.  *Cf. Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005) ("Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right …. We answer in the affirmative ….").

### E.    REPUBLIC MUST IMMEDIATELY TURN OVER THE SURPLUS FUNDS AND THE PROCEEDS OF THE UNASSIGNED INVOICES.

32.    Section 542(a) of the Bankruptcy Code requires that a person with possession, custody, or control of any property of the estate or property that the debtor in possession may use, sell, or lease under section 363 turn that property over to the debtor in possession.[75] "Section 542(a) has been construed to establish an affirmative obligation on the creditor to return estate property unless it is of inconsequential value to the estate, and nothing in section 542(a) requires the debtor to provide adequate protection as a condition precedent to turnover."[76] Republic's continued refusal to turn over the Surplus Funds and the proceeds of the Unassigned Invoices "is a violation of its obligation under § 542(a) to turn over estate property."[77]

33.    The funds Republic acquired from its collection of the Unassigned Invoices, which invoices the Debtors never submitted to Republic for factoring, are property of the estate that the Debtors may use as debtors in possession.  Likewise, the Surplus Funds are property of the estate because they were collected after the Factoring Agreement terminated and after Republic had been paid in full.  These two categories of funds overlap to the extent that $89,449.17 of the Surplus Funds are proceeds of Unassigned Invoices.[78]  Accordingly, the Court should enter partial summary judgment on the Debtors' cause of action for turnover under section 542 with respect to the proceeds of the Unassigned Invoices ($251,567.36), plus the Surplus Funds ($307,802.78), minus the overlap ($89,449.17), which equals $469,920.97.

---

[75]    *See* 11 U.S.C. §§ 363; 542(a); & 1107.

[76]    Nissan Motor Acceptance Corp. v. Baker, 239 B.R. at 489.

[77]    *Id.*

[78]    *See* Appx. 1074 - 1076.

## F.    REPUBLIC CONVERTED THE PROCEEDS OF THE UNASSIGNED INVOICES.

34.    "Conversion is the unlawful taking of control or dominion over another person's personal property in denial of that person's right in the property."[79]    Accounts receivable are personal property subject to conversion.[80]    As discussed above, the Debtor never assigned and Republic never purchased the Unassigned Invoices.    Nevertheless, Republic collected the Unassigned Invoices and continues to hold their proceeds in denial of the Debtors' rights. Accordingly, there is no genuine issue of material fact that Republic converted the Unassigned Invoices.

## G.    REPUBLIC COMMITTED THEFT OF THE UNASSIGNED INVOICES.

35.    "A person commits an offense [of theft] if he unlawfully appropriates property with intent to deprive the owner of property."[81]    "Appropriation of property is unlawful if: (1) it is without the owner's effective consent ...."[82]    "'Appropriate' means: (A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or to another; or (B) to acquire or otherwise exercise control over property other than real property."[83]    The Texas Theft Liability Act incorporates this definition of "theft."[84]    "A person who commits theft is liable for the damages resulting from the theft."[85]

---

[79]    *Conoco, Inc. v. Amarillo Nat. Bank.*, 950 S.W.2d 790, 796 (Tex. App.—Amarillo 1997) (reversed on other grounds).

[80]    *See id.*

[81]    Tex. Penal Code § 31.03(a).

[82]    Tex. Penal Code § 31.03(b)(1).

[83]    Tex. Penal Code § 313.01(4).

[84]    Tex. Civ. Prac. & Rem. Code § 134.002(2).

[85]    Tex. Civ. Prac. & Rem. Code § 134.003(a).

36.     In this case, there is no genuine issue of material fact that Republic appropriated the Unassigned Invoices and the proceeds thereof without the Debtors' consent.   Indeed, the Debtors have made several demands, including by filing this lawsuit, for Republic to turn over the proceeds of those invoices.[86]   Under the circumstances, the Court should enter partial summary judgment on the Debtors' Texas Theft Liability Act claims with respect to the proceeds of the Unassigned Invoices.

## H.     THE FACTORING AGREEMENT CONSTITUTED A FRAUDULENT TRANSFER.

37.     To the extent Republic is correct, and it purchased all of the Debtors' accounts in to perpetuity, then the sale constituted a fraudulent transfer.   Section 548 of the Bankruptcy Code provides in relevant part as follows:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> * * *
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or]
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital ….

38.     A "transfer" includes, *inter alia*, "each mode, direct or indirect, absolute or

---

[86]     *See* Appx. 301 - 312.

conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."[87]   There is no genuine issue of material fact that the Debtors' sale of accounts to Republic—whether it sold all its accounts or only those submitted on assignment schedules—constitutes a "transfer" within the broad meaning Congress included in the Bankruptcy Code.   Nor is there any genuine issue of material fact that the Debtors' accounts were their property or an interest in their property.[88]

39.    Determining "[r]easonably equivalent value requires a comparison of the value of what went out to the value of what came in."[89]   According to Republic, what went out from the Debtors was all of their accounts receivable, and what came in was Republic's absolutely discretionary option to pay for those accounts.   Republic's position is that it can divert 100 percent of collections from the Debtors' accounts to a reserve to pay continuously-accruing fees and expenses until the Debtors also grant a broad, unconditional release.   If Republic is correct, then it means the Debtors could conceivably receive nothing in exchange for its accounts. Indeed, it could actually lose valuable causes of action.   Accordingly, there is no genuine issue of material fact that the Debtors did not receive reasonably equivalent value in exchange for their accounts.

40.    The term "insolvent" means, with respect to a corporation, a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation …."[90]   Fair value is determined "by 'estimating what the debtor's assets would realize

---

[87]    11 U.S.C. § 101(54)(D).

