Vickie L. Driver
State Bar No. 24026886
Emily S. Chou
State Bar No. 24006997
**Lewis Brisbois Bisgaard & Smith, LLP**
2100 Ross Avenue, Suite 2000
Dallas, Texas 75201
Telephone: 214.722.7123
Facsimile: 214.722.7111
Email: vickie.driver@lewisbrisbois.com
Email: emily.chou@lewisbrisbois.com

**COUNSEL FOR REPUBLIC BUSINESS CREDIT, LLC**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-bjh11** |
| **MANUFACTURING COMPANY, et al.** | § | **Chapter 11** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Adv. No. 16-03025-bjh** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| **Counter-Defendant.** | § | |
| | § | |

_____  §  _____

**REPUBLIC BUSINESS CREDIT, LLC,**           §
                                            §
         **Third-Party Plaintiff,**          §
                                            §
**v.**                                       §
                                            §
**JOHN BUTTLES, TENNECO, INC.,**             §
**TRELLEBORG AUTOMOTIVE**                    §
**USA, INC.**                                §
                                            §
         **Third-Party Defendants.**         §

**REPUBLIC BUSINESS CREDIT, LLC'S BRIEF IN SUPPORT OF ITS RESPONSE
IN OPPOSITION TO DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

I.   FACTUAL BACKGROUND ................................................................................1

II.   SUMMARY JUDGMENT STANDARDS .......................................................11

III.   ARGUMENT AND AUTHORITIES ..............................................................11

    A.   Article 2004 of the Louisiana Civil Code Does Not Apply to the Factoring Agreement ...........................................................................................12

    B.   The Debtors Sold All of Their Accounts to RBC Pursuant to the Factoring Agreement ...........................................................................................15

    C.   The Factoring Agreement Has Not Been Terminated ...........................................21

        (a)   RBC Has Consistently Maintained That the Factoring Agreement Has Not Been Terminated...........................................................21

        (b)   The Factoring Agreement Was Not Terminated Under Paragraph 8.2........................................................................................22

        (c)   The Notice of Termination Given by Counsel for the Debtors Cannot Effectuate a Termination Without the Debtors Executing the Form Release..........................................................................24

    D.   The Funds Collected by RBC Constitute Property of RBC and Not Property of the Debtors' Estate.............................................................24

    E.   The Surplus Funds and Proceeds of Unassigned Invoices Are Property of RBC Not Subject to Turnover.............................................................25

    F.   RBC Committed Neither Conversion nor Theft of Debtors' Property .................26

    G.   The Factoring Agreement Did Not Constitute a Fraudulent Transfer ..................28

IV.   CONCLUSION.................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................. 10

*Besing v. Hawthorn*,
    981 F.2d 1488 (5th Cir. 1993) .................................................................................. 27

*Connolly v. The City of Houston (In re Western Integrated Networks, LLC)*,
    329 B.R. 334 (Bankr. D. Colo. 2005) ...................................................................... 25

*Express Working Capital, LLC v. Starving Students, Inc.*,
    28 F. Supp.3d 660 (N.D. Tex. 2014) ................................................................. 2, 15

*Fields v. City of South Houston*,
    922 F.2d 1183 (5th Cir. 1991) .................................................................................. 10

*Id.; Collins v. Natchez Cmty. Hosp., Inc.*,
    2008 U.S. Dist. LEXIS 19357 (S.D. Miss. 2008) .................................................. 11

*In re Argo Financial, Inc.*,
    337 F.3d 516 (5th Cir. 2003) ............................................................................. 2, 15

*In re Ozark*,
    850 F.2d 342 (8th cir. 1988) .................................................................................... 28

*In re Vallecito Gas, LLC*,
    461 B.R. 358 (Bankr.N.D.Tex. 2011) ..................................................................... 23

*Lamar Haddox Contractor, Inc. v. Harvey*,
    40 F.3d 118 (5th Cir. 1994) ..................................................................................... 28

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
    910 F.2d 167 (5th Cir. 1990) .................................................................................. 10

*Occidental Chem. Corp. v. Elliott Turbomachinery Co.*,
    84 F.3d 172 (5th Cir. 1996) ..................................................................................... 13

*Schmidt v. United States Marshal Service (In re Villarreal)*,
    2007 Bankr. LEXIS 463 (Bankr. S.D. Tex. 2007) .................................................. 25

*Stults v. Conoco, Inc.*,
    76 F.3d 651 (5th Cir. 1996) ..................................................................................... 10

*Watts. v. MTC Dev., LLC*,
    501 B.R. 896 (Bankr.N.D.Ga. 2013) ...................................................................... 28

*Weaver v. Kellogg*,
    216 B.R. 563 (S.D. Tex 1997) ................................................................................. 28

*Weinman v. Graves*,
    396 B.R. 70 (10th Cir. BAP 2008) .................................................................... 23, 24

*WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File*,
    282 B.R. 343 (Bankr.W.D.La. 2001) ...................................................................... 28

## Statutory Authorities

11 U.S.C. § 542 ............................................................................................................. 25

11 U.S.C. §548(a) ......................................................................................................... 27

La. Civ. Code Art. 2045 ................................................................................................ 21

La. Civ. Code Art. 2050 ................................................................................................ 22

La. Civ. Code Art. 2053 ................................................................................................ 22

**Rules and Regulations**

Fed. R. Civ. P. 56(c) ........................................................................................................... 10
Fed. R. Civ. P. 56(e) ........................................................................................................... 10
Fed. R. Evid. 408 ................................................................................................................... 8
Fed.R.Civ.P. 56(c) .............................................................................................................. 10

Republic Business Credit, LLC, ("RBC"), hereby files this brief in support of *Republic Business Credit, LLC's Brief in Support of Its Response in Opposition to Debtors' Motion for Partial Summary Judgment* (collectively, the "Response") in opposition to the *Debtors' Motion for Partial Summary Judgment* [Dkt. No. 72] and *Brief in Support of Motion for Partial Summary Judgment* [Dkt. No. 73] (collectively, the "Summary Judgment Motion")[1] filed by the Debtors Bailey Tool & Manufacturing Company, Hunt Hinges, Inc. and Cafarelli Metals, Inc. (collectively, "Plaintiffs" or "Debtors").  The Response is supported by the Affidavit of Melissa B. Baines ("Baines Affidavit"), attached as Appendix 1 – 8, and other documents contained in the Appendix concurrently filed herewith.  In support hereof, RBC respectfully state as follows:

<div align="center">

**I.**
**FACTUAL BACKGROUND**

</div>

1.      On or about February 25, 2015, each of the Debtors entered into that certain *Agreement for Purchase and Sale* dated February 25, 2015 (collectively referred to as the "Factoring Agreement").  The Factoring Agreement consists of several sections:  (1) the Agreement for Purchase and Sale section, (2) the Purchase Provisions section, and (3) the Annex A containing Definitions.  The Factoring Agreement became effective on or about March 3, 2015, the date the Plaintiffs received the first advance under the Factoring Agreement.  The Factoring Agreement executed with each of the Debtors are attached as Appendix 9 - 23(Bailey), Appendix 24 - 37 (Cafarelli) and Appendix 38 - 51 (Hunt).

2.      The Factoring Agreement is controlled by Louisiana law.  Factoring Agreement, Purchase Provisions, ¶10.1, Appendix 16.  Under the Factoring Agreement, the Plaintiffs sold "all of [Plaintiffs'] right, title and interest in and to [Plaintiffs'] *now existing and herein after created*

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning given to them in the MSJ.

*Accounts*, together with all corresponding rights with respect thereto and proceeds thereof…" Factoring Agreement, ¶1.1, Appendix 11.   For clarity, the Factoring Agreement's Purchase Provisions state that "[i]t is the intention of [Plaintiffs] and [RBC] that the sales of the Accounts constitute true and actual sales of the Accounts from [Plaintiffs] and [RBC]."   Factoring Agreement, ¶1.5., Appendix 11.

3.      The purchase of Accounts is considered a "secured transaction" that is governed by Article 9 of the Uniform Commercial Code ("UCC").  This is the case even if a factoring transaction is truly a purchase and sale, or often referred to as a true sale.

