Jerry C. Alexander
Texas Bar No. 00993500
Christopher A. Robison
Texas Bar No. 24035720
PASSMAN & JONES, P.C.
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
P: (214) 742-2121
F: (214) 748-7949

Andrew B. Sommerman
Texas Bar No. 18842150
Sean J. McCaffity
Texas Bar No. 24013122
SOMMERMAN & QUESADA, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
P: (214) 720-0720
F: (214) 720-0184

*Special Litigation Counsel for James W. Cunningham, Chapter 7 Trustee*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-bjh7** |
| **MANUFACTURING COMPANY.** | § | **Chapter 7** |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Adv. No. 16-03025-bjh** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| **Counter-Defendant.** | § | |
| | § | |

Response to Republic's Motion for Partial Summary Judgment Against Debtors
and Supplement To Its Motion for Partial Summary Judgment, and Brief in Support

Page 1
441726

|  |  |  |
|---|---|---|
| **REPUBLIC BUSINESS CREDIT, LLC,** | § § § | |
| **Third-Party Plaintiff,** | § § § | |
| v. | § § | |
| **JOHN BUTTLES, TENNECO, INC.,** **TRELLEBORG AUTOMOTIVE** **USA, INC.** | § § § § | |
| **Third-Party Defendants.** | § | |

## TRUSTEE'S RESPONSE TO DEFENDANT REPUBLIC BUSINESS CREDIT, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT [ADV. DKT. 235] AND SUPPLEMENT TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT [ADV. DKT. 244]

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

    A.   The First Summary Judgment Proceeding. ........................................... 1

    B.   Republic's Motion and Summary Judgment Record. ............................ 2

II.   FACTUAL BACKGROUND ............................................................................ 3

    A.   The Debtors' Business. .......................................................................... 3

    B.   The Factoring Agreement and the Debtors Early Dealings with
         Republic. ................................................................................................ 4

    C.   The Debtors' Relationship with Republic Sours, and Republic Takes
         Over Control of the Debtors' Business. ................................................. 5

    D.   The Buttles Homestead Transaction. ..................................................... 8

    E.   RBC is Paid in Full, but Nevertheless Attempts to Extort a Release
         from the Debtors. ................................................................................. 11

    F.   The Secret Termination Fee. ............................................................... 12

    G.   The Debtors File Chapter 11, and Republic Sabotages the Debtors'
         Opportunity to Reorganize .................................................................. 12

    H.   Republic Celebrates the Debtors' Demise. ......................................... 16

III.   ARGUMENT AND AUTHORITIES .............................................................. 18

    A.   Republic Owed the Debtors Duties of Good Faith and Fair Dealing
         Under Both Louisiana and Texas Law ................................................ 18

    B.   Republic Owed the Debtors Fiduciary Duties. ................................... 20

    C.   The Trustee's Summary Judgment Evidence Establishes a Partnership
         Between the Debtors and Republic ...................................................... 21

    D.   Republic's Fraud, DTPA, and Negligent Misrepresentation Argument
         Ignores Representations Republic Made After Entering into the
         Factoring Agreement .......................................................................... 23

    E.   The Trustee's Business Disparagement Claim was Not Resolved by the
         Court's Prior Summary Judgment Ruling ............................................ 26

F.   The Court's Prior Order Did Not Resolve All of the Referenced Claims for Declaratory Relief. ...................................................................... 28

G.   Republic's Motion Should be Denied with Respect to the Trustee's Conversion Claim. ......................................................................... 30

  i.   Republic Bears the Burden on Qualified Refusal. .................................... 30

  ii.   Republic Failed to Meet its Burden. ........................................................ 30

  iii.   Republic's Argument with Respect to Proceeds of Accounts Generated *Before* November 5, 2015 Mischaracterizes the Court's Prior Order. .................................................................. 32

  iv.   Republic's Argument Regarding Funds Collected on Accounts Created On or After November 5, 2015 is Likewise Without Merit. ................................................................................ 33

H.   Republic's Motion Should be Denied with Respect to the Trustee's Texas Theft Liability Act Claim. ............................................................. 34

I.   The Trustee's Summary Judgment Evidence Establishes Fact Issues with Respect to his Claim for Tortious Interference with Contract/Business Relations. .............................................................. 35

J.   Fact Issues Preclude Summary Judgment on the Trustee's Claim for Tortious Interference with Prospective Contracts and Business Relations. ............................................................................... 36

K.   Fact Issues Preclude Summary Judgment on the Trustee's Claim for Interference with Debtors in Bankruptcy and their Attempt to Reorganize. ................................................................................ 37

L.   Republic's Breach of Contract Argument is Without Merit. ................................ 38

IV.   RESPONSE TO REPUBLIC'S SUPPLEMENT TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND ARGUMENT REGARDING THE TRUSTEE'S ATTORNEYS' FEES ...................................................... 41

A.   Case Law Holding Contractual Limits on Liability Unenforceable Pursuant to Article 2004. ...................................................................... 42

B.   The Trustee's Summary Judgment Evidence Shows Republic Acted Intentionally, Consciously, in Bad Faith, and with Gross Negligence. ................ 44

V.   CONCLUSION ............................................................................ 47

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alonso v. Westcoast Corp.,* 920 F.3d 878, 884-885 (5th Cir. 2019)........................................ 42, 46

*Ashley v. KMart Corp.*, No. 3:96-CV-0954-P, 2000 WL 1478655, at * 2 (N.D. Tex.
  October 5, 2008) ............................................................................................................ 35

*Cameron v. Bruce,* 981 So.2d 204, 206 (La.App. 2d Cir. 2008) ................................................ 43

*Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002)........................................ 30

*Esty v. Beal Bank SSB*, 298 S.W.3d 280, 304 (Tex.App. – Dallas 2009)................................... 20

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)................................................... 30

*Freeman v. Department of Highways*, 253 La. 105, 217 So.2d 166 (1968) ........................... 24, 42

*Grisaffi v. Dillard Department Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995) ........................... 18

*Hayes v. Hayes*, 8 La.Ann. 468 (1852) ............................................................................ 24, 25, 42

*Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) .................................................. 19

*Ingram v. Deere*, 288 S.W.3d 886, 891 (Tex. 2009) ................................................................. 22

*Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex.App. – Dallas 2008)................. 30, 31, 32

*Meza v. Honorcare Home Health, Inc.*, No. 04-17-00741-CV, 2018 WL 6793839, at *
  1 (Tex.App. – San Antonio December 27, 2018) ..................................................................... 20

*Milltex Indus. Corp. v. Jacquard Lace Co.*, 922 F.2d 164 (2nd Cir. 1991)................................. 31

*Morey v. Page*, 802 S.W.2d 779, 786 (Tex.App. – Dallas 1990) .......................................... 31, 32

*Nakash v. Marciano*, 882 F2d 1411 (9th Cir. 1989).................................................................. 31

*Olympia Minerals, LLC v. HS Resources, Inc.,* 123 So.3d 281, 295 (La.App. 3d Cir.
  2013) .................................................................................................................................. 43, 44

*Ostrowiecki v. Aggressor Fleet, Ltd.,* Nos. 07-6598, 07-6931, 2008 WL 3874609, at
  *11 (E.D. La. August 15, 2008)................................................................................................ 43

*Poole v. Jefferson Co. Sheriff's Dept.*, 921 F.Supp. 431, 432 (E.D. Tex. 1996) ......................... 37

*Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 637-638 (Tex.App. –
  Houston [1st Dist.] 2002).................................................................................................... 19

*Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1998) ................. 25, 26

*Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 343-44 (Tex.App. – Austin 2004) ............... 30

*Vales v. Preciado*, No. DKC 2005-3110, 2008 WL 11509678, at *1 (D. Md. February 8, 2008) ............................................................................................................................ 31

*Wadick v. General Heating & Air Conditioning, LLC*, 145 So. 3d 586, 595-596-599 (La.App. 4th Cir. 2014) ........................................................................................................ 44

*Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex.1971) ................................................. 30

**Statutes**

21A FED. PROC., L. ED. § 51:247 ............................................................................................ 31

Louisiana Civil Code Chapter 8, Section 1, Art. 1983 ................................................................ 18

Louisiana Civil Code Chapter 8, Section 4, Art. 2004 ............................................................... 20

RESTATEMENT (SECOND) OF CONTRACTS § 77 ........................................................................... 39

TEX. BUS. & COM. CODE. § 1.304 ........................................................................................... 19

TEX. BUS. ORGS. CODE § 152.051 ...................................................................................... 21, 22

James W. Cunningham, Chapter 7 Trustee of the Bankruptcy Estates of Bailey Tool &
Manufacturing Company ("**Bailey**"), Hunt Hinges, Inc. ("**Hunt**"), and Cafarelli Metals, Inc.
("**Cafarelli**" and with Bailey and Hunt, the "**Debtors**"), and file this Response to Defendant
Republic Credit, LLC's ("**Republic**" or "**RBC**") Motion for Partial Summary Judgment and Brief
in Support (Adv. Dkt. 235) and Republic's Supplemental Motion for Summary Judgment (Adv.
Dkt. 244).[1]

## I.
## INTRODUCTION

### A.  The First Summary Judgment Proceeding.

1.      This case has already been through one summary judgment proceeding.

2.      Almost one year ago, on January 28, 2019, the Court (Dodd, J. presiding) ruled on
the *Trustee's* motion for summary judgment. *See* Adv. Dkt. 165.

3.      Generally speaking, the Court granted the Trustee some substantial relief, denied
other relief (mostly due to fact disputes), and made various factual findings and rulings on matters
of law.

4.      The Court's ruling is summarized below:

- Trustee's Count 1 (Violation of the Automatic Stay): The Court found **Republic's
  control over Accounts and proceeds of Accounts generated by the Debtors on
  or after November 5, 2015 was a violation of the automatic stay**.  Whether or
  not the violation was "willful" was reserved for trial.

- Trustee's Count 2 (Turnover): The Court **granted summary judgment on the
  Trustee's claim for turnover** with respect to Accounts generated by the Debtors
  on or after November 5, 2015 and denied summary judgment on the Trustee's
  turnover claim with respect to Accounts generated by the Debtors before November
  5, 2015.

---

[1] To simply the summary judgment record for the Court, the Trustee and John Buttles have prepared a Joint Appendix
in support of their respective response briefs.  The summary judgment evidence on which both the Trustee and Buttles
rely is contained in the Joint Appendix (cited herein as "Pltf. Appx.").

- <u>Trustee's Count 3 (Declaratory Relief)</u>: The Court: (1) **granted** the Trustee's Motion for a declaration that the Factoring Agreement does not last into perpetuity; (2) **denied** summary judgment and found that, during the term of the Agreement, the Debtors' listing an Account on an Assignment Schedule was not a condition precedent to Republic's purchase of that Account; (3) **granted** summary judgment and found that proceeds from accounts generated on or after November 5, 2015 are property of the Debtors' estates; (4) **granted** summary judgment and found a general release of Republic was not a prerequisite to termination of the Factoring Agreement under ¶ 8.2; and (5) **denied** summary judgment with respect to the Trustee's request for a declaration that the entire Factoring Agreement is null under Louisiana Civil Code Article 2004.

- <u>Trustee's Count 4 (Conversion)</u>: The Court **denied** summary judgment on the Trustee's claim for conversion due to a fact issue on one of Republic's defenses.

- <u>Trustee's Count 5 (Texas Theft Liability Act)</u>: The Court **denied** summary judgment on the Trustee's claim that Republic violated the Texas Theft Liability Act due to a fact issue regarding whether or not Republic acted with the requisite intent.