[88]    *See Begier v. I.R.S.*, 496 U.S. 53, 58-59 (1990).

[89]    *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (Bankr. N.D. Tex. 1992).

[90]    11 U.S.C. § 101(32)(A).

if sold in a prudent manner in current market conditions.'"[91]   At the time the Debtors entered into

the Factoring Agreement, they were insolvent.[92]   Accordingly, there is no genuine issue of

material fact that the Debtors were insolvent when they entered into the Factoring Agreement,

and the Court should enter summary judgment on the Debtors' cause of action for fraudulent

transfer.

41.    Even if the entire Factoring Agreement did not constitute a fraudulent transfer

because Republic did not purchase all the Debtors' accounts into perpetuity, each collection of

an invoice by Republic after November 20, 2015 was a fraudulent transfer.   November 20 was

the day that Republic informed the Debtors that Republic had been paid in full and was holding

$152,064.03 due to the Debtors.[93]   Since then, Republic has collected a further $155,738.76 from

the Debtors' customers.[94]   The total of these amounts constitute the Surplus Funds.   Under the

circumstances, Republic did not give anything of value to or for the benefit of the Debtors in

exchange for the Surplus Funds.

42.    As discussed above, there is no question that the Debtors were insolvent.   But it is

also the case that the Debtors were "engaged in a business or transaction, or [were] about to

engage in a business or transaction, for which any property remaining with the [Debtors] was an

unreasonably small capital ...."[95]   The most significant factor in determining whether a debtor's

remaining property was an unreasonably small capital is "whether the debtor has and will have

---

[91]    *Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994) (quoting *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr. S.D. Fla. 1991)).

[92]    Affidavit of John Buttles, Appx. 1.

[93]    Appx. 246.

[94]    *See* Collection Report Summary, Appx. 1074 - 1078; and Collection Reports; 1079 - 1140.

[95]    11 U.S.C. § 548(a)(1)(B)(ii)(II).

sufficient cash flow to conduct its business."[96]    Republic refused to advance any funds after September 11, 2015 but continued to collect all of the Debtors' invoices, regardless of whether they had been assigned.  And Republic ultimately collected $1,488,248.41 after September 11, leaving the Debtors with insufficient cash flow to operate their business.[97]    Accordingly, there is no genuine issue of material fact that Republic's collection and retention of the Surplus Funds constituted a fraudulent transfer.    There is likewise no genuine issue of material fact that Republic was the initial transferee of the Surplus Funds.  Accordingly, the Debtors may recover the invoices or the value of the invoices from Republic.[98]

## V.    PRAYER

WHEREFORE, CONSIDERING THE FOREGOING, the Debtors respectfully request that the Court enter an order: (i) granting this Motion; (ii) entering summary judgment in the Debtors' favor on the following causes of action:

    a)    Count 1:  Violation of the Automatic Stay / Contempt of Court.

        i.    Republic refusing to turn over the funds constitutes an ongoing, willful violation of the automatic stay; and

        ii.    Mr. Brown's February 10 email constituted a willful violation of the automatic stay;

    b)    Count 2:  Turnover of Property of the Estate.

        i.    The Debtor must turn over the funds or some portion thereof immediately.

    c)    Count 3:  Declaratory Relief.

        i.    Under the Factoring Agreement, the Debtors did not sell and Republic did not purchase all the Debtors' accounts into

---

[96]    5 Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2012) (citing *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992)).

[97]    Buttles Aff., Appx. 1 – 5, Summary of post-Sept. 11 collections, Appx. 1047 - 1068.

[98]    11 U.S.C. § 550(a)(1).

perpetuity;

    ii.       Under the Factoring Agreement, the Debtors only sold and Republic only purchased those accounts that the Debtor submitted to Republic on assignment schedules;

    iii.      The Debtors did not submit the Unassigned Invoices to Republic on assignment schedules;

    iv.      Republic did not purchase the Unassigned Invoices nor the proceeds thereof;

    v.       Republic collected the Unassigned Invoices and is currently holding the proceeds thereof;

    vi.      The proceeds of the Unassigned Invoices are property of the Debtors' estates;

    vii.      A general release is not a prerequisite to termination of the Factoring Agreement under ¶¶ 8.2 and or 8.3 of the Factoring Agreement;

    viii.     The general release requirement in ¶ 8.1 of the Factoring Agreement is null under LA. CIV. CODE ANN. ART. 2004;

    ix.      The Factoring Agreement is null under LA. CIV. CODE ANN. ART. 2004 and LA. CIV. CODE ANN. ART. 2034;

    x.       The funds held by Republic or some portion thereof are property of the Debtors' bankruptcy estates; and

d)    Count 4:  Conversion;

e)    Count 5:  Test Theft Liability Act;

f)    Count 7:  Fraudulent Transfer under 11 U.S.C. §§ 544, 548, and 550 and TEX. BUS. & COMM. CODE §§ 24.001 *et seq.*

(iii)  granting the Debtors such other and further relief to which they may show themselves to be justly entitled.

Dated:  December 9, 2016.

             Respectfully submitted,

             **FRANKLIN HAYWARD LLP**

             By:/s/  *Melissa S. Hayward*

Melissa S. Hayward
  Texas Bar No. 24044908
Julian Vasek
  Texas Bar No. 24070790
  JVasek@FranklinHayward.com
10501 N. Central Expy., Suite 106
Dallas, Texas 75231
972.755.7100 (phone)
972.755.7110 (facsimile)

**ATTORNEYS FOR THE DEBTORS**

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on December 9, 2016 a true and correct copy of the foregoing Motion was served upon all parties who receive CM/ECF service, including counsel for Republic, Vickie Driver.

*/s/ Melissa Hayward*
Melissa Hayward