4.      There are two states in the United States where the parties to a factoring contract can declare their intent to put into effect a true sale of accounts, and such written declaration alone would be dispositive of the issue of whether a true sale has occurred.  Those two states are Louisiana and Texas.  *See, In re Argo Financial, Inc.*, 337 F.3d 516, 526-527(5th Cir. 2003)(discussing Louisiana law); *Express Working Capital, LLC v. Starving Students, Inc.,* 28 F. Supp.3d 660, 670-71 (N.D. Tex. 2014)(discussing Texas law).

5.      Factoring involves a crucial contractual and economic trade off:  factors such as RBC agree to accept a great amount of risk by providing financial services to oftentimes unbankable clients.   In this case, the Debtors' traditional lender, Comerica Bank had refused to extend the Debtors' line of credit and the Debtors were apparently unable to obtain financing from other traditional bank lenders like Comerica Bank.  Thus the Debtors turned to factoring.

6.      In order to protect against the high risks involved with providing financial services to a client that other traditional lenders have rejected, the Factoring Agreement require that *all* of the Debtors' Accounts (as defined in the Factoring Agreement) were sold to RBC and all Accounts were collected by RBC.  Therefore, pursuant to the Factoring Agreement, RBC is entitled to notify the

Debtors' Account Debtors to direct payment on accounts receivable so that payment shall be made to RBC. Factoring Agreement, Purchase Provisions, ¶1.3.1, Appendix 11; see also, UCC 9-406(a). RBC did, in fact, send these notices of assignment ("NOA") to the Account Debtors. An example of a NOA sent to an Account Debtor is attached as Appendix 63.

7.      The Debtors had affirmative duty to offer for sale to RBC *all* of the Debtors' Accounts. Factoring Agreement, Purchase Provisions, ¶1.1 ("Purchaser shall have the option to purchase from and Seller *shall assign and offer for sale exclusively to Purchaser... all of Seller's right, title and interest in and to: (a) Seller's now existing and hereafter created Accounts...*") (emphasis added), Appendix 11.

8.      The term "Account" is defined in the Factoring Agreement as such term is defined under the Uniform Commercial Code ("UCC") as adopted in Louisiana. *See* Factoring Agreement, Annex A, ¶C, Appendix 19. As defined under the UCC "account," except as used in "account for," means "a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered . . .." UCC 9-102(a)(2); Louisiana R.S. 10:9-102(a)(2).

9.      The Debtors were required to list all invoices related to and generated from their Accounts on Assignment Schedules. Factoring Agreement, Purchase Provisions, ¶1.2 ("*All* Accounts *shall be* submitted to Purchaser and *shall be* listed on an executed Assignment Schedule…") (emphasis added), Appendix 11.

10.      Requiring the Debtors to list all of their invoices from their Accounts on the Assignment Schedules is consistent with the Debtors' obligation to sell all of their Accounts. RBC has the option not to purchase an Account as listed on Assignment Schedules by providing a written notice that it would not purchase a particular Account. Factoring Agreement,  Purchase Provisions,

¶2 ("Upon Seller's submission of an Assignment Schedule, *Purchaser shall be deemed* to have

purchased the Accounts set forth therein, *unless* Purchaser provides written notice of its intent *not* to

purchase such Accounts.") (emphasis added), Appendix 11. The Assignment Schedules are used for

administrative convenience to keep track what was bought and sold, help calculate potential

advances, and help keep track of payments. Baines Affidavit, ¶8, Appendix 4. Similarly, RBC's

collection reports are also used for administrative purposes to track invoices and payments collected.

*Id.* Neither the Assignment Schedule nor the collection report is a vehicle by which the Debtors pick

and choose which Accounts, as evidence by invoices, were to be sold to RBC.

11.    The NOA is further support that the Debtors sold *all* of their Accounts. The NOA

notifies the Account Debtor to send all payments to RBC and clearly informs the Account Debtor

that, "[a]s part of the agreement with RBC, all of [debtor name]'s present and future accounts

receivable have been assigned to RBC, all payment for accounts receivable currently outstanding

and in the futures must be made **directly** to RBC and not to your vendor or any other entity…" *See*

NOA (emphasis original), Appendix 63.

12.    While the Factoring Agreement allowed RBC to make advances of up to 90% of the

Debtors' Accounts, the making of advances is a discretionary option held by RBC. It is not an

obligation. Factoring Agreement, Purchase Provisions, ¶2, Appendix 11.

13.    RBC has the right, under Paragraph 4 of the Purchase Provisions, to hold back

amounts in order to create a reserve for amounts and Obligations that would otherwise be due RBC

under the terms of the Factoring Agreement (the "Reserve"). Factoring Agreement, Purchase

Provisions, ¶4, Appendix 12. RBC determines the amount and duration of the Reserve in its "sole

and exclusive discretion." *Id.* The term "Obligation" is defined, in part, as "*all present and future*

*obligations owing by Seller to Purchaser...*" Factoring Agreement, Annex A (emphasis added),

Appendix 20.  Among other things, the Debtors have the obligation to reimburse RBC of attorneys' fees incurred by RBC.  Factoring Agreement, Purchase Provisions, ¶10.4, Appendix 17.  Accordingly, RBC has the right to hold funds in Reserve for, among other things, attorneys fees in anticipation of litigation.

14.    Furthermore, Paragraph 8.4 of the Purchase Provisions provides, among other things, that upon the termination of the Factoring Agreement, the terms of the Factoring Agreement "continue to be effective, until all transactions entered into and Obligations incurred hereunder have been completed and satisfied in full."  Factoring Agreement, Purchase Provisions, ¶8.4, Appendix 15.

15.    Paragraph 8 of the Purchase Provisions controls how and when the Factoring Agreement may be terminated by either party thereto.  No termination by the Debtors is effective until the Debtors execute and deliver to RBC general releases per the following language:  "Any notice of termination by [Plaintiffs], however, and notwithstanding payment in full of Obligations by [Plaintiffs], is conditioned on [Plaintiffs'] execution and delivery, to [RBC], of a general release in a form satisfactory to [RBC]."  Factoring Agreement, Purchase Provisions, ¶8, Appendix 15.

16.    Almost immediately after the Factoring Agreements were signed, significant issues at the Debtor's business became apparent.  The Debtors' business was disorganized and its documentation unreliable and inconsistent.  Debtors often demanded that RBC make advances against Accounts that were "ineligible" under the Factoring Agreement, such as the Accounts being past invoice terms, or due from an account debtor who did not pay within invoice terms.  Under the Factoring Agreement, RBC has the option but never the obligation to make advances of its own funds against any particular Account, and the Factoring Agreement provides that aged Accounts or Accounts due from account debtors that do not pay within invoice terms are ineligible for advances.

Factoring Agreement, Purchase Provisions, ¶4, Appendix 12.  Debtors nevertheless accused RBC of breaching its contract when it refused to make advances against ineligible Accounts as Debtors demanded.  Debtors routinely claimed they needed additional emergency inventory or payroll loans or their whole business would collapse.  Mr. Buttles and his representatives routinely threatened RBC with "lender liability" claims.

17.     On July 10, 2015, RBC sent the Debtors a Notice of Default letter.  The letter describes the Debtors' numerous and material breaches of the Factoring Agreement.  A true and correct copy of the July 10, 2015 Notice of Default Letter is found in Appendix 52 - 55.   On September 17, 2015, RBC sent the Debtors a Notice of Default and Demand for Payment letter, which payment demand was required to be satisfied by the Debtors on or before September 21, 2015.  A true and correct copy of the September 17, 2015 Notice of Default Letter and Demand for Payment is found in Appendix 56 - 58.

18.     In late September, 2015, the parties appeared to be on the verge of a negotiated parting of the ways.  *See* Appendix 60The terms of a forbearance agreement were discussed.  On or about October 1, 2015, counsel to RBC sent counsel to the Debtors an unsigned draft forbearance agreement for review and comment.  The terms were not finalized and remained subject to additional changes.  Before counsel to Debtors could respond, RBC received a payment from the Debtors.  *See* Baines Affidavit, Appendix 5.  Nevertheless, RBC stood prepared to finalize the terms of the forbearance agreement.  However, Debtors then inexplicably ceased communication with RBC for many weeks.  In the absence of a finalized forbearance agreement, RBC applied the payment to the debts outstanding.  *Id*.