- <u>Trustee's Count 8 (Fraudulent Transfer)</u>: The Court **denied** summary judgment because the Trustee did not prove the Debtors' insolvency as a matter of law.

5.    Shortly after its initial Order, the Court clarified that its ruling with respect to the proceeds of pre- and post- November 5, 2015 Accounts was "not intended to be a ruling that RBC can keep the entirety of the pre-November 5, 2015 Account proceeds in any final accounting between the parties under the Agreement."

6.    Accordingly, that issue remains in dispute.[2]

## B.    Republic's Motion and Summary Judgment Record.

7.    Despite the Trustee winning an affirmative summary judgment on two of his claims, and the Court finding fact issues on others, Republic now moves for a summary judgment on thirteen (13) of the Trustee's claims.  Without submitting *any* new evidence, Republic even

---

[2] As set forth below, the Trustee contends the Debtors' facility with Republic was paid in full on October 23, 2015, and the Trustee's summary judgment evidence supports that contention.

moves for summary judgment on two of the Trustee's claims on which the Court previously found a fact issue for trial (conversion and Texas Theft Liability Act).

8.      Republic's summary judgment evidence is, at best, sparse.  It generally consists of a conclusory affidavit from Republic representative Melissa Baines, some "soundbite" deposition testimony from the Debtors' former CEO John Buttles, and Debtor tax returns (which have no relevance to any argument made in Republic's Motion).

9.      Worse yet is Republic's "shotgun" approach.  With respect to the vast majority of the Trustee's claims, Republic's "attack" is limited to 2-3 sentences.  The Motion contains little in the way of legal analysis or discussion of the summary judgment evidence.

10.      As shown below, Republic did not come close to meeting its summary judgment burden.  Many of its arguments simply fail as a matter of law.  With respect to the balance, the Trustee's summary judgment evidence establishes numerous fact issues for trial (which will be a trial to the Court in any event).  Accordingly, Republic's Motion should be denied.

## II.
## FACTUAL BACKGROUND

### A.      The Debtors' Business.

11.      Bailey Tool & Equipment Company ("***Bailey***") was a metal fabrication, engineering, and design company that had been in existence since the mid-1980's.  Pltf. Appx. p. 146 (Buttles Declaration, ¶ 1).

12.      Bailey had two wholly owned subsidiaries – Hunt Hinges, Inc. ("***Hunt***") and Cafarelli Metals, Inc. ("***Cafarelli***").  *Id*. (Buttles Declaration, ¶ 2).

13.      Generally speaking, Hunt created and manufactured metal hinges used in the boating industry.  *Id*.  Cafarelli slit the metals that Bailey and Hunt would use to manufacture the products.  *Id*.

14.    When Bailey was formed, its core customer groups were Tier One and Tier Two automotive and truck suppliers that supply OEM and aftermarket parts in the United States.  *Id.* For example, one of the main parts that Bailey manufactured were steps that would be put into large trucks (*e.g.* Peterbilt).  *Id.*

15.    When the economy (including the automotive industry) suffered in 2008 and 2009, some of Bailey's customers ended up going out of business.  *Id.* at pp. 146-147 (Buttles Declaration, ¶ 4).  Bailey found revenue declining, and so it began expanding into other lines of business in addition to the automotive part manufacturing industry.  *Id.*

16.    One of the primary lines of business Bailey started to engage in was manufacturing ammunition and bullet assembly machines.  *Id.* at p. 147 (Buttles Declaration, ¶ 5).  Bailey would not only make the parts, but Bailey would also perform engineering work to develop the presses that it used to create and stamp its parts.  *Id.*  A substantial amount of Bailey's work was on the engineering side where it would build massive presses, some of them the size of a two-story building.  *Id.* at p. 3 (Hayward Affidavit, ¶ 10).

17.    Bailey's efforts resulted in a contract with the Department of Defense.  *Id.* at p. 147 (Buttles Declaration, ¶ 5). The contract called for Bailey to create or develop a bullet assembly machine.  *Id.*  Bailey created the machine, and it was well-received.  *Id.*  In addition to bullet manufacturing, the Debtors expanded into other metal fabrication products, including clamps used on underground utilities.  *Id.*

**B.    The Factoring Agreement and the Debtors Early Dealings with Republic.**

18.    In late 2014 and in early 2015, Bailey began negotiations with Republic Business Credit, LLC ("***Republic***") regarding what it called a factoring and inventory financing arrangement to finance Bailey's working capital needs.  *Id.* (Buttles Declaration, ¶ 6).  The arrangement was intended to be short term banking bridge from Comerica to a future bank.  *Id.*

19.     In the Debtors' negotiations with Republic, Republic represented the Debtors would receive 90% of all accounts receivable immediately under a factoring arrangement, and Republic would take its fees and expenses out of the 10% held back.  *Id*. at p. 148 (Buttles Declaration, ¶ 9).  Periodically, Republic was to return the holdback to the Debtors.  *Id*.

20.     Based on the representations described above, the Debtors entered into an "Agreement for Purchase and Sale" (the "***Factoring Agreement***") on or about February 25, 2015. *Id*. (Buttles Declaration, ¶ 11).

21.     While there were a few early issues and problems, the factoring arrangement generally worked as expected from late-February 2015 through early-July 2015.  *Id*. at pp. 68-69 (Buttles Declaration, ¶ 8).

22.     To explain how the relationship generally worked during this early time period, (1) invoices were created and sent to the Debtors' customers; (2) the corresponding accounts receivable were assigned to Republic; (3) Republic would factor and wire approximately 90% of the receivables sent to Republic to the Debtors' bank account; and (4) when the customer paid the invoices, payments went to a lockbox controlled by Republic (*i.e.* no incoming revenue went to the Debtors – it all went to Republic).  *Id*. at p. 149 (Buttles Declaration, ¶ 14).  The Debtors continued to run its business and determine how to apply the funds advanced by Republic in operating the business.  *Id*.

**C.     The Debtors' Relationship with Republic Sours, and Republic Takes Over Control of the Debtors' Business.**

23.     In July 2015, Comerica Bank (which was a lender to the Debtors on a line of credit) called a default based upon some allegedly unpaid property taxes, which, in turn caused Republic to call an alleged default on the factoring arrangement.  Plf. Appx. p. 4 (Hayward Affidavit, ¶ 14); pp. 151-152 (Buttles Declaration, ¶ 23).  From the Debtors' perspective, the Debtors had a payment

plan worked out with the taxing authorities, which had previously been communicated to both the bank and Republic. *Id*. Moreover, the matter was previously disclosed to Republic and well-understood by it during the due diligence period, and the issue could have been easily corrected by filing a form in the Dallas County records. *Id*. at p. 151 (Buttles Declaration, ¶ 152). Accordingly, the Debtors disputed the alleged default. *Id*. at p. 4 (Hayward Affidavit, ¶ 14); pp. 151-152 (Buttles Declaration, ¶ 23)

24.     In early-July 2015, representatives of Republic reversed a deposit made to fund the Debtors' payroll. *Id*. at p. 152 (Buttles Declaration, ¶ 25). This action caused significant damage to employee morale, goodwill, and productivity. *Id*.

25.     Republic also required additional (extra-contractual) concessions from the Debtors, including requiring the Debtors to allow Republic to control the Debtors. *Id*. at pp. 152-154 (Buttles Declaration, ¶¶ 24-30).

26.     From approximately early-July 2015 through mid-September 2015 (when Republic stopped funding entirely), Republic controlled the Debtors by:

- directly paying the Debtors' employees;

- deciding which employees would be paid;

- hiring security guards and installing cameras at the Debtors' facility to maintain watch over the Debtors' CEO John Buttles and the Debtors' employees (all charged to the Debtors by Republic);

- requiring the Debtors and their vendors to enter into "Three Party Payment Agreements," under which Republic imposed terms on the vendors;

- paying Bailey's vendors directly; and

- misrepresenting to vendors that Republic would issue payment on a COD basis, then later refusing to do so.

*Id*. at pp. 152-154 (Buttles Declaration, ¶¶ 24-30).

27.    Republic's control permeated every aspect of the Debtors business and was complete:

- Republic decided which employees were "absolutely necessary;"

- Republic ordered layoff of employees who Republic decided were not "absolutely necessary;"

- Republic refused to allow for purchase of raw materials used to create accounts receivable;

- Republic refused to allow for purchase of materials used to run the plant (*i.e.* oil for the machines);

- Republic refused to allow for purchase of basic business supplies (*i.e.* toner for the printers);

- Republic refused to allow for payment of goods and services used to ship product (*i.e.* boxes and delivery services);

- Republic refused to allow the Debtors to make basic overhead expenditures (*i.e.* utilities, taxes, trash collection); and

- Republic refused to make payments for a company truck used to make deliveries, pick up raw materials, etc. (the truck was eventually repossessed).

*Id*. at pp. 69-70 (Buttles Declaration, ¶ 11).

28.    Republic ordered and required that the Debtors sign "Letters of Direction" (LOD) before it would pay any bill that Republic decided to pay.  LOD's were not signed voluntarily and are not a reflection of the Debtors' management's control over the business.  *Id*.

29.    During the July-October 2015 time period, Republic's control over the Debtors exclusively benefited Republic because it accelerated Republic's payoff.  Republic's control was not in the Debtors' best interest – rather, it was radically detrimental to the companies.  *Id*. at p. 70 (Buttles Declaration, ¶ 12).

30.    Republic's control and decision-making choked the Debtors' ability to serve its existing clients, generate new accounts receivable, generate cash flow, and successfully transition

into a new banking relationship.  *Id*.  Further, Republic's control and decision-making destroyed

the Debtors' relationship with its suppliers, and it terminated the Debtors' ability to expand into

new lines of business and otherwise recover and continue as a going concern.  *Id*.

31.     In retrospect, it is clear Republic implemented an "unannounced liquidation" of

Bailey beginning in early-July 2015.  *Id*. at pp. 70-71 (Buttles Declaration, ¶¶ 14-15).  However,

Republic did so in a way so as to not alert Bailey or Bailey's customers, since transparency would

have impaired Republic's ability to collect Bailey's accounts receivable.  *Id*.

**D.     The Buttles Homestead Transaction.**

32.     In addition to running the Debtors' business, Republic required John Buttles, the

CEO of the Debtors, to provide Republic with a lien on his homestead in Texas.  Pltf. Appx. pp.

154-157 (Buttles Declaration, ¶¶ 35-42).  Republic represented to Buttles that it was legally

entitled to obtain the lien/mortgage and that it was necessary to allow the Debtors to continue as a

going concern.  *Id*. at p. 155 (Buttles Declaration, ¶ 155).

33.     An example of the threatening and belittling communications Republic heaped on

Buttles and the Debtors during the late-Summer and Fall of 2015 is below:

*Id*.

34.    On or about July 21, 2015, under extreme duress and due to Republic's promise to resume funding, Buttles and his wife executed and delivered to Republic a document provided by Republic's lawyers.  *Id*. at p. 156 (Buttles Declaration, ¶ 38).  Republic then caused a lien on Buttles homestead to be filed in the public records of Dallas County.  *Id*.  In addition, Republic pressured Buttles to put his house on the market in the late-Summer, which was the worst time of year to sell his house (which was suitable for a family with several children).  *Id*.