19.     On or about October 2, 2015, with sufficient funds in hand, RBC charged the termination fee under the Factoring Agreement and was then fully prepared to turn over whatever

excess proceeds were available upon RBC's receipt of the signed general releases from the Debtors as required under the Factoring Agreement for termination.   Factoring Agreement, Purchase Provisions, ¶8.1; ¶8.3 (termination "is conditioned on Seller's execution and delivery, to Purchaser, of a general release in a form satisfactory to Purchaser… Purchaser shall not be required to record any terminations or satisfactions of any Purchaser's security interests unless and until Seller has executed and delivered to Purchaser said general release…), Appendix 15;  *See* Baines Affidavit, Appendix 5 - 6.

20.     On November 20, 2015, RBC again initiated communications to the Debtors to make arrangements for the exchange of the signed general releases for the return by RBC of any excess collections, as provided in the Factoring Agreement. Factoring Agreement, Purchase Provisions, ¶8.1 (Factoring Contract does not cease to be legally operative until Debtors signed releases).  A copy of the email dated November 20, 2015 from Ms. Melissa Baines to Mr. John Buttles is attached hereto in Appendix 59.  Neither the forbearance agreement nor the general releases required under the Factoring Agreement for termination were ever executed by the Debtors.  *See* Baines Affidavit, Appendix 6.

21.     On December 3, 2015, RBC began receiving communications from counsel to a customer of the Debtors named Trelleborg.  Trelleborg had previously received a notice of assignment ("NOA") from RBC, which notified Trelleborg that it was legally obligated to pay over to RBC all amounts that it owed for goods and services received from the Debtors.  *See* Appendix 60.   Trelleborg demanded a waiver from RBC,[2] so that Trelleborg could direct payment to the Debtors.  RBC had no obligation to grant such a waiver.

---

[2] UCC-9-406(a) creates double liability for any party who, after receiving a notice of an account assignment, wrongfully makes payment to the account assignor instead of to the account assignee.  Trelleborg demanded that RBC waive its rights as an assignee so that Trelleborg could safely pay Debtors and not be exposed
(footnote continued)

22.     On December 3, 2015, RBC also received correspondence from the Debtors demanding that RBC waive its UCC rights vis-à-vis Trelleborg, so that Trelleborg could pay the Debtors.

23.     On February 1, 2016 ("Petition Date"), the Debtors filed for bankruptcy protection.

24.     RBC made sure that none of its actions after February 1, 2016 could be reasonably construed as a violation of the automatic stay.  RBC never initiated any communication to Debtors or to any account debtor or third party.  When contacted by third parties, RBC's general policy was to reference the bankruptcies, and inform such third parties that RBC could n ot issue legal advice.

25.     Pursuant to the Temporary Restraining Order entered on March 4, 2016 [Docket No. 14] (the "TRO"), RBC turned over payments received from invoices dated after November 5, 2015 that were collected after the entry of the TRO.[3]

26.     After the Petition Date, Trelleborg continued to contact RBC and to demand releases under 9-406(a) so that Trelleborg could make payments to RBC directly.

27.     On February 10, 2016, counsel to RBC responded to counsel to Trelleborg in an email that informed Trelleborg that RBC would not waive its rights with respect to any funds held by Trelleborg that were the proceeds of purchased Accounts.  A copy of the email from counsel to RBC is attached hereto in Appendix 61 - 62.  Contrary to the Debtors' assertion, RBC did not demand payment from Trelleborg.  Instead, RBC simply refused to waive its potential claims against a third-party and non-Debtor.  The very last paragraph of this email reads as follows:

---

to double liability.  The Factoring Contract was still in effect, however, and the funds in question belonged to RBC until releases were signed.

[3] RBC voluntarily agreed to turn over funds collected from invoices dated after November 5, 2015.  RBC's agreement to do so is not an admission, nor does it have any impact, or res judicata effect on whether the invoices dated after November 5, 2015 were invoices generated from Accounts sold to RBC or not.  *See* the TRO.

THIS IS A FRE RULE-408-PROTECTED OFFER OF COMPROMISE.[4] You will note that what RBC attempts here is merely to exit the situation, turn over excess funds to the estate, help your client out, and be left in peace. This is not an attempt to collect a prepetition debt. Please do not attach this email to any Court pleading or otherwise make its contents public.

*See* Appendix 61 - 62.

28.     Ever since the Debtors executed the Factoring Agreement, the Debtors have contumaciously ignored what the Factoring Agreement says. The Debtors allege RBC engaged in wrongful actions that RBC had every contractual right to take, such as preserving its property, maintaining a Reserve to cover expenses of imminent or threatened litigation, charging fees as provided under the Factoring Agreement, or asking for the Debtors to follow the provisions of the Factoring Agreement to effectuate a termination thereof.

29.     Throughout the relationship with the Debtors, RBC acted within the terms of the Factoring Agreement with the Debtors. The Factoring Agreement was never terminated by the parties as the required general releases were not executed; and RBC therefore continues to be the owner of all of the Debtors' Accounts. As such the Accounts are not property of the Debtors' estates.

30.     As addressed in more detail below, the Debtors sold all of their Accounts to RBC under the Factoring Agreement. As such, there can be no Unassigned Invoices as the Debtors contend. All of the invoices were invoices of Accounts sold to RBC and thus the funds collected on account of the invoices constitute property of RBC.

31.     Counsel for Debtors acknowledges RBC's ownership rights in the "Unassigned Invoices" in taking the following position as to Comerica Bank: "*To the extent Comerica claims a*

---

[4] The invocation of Federal Rule of Evidence 408 did not stop Debtors from then attaching this offer of compromise to its pleading. *See* Dkt. No. 112-9, page 2 of 3.

*lien on the Debtors' accounts receivable [*which includes, through its silence on the matter, the "non-assigned" Accounts in their claim*], the Debtors contend that **such lien was extinguished as and when the Debtors sold their accounts to Republic**.*" *See Amended Disclosure Statement Under 11 U.S.C. §1125 in Support of the Plan of Reorganization for: (I) Bailey Tool & Manufacturing Company; (II) Hunt Hinges, Inc.; (III) Cafarelli Metals, Inc.; and (IV) Bailey Shelter, LP* [docketed in the Debtors' jointly administered chapter 11 case: 16-30503 under Docket No. 363], p. 23., Art. VI, Sec. G., ¶1.

32.    With respect to the amount of $152,064.03 which the Debtors contend that RBC had stated was due the Debtors in an email from Ms. Baines to Mr. John Buttles, Ms. Baines was clear in her email that such amount was the amount to be turned over to the Debtors at such time as the Debtors executed the general releases *as of November 23, 2015* terminating the Factoring Agreement.  See Appendix 59.  Pursuant to the terms of the Factoring Agreement, the amount of excess funds that may be due the Debtors in the event of a termination of the Factoring Agreement will vary depending on the Obligations incurred and thus can change from day to day.  Accordingly, while on November 23, 2015, the amount of excess funds available to the Debtors may be $152,064.03, because the Debtors did not execute the required general releases, such amount was no longer applicable after November 23, 2015. *See* Baines Affidavit, Appendix 6.

33.    With respect to the $155,738.75 that the Debtors contend that RBC collected after November 20, 2015, RBC submits that any such funds collected also constitute property of RBC pursuant to the Factoring Agreement.  Notwithstanding, however, and pursuant to the TRO, RBC has turned over to the Debtors funds collected after March 4, 2016 that were from invoices dated November 6, 2015 and after.  *See*, Baines Affidavit, Appendix 6.