35.    During the summer of 2015, as a result of pressure for quick sale from Republic, Buttles put his homestead on the market for a price below market value.  *Id*. at p. 156 (Buttles Declaration, ¶ 39).  During August-September, Buttles received an offer on the homestead, but closing was delayed due to Republic's lien.  *Id*.  Buttles then continued his efforts to sell the homestead, and Republic continued to claim: (i) it was entitled to the sale proceeds; and (ii) Republic would fund the Debtors if Republic was given the sales proceeds.  *Id*.

36.    Buttles' homestead sale was scheduled for closing when he contacted a lawyer, Melissa Hayward.  *Id*. at p. 156 (Buttles Declaration, ¶ 40).  Ms. Hayward contacted Republic and was told that the accounts it purchased from Bailey were no good (a remarkable statement given that Republic would be paid in full within about a month!), the inventory line was overextended, and the equity in Buttles' home was needed to clear the Debtors' debt to Republic.  *Id*.

37.    Republic demanded Buttles sell the homestead, pay Republic $275,000, and use any remaining equity to fund Bailey's operations.  *Id*.  Ms. Hayward negotiated a forbearance/settlement where Republic would be paid as assigned Bailey accounts were collected. *Id*.  As part of the settlement structure, Buttles agreed to contribute $225,000 from the house sale. *Id*.

38.     On October 2, 2015, the sale closed, and the title company wired $225,000 to Republic.  *Id*. at pp. 156-157 (Buttles Declaration, ¶ 41).  The money was sent in good faith and based upon Buttles' understanding that the basic terms of an agreement had been reached.  *Id*.

39.     After the funds were sent to Republic, Ms. Hayward received a draft forbearance agreement from Republic, and she immediately concluded that the document was inconsistent with the parties' verbal agreement.  *Id*. at p. 157 (Buttles Declaration, ¶ 42).  Accordingly, Ms. Hayward immediately sent Republic an e-mail stating the funds had been sent in trust as part of the parties' agreement and Republic was not to apply the funds until the documents were finalized.  *Id*.

40.     Republic refused and applied the funds from the sale of Buttles' homestead sale to the Debtors' alleged debt with Republic:

> **From:** Montplaisir, Laurie A. Martin [mailto:lmontplaisir@srcattorneys.com]
> **Sent:** Friday, October 02, 2015 3:31 PM
> **To:** Melissa Hayward
> **Cc:** Brown, S. Joseph; Vickie.Driver@lewisbrisbois.com; Melissa Baines
> **Subject:** RE: RE: Bailey-Confidential Settlement Communication Subject to the FRE
>
> Melissa:   My client never agreed to hold any money in trust.  The funds have been applied to the inventory over advance.  Laurie
>
> Laurie A. Martin Montplaisir
> **Schuyler, Roche & Crisham, P.C.**
> LMontplaisir@SRCattorneys.com
> 312 565.8496 TEL | 312 565.8300 FAX

*Id*.

41.     From that point (early-October 2015) on, Republic continued to collect all of the Debtors' accounts receivable, because Republic had already sent notices to all of the Debtors' customers directing that payment go exclusively through Republic's lockbox.  Pltf. Appx. p. 5 (Hayward Affidavit, ¶ 21).

42.     Worse yet, Republic had not funded the Debtors since **September 11, 2015** – which turned out to be the date on which Republic made its **last** advance to the Debtors.  *Id*. at p. 24 (Carter Report – Section entitled "*Date RBC Paid in Full*").

**E.    RBC is Paid in Full, but Nevertheless Attempts to Extort a Release from the Debtors.**

43.     Having not funded for weeks, by mid-November 2015, RBC had collected more than enough accounts receivable from the Debtors to pay its facility off in full.  *Id*. at p. 5 (Hayward Affidavit, ¶ 22).  In approximately mid-November 2015, the Debtors' counsel received an email from Republic confirming the facility had been paid in full, and stating that RBC was holding approximately $150,000 and would turn it over to the Debtors so long as the Debtors executed full releases of any claims they had against Republic:

---

**From: Melissa Baines <mbaines@republicbc.com>**
**Date: November 20, 2015 at 6:09:50 PM CST**
To: jbuttles@baileytool.com
Cc: Melissa Baines <mbaines@republicbc.com>
**Subject: Bailey Tool, et al. / RBC**

John,

With the posting of today's collections, the amounts due as of today to RBC from the companies under the Purchase Agreements have been collected.  Upon full execution of the attached General Release Agreement, but not before the Date of the General Release Agreement (Monday, November 23, 2015), the Obligation due and owing to RBC will be considered satisfied.

Please review the attached documents and have them executed with a notarized signature.  As there are three separate clients, thereby three separate Releases, I have included a Letter of Direction for the small amount due under the Bailey Tool account, which Letter of Direction provides for RBC to reduce the amount from the total due to Hunt Hinges.

The consolidated wire amount due to the companies, effective November 23, 2015, will be $152,064.03.  Please provide direction as to where you would like those funds wired.  I have provided a blank Letter of Direction for you to complete with the directions for the release of funds to each of Hunt Hinges, Inc. and Cafarelli Metals, Inc. (i.e. please do a letter of direction for each of the companies).  In the event they are directed to the same account, we can send as one wire, if you prefer.

Please let me know if you have any questions.

Regards,

Melissa Baines
Risk Manager

---

*Id.; see alsp* Adv. Dkt. 73-2, p. 309 (e-mail included record from prior summary judgment proceeding). The Court has since held Republic was not entitled to hold out for a release. *See* Adv. Dkt. 165, p. 7 ("Republic argues that § 8.1 requires that *any* termination of an Agreement by a Debtor requires the Debtor to sign a general release. **This court disagrees**.") (emphasis added).

## F.    The Secret Termination Fee.

44.    On or about October 2, 2015 – Republic charged a $75,000 termination fee against money collected from the Debtors' accounts. Pltf. Appx. p. 157 (Buttles Declaration, ¶ 43). The Debtors received no notice that Republic was taking a termination fee. *Id*. At the same time, Republic was telling the Debtors to continue submitting accounts and promised it would fund Bailey's operations. *Id*.

45.    Based on Republic's promise (and failure to disclose the termination fee), the Debtors continued to submit receivables to Republic until November 5, 2015. *Id*. at pp. 157-158. Although Republic continued to collect receivables, it advanced no additional funds to the Debtors. *Id*. Worse yet, Republic continued to claim ownership of all of the Debtors' receivables and hold out for a release (which lasted well into the Debtors' bankruptcy case and this adversary proceeding).

## G.    The Debtors File Chapter 11, and Republic Sabotages the Debtors' Opportunity to Reorganize.

46.    In the Fall of 2015, the Debtors continued to believe they had valid legal claims against Republic, and the Debtors declined to sign any release. Pltf. Appx. p. 5 (Hayward Affidavit, ¶ 23),

47.    From that point through the February 1, 2016 date of the Debtors' bankruptcy filing (the "***Petition Date***"), Republic continued to collect the Debtors' accounts receivable. *Id*. at pp. 5-6. In fact, as of the Petition Date, the Debtors and their counsel calculated that Republic was

holding approximately \$450,000[3] of accounts receivable that it had collected from the Debtors' customers, despite the fact that its debt facility had been paid in full in November of the year before. *Id.*

48.     Beginning on the Petition Date, Republic claimed that the factoring agreement had not been terminated; and (ii) under the factoring arrangement, it acquired all of the Debtors' account receivables into perpetuity, regardless of whether Bailey had actually sold those accounts receivable to Republic.  *Id.* at p. 6 (Hayward Affidavit, ¶ 24).  For example, Republic sent the following e-mail to one of the Debtors' customers on February 10, 2016.  The e-mail wrongfully claimed Republic and the Debtors were parties to a "very active and non-terminated factoring agreement, which exists in place" [image of email on following page]:

---

[3] This calculation was performed around the time of the Debtors' bankruptcy filing.  The Trustee has retained an expert witness, who has performed his own, more current, calculation of what Republic owes the Debtors.  Mr. Carter's Affidavit (including its exhibits) is included in the summary judgment record at Pltf. Appx. pp. 9-59.

I work with Laurie Montplaisir on her RBC team as her insolvency specialist.  I therefore represent RBC, as does the local counsel (Vickie Driver) that we specifically hired to appear on RBC's behalf in the Bailey bankruptcy.   I CC Vickle Driver above, and I also CC Melissa Hayward, Bankruptcy Counsel to Bailey.  As I understand, you have called Laurie expressing frustration that the status quo leaves your client, a Bailey customer, in a bind.    You need the provision of additional goods or services from Bailey, but Bailey insists that you pay Bailey first.   And you claim that you cannot pay because of the continuing effect and existence of RBC's 9-406(a) claim on the funds that you hold that you might otherwise turn over to Bailey.

Here are a few observations and suggestions:

1       There is no doubt that RBC continues to assert an active claim on the funds that your client holds.  Those funds belong to RBC under a very active and non-terminated factoring agreement, which exists in place.  Under the status quo, your client is obliged to pay such funds only to RBC.   So you are absolutely correct that your client would be exposed to potential double liability if you turn the funds over to Bailey.  We will not simply waive our rights, or give you a get-out-of-jail free card on this point;

2       RBC's current claim on the funds that your client holds is a legally valid contractual claim that will withstand any future legal scrutiny.  We are currently preserving a prepetition right of setoff, which controlling law gives us the right to do even after a bankruptcy.  Your client has no recourse to, no privity with, and no cause of action against mine.  There are no threats that you can credibly make against RBC.  If anything, your continued insistence that you be given permission to release the funds indicate that there are no contractual defenses to payment.

And

3       Here is how we might help each other:  If RBC can simply get a proper termination of its factoring agreement as well as fulsome releases from Bailey and its insiders and affiliates, we would be prepared to waive our claim on the funds that your client holds.   That would require, however, 9019 motion practice to obtain a court approval of the arrangement before we could give you our waiver.   Hence, I CC Ms. Hayward above.   Everybody would win: My client could safely exit the situation in the knowledge that it would not be sued down the road; you get the product that you need; Ms. Hayward's client gains access to funds and a job to do.  Indeed, such an arrangement would actually allow for a greater amount of funds than you currently hold to reach Bailey (we hold some as well, that would also be released).

THIS IS A FRE RULE-408-PROTECTED OFFER OF COMPROMISE.   You will note that what RBC attempts here is merely to exit the situation, turn over excess funds to the estate, help your client out, and be left in peace.   This is not an attempt to collect a prepetition debt.  Please do not attach this email to any Court pleading or otherwise make its contents public.

Stephen "Joseph" Brown
Partner
SJBrown@SRCattorneys.com
312 565.8339 tel | 312 565.8300 fax

*See* Adv. Dkt. 77-1, p. 62 (copy of the foregoing e-mail previously filed of record in the adversary

*by Republic*).

49.     Republic used that position (which has since been rejected by the Bankruptcy Court

and District Court) as a sword every step of the way in the bankruptcy case.  Pltf. Appx. p. 6

(Hayward Affidavit, ¶ 25).   For example, during a cash collateral or DIP financing hearing,

Republic argued that the Debtors could not use cash collateral or could not obtain DIP financing because the Debtors didn't own any of its accounts receivable, it had sold them all to Republic. *Id.*

50.     Republic's position was wrong both legally and factually, and it should never have been raised in the first place since (i) Republic had taken a termination fee (*see* Part II.F, *supra*); (ii) the facility had been paid in full, and (iii) Republic was not entitled to hold out for a release. *Id.* (Hayward Affidavit, ¶ 26).