## II.
## SUMMARY JUDGMENT STANDARDS

34.     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   A "dispute about a material fact is 'genuine'… if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stults v. Conoco, Inc.*, 76 F.3d 651, 654 (5th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "For purposes of summary judgment determination, all fact questions are viewed in the light most favorable to the nonmovant." *Id.* (citing *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1078 (5th Cir.), *cert denied*, 516 U.S. 995). The moving party bears the initial burden of establishing the absence of genuine issues of material fact. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). The nonmoving party is obligated to oppose the motion either by referring to evidentiary material already in the record or by submitting additional evidentiary documents which set out specific facts indicating the existence of a genuine issue for trial. Fed. R. Civ. P. 56(e); *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). If the nonmovant satisfies its burden, summary judgment will not be granted. *Id.*; *Collins v. Natchez Cmty. Hosp., Inc.*, 2008 U.S. Dist. LEXIS 19357 (S.D. Miss. 2008).

## III.
## ARGUMENT AND AUTHORITIES

35.     The Debtors contend that they are entitled to summary judgment largely from three "overarching legal conclusions" as follows: (A) the Factoring Agreement is null under Louisiana Law, (B) even if the Factoring Agreement were not null, the Debtors did not sell and RBC did not purchase all of the Debtors' accounts into perpetuity, that RBC only purchased Accounts submitted

via an assignment schedule; and (C) the Factoring Agreement terminated no later than December 3,

2015.  The Debtors further assert that based on, and stemming from those presumed conclusions, as

a result:  (D) RBC violated the automatic stay; (E) RBC must turnover proceeds of Unassigned

Invoices because they are property of the Debtors' estates; (F) RBC committed conversion; and (G)

RBC violated the Texas Theft Liability Act with respect to the Unassigned Invoices.  Finally, (H) the

Debtors assert that if the Factoring Agreement is not null, it constituted a fraudulent transfer.

36.    RBC denies that the Debtors are entitled to summary judgment with respect to any of

their claims.  RBC refutes each of the Debtors' presumed conclusions and addresses each of them as

follows.

**A.    Article 2004 of the Louisiana Civil Code Does Not Apply to the Factoring
        Agreement**

37.    Under Paragraph 8.1 of the Purchase Provisions, the Debtors, as a condition to

terminate the Factoring Agreement, must first execute a general release (the "Form Release").

Factoring Agreement, Purchase Provisions, ¶8.1, Appendix 15.  The Debtors contend that the this

provision violates Article 2004 of the Louisiana Code ("Article 2004") and is thus rendered null and

unenforceable.

38.    Article 2004 of the Louisiana Code ("Article 2004") provides as follows:

> Any clause is null that, in advance, excludes or limits the liability of one
> party for intentional or gross fault that causes damage to the other party.
>
> Any clause is null that, in advance, excludes or limits the ability of one party
> for causing physical injury to the other party.

La. Civ. Code. Ann. Art. 2004

39.    The purpose of Article 2004 was to codify the long recognized principal in Louisiana

that:

> "it is against public policy to permit any party to obtain a license for the commission of future bad acts, i.e., *if a party, in effect, were to receive in advance forgiveness for the commission of a future bad act*, then it would act as an invitation, as it were, to commit the bad act… Therefore, it is against public policy to enforce contracts that would allow parties to do so."

*Hymel v. Eagle, Inc.*, 7 So., 3d 1249, 1254 (La.App. 4 Cir. 2009) (emphasis added).

40.    Clearly, the purpose of Article 2004 is to prevent a party from preemptively requiring the proverbial "get out of jail" card from another party before the two parties enter into a business or transactional relationship.

41.    Article 2004 is not applicable to the Factoring Agreement because the Factoring Agreement did *not* require the Debtors to execute the Form Release *in advance* as a condition for entering into the Factoring Agreement.  RBC did not obtain "advance forgiveness" for intentional or gross fault from the Debtors before entering into the factoring relationship with the Debtors.

42.    The purpose of executing the Form Release is to terminate the Factoring Agreement and end the relationship so the parties could part ways.  The Form Release is a negotiated termination to *end* a relationship; it is not a license to commit gross wrong in the future at the time the parties *enter* into a relationship.  RBC expressly bargained to avoid the scenario in which a client terminated a factoring agreement, obtained a return of Available Funds (as defined in the Factoring Agreement) and then sued RBC after RBC had surrendered the very funds which RBC might have defended itself in litigation.  To avoid this scenario, RBC conditioned its client's right to terminate the Factoring Agreement in exchange for the return of excess funds.  That condition was that the client had to sign a Form Release.  This contractual condition does not occur until the parties wish to *end* the relationship and thus does not, *in advance,* deprive the Debtors of their right to make claims against RBC.

43.     The case cited by the Debtors is distinguishable from the facts of the instance case.  In

*Occidental Chem. Corp. v. Elliott Turbomachinery Co.*, 84 F.3d 172 (5th Cir. 1996), cited by the

Debtors, the agreement at issue contained a provision limiting the warranty period, *in advance*, at the

time the parties executed the agreement.  On the contrary, the Factoring Agreement did not require

the Form Release to be signed at the time the Factoring Agreement was executed.  Throughout the

term of the Factoring Agreement, the Debtors maintained their right to sue RBC if they wished.  This

Adversary Proceeding clearly evidences the Debtors did not waive or release their rights to sue RBC

*in advance.*

44.     For the reasons set forth above, RBC submits that Article 2004 does not apply to the

Factoring Agreement because it is clear and unambiguous from the language of the Factoring

Agreement that there is no requirement for the Debtors to execute the Form Release in advance at

the time the Factoring Agreement was executed.  Because Article 2004 does not apply to the

Factoring Agreement, the Debtors' claim that Article 2004 nullifies the release provision must be

denied as a matter of law.

45.     Additionally, the claims asserted by the Debtors in this Adversary Proceeding do not

implicate the enforcement of any waivers or releases in the Form Release.   The Form Release was

never executed and thus cannot be enforced by RBC.  As such, there is no controversy with respect

to the terms of the Form Release before the Court to make a determination of whether Article 2004

would apply.

46.     Even assuming, *arguendo*, that the provision to execute the Form Release is ripe to be

determined by the Court under Article 2004, RBC cannot be fairly accused of "intentional or gross

fault" even if the Court were to hold against RBC with respect to RBC's good-faith understanding

and interpretation of its own contract.  This good-faith understanding has guided all of RBC's

actions.  RBC at all times acted in accordance with the terms of the Factoring Agreement.  The

Debtors, by being forced to abide by the letter of a contract that they had the opportunity to review

with counsel before executing, are not "damaged."  Thus Article 2004 is not applicable here.

47.     Since Article 2004 is not applicable, Article 2034 of the Louisiana Civil Code is

similarly rendered inapplicable to the Factoring Agreement and the Debtors' claim that the Factoring

Agreement is null in its entirety must be denied.[5]

**B.     The Debtors Sold All of Their Accounts to RBC Pursuant to the Factoring Agreement.**

48.     The Factoring Agreement is controlled under Louisiana law.  Factoring Agreement,

Purchase Provisions, ¶10.1, Appendix 16.  There are two states in the United States where the parties

to a factoring contract can declare their intent to put into effect a true sale of accounts, and such

written declaration alone would be dispositive of the issue of whether a true sale has occurred.

Those two states are Louisiana and Texas.   *See, In re Argo Financial, Inc.*, 337 F.3d 516, 526-

527(5th Cir. 2003)(discussing Louisiana law); *Express Working Capital, LLC v. Starving Students,*

*Inc.,* 28 F. Supp.3d 660, 670-71 (N.D. Tex. 2014)(discussing Texas law).

49.     The Factoring Agreement states that the parties thereto intend to create a true sale

thereunder.  Factoring Agreement, Purchase Provisions, ¶1.5, Appendix 11.   Section 109(e) of

Article 9 of the Louisiana UCC provides as follows:

> For all purposes, in the absence of fraud or intentional misrepresentation, the
> parties' characterization of a transaction  as a sale of accounts, chattel paper,
> payment intangibles, or promissory notes shall be conclusive that the transaction
> is a true sale and is not a secured transaction and that title passed to the party

---

[5] RBC notes that the Debtors' Court approved post-petition factoring agreement with Sterling Financial ("Sterling Agreement") also contains the same requirement that a termination be prefaced by a release of the factor. *See* docket of the Debtors' jointly administered Chapter 11 case, Docket No. 106-1.  If, *arguendo*, the Form Release violates Article 2004 and is held to be null by the Court, then the same provision in the Sterling Provision should be null as well, and a determination should also be made whether Article 2034 would apply to the Sterling Agreement and nullify that agreement as well.

characterized as the purchaser regardless of whether the purchaser (secured party) has any recourse against the seller (debtor),  whether the seller is entitled to any surplus, whether the purchaser has possession of the note, contract, account agreement, invoice, or other evidence of indebtedness, or any other term of the parties' agreement.