51.     The Debtors' attempt at reorganization failed primarily because Republic was holding so much of the Debtors' cash. *Id.* (Hayward Affidavit, ¶ 27). Because the Debtors were manufacturing companies, they had to acquire their raw materials and inventory in order to stamp the products and create the metal products that they would then turn around and sell to their customers. *Id.* Therefore, the Debtors needed to have capital to acquire the material so that they could actually create the products, send them to customers, and ultimately get paid. *Id.*

52.     Republic's holding the Debtors' cash hostage precluded the Debtors from purchasing raw materials/inventory, which the Debtors' needed to fill customer orders, generate revenue, and ultimately reorganize. *Id.* at pp. 67 (Hayward Affidavit, ¶ 28). Republic also irreparably damaged the Debtors' relationships with certain of their customers by demanding, even Post Petition, that the Debtors' customers pay all accounts receivable to Republic. *Id.* at p. 7. Republic even brought several of the Debtors' customers into this lawsuit as third-party defendants. *Id.* Republic's wrongful actions irreparably damaged the Debtors' relationship with their customers, and the Debtors ultimately lost that business and the significant revenue provided by those customers as a result. *Id.*

53.     During the Chapter 11, the Debtors' revenue increased, but the Debtors needed capital to acquire inventory. *Id.* (Hayward Affidavit, ¶ 29). The main thing holding the companies

back was the lack of cash so they it could purchase the materials needed to fill customer orders and bring in revenue. *Id*. Republic caused the Debtors' lack of cash by: (1) improperly holding funds generated by the Debtors' receivables; and (2) improperly claiming to own the Debtors' accounts receivable into perpetuity, which impaired the Debtors' ability to use cash collateral or obtain debtor in possession financing. *Id*.

54.     For example, Bailey had a very profitable contract with the Department of Defense; and in order to fill it, Bailey needed to acquire a particular type of expensive metal. *Id*. (Hayward Affidavit, ¶ 30). It was a highly specialized metal that Bailey needed to buy so that it could create these pieces that it was going to manufacture for the government. *Id*.

55.     Because Republic was holding so much cash (including cash collected on post-November 5, 2015 receivables), Bailey did not have the money to buy the metal and perform the contract. *Id*. (Hayward Affidavit, ¶ 31).

56.     Had the Debtors been able to acquire the materials needed, they could have successfully reorganized. *Id*. at pp. 7-8 (Hayward Affidavit, ¶ 32). The Debtors had 40 employees. They had been around for decades. *Id*. Had Republic not held the Debtors' cash and continued to claim ownership of the Debtors' receivables, the Debtors ultimately would have been able to develop a plan to reorganize and pay back creditors, even without the use of an investor. *Id*.

**H.     Republic Celebrates the Debtors' Demise.**

57.     If there were any doubts about Republic's motives and bad faith, Republic's Melissa Baines put them to rest in June 2016, when she received news that the Debtors' Chapter 11 case would be converted to a Chapter 7.

58.     By June 2016, Republic had, among other things:

•     Failed to advance funds under the Factoring Agreement in good faith;

•     Exercised excessive control over the Debtors' business;

- Misappropriated the equity from Mr. Buttles' homestead;
- Taken a secret termination fee of $75,000;
- Wrongfully held out for a release;
- Wrongfully exercised control over proceeds of Accounts created on or after November 5, 2015;
- Violated the automatic stay; and
- Prevented the Debtors from obtaining DIP financing by maintaining the absurd (and now legally decreed to be incorrect) position that Republic owned the Debtors Accounts into perpetuity.

59.     Having been successful in sabotaging the Debtors' business both pre and post-petition, Republic executives celebrated the Debtors' "**implosion**."  Pltf. Appx. p. 165 (RBC 17663).

60.     Republic was delighted because: (i) the Debtors would not be permitted to use proceeds from asset sales to litigate their adversary proceeding with Republic; and (ii) Republic believed a trustee, would be more "reasonable" than the Debtors' long-time CEO John Buttles.  *Id*.

---

On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:

Unofficially, Bailey Tool has imploded.  The official nail is expected to hit in the next 7 to 30 days.  Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week.  Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more.  In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week.  Oh, what I wouldn't do to be there to see the walls come crashing down…

We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.

Melissa Baines
Risk Manager

Republic Business Credit, LLC
201 St. Charles Avenue, Suite 2210
New Orleans, LA 70170
t: 504.262.8604

---

*Id.*

61.     Conversely, a decades-old company was put out of business, dozens of employees

(many of whom lived paycheck-to-paycheck) lost their jobs.  Nevertheless, Republic was thrilled

to "see the walls come crashing down."

### III.
### ARGUMENT AND AUTHORITIES

**A.     Republic Owed the Debtors Duties of Good Faith and Fair Dealing Under Both
Louisiana and Texas Law.**

62.     Republic argues Count 15 (Breach of Duty of Good Faith and Fair Dealing) fails

because "Texas law does not impose a generalized contractual duty of good faith and fair dealing."

Motion, Adv. Dkt. 235, p. 9.  Republic is wrong for three reasons.

63.     *First*, Republic admits the Factoring Agreement is "controlled by **Louisiana law**."

*Id.* at p. 1 (emphasis added).

64.     Under Louisiana Law, "**[c]ontracts must be performed in good faith**."  *See*

Louisiana Civil Code Chapter 8, Section 1, Art. 1983; *Grisaffi v. Dillard Department Stores, Inc.*,

43 F.3d 982, 983 (5th Cir. 1995) ("**Good faith performance is an implied requirement of every

contract under Louisiana law**.") (emphasis added).  Accordingly, Republic's argument plainly

fails as a matter of law.

65.     *Second*, in the event Republic is correct and Count 15 is somehow governed by

Texas law,[4] Article 1.304 of the Uniform Commercial Code applies and imposes a duty of good

faith.[5]  Specifically, Article 1.304 provides: "**Every contract or duty within this title imposes**

---

[4] Republic's Motion fails to offer any explanation of how Texas law would apply to the Trustee's claim for breach of
the duty of good faith and fair dealing.

[5] *See* Republic Response to the Trustee's Motion for Summary Judgment, Adv. Dkt. 77, p. 7 (taking the position that
the UCC applies to the Factoring Agreement); AM. BANKR. INST. JOURNAL, Vol. XXX, No. 8, October 2011
("…Article 9…covers both outright sales of accounts where title is transferred to the factor, and loans against accounts
that continue to be owned by the debtor and are merely pledged to the lender as security for the loan."); *see also*
Factoring Agreement, Annex A, RBC MSJ App p. 110 (referencing the UCC for definitions of capitalized terms); *Id.*
at ¶ 6, RBC MSJ APP p. 89 (purporting to grant Republic a security interest in, *inter alia*, Accounts and Inventory).

**an obligation of good faith in its performance and enforcement**." TEX. BUS. & COM. CODE. § 1.304.[6]

66.      *Third*, even Republic's own authority acknowledges that under Texas common law, a duty of good faith and fair dealing arises when there is a special or confidential relationship between the parties. *See* Motion, Adv. Dkt. 235, p. 9 (citing *Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016)).

67.      Here, the Trustee's summary judgment record contains ample evidence of a special or confidential relationship between Republic and the Debtors:

- There was an imbalance of bargaining power between Republic and the Debtors (Pltf. Appx., p. 151 (Buttles Declaration, ¶ 20));[7]

- Republic utilized the imbalance of bargaining power to gain control over the Debtors' business operations (*Id.*; *see also* Pltf.'s Appx. pp. 152-154 (Buttles Declaration, ¶¶ 24-34));

- Republic usurped the duties and responsibilities that ordinarily would have been carried out by one or more of the Debtors' fiduciaries (*e.g.* officers and directors) (*Id.*);

- In exercising the duties and responsibilities that ordinarily would have been carried out by the Debtors' fiduciaries, Republic had an inherent conflict of interest (*Id.*);

- Republic acted in its own self-interest, rather than that of the Debtors (*Id.*).

---

[6] The Uniform Commercial Code Comments to Article 1.304 further provide: "This section sets forth a basic principle running throughout the Uniform Commercial Code. The principle is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. While this duty is explicitly stated in some provisions of the Uniform Commercial Code, the applicability of the duty is broader than merely these situations and applies generally, as stated in this section, to the performance or enforcement of every contract or duty within this Act. It is further implemented by Section 1-303 on course of dealing, course of performance, and usage of trade."
[7] *See Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 637-638 (Tex.App. – Houston [1st Dist.] 2002) (special or confidential relationship may arise based on extra-contractual duties arising from an imbalance of bargaining power; confidential relationship may exist where influence has been acquired and abused, and confidence has been reposed and betrayed).

68.     In sum, Republic's attempt to dismiss Count 15 should be rejected because the Trustee has identified three legal bases for a contractual duty of good faith and fair dealing owed by Republic to the Debtors.

**B.    Republic Owed the Debtors Fiduciary Duties.**

69.     Republic moves for summary judgment on the Trustee's breach of fiduciary duty claim on the basis that the Agreement disclaims a fiduciary relationship.  Republic argument is without merit for two reasons.

70.     *First*, Republic's reliance on Section 12.6 of the Agreement to prospectively exclude or limit its liability for breach of fiduciary duty – an intentional tort[8] – is improper under Article 2004 of the Louisiana Civil Code.  *See* Louisiana Civil Code Chapter 8, Section 4, Art. 2004 ("Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.").  Accordingly, Republic's Motion fails as a matter of law.

71.     *Second*, Texas law (which Republic relies upon throughout its Motion with respect to the Trustee's tort claims) recognizes that, under certain circumstances, a lender may owe fiduciary duties to its borrower.  *Esty v. Beal Bank SSB*, 298 S.W.3d 280, 304 (Tex.App. – Dallas 2009) (fiduciary duty may arise between lender and borrower when the lender exercises excessive control and influence over the borrower's business activities).

72.     Here, the Trustee's summary judgment evidence shows Republic exercised excessive control over the Debtors' business activities.

73.     For example, John Buttles, the Debtors' former CEO, testified that Republic controlled the Debtors' business operations in at least eight different ways, including managing

---

[8] *See Meza v. Honorcare Home Health, Inc.*, No. 04-17-00741-CV, 2018 WL 6793839, at * 1 (Tex.App. – San Antonio December 27, 2018) (referring to breach of fiduciary duty as an intentional tort).

the Debtors' payroll; deciding which employees the Debtors kept on the payroll; managing the

Debtors' purchase of raw materials; and managing the Debtors' relationships with vendors. *See*

Plf Appx pp. 69-70 (Buttles Declaration ¶¶ 10-11).

74.     Further, the Trustee's lender liability and fiduciary duty expert, Jeff Anapolsky, has

opined that the control Republic exercised over the Debtors' business was far outside the bounds

of a lender.  Pltf. Appx. p. 64 (Anapolsky Affidavit ¶ 14) ("…RBC's actions with respect to the

Debtors were inconsistent with, and overstepped the bounds of, a passive investor…").

75.     Accordingly, at a minimum, the Trustee's summary judgment evidence is sufficient

to create a fact issue as to whether or not Republic owed the Debtors fiduciary duties.

**C.     The Trustee's Summary Judgment Evidence Establishes a Partnership Between the Debtors and Republic.**

76.     Citing the testimony of John Buttles, Republic contends it cannot be liable to the

Debtors' creditors as a partner because there was no agreement between Republic and the Debtors

to share profits and losses. *See* Motion, Adv. Dkt. 235, pp. 6-7.

77.     Under Texas law, "an association of two or more persons to carry on a business for

profit as owners creates a partnership, regardless of whether [ ] the persons intend to create a

partnership ...."  TEX. BUS. ORGS. CODE § 152.051.