Louisiana Revised Statutes 10:9-109(e).

50.     Further, Debtors have misconstrued the Factoring Agreement by failing to interpret each provisions in light of other provision to give the contract the meaning suggested by the contract as a whole.  The relevant provisions include:

"**WHEREAS**, Purchaser desires to acquire *all* the *Accounts* of Seller and provide other financial accommodations to Seller; and

**WHEREAS**, Seller desires to sell *all* the *Accounts* of Seller to Purchaser and utilize Purchaser's accounts receivable management services, including enhanced credit protection, collection services, real time detailed online accounts status and other professional accounts receivable management services and receive other financial accommodations from Purchaser."

**1.1** __EXCLUSIVE RIGHT TO PURCHASE.__  Purchaser shall have the option to purchase from and Seller shall assign and offer for sale exclusively to Purchaser as absolute owner, *all* of Seller's right, title and interest in and to: (a) Seller's now existing and hereafter created *Accounts* together with all corresponding rights with respect thereto and proceeds thereof; (b) the Goods and/or services sold giving rise to each such Account; (c) all Good returned by any customer in connection with the Accounts; (d) all remedies available to Seller including rights of stoppage in transit, replevin, repossession and reclamation; (e) all deposits or other security relating to the Accounts; (f) all rights under any insurance policy covering any Good giving rise to the Accounts; and (g) all payments or other proceeds of the foregoing in any form.

**1.2** __ASSIGNMENT SCHEDULE.__  *All Accounts* shall be submitted to Purchaser and shall be listed on an executed Assignment Schedule in a form satisfactory to Purchaser and shall be delivered to Purchaser with:  (a) identical duplicates of each Invoice evidencing the terms of each Account, the originals having been mailed by Seller to Seller's customers at Seller expense or at Purchaser's election originals shall be delivered to Purchaser for forwarding to Seller's customers; (b) all original shipping or deliver receipts, including, but not limited to, Bills of Lading; and (c) such other documents and proof of delivery of merchandise or rendition of services as Purchase may require (hereinafter the

documents in foregoing a-c shall collectively be referred to as "Supporting Documentation")

### 1.3    ACCOUNT DEBTORS.

1.3.1.    Upon execution of this Purchase Agreement, Purchaser shall have the right to notify all present and future Account Debtors that payment shall be made directly to Purchaser (the "Notification").

1.3.2    The Notification shall include the Payment Notation on Seller's Invoices, which informs the account debtor that the Account has been sold and assigned and that payment is due exclusively to Purchaser, such Payment Notation to be at the sole discretion of Purchaser. Seller shall be obligated for the Missing Payment Notation Fee on any Account Purchased in which the Invoices Issued by Seller to an Account Debtor does not contain the Payment Notation. During the Term and until all Obligations are paid in full, Seller shall not change or provide contrary remittance or payment Information to any Account Debtor. Notification may be made to any Account Debtor whether or not Purchaser makes an Advance against such Accounts, provided, however, that as to any Account proceeds that do not represent any Account for which Seller has received an Advance, and so long as no Event of Default has occurred, such proceeds of Accounts shall be Available Funds for and on account of Seller, subject to the right of Purchaser to maintain a Reserve.

1.3.3    Purchaser shall have the right to verify directly with the Account Debtor that each Account submitted by Seller on an Assignment Schedule Is an Eligible Account.

### 1.5    TRUE SALE. It is the Intention of Seller and Purchaser that the sales of the Accounts constitute true and actual sales of the Accounts from Seller to Purchaser.  If, despite such mutual intention, a court determines that Such Sales of the Accounts instead constitute financing transactions, or if for any other reason ownership of the Accounts is not vested in Purchaser, Seller, as a protective measure against such characterization of the sale of the Accounts, hereby grants Secured Party a security interest in the Accounts and other Collateral as set forth in §6 herein.

### 2.    ADVANCES. Upon Seller's submission of an Assignment Schedule, Purchaser shall be deemed to have purchased the Accounts set forth therein unless Purchaser provides written notice of Its Intent not to purchase such Accounts. Upon Purchaser's purchase of the Accounts, Purchaser shall have the option to pay to Seller an Advance for all Eligible Accounts based on the Advance Rate for said Accounts or any portion thereof. Thereafter, Available Funds will be distributed to Seller upon request, subject to Purchaser's right to maintain a Reserve. Unless otherwise provided in writing and signed by Purchaser, the maximum total aggregate amount that Purchaser will Advance to

Seller at any given time shall not exceed the Facility Limit, *provided, however,* that Seller shall not be excused from any obligation hereunder If Purchaser makes any Advance in excess of the Facility Limit.

**ANNEX A** "**Accounts Purchased**" shall mean all Accounts that are offered for sale to Purchaser regardless of whether an Advance is made against such Account.

Factoring Agreement, Purchase Provisions, ¶¶1.1, 1.2, 1.3, 1.5, 2, and Annex A, Appendix 11 & 19.

51.     The Debtors have erroneously insisted that Paragraphs 1.1 and 1.2 of the Purchase Provisions should be interpreted to mean that RBC only purchased Accounts that Debtors listed on an Assignment Schedule.  That construction of the contract is inconsistent with: (1) the overall purpose as set forth in the "WHEREAS" clause; (2) Paragraph 1.3 of the Purchase Provisions which includes: "[u]pon execution of this Purchase Agreement, Purchaser shall have the right to notify all present and future Account Debtors that payment shall be made directly to Purchaser"; and (3) the definition f Accounts Purchased provided in the Annex A:  "All Accounts that are offered for sale to Purchaser regardless of whether an Advance is made against such Account."  Each of those clauses, especially in light of the true sale provision, makes clear that the intent of the Factoring Agreement was to effectuate an immediate sale of *all* Accounts.

52.     The Debtors have repeatedly contended that the Factoring Agreement is an agreement that lasts into perpetuity.  This contention is clearly incorrect, and rather absurd, in light of the fact that Paragraph 8 of the Purchase Provisions provides the procedures for the parties to terminate the Factoring Agreement.

53.     Pursuant to Paragraph 8.1, the Factoring Agreement may be terminated by the Debtors by giving notice and executing a release.  The procedural requirements for a termination of the Factoring Agreement by the Debtors were clearly written in Paragraph 8.l at the time the Debtors entered into the Factoring Agreement.  But once the Debtors entered into the Factoring Agreement, they decided they did not like the terms of the agreement and were unhappy when RBC acted within

and abided by the terms of the agreement.   *See* Factoring Agreement, Purchase Provisions, ¶8.1, Appendix 15.

54.    The Debtors have had every opportunity to terminate the Factoring Agreement pursuant to Paragraph 8.1.  They chose not to do so.  Instead they chose to file suit against RBC simply because they did not like the terms and conditions of the Factoring Agreement.

55.    It is clear from the language of the Factoring Agreement, in various provisions demonstrated above, that the Debtors sold all of their Accounts to RBC.  Nowhere in the Factoring Agreement is there a provision allowing the Debtors to have the freedom to pick and choose the particular Accounts they would sell.

56.    The Factoring Agreement does not last into perpetuity.  The Factoring Agreement has remained in effect and not terminated because the Debtors *chose* not to take the steps to terminate it.  Instead, the Debtors chose to file suit against RBC.  Having made the conscience choice not to terminate, the Debtors should not now be permitted to take the absurd position that the Factoring Agreement is an agreement that forces them to continue to sell their Accounts into perpetuity when it is the Debtors themselves who chose not to terminate the Factoring Agreement in accordance with the terms therein.