78.     Section 152.052 of the Texas Business Organizations Code, titled "Rules for

Determining if Partnership is Created," provides:

Factors indicating that persons have created a partnership include the persons':

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) agreement to share or sharing:

(A) losses of the business; or

(B) liability for claims by third parties against the business; and

(5) agreement to contribute or contributing money or property to the business.

*Id*. at § 152.052(a).

79.     In applying the factors, Texas courts look at the **totality of the circumstances** to determine the existence of a partnership.  *Ingram v. Deere*, 288 S.W.3d 886, 891 (Tex. 2009).  No single factor is necessary or sufficient to prove the existence of a partnership.  *Id*.  Direct proof of the parties' intent to form a partnership is **not** required, nor is proof of all five factors.  *Id*. at 895-96.  However, sharing profits and control over the business are the "most important" factors.  *Id*. at 896.

80.     Here, while Republic's summary judgment evidence only relates to two of the factors (agreements to share profits and losses), the Motion fails to address the other "most important" factor – control over the business.

81.     The Trustee's evidence, on the other hand, shows the presence of other factors.

82.     For example, the Trustee's summary judgment evidence demonstrates that, from early-July 2015 through mid-September 2015, Republic controlled virtually every major component of the Debtors' business:

- Republic paid the Debtors' employees directly;

- Republic decided which employees would be paid;

- Republic decided which employees were "absolutely necessary;"

- Republic ordered layoff of employees;

- Republic hired security personnel and installed cameras at the Debtors' facility;

- Republic required the Debtors' vendors to enter into "Three Party Payment Agreements," under which Republic imposed terms on the vendors;

- Republic paid the Debtors' vendors directly;

- Republic determined when and what raw materials the Debtors purchased; and

- Republic controlled the Debtors' purchase of basic business supplies.

Pltf. Appx. pp. 69-70 (Buttles Declaration ¶¶ 10-12).

83.     In sum, the Trustee has submitted summary judgment evidence overwhelmingly demonstrating one of the "most important" factors in determining a partnership.  Moreover, Mr. Buttles' testimony as to an agreement to share profits and losses is not dispositive.  *Ingram*, 288 S.W.3d at 895 *v. Deere*, 288 S.W.3d 886, 891.  Accordingly, a fact issue remains for trial.

## D.     Republic's Fraud, DTPA, and Negligent Misrepresentation Argument Ignores Representations Republic Made After Entering into the Factoring Agreement

84.     In its Motion, Republic argues it is entitled to summary judgment on the Trustee's claims for fraud, DTPA, and negligent misrepresentation because paragraph 12 of the Factoring Agreement contractually negated reliance – an element of each of the Trustee's claims.  Motion, Adv. Dkt. 235, pp. 7-9.  Republic also cites high-level testimony from John Buttles regarding representations made to the Debtors *at their first meeting* with Republic in support of its argument. *Id*. at p. 8.

85.     Republic's argument is without merit for several reasons.

86.     *First*, Republic's argument should be rejected out of hand because it fails to address the Fourth Amended Complaint's numerous allegations of misrepresentations occurring ***after*** the Factoring Agreement was signed.  For example, the Complaint alleges:

> Republic repeatedly misrepresented it would begin funding if Debtors would simply forward more account invoices for processing, or performed other acts harmful to Debtors but beneficial to Republic when Republic never did so and had no intention of doing so.  Republic continued making these misrepresentations even after taking a Termination Fee on **October 2, 2015** until Debtors finally stopped assigning accounts receivable on **November 5, 2015**.

*See* Fourth Amended Complaint, Adv. Dkt. 226, pp. 34-35 (emphasis in original).

87.    The Complaint's allegations of Republic's misrepresentations and omissions of material fact *after* the Factoring Agreement was signed are further confirmed by competent summary judgment evidence.    Pltf. Appx. p. 152 (Buttles Declaration, ¶ 25, describing misrepresentations with respect to payroll); pp. 153-154 (Buttles Declaration, ¶¶ 30-34, describing Republic's unannounced liquidation of Bailey), p. 154-157 (Buttles Declaration, ¶¶ 35-42, describing misrepresentations with respect to Buttles Homestead transaction); pp. 157-158 (Buttles Declaration, ¶¶ 43-46, describing secret termination fee); p. 6 (Hayward Affidavit, ¶ 24) (describing misrepresentations after the Petition Date); Adv. Dkt. 77-1, p. 62 (e-mail from Republic's counsel to one of the Debtors' customers containing misrepresentations about ownership of the Debtors' accounts and the factoring agreement).

88.    *Second*, Louisiana law, which indisputably governs the Factoring Agreement,[9] invalidates Republic's attempt to use the "merger/no reliance" clause to negate misrepresentations Republic made after entering into the agreement.

89.    Louisiana Civil Code Article 2004 provides: "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party."  *See* Louisiana Civil Code Chapter 8, Section 4, Art. 2004.

90.    The Comments to Article 2004 further provide:

In *Freeman v. Department of Highways*, 253 La. 105, 217 So.2d 166 (1968), the Supreme Court held that, **as a matter of principle, clauses excluding or limiting liability for intentional fault (fraud or dol) are invalid** because a party would be free to perform or not to perform at will.  Hence, his obligation would be subject to a purely potestative condition that would make it null.  That reasoning aside, **such clauses are against public policy because the overriding principle of good faith would be destroyed if it were possible to contract away liability for fraud**. Foreign civil codes contain abundant indication of the universality of this conclusion. *See also Hayes v. Hayes*, 8 La.Ann. 468 (1852).

---

[9] *See* Motion, Adv. Dkt. 235, p. 1, ¶ 3 ("The Purchase Agreement is controlled by Louisiana law.").

*Id*. at cmt. (a) (emphasis added).

91.     Here, Republic attempts to use paragraph 12 of the Factoring Agreement in a manner strictly prohibited by Louisiana law – *i.e.* "to contract away [Republic's] liability for fraud." Accordingly, Republic's argument should be rejected as a matter of law.

92.     *Third*, contrary to the way they portrayed Republic's Motion, *Schlumberger* and *Forest Oil* (to the extent they even apply since they are Texas cases) do **not** create a bright line rule barring fraudulent inducement claims when there is a contractual waiver of reliance.

93.     In fact, the Texas Supreme Court in *Schlumberger* expressly <u>declined</u> to adopt a *per se* rule, despite the defendant's urging:

> We emphasize that **a disclaimer of reliance or merger clause <u>will not always bar a fraudulent inducement claim</u>**. We conclude only that **on this record**,[10] the disclaimer of reliance conclusively negates as a matter of law the element of reliance on representations about the feasibility and value of the sea-diamond mining project needed to support the Swansons' claim of fraudulent inducement. As there is **no evidence of a fiduciary or confidential relationship**, the trial court correctly rendered a judgment notwithstanding the verdict…

*Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1998).

94.     *Fourth*, the facts of this case are distinguishable from *Schlumberger* and *Forest Oil*. For example:

- The agreements in *Schlumberger* and *Forest Oil* were **settlement agreements**. Thus, the agreements were designed to put an <u>end</u> to an adversarial relationship, and the parties had good reason not to trust each other. *See Schlumberger*, 959 S.W.2d at 179 (noting that one factor in the case's outcome was "the ability of parties to fully and finally resolve disputes between them").

- Here, the agreement at issue is not a settlement agreement, and the Debtors and Republic were not adversarial when they signed the Factoring Agreement. In fact, Mr. Buttles testified that he believed, based on Republic's representations, that it would "be a reliable factor" and "would act honorably and faithfully." Pltf. Appx. p. 148 (Buttles Declaration, ¶ 10). Moreover, Republic holds itself out as a

---

[10] Here, the "record" Republic submitted on this point consists **solely** of the Factoring Agreement. Republic did **not** submit a declaration or affidavit demonstrating any parallels between the facts of this case and *Schlumberger* or *Forest Oil*.

"**resource and funding partner** that knows how to support and work with you." *Id*.

- In *Schlumberger*, the complaining party was represented by "highly competent and able legal counsel."

- Here, the Debtors were **not** represented by counsel at all in negotiating the Factoring Agreement.

- In *Schlumberger*, both sides were "knowledgeable and sophisticated business players…engaged in a business venture involving tens of millions of dollars and in negotiations to sell their interests ultimately for several million dollars." The *Schlumberger* court also noted: "**Significantly, throughout the parties' negotiations, the Swansons disagreed with Schlumberger about the feasibility and value of the sea-diamond project…The sole purpose of the release was to end the dispute about the value of this commercial project between Schlumberger and the Swansons once and for all**." *Id*. at 180.

- Here, the subject matter of the misrepresentations was not fiercely negotiated, and the purpose of the Factoring Agreement was not to end a dispute "once and for all."

95.    In sum, the facts of this case are wildly different than *Schlumberger* and *Forest Oil*. Accordingly, the Court should reject Republic's argument with respect to the Trustee's claims for fraud, DTPA, and negligent misrepresentation.   In any event, Republic claims Louisiana law governs the contract, and Louisiana Civil Code Article 2004 makes the contractual provision Republic relies upon a nullity.

**E.    The Trustee's Business Disparagement Claim was Not Resolved by the Court's Prior Summary Judgment Ruling**

96.    Republic's Motion devotes exactly two whole sentences to the Trustee's business disparagement claim (Count 9).

97.    According to Republic, the Trustee's business disparagement claim should be dismissed because the Court held that the allegedly disparaging statement – that the Debtors did not own their accounts receivable – was true.  Once again, Republic is wrong.

98.    While the Court previously held Republic purchased the Debtors' Accounts "during the Term of the Agreements," it likewise held that the Agreements terminated on November 5, 2015.  *See* Adv. Dkt. 165, p. 8.

99.    Specifically, the Court held:

Thus, when reviewed using the guidance of the Louisiana Civil Code, **the Agreements terminated on November 5, 2015** when the Debtors each ceased submitting Accounts to Republic on Assignment Schedules, triggering a deemed termination under § 8.2.  Upon termination, Republic was entitled to the Termination Fee and other amounts owing under the Agreements and to continue to collect Accounts it had purchased before November 5, 2015.[11]  **But, because Republic did not purchase any Accounts after November 5, 2015, it was not entitled to hold any funds generated by Accounts that came into existence on or after November 5, 2015**.

…**[I]f the Trelleborg [one of the Debtors' customers] Accounts were generated on or after November 5, 2015, they belonged to one of the Debtors** and Republic's attempts to control those funds violated the automatic stay.

*See* Adv. Dkt. 165, p. 8, 9 (emphasis added).

100.    In short, the Court did not hold that Republic's statement that the Debtors did not own their accounts receivable was true (in fact, the Court held quite the opposite as to accounts generated after November 5, 2015).  Moreover, the disparaging statements the Trustee complains of damaged the Debtors after November 5, 2015.

101.    Accordingly, Republic's Motion should be denied with respect to Count 9.[12]

---

[11] The Court later clarified that the statement above was "not intended to be a ruling that RBC can keep the entirety of the pre-November 5, 2015 Account proceeds in any final accounting between the parties under the Agreement." *See* Adv. Dkt. 208, "Order on Trustee's Motion for Clarification, or in the Alternative, Reconsideration of Report and Recommendation."

[12] Even though Republic makes a purely legal argument with respect to Count 9 based on the Court's prior Order (*i.e.* Republic submitted no evidence), the Trustee nevertheless is submitting summary judgment evidence demonstrating that: (1) Republic continued to state and claim that it owned the Debtors' accounts receivable after November 5, 2015, and (2) Republic's statements and claims damaged the Debtors.