57.    The Debtors also contend that only those invoices listed on the Assignment Schedules are eligible for sale to RBC.  This contention is in direct contradiction to the language of the Factoring Agreement.  In Paragraph 1.1 of the Purchase Provisions, among other places as described above, the Debtors unequivocally agreed to "offer for sale… *all* of Seller's right, title and interest in and to: (a) Seller's now existing and hereafter created Accounts."  Factoring Agreement, Purchase Provisions, ¶1.1 (emphasis added), Appendix 11.

58.     Pursuant to Paragraph, 1.2 of the Purchase Provisions, the Assignment Schedule is simply a means by which the Debtors could provide the list of invoices generated under each Account to RBC for record keeping purposes to track outstanding invoices and payments collected, among other things.

59.     Contrary to the Debtors' contention, the Assignment Schedule is not a vehicle by which the Debtors offered the particular Accounts the Debtors wish to sell.  There is no provision in the Factoring Agreement providing this right.  The Debtors did not have the right to pick and choose Accounts to sell to.  Factoring Agreement, Purchase Provisions, ¶1.1, Appendix 11. Paragraph 1.2 clearly required the Debtors to list all Accounts on Assignment Schedules.  Factoring Agreement, Purchase Provisions, ¶1.2, Appendix 11.  This requirement is consistent with Paragraph 2 where RBC has the right to decide which of the Debtors Accounts RBC may choose not to purchase. Factoring Agreement, Purchase Provisions, ¶2, Appendix 11.

60.     Indeed, for the Debtors to contend that they were free to put on the Assignment Schedules only those Accounts the Debtors wish to sell, the Debtors would directly contradict the Representations and Warranties they made under Paragraph 5.2 of the Purchase Provisions. Paragraph 5.2 provide in relevant part, "[i]n connection with the Accounts, (a) Seller has offered for sale *all* Accounts created since the last Assignment Schedule…" Factoring Agreement, Purchase Provisions, ¶5.2 (emphasis added), Appendix 12.

61.     The Debtors also contend that in the collection reports prepared by RBC, if the column called "Purchased" is blank with respect to an invoice, it meant that the invoice was not sold to RBC.  This contention is also without merit pursuant to the terms of the Factoring Agreement. The collection report is another administrative tool to keep track of invoices and collections only.

62. Based on the foregoing, it is clear and unambiguous from the language of the Factoring Agreement that: (1) the Debtors agreed to sell all of their Accounts to RBC pursuant to the Factoring Agreement, and (2) the Factoring Agreement did not require the Debtors to sell their Accounts to RBC into perpetuity because the Debtors had the means to terminate the Factoring Agreement pursuant to Paragraph 8. For the foregoing reasons, the Debtors' claim that the Debtors had the right to sell only those Accounts (evidence by invoices) listed on the Assignment Schedules must be denied as a matter of law.

## C.   The Factoring Agreement Has Not Been Terminated

63. As described hereinabove, under its own express terms, the Factoring Agreement has never been terminated because the Debtors have not followed the contractually agreed upon procedure to for termination.

64. The Debtors contend that the Factoring Agreement had been terminated because (1) RBC itself terminated the Factoring Agreement because it charged a termination fee on or about October 2, 2015; (2) the Debtors last submitted an Assignment Schedule on November 5, 2015 and thus effectuating a termination under Paragraph 8.2; and (3) counsel for the Debtors gave written notice of termination to RBC on December 3, 2015.

### (a)   RBC Has Consistently Maintained That the Factoring Agreement Has Not Been Terminated

65. As described above, on July 10, 2015 RBC sent the Debtors a Notice of Default letter. *See* Exhibit 5. Thereafter, in late September, 2015, RBC and the Debtors appeared to be on the verge of a negotiated parting of their ways. On October 1, 2015, counsel for RBC sent counsel for the Debtors an unsigned draft forbearance agreement. In RBC's communication to the Debtors, RBC made it clear that the terms of the forbearance agreement were not finalized and remained subject to additional changes by the parties.

66.    At that time, because there were sufficient funds collected and in anticipation of the parties finalizing the terms of the forbearance agreement and thus terminating the Factoring Agreement, RBC charged the termination fee.    The termination fee was an Obligation of the Debtors.  Factoring Agreement, Purchase Provisions, ¶7.2, Appendix 14.

67.    As the Form Release from the Debtors was required under the Factoring Agreement, RBC reasonably anticipated it would receive the Form Release, at which time RBC would turn over excess funds and terminate the Factoring Agreement.    However, Debtors did not execute the forbearance agreement and did not execute the Form Release.

68.    Thus, the termination fee was charged as an Obligation of Debtors in connection with the anticipated of the termination at the time of the execution of the Form Release, which never materialized.  RBC never waivered from its position that the Factoring Agreement continues to be in effect and would not be terminated until the Debtors executed the Form Release.   In all communications with the Debtors RBC has always maintained that the Factoring Agreement has not been terminated.  *See* e.g. Appendix 59.

**(b)    The Factoring Agreement Was Not Terminated Under Paragraph 8.2**

69.    The Debtors contend that having failed to submit Assignment Schedules after November 5, 2015, such failure to act constituted a "failure of Seller to submit Accounts during the Term of this Purchase Agreement" and therefore, under Paragraph 8.2, the Factoring Agreement was terminated by the Debtors.  Factoring Agreement, Purchase Provisions, ¶8.2, Appendix 15. The Debtors contend that Paragraph 8.2 does not require the Debtors to execute the Form Release before effectuating a termination of the Factoring Agreement.

70.    Fundamental to any contractual interpretation matter is the precept that: "Interpretation of a contract is the determination of the common intent of the parties."  *See* La. Civ. Code Art. 2045.  The Louisiana Civil Code further instructs that: "Each provision in a contract must

be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code Art. 2050.

71.     Paragraph 8.1 provides the procedure for the Debtors to terminate the Factoring Agreement if they wished to do so. Paragraph 8.1 requires that termination of the Factoring Agreement by the Debtors is conditioned upon Debtors executing the Form Release.

72.     Paragraph 8.2 is not inconsistent with Paragraph 8.1 because Paragraph 8.2 simply provides one of the many scenarios whereby the Debtors may seek to terminate the Factoring Agreement. Paragraph 8.2 describes the scenario where the Debtors desired to stop selling their Accounts to RBC and stopped submitting their Accounts to RBC, then such act would constitute the Debtors' termination of the Factoring Agreement even without the Debtors sending a written notice. This act would then logically lead back to the procedure by which the Factoring Agreement can be terminated by the Debtors as set forth in Paragraph 8.1. There is no language in Paragraph 8.2 that carves out, or exempts, the Debtors from following the procedure set forth under Paragraph 8.1 to terminate the Factoring Agreement. As such, even if the Debtors sought to terminate the Factoring Agreement under Paragraph 8.2, the termination would not be effectuated until the Debtors executed the Formal Release pursuant to Paragraph 8.1.

73.     Even assuming, *arguendo*, that there is doubt that termination under Paragraph 8.2 required the execution of the Form Release, under Louisiana law, "a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract…" La. Civ. Code Art. 2053. RBC throughout the parties' relationship consistently maintained the position that any termination of the Factoring Agreement by the Debtors required the execution the Form Release. *See* Appendix 59. Accordingly, a reasonable reading of Paragraph 8.2 consistent with the nature of the Factoring Agreement would lead to the

conclusion that even if the Debtors sought to terminate the Factoring Agreement pursuant to the scenario described in Paragraph 8.2, the procedure set forth in Paragraph 8.1 would be required to effectuate the termination.

### (c)    The Notice of Termination Given by Counsel for the Debtors Cannot Effectuate a Termination Without the Debtors Executing the Form Release.

74.    As described above, the Form Release did not seek "in advance" releases that are subject to be nullified by Article 2004; thus Article 2004 does not apply to the Factoring Agreement. As such, Ms. Hayward's communication to Ms. Montplaisir, dated December 3, 2015, seeking to terminate the Factoring Agreement, represents a notice of termination under Paragraph 8.1, and as such, no formal termination can be effectuated until the Debtors executed the Form Release.