## F.   The Court's Prior Order Did Not Resolve All of the Referenced Claims for Declaratory Relief.

102.   Without any analysis or explanation, Republic argues that ten (10) of the Trustee's requests for declaratory relief were disposed of by the Court's prior summary judgment ruling.

103.   The Trustee disagrees – the vast majority of the declarations referenced in Republic's Motion were only *partially* resolved (many in the Trustee's favor), and several were not resolved at all.

104.   Since Republic's Motion did not quote or explain any particular declaration, the Trustee sets forth each requested declaration below, along with his position with respect thereto:

| Requested Declaration | Resolved by Court's Prior Ruling? |
|---|---|
| ¶ 120(a) "Under the Factoring Agreement Republic contends was in effect, the Debtors did not sell and Republic did not purchase all of the Debtors' accounts into perpetuity." | Resolved in the Trustee's Favor. The Court held Republic did **not** purchase Debtors' accounts generated after November 5, 2015.[13] |
| ¶ 120(b) "Under the Factoring Agreement, the Debtors only assigned and Republic only came into possession of those accounts that the Debtor submitted to Republic on assignment schedules." | Partially Resolved.  The Court held accounts generated on or before November 5, 2015 were purchased by Republic.  Accounts generated after November 5, 2015 belong to the Debtors. |
| ¶ 120(d) "Republic did not legally control the accounts listed in Exhibit A nor the proceeds thereof." | Partially Resolved.  Exhibit A includes accounts generated on, before, and after November 5, 2015.

Court held accounts generated on or before November 5, 2015 were purchased by Republic. Accounts generated after November 5, 2015 belong to the Debtors.


The Court later clarified that the statement above was "not intended to be a ruling that Republic can keep the entirety of the pre-November 5, 2015 Account proceeds in any final accounting between the parties under the Agreement." *See* Adv. Dkt. 208. |

---

[13] *See* Adv. Dkt. 165, p. 8.

| | |
|---|---|
| ¶ 120(e) "Republic collected the accounts listed in Exhibit A and is currently wrongfully withholding the proceeds thereof." | <u>Partially Resolved</u>.  The Court held that the proceeds of accounts generated by the Debtors on or after November 5, 2015 are property of the estate that Republic must turn over to the Trustee. In its clarification, the court left open that even proceeds of pre-November 5, 2015 Accounts might wind up on the Debtors' side of the ledger in any final accounting. |
| ¶ 120(f) "The proceeds of the accounts listed in Exhibit A are property of the Debtors' estates." | <u>Partially Resolved</u>.  The Court held that the proceeds of accounts generated by the Debtors on or after November 5, 2015 are property of the estate that Republic must turn over to the Trustee.  In its clarification, the court left open that even proceeds of pre-November 5, 2015 Accounts might wind up on the Debtors' side of the ledger in any final accounting. |
| ¶ 120(i) "The Factoring Agreement is null under La. Civ. Code Ann. Art. 2004 and La. Civ. Code Ann. Art. 2034." | <u>Not Resolved</u>.  The Court denied the Trustee's motion for summary judgment, but it did not grant summary judgment in Republic's favor.  Likewise, the Court did not rule on the applicability of Article 2004 to any particular provision of the factoring agreement. |
| ¶  120(j)  "The  Factoring  Agreement  is unenforceable due to failure of consideration." | <u>Not Resolved</u>.  The Court did not rule on this issue in its prior summary judgment Order. |
| ¶  120(o)  "The  Factoring  Agreement  is unenforceable due to fraud in the inducement and fraud during Republic's non-execution of the Factoring Agreement." | <u>Not Resolved</u>.  The Court did not rule on this issue in its prior summary judgment Order |
| ¶ 120(p) "The Funds held by Republic or some portion thereof are property of the Debtors' bankruptcy estates." | <u>Partially Resolved</u>.  The Court held that the proceeds of accounts generated by the Debtors on or after November 5, 2015 are property of the estate that Republic must turn over to the Trustee.  In its clarification, the court left open that even proceeds of pre-November 5, 2015 Accounts might wind up on the Debtors' side of the ledger in any final accounting. |
| ¶ 120(q) "The Debtors' customers will not incur liability to Republic by paying the Debtors any outstanding or future accounts receivable." | <u>Partially Resolved</u>.  The Court held accounts generated on or before November 5, 2015 were purchased by Republic.   Accounts generated after November 5, 2015 belong to the Debtors |

105.    In sum, the declarations referenced in Republic's Motion were not disposed of by the Court's prior Order, or they were resolved in the Trustee's favor.  As a result, Republic's Motion should be denied.

## G.    Republic's Motion Should be Denied with Respect to the Trustee's Conversion Claim.

### i.    Republic Bears the Burden on Qualified Refusal.

106.    Republic's attempt to dispose of the Trustee's conversion claim is based primarily on "qualified good faith refusal," a defense to a claim for conversion.  Motion, Adv. Dkt. 235, p. 10; *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 343-44 (Tex.App. – Austin 2004) (qualified refusal is a defense).

107.    Accordingly, Republic must establish, beyond peradventure, all of the essential elements of qualified good faith refusal.  *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) ("To obtain summary judgment, 'if the movant bears the burden of proof on an issue ... because ... as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the ... defense to warrant judgment in his favor.' ") (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

### ii.    Republic Failed to Meet its Burden.

108.    Conversion is the wrongful exercise of dominion or control over the property of another in denial of, or inconsistent with, the other's rights in the property.  *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex.1971)

109.    "It is well-established under Texas law that acting with good faith or innocence does not constitute a defense to conversion."  *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex.App. – Dallas 2008).

110.    "However, a 'qualified refusal' is the one exception to this rule."  *Id*.  When the refusal is (1) not absolute, (2) qualified by certain conditions which are reasonable and justifiable,

(3) qualified by conditions imposed in good faith, and (4) in recognition of the rights of plaintiff, the refusal will not serve as a sufficient basis for an action for conversion. *Id.*

111.    Moreover, in asserting qualified refusal, the defendant (1) may only retain the property for a reasonable period of time and (2) must use this period to make a reasonable investigation into the parties' rights to the property. *Morey v. Page*, 802 S.W.2d 779, 786 (Tex.App. – Dallas 1990).

112.    Whether a conversion defendant acted in good faith and upon reasonable grounds under the circumstances is generally question for the jury. *See Khorshid*, 257 S.W.3d. at 344.

113.    Here, Republic relies solely on the Court's prior summary judgment Order in support of its qualified refusal defense.  According to Republic:

> This Court's partial denial of Debtors' Motion for Summary Judgment on the issue of ownership of the funds is evidence that there was a genuine dispute as to the parties' rights and that RBC's assertion that it owned the funds was not in bad faith."

Motion, Adv. Dkt. 235, p. 11.

114.    Republic's argument is complete nonsense.

115.    *First*, the Court's prior Order found a fact issue with respect to qualified refusal (Adv. Dkt. 165, p. 14), and Republic has not introduced any new evidence in support of its defense. Accordingly, the Court should reach the same result this time around – there are fact issues for trial.

116.    *Second*, "[a]n order ***denying*** a motion for summary judgment is not a judgment on the merits and does not have any preclusive effect." *Vales v. Preciado*, No. DKC 2005-3110, 2008 WL 11509678, at *1 (D. Md. February 8, 2008) (emphasis added).[14] Thus, the fact that the Court

---

[14] Citing 21A FED. PROC., L. ED. § 51:247 (citing *Milltex Indus. Corp. v. Jacquard Lace Co.*, 922 F.2d 164 (2nd Cir. 1991); *Nakash v. Marciano*, 882 F2d 1411 (9th Cir. 1989)).

denied the Trustee's motion for summary judgment on his claim for conversion is not evidence of anything, other than a fact issue remaining for trial.

117.    *Third*, the Court's Order does not establish a single element of Republic's qualified refusal defense.  For example, the Order did <u>not</u> find any of the following elements of Republic's defense: (i) Republic's refusal was qualified by certain conditions that were reasonable and justifiable, (ii) Republic's refusal was qualified by conditions imposed in good faith, (iii) Republic only retained the property for a reasonable period of time, or (iv) Republic used the time it retained the property to make a reasonable investigation into the parties' rights to the property.  *See Khorshid* and *Morey*, *supra* (setting forth the elements of qualified refusal defense).

118.    *Fourth,* the Court's Order found that Republic's exercise of control over these same Accounts and proceeds was a violation of the automatic stay (Adv. Dkt. 165, p. 8) – clearly a wrongful exercise of control over Debtors' property – which on its own shows Republic's control was not "qualified with reasonable conditions."

119.    In short, the Court's Order comes nowhere close to satisfying Republic's burden because: (i) an order denying a motion for summary judgment is not entitle to preclusive effect; and (ii) the Court did not make any findings regarding any essential element of the qualified refusal defense.  In fact, the Order actually gives Republic a heavier burden in proving the elements of qualified refusal.

### iii.    Republic's Argument with Respect to Proceeds of Accounts Generated *Before* November 5, 2015 Mischaracterizes the Court's Prior Order.

120.    Republic misstates the Court's prior Order as standing for the proposition that "*funds* from Accounts generated before November 5, 2015 belong to RBC."  *See* Motion, Adv. Dkt. 235, p. 11.  But that is not what the Court held.

121.    While the Court held that *accounts* that arose prior to November 5, 2015 at one time belonged to Republic, it later clarified that its ruling was "**not** intended to be a ruling that Republic can keep the entirety of the pre-November 5, 2015 Account *proceeds* in any final accounting between the parties under the Agreement." *See* Adv. Dkt. 208, p. 2.

122.    Accordingly, the Court did not rule that "funds from Accounts generated before November 5, 2015 belong to RBC."  In fact, that issue was expressly left open pending a final accounting.

### iv.    Republic's Argument Regarding Funds Collected on Accounts Created On or After November 5, 2015 is Likewise Without Merit.

123.    Finally, in an effort to justify its theft of proceeds from accounts generated on or after November 5, 2015, Republic contends it was entitled to create a "reserve" to secure a debt of $1,292,077.94 allegedly owed by the Debtors to Republic.   Again, Republic's argument is nonsense.

124.    *First*, the Court has already ruled that the Factoring Agreement terminated on November 5, 2015 (Adv. Dkt. 165, p. 8), and Republic does not even attempt to explain how it was entitled to create a "reserve" after termination of the Factoring Agreement.

125.    *Second*, the Court has already ruled that "**the Accounts and proceeds of Accounts generated by the Debtors on or after November 5, 2015 are property of the estate that Republic must turn over to the Trustee**." *Id.*, p. 9 (emphasis added).  Republic's argument entirely ignores this portion of the Court's ruling.

126.    *Third*, the Trustee's summary judgment evidence shows Republic was **paid in full** on October 23, 2015 and that Republic did not advance any additional funds to the Debtors after that date.  Pltf. Appx. p. 14 (Carter Affidavit, ¶ 21).  Accordingly, Republic had no basis or need for a "reserve."

### H.    Republic's Motion Should be Denied with Respect to the Trustee's Texas Theft Liability Act Claim.

127.    Republic's argument with respect to the Trustee's Texas Theft Liability Act claim does not cite or refer to any summary judgment evidence.

128.    Instead, Republic makes three "legal" arguments, all of which are incorrect.

129.    First, Republic argues that the Court's prior summary judgment Order establishes that "there was a bona fide dispute regarding whether Republic purchased all Accounts from Debtors and whether execution of a release was required to terminate the Agreement."