### D.    The Funds Collected by RBC Constitute Property of RBC and Not Property of the Debtors' Estate.

75.    As set forth above, pursuant to the Factoring Agreement, the Debtors sold all of their Accounts to RBC and the Factoring Agreement has never been terminated because the Debtors have not followed the contractually agreed upon procedure for termination.

76.    Since RBC owns all of the Debtors Accounts, at best the Debtors have a reversionary interest in some portion of the funds collected by RBC in the form of Available Funds as defined in Annex A.  It is black letter law that filing a bankruptcy does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest.  *See In re Vallecito Gas, LLC*, 461 B.R. 358, 380 (Bankr.N.D.Tex. 2011) (citing *Weinman v. Graves*, 396 B.R. 70 (10th Cir. BAP 2008)). To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate.  *Id.*  In *Vallecito*, this Court discussed at length the 10th Cir. BAP case of *Weinman v. Graves*. In *Graves*, the court held that IRS could retain liquid funds given by the debtor to the IRS because prior to the bankruptcy, such funds had been irrevocably pledged to the IRS to cover the debtor's future tax liabilities. *Graves* has an analogous fact pattern close to this case:  the funds

currently in RBC's possession are clearly analogous to the funds by the IRS because the Debtors unequivocally sold all of their Accounts to RBC.  In *Graves*, the court found that the target of a turnover action had to be in "possession, custody, or control" of property that the trustee could otherwise "use, sell, or lease."  A stay violation is about *deprivation* of an asset that rightfully belongs to the trustee.  The *Graves* court found that the property in question was not subject to any right held by the trustee for possession or use.  *Vallencito* at 380.  The trustee in *Graves* was deprived of nothing.  Here, quite similarly, the Debtors have no right under the Factoring Agreement to possession of or use of the funds collected by RBC from Accounts sold to RBC.  All the Debtors posses is a reversionary interest in funds collected from the sold Accounts after the termination of the Factoring Agreement.  But until the Factoring Agreement is terminated and there is a determination that there is any Available Funds available to the Debtors, the Debtors have no right to the possession or use of any funds collected by RBC from Accounts it purchased.  Until such time as the Available Funds, if any, can be determined, the Debtors are not deprived of their property.  As such, RBC is not violating the automatic stay because RBC is not in possession of or exerting control over property of the Debtors.

**E.**    **The Surplus Funds and Proceeds of Unassigned Invoices Are Property of RBC Not Subject to Turnover.**

77.    Because the Unassigned Invoice and Surplus Funds, to the extent such funds exist, were collected by RBC from the Accounts sold by the Debtors to RBC, the Debtors at best only have a reversionary interest to any Available Funds to be calculated after the Factoring Agreement has been terminated (which it has not been) and all costs and expenses that RBC are entitled to under the Factoring Agreement have been netted out from the Reserve.  At this current time, the Debtors have not right or title to the possession of the funds collected by and in the possession of RBC.

78.      Since the Unassigned Invoices and Surplus Funds, to the extent such funds exist, are property of RBC and not property of the Debtors' estates, the Debtors are not entitled to demand a return thereof pursuant to Section 542 of the Bankruptcy Code. *See e.g.  Connolly v. The City of Houston (In re Western Integrated Networks, LLC)*, 329 B.R. 334, 342 (Bankr. D. Colo. 2005) ("§ 542 is inapplicable until there is a resolution of any dispute relating to whether the challenged item is 'property of the estate.'"); *Schmidt v. United States Marshal Service (In re Villarreal)*, 2007 Bankr. LEXIS 463, 9 (Bankr. S.D. Tex. 2007) ("Turnover under 11 U.S.C. § 542 is a remedy available to debtors to obtain what is acknowledged to be property of the bankruptcy estate.  It is not a remedy to recover claimed debts which remain unliquidated and/or in dispute.").

**F.**      **RBC Committed Neither Conversion nor Theft of Debtors' Property**

79.      To prevail on a conversion or the theft claim, the Debtors have to show that RBC "unlawfully" appropriated or took control of the Debtors' property.  For the same reasons set forth above that RBC is not in violation of the automatic say and that the funds held by RBC are not subject to a turnover action, RBC cannot be held to have converted nor committed theft of the Debtors' property because RBC did not appropriate an is not in possession of property of the Debtor.

80.      As evidenced by the Factoring Agreement, the Debtors sold and assigned all of their Accounts to RBC, and RBC purchased all of the Debtors' Accounts.  Thus the funds collected by RBC from the invoices issued under the Accounts sold rightfully belong to RBC, not to the Debtors. Only in the event that the Factoring Agreement has been terminated (which it has not), the Debtors may have reversionary interest to the extent any Available Funds eventually becomes available pursuant to the terms of the Factoring Agreement.

81.     RBC never took control of the Debtors' property.  RBC at all times in good faith abided by, and acted in a way consistent with, the terms of the Factoring Agreement and collected funds from the Accounts it purchased.

82.     Even assuming, *arguendo*, that the Court determines certain invoices were not assigned to RBC, it remains that RBC had reasonable and justifiable basis in its refusal to turnover such funds (prior to the Court's determination) because of its good faith belief that it was entitled to the funds pursuant to the Factoring Agreement.  RBC rightfully has the defense of "qualified refusal" to defeat the Debtors' claim of conversion.  *See Earthman's Inc. v. Earthman*, 526 S.W.2d 192, 204 (Tex. Civ. App.—Houston [1st Dist.] 1975, no writ)("Where the refusal is not absolute, but is qualified by certain conditions which are reasonable and justifiable, and which are imposed in good faith, and in recognition of the rights to plaintiff, it will not serve as a sufficient basis for an action for conversion").  The defense of "qualified refusal" is a fact issue to be determined by the Court.  Accordingly, a genuine issue of material fact exists and the Debtors are not entitled to summary judgment on the conversion claim.

83.     Under Texas Theft Liability Act, the  Debtors' must prove that RBC *intended* to deprive the Debtors' property at the time the alleged theft was committed.  *See McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 906 (Tex.App.—Dallas, 2014, pet. denied) (Intent is determine at the time the appropriation the property occurred).  If there is a bona fide dispute as to ownership of the property, the evidence cannot support a TLA claim.  *Bokor v. State*, 114 S.W.3d 558, 560 (Tex.App.—Fort Worth 2002, no pet.); *Roper v. State*, 917 S.W.2d 128, 131-32 (Tex.App.—Fort Worth 1996, pet. ref'd)(ordering acquittal in theft case that was based on "a simple case of a civil contract dispute").  Pursuant to the Factoring Agreement, the Debtors sold all of their Accounts to RBC and therefore RBC collected funds that rightfully belong to RBC.  Thus the

Debtors have not and cannot show that RBC intended to deprive the Debtors of their property. Moreover, as addressed in detail hereinabove, a genuine dispute of fact exists with respect to whether the Debtors' sold all of their Accounts to RBC.  As such summary judgment must be denied.

84.     Accordingly, the facts do not support that either conversion or theft was committed by RBC and the Debtors' claim for conversion and theft must be denied.

**G.     The Factoring Agreement Did Not Constitute a Fraudulent Transfer**

85.     Section 548 of the Bankruptcy Code provides, in relevant part:

(a)(1) The trustee may avoid any transfer… of an interest of the debtor in property… if the debtor voluntarily or involuntarily –

…

(B)(i) received less than reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was in solvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

11 U.S.C. §548(a).

86.     The Debtors bear the burden of proof on each element of its Section 548 fraudulent transfer claim.  *See Besing v. Hawthorn*, 981 F.2d 1488, 1494 (5th Cir. 1993).

87.     Whether a debtor received "reasonably equivalent value" must be measured at the time the debtor made the challenged transfer.  *Fairchild Aircraft Corp.,* 6. F.3d 1119, 1126 n.8 (5th Cir. 1993).   The Fifth Circuit follows the "totality of circumstances" approach to determining reasonably equivalent value.  *Id.*  The detailed fact-finding and valuation entailed in the reasonably

equivalent value analysis often requires the fact finder to assess the contrary opinions of competing experts. *Weaver v. Kellogg*, 216 B.R. 563, 574 n. 13 (S.D. Tex 1997). "Fair market value" in the context of reasonably equivalent value generally means what the property would bring if actually sold on the market at the time of the transfer, assuming a hypothetical willing seller and a hypothetical willing buyer with reasonable timeframe to sell the property. *See In re Ozark*, 850 F.2d 342, 344-45 (8th cir. 1988).