130.    Republic is wrong because: (i) the Court's Order made absolutely no finding of a "bona fide dispute;" and (ii) as set forth above, a mere order *denying* a motion for summary judgment is not entitled to preclusive effect.

131.    Second, Republic argues that "[t]he fact that the court found in favor of Republic on Accounts through November 5, 2015 is dispositive of the Texas Theft Act Claim."  Once again, Republic is wrong.

132.    While the Court held that accounts arose prior to November 5, 2015 belonged to Republic, it later clarified that its ruling was "**not** intended to be a ruling that Republic can keep the entirety of the pre-November 5, 2015 Account proceeds in any final accounting between the parties under the Agreement."  *See* Adv. Dkt. 208, p. 2.

133.    Third, Republic asserts that "[t]here was a bona fide dispute about the rightful ownership of the property."  But Republic provides no record cite or summary judgment evidence in support.[15]  Accordingly, Republic's assertion is a non-event and should not be relied upon in deciding the Motion.  *Ashley v. KMart Corp.*, No. 3:96-CV-0954-P, 2000 WL 1478655, at * 2

---

[15] In fact, the Court found exactly the opposite with respect to proceeds of Accounts arising on or after November 5, 2015 – the Court found that Republic wrongfully withheld those funds from the Debtors and that the proceeds are subject to turnover.

(N.D. Tex. October 5, 2008) (court will not rely on factual assertions unsupported by evidence in deciding motion for summary judgment).

## I.    The Trustee's Summary Judgment Evidence Establishes Fact Issues with Respect to his Claim for Tortious Interference with Contract/Business Relations.

134.    Republic makes two arguments in support of its motion for summary judgment on the Trustee's claim for tortious interference with contract/business relations.

135.    First, Republic argues that it was contractually entitled to notify Account Debtors to remit payment directly to Republic; thus, Republic's sending Notices of Assignment to the Debtors' Account Debtors did not constitute tortious interference.

136.    Republic's argument fails because it ignores that Republic continued to assert that the Debtors' customers were required to pay Republic after November 5, 2015 – the date the Factoring Agreement was terminated and after which Republic no longer owned the Debtors' Accounts.  *See, e.g.*, Pltf. Appx. pp. 6-7 (Hayward Affidavit, ¶¶ 24-31, describing actions Republic took with respect to the Debtors' customers); *see also* Adv. Dkt. 77-1, p. 62 (exemplar e-mail from Republic's counsel to one of the Debtors' customers falsely claiming the Factoring Agreement was still active and that as a result, the customer had to pay Republic).

137.    Second, Republic argues it "did not prevent Debtors from paying any vendor at any time" because "RBC was not a signatory to any Debtor bank account."  Motion, Adv. Dkt. 235, p. 13.  Again, Republic's argument is nonsense.

138.    The Trustee's summary judgment establishes that, through its control over the Debtors' receivables, Republic controlled virtually all of the Debtors' cash.  Mr. Buttles explained:

- The Debtors were dependent upon Republic for cash;

- Republic was collecting all of the Debtors' receivables;

- Receivables were the Debtors' only real source of cash to make payroll, pay vendors, buy raw materials, etc.

Pltf. Appx. p. 151 (Buttles Declaration, ¶ 20).  In short, that Republic was not a signatory on the Debtors' bank accounts meant nothing – Republic controlled the Debtors' cash.  *Id.*

139.    As a result, there are clear fact issues with respect to the Trustee's claim for tortious interference with contract/business relations that preclude summary judgment.

**J.     Fact Issues Preclude Summary Judgment on the Trustee's Claim for Tortious Interference with Prospective Contracts and Business Relations.**

140.    Republic attacks the first element of the Trustee's claim for tortious interference with prospective contracts and business relations – that there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person.

141.    Republic's argument is based **solely** on testimony from John Buttles regarding a prospective contract between the Debtors and TEAM Partners.  *See* Motion, Adv. Dkt. 235, pp. 13-14.[16]  Republic's argument fails for several reasons.

142.    *First*, the Trustee's claim is not limited to TEAM Partners.  *See* Fourth Amended Complaint, Adv. Dkt. 226, ¶ 146 (referring to the prospective relationships with NASA, SPACEX, and metal works for oilfield endeavors).  Republic wholly fails to address those prospective relationships in its Motion.

143.    *Second*, Mr. Buttles testimony is taken out of context.  As shown by his Affidavit filed in support hereof, the primary reason he handicapped the TEAM Partners transaction at "less than 50 percent" was due to Republic's own improper conduct.  Pltf. Appx. pp. 151-152 (Buttles Declaration, ¶¶ 22-23).  Accordingly, there is a fact issue with respect to the TEAM Partners relationship.

---

[16] Republic also makes the conclusory assertion that it "was under no obligation to provide additional money to the Debtors."  Motion, Adv. Dkt. 235, p. 14.  In response to that assertion, the Trustee refers the Court to his response to Republic's motion for summary judgment on Count 14 (Breach of Contract), *infra*.

144.    In sum, Republic's Motion should be denied with respect to the Trustee's tortious interference with prospective business relations claim because: (1) Republic's Motion and evidence fails to address all of the prospective relationships identified in the Trustee's Complaint; and (2) there is a fact issue with respect to the TEAM Partners transaction.

**K.    Fact Issues Preclude Summary Judgment on the Trustee's Claim for Interference with Debtors in Bankruptcy and their Attempt to Reorganize.**

145.    Republic devotes a total of two sentences to Count 8 of the Complaint.  It argues: "There is no allegation, or evidence, that the Debtors could have successfully reorganized with only the proceeds from accounts created after November 6, 2015."[17]  Motion, Adv. Dkt. 235, p. 14.  Republic is wrong for several reasons.

146.    *First*, Republic's conclusory assertion that there is "no evidence" to support the Trustee's claim is insufficient to carry Republic's burden as the summary judgment movant. *Carter v. H2R Restaurant Holdings, LLC*, No. 3:16-cv-1554-N-BN, 2017 WL 4573698, at *5 (N.D. Tex. August 23, 2017) ("To meet its initial burden, '[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.'") (quoting *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993); *Poole v. Jefferson Co. Sheriff's Dept.*, 921 F.Supp. 431, 432 (E.D. Tex. 1996) ("A mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's burden.").

147.    *Second*, Republic again misstates the Court's prior ruling.  As set forth above, the Court did not rule that Republic was entitled to all of the proceeds from accounts generated prior to November 5, 2015.  *See* Adv. Dkt. 208, "Order on Trustee's Motion for Clarification, or in the Alternative, Reconsideration of Report and Recommendation." (clarifying that the summary judgment ruling was "not intended to be a ruling that RBC can keep the entirety of the pre-

---

[17] **Note**: Republic's Motion mistakenly references November 6.  The date should be November 5, 2015.

November 5, 2015 Account proceeds in any final accounting between the parties under the Agreement." ).

148.    *Third*, the Trustee's summary judgment evidence shows Republic was **paid in full** on October 23, 2015.  Pltf. Appx. p. 14 (Carter Affidavit, ¶ 21).  Accordingly, the Debtors would have been entitled to proceeds generated by accounts created prior to November 5, 2015.  *See* Adv. Dkt. 73-2, p. 309 (Baines Affidavit admitting Republic had been paid in full and was holding over $152,000 of the Debtors' cash as of November 20, 2015); *see also* Pltf. Appx. p. 14 (Carter Affidavit, ¶ 22).

149.    *Fourth*, the Trustee's summary judgment evidence shows that Republic's conduct prevented the Debtors from successfully reorganizing.  According to the Affidavit of Melissa Hayward, the Debtors' counsel during the Chapter 11 proceeding:

- Republic maintained the position that it owned the Debtors' accounts into perpetuity, which prevented the Debtors from obtaining DIP financing (Pltf. Appx. p. 6 (Hayward Affidavit, ¶¶ 24-25);

- The Debtors' attempt to reorganize failed primarily because Republic was holding so much of the Debtors' cash; without that cash, the Debtors could not acquire raw materials to create inventory. *Id*. (Hayward Affidavit, ¶ 27); and

- Republic damaged the Debtors' relationships with customers post-petition by demanding the customers pay all accounts to Republic.  *Id*. pp. 6-7 (Hayward Affidavit, ¶ 28).

150.    *Finally*, Republic fails to even address the Trustee's allegation that it wrongfully claimed ownership of the Debtors' accounts receivable.

## L.    Republic's Breach of Contract Argument is Without Merit.

151.    At the end of its Motion, Republic takes the remarkable position that: "The Purchasing Agreement clearly provides that it was within Republic's sole discretion to advance funds at a rate of up to 90%, **but that such advance was in no way an obligation**."  Motion, Adv. Dkt. 235, p. 15 (emphasis added).

152.     Stated differently, Republic's position is that it had no obligation whatsoever to advance funds.     This argument is simply absurd, and it blatantly conflicts with Republic's representations to the Debtors leading up to the Factoring Agreement; the parties' course of dealing for the first five (5) months of the factoring arrangement; traditional cannons of contract construction; and the Louisiana Civil Code.

153.     *First*, the Affidavit of John Buttles establishes that (1) in the Debtors' negotiations with Republic, it represented Bailey would receive 90% of all accounts receivable immediately under the Factoring agreement; and (2) the Debtors' arrangement with Republic generally comported with that representation between late-February 2015 and early-July 2015.  Pltf. Appx. p. 68 (Buttles Declaration, ¶ 68).

154.     *Second*, Republic's proffered interpretation of the Factoring Agreement – that it had no obligation to advance funds – would render Republic's consideration entirely illusory.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 77, cmt. a ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.").

155.     *Third*, Republic's proffered interpretation of the Factoring Agreement does not comport with the Louisiana Civil Code.

156.     Under Article 2053 of the Louisiana Civil Code: "A doubtful provision [*i.e.* a provision whose meaning is in doubt] must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after formation of the contract, and of other contracts of a like nature between the same parties."

157.     Here, as set forth above, the conduct of the parties before and immediately after formation of the contract is entirely *inconsistent* with Republic's current position.

158.    Moreover, under Louisiana Civil Code Article 2055: "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another.  Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation."

159.    Clearly, Republic's position that it bought the Debtors' receivables, but had no obligation to advance funds thereon, would allow Republic to take unfair advantage of the Debtors and unjustly enrich itself at the expense of the Debtors.

160.    In sum, Republic's position that it had no obligation to advance funds under the Factoring Agreement is entirely without merit.

161.    Republic also argues (without any explanation, evidence, or analysis), that "while this court found that Debtor's were not required to execute a Release, Republic was still not required to release the funds because it was contractually entitled to create a Reserve and withhold funds as an offset for attorneys' fees and other charges."  Motion, Adv. Dkt. 235, p. 15.  Again, Republic is wrong.

162.    *First*, the Court has already ruled that the Factoring Agreement terminated on November 5, 2015 (Adv. Dkt. 165, p. 8), and Republic does not even attempt to explain how it was entitled to create a "reserve" after termination of the Factoring Agreement.

163.    *Second*, the Court has already ruled that "the Accounts and proceeds of Accounts generated by the Debtors on or after November 5, 2015 are property of the estate that Republic must turn over to the Trustee."  *Id*. at p. 9.  Republic's argument entirely ignores this portion of the Court's ruling.

164.    *Third*, the Trustee's summary judgment evidence shows Republic was **paid in full** on October 23, 2015 and that Republic did not advance any additional funds to the Debtors after that date.  Pltf. Appx. p. 14 (Carter Affidavit, ¶ 21).  Accordingly, it had no basis or need for a "reserve."