88.    Whether a debtor is insolvent for purposes of Section 548 is also determined as of the date of the challenged transfer. *Lamar Haddox Contractor, Inc. v. Harvey*, 40 F.3d 118, 121 (5th Cir. 1994). "Insolvency" as defined under Section 101(32) of the Bankruptcy Code as the "financial condition such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation… ." The court must first determine whether the debtor's assets should be valued on a going-concern basis or on a liquidation basis. *Watts. v. MTC Dev., LLC*, 501 B.R. 896 (Bankr.N.D.Ga. 2013). Only after such a determination is made then may the court conduct a fair valuation and assign a value to the debtor's assets. *Id.* "Fair value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in prudent manner within a reasonable period of time to pay the debtor's debts." *See*, *Lamar v. Haddox*, 40 F.3d at 121. The burden is often met by expert testimony, financial statements, appraisals, public documents or a combination thereof. *See* e.g. *WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File*, 282 B.R. 343, 367 (Bankr.W.D.La. 2001). In reaching a determination on "fair value," the court "may adopt the asset value of one party or another, or the court may choose its own fair valuation figure after weighing all the evidence." *Id.* at 370.

89.    Whether the Debtors received reasonably equivalent value in exchange for the sale of their Accounts pursuant to the terms of the Factoring Agreement must be analyzed at the time of the

execution of the Factoring Agreement.  Similarly, the Debtors have the burden to prove that each of them was insolvent at the time the Factoring Agreement was executed.  The Debtors provided only the affidavit of Mr. Buttles simply declaring that the Debtors were insolvent by virtue of intercompany obligations without any other support.

90.     A genuine dispute of material fact exists with respect to the Debtors' insolvency at the time of the execution of the Factoring Agreement.  In executing the Factoring Agreement each of the Debtors represented and warranted to RBC that each of them was solvent.  See Factoring Agreement, Purchase Provisions, ¶5.1(e), Appendix 12.  RBC relied on the Debtors' representations and warranties in entering into the Factoring Agreement.  Mr. Buttles executed the Factoring Agreement on behalf of each of the Debtors.  Mr. Buttles now claims, by his affidavit, in direct contradiction to the representation made in the Factoring Agreement, that the Debtors were insolvent at the time they entered into the Factoring Agreement.  As of the date of the filing of this Response, discovery is still open[6] and RBC has a right to conduct discovery on the conflicting positions taken by the Debtors.

91.     Furthermore, at the time the parties negotiated the Factoring Agreement, the Debtors provided financial statements to RBC.  The financial statements provided by the Debtors are attached hereto in Appendix 63 - 67 (the "Debtor Financials"); see also Baines Affidavit, Appendix 7.  The financial statements showed that the value of the Debtors' assets exceeded their liabilities and in no way suggested that the Debtors were either insolvent or that the Debtors were engaged or about to engage in a transaction for which any property remaining with the Debtors was "unreasonably small capital."

---

[6] See Agreed Scheduling Order entered on August 30, 2016 as docket number 53.  Under the Scheduling Order, fact discovery closes on March 8, 2017 and expert discovery closes on April 7, 2017.

92.     The whole purpose of the Factoring Agreement was to provide the Debtors with liquid funds with which to operate.  Courts determine "unreasonably small capital" by considering "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."  *Peltz v. Hatten*, 279 B.R. 710, 745 (Bankr.D.Del. 2002) (citing *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3d. Cir. 1992)).  Based on the financial information provided by the Debtors to RBC, the Debtor financial condition did not suggest that the Debtors had unreasonably small capital.  *See* Debtor Financials, Appendix 63 - 67; Baines Affidavit, Appendix 7.  The Debtors and Mr. Buttles also represented to RBC just prior to executing the Factoring Agreement that the Debtors anticipated their sales to be "$14M+" in 2015 and that the Debtors projected their revenues "will be in excess of $20MM" by the end of 2016.  *See* copies of records maintained in the due diligence file relating to the Debtors attached as Appendix 68 - 80  Pursuant to Paragraph 5.3 of the Purchase Provisions, the Debtors represented and warranted that "each fact in any financial record, statement, books and records or other documents [Debtor] has shown to [RBC], either before or after the execution of the [Factoring] Agreement, is true and accurate…" Factoring Agreement, Purchase Provisions, ¶5.3, Appendix 12.  RBC relied on those representation made by the Debtors and Mr. Buttles in agreeing to enter into a factoring relationship with the Debtors.  Based on the foregoing, RBC submits that genuine issues of material fact exist with respect to the claim of unreasonably small capital and RBC is entitled to complete discovery and present evidence at trial on this issue.

93.     By late February, 2015, when the Factoring Agreement was executed, the Debtors' primary secured lender, Comerica Bank, had refused to further extend the Debtors' line of credit.  The Debtors apparently was unable to obtain financing from other traditional lenders like Comerica Bank.  As a result, the Debtors turned to factoring.

94.     In order to meet their burden of proof that the Debtors did not receive reasonably equivalent value under the Factoring Agreement, the Debtors must present evidence that in or about February, 2015, a willing hypothetical buyer would have paid more for the Debtors' Accounts.  The Debtors have alleged no undisputed facts to support their claim that in or about February 2015, a willing hypothetical buyer would have paid more for the Debtors' Accounts than what the Factoring Agreement provided.  The Debtors only offered the affidavit of Mr. John Buttles, an officer of each of the Debtors, where he simply concluded, without any other evidentiary support, that the Debtors did not receive reasonably equivalent value.

95.     RBC objects to Mr. Buttle's affidavit with respect to his conclusory statements on insolvency and reasonably equivalent value because his statement were made without support. Additionally, there was no separate analysis of each of the Debtor's insolvency and whether each Debtor separate received reasonably equivalent value.

96.     Furthermore, assuming, *arguendo,* to the extent that the Debtors contend that the collection by RBC after November 20, 2015 constituted fraudulent transfers, the Debtors have similarly provided no evidence, that they did not receive reasonably equivalent value.  RBC has the right under due process to be able to complete discovery and put into the record evidence to controvert the Debtors claims.  Thus summary judgment on this issue is premature and must be denied.

97.     RBC would further submit that, as described hereinabove,  the Debtors had the right and the option to terminate the Factoring Agreement on November 20, 2015.  The Debtors chose not to do so because the Debtors apparently believed that pursuing causes of action against RBC would result in a higher recovery than the value of the Accounts sold.  It was a strategic decision on part of the Debtors to opt not to terminate the Factoring Agreement and stop the sale of their Accounts.

Since the Debtors chose to pursue litigation against RBC rather than terminate the Factoring

Agreement presumably there of value to opt to litigate.  RBC is entitled o present evidence with

respect to this issue and the Debtors' request for summary judgment must be denied.

## IV.
## <u>CONCLUSION</u>

98.    For the reasons set forth in detail above, RBC respectfully requests that the Court

deny the Debtors' Summary Judgment Motion and grant RBC such further relief as the Court deem

just and proper.


Dated:  January 13, 2017

<div style="margin-left: 40%">

Respectfully submitted,


*/s/ Vickie L. Driver*
Vickie L. Driver
State Bar No. 24026886
Emily S. Chou
State Bar No. 24006997
Lewis Brisbois Bisgaard & Smith, LLP
2100 Ross Avenue, Suite 2000
Dallas, Texas 75201
Phone: (214) 722-7100
Fax: (214) 722-7111
Email:  vickie.driver@lewisbrisbois.com
Email: emily.chou@lewisbrisbois.com

**COUNSEL FOR REPUBLIC BUSINESS
CREDIT, LLC**

</div>

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a true and correct copy of the foregoing pleading was served upon the counsel for the Debtors via the Court's electronic filing transmission on the 13th day of January, 2017.

<div align="right">

*/s/ Vickie L. Driver*
Vickie L. Driver

</div>