165.    Finally, Republic contends (again, without any explanation, evidence, or analysis) that "[t]he actions of which Debtors complain were expressly permitted by the terms of the Purchasing Agreement."  Republic's conclusory, unsupported assertion cannot serve as a basis for a summary judgment.  *See Carter*, 2017 WL 4573698, at *5.

## IV.
### RESPONSE TO REPUBLIC'S SUPPLEMENT TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND ARGUMENT REGARDING THE TRUSTEE'S ATTORNEYS' FEES

166.    According to Republic, Section 12.5 of the Factoring Agreement bars the Trustee's claim for consequential damages.  *See* Adv. Dkt. 244, ¶ 2.  Other than the Factoring Agreement itself, Republic does not rely on any summary judgment evidence in support of its argument.

167.    Republic's attempt to limit the Trustee's damage claims to "Available Funds" (and to exclude claims for consequential damages) should be rejected because paragraph 12.5 of the Factoring Agreement is null (*i.e.* void and unenforceable) under Article 2004 of the Louisiana Civil Code.

168.    As set forth above, Louisiana Civil Code Article 2004 provides:

Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.

*See* Louisiana Civil Code Chapter 8, Section 4, Art. 2004.[18]

169.     Numerous cases (both state and Federal) have applied Article 2004 and held contractual provisions similar to paragraph 12.4 null when there is evidence of a defendant's bad faith, intentional conduct, or gross negligence.

A.     **Case Law Holding Contractual Limits on Liability Unenforceable Pursuant to Article 2004.**

170.     In *Alonso v. Westcoast Corp.*, the defendant subcontractor argued it was not responsible for delay damages because its contract provided: "It is agreed that in no event will the Contractor be liable for Subcontractor's claims for delay."  920 F.3d 878, 884-885 (5th Cir. 2019). In response, the plaintiff argued that the provision barring delay damages was unenforceable under Article 2004 because the jury found the subcontractor breached the contract in bad faith, which is tantamount to a finding of intentional conduct or gross negligence.  *Id.* at 885.

171.     The Fifth Circuit agreed with the plaintiff:

**The term "gross fault" in that provision [Article 2004] "encompasses not only gross negligence, but also bad faith breach of contract or fraud."**

…

**There was sufficient evidence from which the jury could reasonable conclude that [the defendant] breached the contract in bad faith.  <u>Therefore, the provision of the subcontract barring delay damages was unenforceable under Louisiana law [Article 2004].</u>**

*Id.* (emphasis added).

---

[18] The Comments to Article 2004 further provide:

> In *Freeman v. Department of Highways*, 253 La. 105, 217 So.2d 166 (1968), the Supreme Court held that, **as a matter of principle, clauses excluding or limiting liability for intentional fault (fraud or dol) are invalid** because a party would be free to perform or not to perform at will.  Hence, his obligation would be subject to a purely potestative condition that would make it null.  That reasoning aside, **such clauses are against public policy because the overriding principle of good faith would be destroyed if it were possible to contract away liability for fraud.**  Foreign civil codes contain abundant indication of the universality of this conclusion. *See also Hayes v. Hayes*, 8 La.Ann. 468 (1852).

172.     In *Ostrowiecki v. Aggressor Fleet, Ltd.* the United States District Court for the Eastern District of Louisiana addressed a similar contractual provision that sought to limit a tour company's liability for damages "for personal injury…and any and all other damages…" *See* Nos. 07-6598, 07-6931, 2008 WL 3874609, at *11 (E.D. La. August 15, 2008).  The provision further required the plaintiff to indemnify the defendants "from any claim or lawsuit." *Id.*  The *Ostrowiecki* court concluded both provisions violated Article 2004 and were **unenforceable**.  *Id.* ("The Court concludes that the waiver provisions offends both prongs of article 2004.").

173.     Louisiana state courts are in accord.

174.     In *Cameron v. Bruce*, the Court of Appeal of Louisiana (Second Circuit) addressed a contractual provision that attempted to limit damages against a home inspection company to $1,000.00.  *See* 981 So.2d 204, 206 (La.App. 2d Cir. 2008).  The trial court granted the defendant's motion for summary judgment limiting liability to $1,000.00.  *Id.* at 208.  The appellate court reversed, applying Article 2004:

> Thus, we find that **the trial court was wrong not to consider La. C.C. art. 2004's proscription against excluding limits of liability in advance for intentional or gross fault.**
>
> In opposition to [the defendant's] motion for partial summary judgment, **[the plaintiff] presented the reports of two civil engineers and a soil stabilization expert.  All of these experts found substantial substructure problems.**
>
> …
>
> The implications are clear and **there are material questions of fact concerning the inspection and whether such an inspection was done or performed so inadequately as to be gross negligence.**  We are constrained to find genuine issues of material fact; thus **[the defendant] was not entitled to summary judgment**.

*Id.* (emphasis added).

175.     In *Olympia Minerals, LLC v. HS Resources, Inc.*, the Court of Appeal of Louisiana (Third Circuit) similarly held null a contractual provision precluding an award of consequential

damages. 123 So.3d 281, 295 (La.App. 3d Cir. 2013). In so holding, the court specifically noted

the trial court's finding that the defendant's breach was in bad faith. *Id.* ("In summary, **the two**

**major breaches of the NSPA by defendants…were not the result of negligence, unforeseen**

**events, or even a lack of ability. <u>These were conscious and calculated business decisions</u>**.")

(emphasis added).

176.    Finally, in *Wadick v. General Heating & Air Conditioning, LLC*, the Court of

Appeal of Louisiana (Fourth Circuit) held null a contractual provision that purported to bar claims

for mold damages. *See* 145 So. 3d 586, 595-596-599 (La.App. 4th Cir. 2014). The *Wadick* court

noted: (1) that the plaintiff's claims sounded solely in contract was no bar to the application of

Article 2004; and (2) the term "gross fault," as used in Article 2004, encompasses not only gross

negligence, but also bad faith breach of contract or fraud. *Id.* at 598-599.

177.    In sum, when the plaintiff presents evidence of bad faith, intentional conduct, gross

fault, or gross negligence, Article 2004 renders contractual limits on liability unenforceable.[19]

**B.      The Trustee's Summary Judgment Evidence Shows Republic Acted Intentionally,
         Consciously, in Bad Faith, and with Gross Negligence.**

178.    Here, the Trustee's summary judgment record establishes Republic's conduct was

the result of conscious, calculated, intentional, and in bad faith – Republic did not make an "honest

mistake."

179.    The Trustee's lender liability expert, Jeff Anapolsky, testified Republic's control

over the Debtors was *far* outside the bounds of the conduct of a typical lender. Pltf. Appx. pp. 63-

64 (Anapolsky Affidavit, ¶¶ 12-14). In fact, according to Mr. Anapolsky, lenders typically strive

---

[19] In addition to its attempt to preclude the Trustee from seeking consequential damages, Republic argues the Trustee's claim for attorneys' fees is likewise barred by the Factoring Agreement. Republic's argument with respect to attorneys' fees fails for the same reasons as its argument with respect to consequential damages (i.e. the provision violates Louisiana Civil Code Article 2004, and Republic is not entitled to a summary judgment because the Trustee's summary judgment record contains sufficient evidence of conscious, bad faith, and grossly negligent conduct on the part of Republic).

*not* to engage in the type of conduct Republic engaged in here (*i.e.* exercising control over the Debtors' business operations).  *Id.*

180.    There are also numerous instances of Republics intentional conduct and bad faith described in the factual background section set forth above, including:

- Republic failed to advance funds under the Factoring Agreement in good faith (see Part II.C, *supra*; see also Pltf. Appx., pp. 149-152, Buttles Declaration Parts C and D);

- Republic exercised excessive control over the Debtors' business, which was not allowed by the Factoring Agreement (*see* Part II.C, *supra*);

- Republic misappropriated $225,000 in equity from Mr. Buttles' homestead (Part II.D, *supra*);

- Republic took a secret termination fee of $75,000, then claimed for months that the Factoring agreement was "active" and "non-terminated" (*see* Part II.F, *supra*);

- Republic attempted to extort a release from the Debtors (which the Court has since held Republic was not entitled to) (*see* Part II.E, *supra*);

- Republic admitted the facility was paid in full, then Republic wrongfully withheld funds it admitted belonged to the Debtors because the Debtors would not exercise a release (*see* Part II.E, *supra*);

- Republic wrongfully exercised control over proceeds of Accounts created on or after November 5, 2015 (*see* Order granting Trustee's motion for summary judgment on claim for turnover, Adv. Dkt. 165, p. 9);

- Republic violated the automatic stay (*see* Order granting Trustee's motion for summary judgment on claim for violation of the automatic stay, Adv. Dkt. 165, p. 8); and

- Republic prevented the Debtors from obtaining DIP financing by maintaining the absurd (and now legally decreed to be incorrect) position that Republic owned the Debtors Accounts into perpetuity (*see* Part II.G, *supra*).[20]

---

[20] The foregoing evidence has been developed *without* the Trustee conducting the deposition of a Republic 30(b)(6) witness.  The Trustee is scheduled to depose a corporate representative of Republic on Monday, December 16, 2019.

181.    If there was any doubt as to Republic's bad faith, they were put to rest by Melissa Baines, who openly celebrated Bailey's inability to reorganize under Chapter 11 (which, in turn, caused numerous hard-working Debtor employees to lose their jobs):

On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:

Unofficially, Bailey Tool has imploded.  The official nail is expected to hit in the next 7 to 30 days.  Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week.  Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more.  In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week.  Oh, what I wouldn't do to be there to see the walls come crashing down...

We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.

Melissa Baines
Risk Manager

Republic Business Credit, LLC
201 St. Charles Avenue, Suite 2210
New Orleans, LA 70170
t: 504.262.8604

182.    In sum, the Trustee's summary judgment record contains sufficient evidence from which a reasonable factfinder could conclude Republic acted consciously, in bad faith, and with gross negligence.  Accordingly, Republic's Supplemental Motion for Summary Judgment should be denied.  *Alonso*, 920 F.3d at 885.

## V.
## CONCLUSION

183.    Republic did not come close to meeting its summary judgment burden.  Many of

its arguments fail as a matter of law, and there are clear-cut fact issues with respect to the balance

of the Trustee's claims.  Accordingly, Republic's Motion and Supplemental Motion should be

denied.

WHEREFORE, premises considered, the Trustee prays the Court deny Republic's Motion

and Supplemental Motion for Summary Judgment so that this matter may proceed to trial on the

merits.

Respectfully submitted,

*/s/ Jerry C. Alexander*
Jerry C. Alexander
Texas Bar No. 00993500
alexanderj@passmanjones.com
Christopher A. Robison
Texas Bar No. 24035720
robisonc@passmanjones.com
**PASSMAN & JONES, P.C.**
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
P:  (214) 742-2121
F:  (214) 748-7949

Andrew B. Sommerman
Texas Bar No. 18842150
asommerman@textrial.com
Sean J. McCaffity
Texas Bar No. 24013122
smccaffity@textrial.com
**SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P.**
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
P:  (214) 720-0720
F:  (214) 720-0184

**COUNSEL FOR THE TRUSTEE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify this 13th day of December 2019 that a copy of the foregoing document was filed electronically in compliance with L.B.R. 7005-1.  Therefore, this document was served on all counsel receiving electronic service in this case.

<u>*/s/ Jerry C. Alexander*</u>
Jerry C. Alexander