| | |
|---|---|
| Jerry C. Alexander | Andrew B. Sommerman |
| Christopher A. Robison | Sean J. McCaffity |
| PASSMAN & JONES, P.C. | SOMMERMAN, McCAFFITY, QUESADA & GEISLER, L.L.P. |
| 1201 Elm Street, Suite 2500 | 3811 Turtle Creek Blvd., Suite 1400 |
| Dallas, Texas 75270-2599 | Dallas, Texas 75219 |

*Special Litigation Counsel for James W. Cunningham, Chapter 7 Trustee*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-SGJ-7** |
| **MANUFACTURING COMPANY.** | § | **Chapter 7** |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Adv. No. 16-03025-SGJ** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| Defendant and Counter-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| Counter-Defendant. | § | |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| v. | § | |

| JOHN BUTTLES, TENNECO, INC., | § |
| TRELLEBORG AUTOMOTIVE | § |
| USA, INC. | § |
| | § |
| | § |
| **Third-Party Defendants.** | § |

## PLAINTIFF TRUSTEE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COME NOW Plaintiff James W. Cunningham, Trustee and Plaintiff and submits the following Proposed Findings of Fact and Conclusions of Law.

## I.
## FINDINGS OF FACT

A. <u>**Procedural Background and Parties.**</u>

1. Bailey Tool & Manufacturing Company ("Bailey") is a Texas corporation and was a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Bailey's Bankruptcy Estate.

2. Hunt Hinges, Inc. ("Hunt") is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Hunt's Bankruptcy Estate.

3. Cafarelli Metals, Inc. ("Cafarelli") is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Cafarelli's Bankruptcy Estate.

4. Collectively, the foregoing entities may be referred to herein as "Bailey," "Debtors" or "Company."

5.      Republic Business Credit, LLC ("Republic") is a Louisiana limited liability company authorized and conducting business in Texas.

6.      On February 1, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing their respective bankruptcy cases.

7.      The Debtors continued to operate and manage their businesses as "debtors in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code until January 26, 2017.

8.      On February 19, 2016, the Debtors filed an adversary proceeding against Republic, which asserted numerous claims against Republic. On March 23, 2016, Republic filed an answer to the adversary complaint.

9.      On May 31, 2016, Republic filed an Amended Answer and Counterclaim, which pleading asserted new claims against the Debtors' former owner, John Buttles ("Buttles"). A formal appearance, answer, and third-party counterclaim was filed on September 23, 2016.

10.     On January 26, 2017, the case was converted to a Chapter 7, and James W. Cunningham was appointed Chapter 7 Trustee ("Cunningham" or the "Trustee") on January 27, 2017, pursuant to 11 U.S.C. § 701(a).

**B.      General History of the Debtors.**

    **i.      The Debtors' Business.**

11.     In 1989, John Buttles bought the company that ultimately became known as Hunt Hinges Inc.  Four years later, in 1993, Buttles acquired Bailey Tool & Equipment Company, which was founded in 1969.  Approximately five years later Buttles continued to build the enterprise by acquiring Cafarelli Metals, Inc.

12.     Hunt created and manufactured metal hinges; Bailey was a metal fabrication company; and Cafarelli slit metal coils to custom widths for Bailey, Hunt, and outside customers,

to use in manufacturing their products. Over time, Buttles expanded the combined companies' capabilities to include not merely metal fabrication, but also product engineering and design.

13. Historically, Bailey's core customers were Tier One and Two suppliers to automotive manufacturers in the United States and Mexico. The company operated in three locations in the Dallas area, employed as many as 130 people, and had annual revenues ranging from $7.9 million to $11.6 million in 2012-2014. *See* **TR.509, 511**

14. In the economic downturn of 2008-9, the auto industry suffered significantly, and so did Bailey's business. In response, the Company expanded into manufacturing oilfield service equipment. It also used its engineering and design abilities to develop entirely new opportunities.

15. One of Bailey's most promising new opportunities came in defense contracting. When Bailey entered the area, ammunition manufacture still used machines built during World War II. Under contract with the United States Army, Bailey designed and built an entirely new and more efficient machine for manufacturing bullets, using state-of-the-art technology and processes. This project created a new pair of markets for Bailey, not only designing and building the machines but also manufacturing bullets.

**ii. The Factoring Agreement and Bailey's Early Dealings with Republic.**

16. While the Company had made progress in developing new markets after the Great Recession, it was still in transition, revenues had not yet returned to pre-Recession levels, and its new markets continued to demand additional capital for research and development. It was in this context that its primary lender, Comerica Bank, asked the Company to move its business in 2014.

17. Bailey found a receptive audience at Regions Bank. As part of the move, Regions suggested Bailey utilize a factoring company for a few months as a bridge from Comerica to Regions. While this factoring "cleanup" period occurred, the rest of the Bailey debt (two notes

secured by the real estate and guaranteed by Buttles, where the Company's plants were located) would remain at Comerica.

18. Bailey was not opposed to this suggestion because it had successfully used a factor some years before following another economic downturn. One of the companies Regions recommended was Republic Business Credit.

19. In late 2014 and in early 2015, the Company discussed a factoring and inventory financing package with Republic Business Credit, LLC to meet its working capital needs. The arrangement was intended to be the short-term bridge that Regions had suggested.

20. Republic's due diligence lasted from October 2014 through February 2015. Bailey showed Republic every document requested. LaCour Miller was responsible for the underwriting on behalf of Republic.

21. Republic's due diligence culminated in a December 31, 2014, report and accompanying e-mail from Mr. Miller to Republic's Credit Committee. Based on Republic's due diligence, Mr. Miller assessed the proposed transaction as a "strong deal" for Republic:

| From: | LaCour Miller [lmiller@republicbc.com] |
|---|---|
| Sent: | 12/31/2014 8:00:44 AM |
| To: | Allen E. Frederic Jr. [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| Subject: | CCCA Bailey Tool and Subsidiaries |
| Attachments: | CCCA_Bailey Tool & Manufacturing_141231.pdf |

All,

Please see the attached CCCA for Bailey Tool. Overall, it seems to be a strong deal. Below are the known issues:

*See* **TR.169.**

22. Mr. Miller's e-mail identified the following as the "known issues:"

- <u>**Issue**</u>: Bailey had failed to pay its 2013 ad valorem taxes to Dallas County, owed $120,000 on that bill, and was engaged in a payment plan agreed to by the County of $20,000 per month; it had not paid its 2014 ad valorems, either;
  - o <u>**Solution**</u>: To deal with the tax arrearages, Miller recommended that Republic take control over tax payments from Bailey after the deal closed;
- <u>**Issue**</u>: Bailey's accounts payable were stretched well beyond 90 days, and half of its trade debt was more than a year old;
  - o <u>**Solution**</u>: Bailey acknowledged that it could probably settle its outstanding trade debt for fifty cents on the dollar, but didn't want to do so, and was making a priority for paying down old accounts payable;
- <u>**Issue**</u>: Bailey stood a good chance of receiving further orders from the Defense Department for its bullet machine, but payments were made on a milestone rather than progress billing basis;
  - o <u>**Solution**</u>: Milestone payments, being irregular, are unattractive to a factor and would need to be closely monitored, so Republic indicated a need to review future contracts and bill on progress rather than milestones.

*See* **TR.509, 511.**

23.     Based on Mr. Miller's e-mail and the attached "Credit Committee Application," Republic's Credit Committee approved the deal the same day Mr. Miller submitted his report. Allen Frederic, Republic's COO, and Stewart Chesters, Republic's CEO, both expressly approved the transaction:

| Message | |
|---|---|
| **From**: | Allen Frederic [afrederic@republicbc.com] |
| **Sent**: | 12/31/2014 1:58:23 PM |
| **To**: | Stewart Chesters [schesters@republicbc.com] |
| **CC**: | LaCour Miller [lmiller@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject**: | Re: CCCA Bailey Tool and Subsidiaries |

I approve

Sent from my iPhone

On Dec 31, 2014, at 8:14 PM, Stewart Chesters <schesters@republicbc.com> wrote:
Approved

**Stewart Chesters | Republic Business Credit | COO, Managing Member**
t: 504.262.8602 | f: 504.262.8699 | c: 312.622.5994
www.republicbc.com

**TR.508.**

24.    Before the Credit Committee's approval, Miller sought confirmation from Bailey on how it would spend the money to be initially advanced by Republic.  The Company's CFO, Jeff Worley, replied that it intended to use the money to pay off Comerica, meet immediate working capital needs, and ramp up manufacturing in the early months of the year:

> The proceeds will be used for:
>
> - Payoff of Comerica
> - Working Capital
> - Ramping up (equipment) for new contracts coming in the first quarter
>
> Not knowing the functionality of the line, we need to payoff Comerica at initial funding and we have some immediate working capital needs (I am planning on having additionally borrowing capacity for working capital over the next 60 days). Since I have not been here through the Nov – Jan cycle I do not know what to anticipate during the seasonally slower time. We do expect to ramp up manufacturing in February and possibly January as well.
>
> Let me know if you need additional clarity.
>
> Thanks, Jeff

**TR. 681 (December 31, 2014 e-mail from Worley to Miller).**

25.    In their negotiations, Republic represented Bailey's advance rate on receivables would be 90%, and Republic would take its fees and expenses out of the 10% held back.  In fact, the advance rate on receivables was a focal point of negotiations:

**From: LaCour Miller <lmiller@republicbc.com>**
**Date:** Friday, December 12, 2014 at 3:20 PM
**To:** John Buttles <jbuttles@baileytool.com>, Jeff Worley <jworley@ccgpllc.net>, "Allen E. Frederic Jr."
<afrederic@republicbc.com>, Underwriting <credit@republicbc.com>
**Subject:** Republic Business Credit

John and Jeff,

I am pleased to present you with the updated Republic proposal. You will note that the advance rate on the A/R has been increased to 90%. Also, we have agreed to move the funding fee down from 2.5% to 2.25%.

I hope our call today was informative and that you all have a better understanding of the proposed facility. If you have any further questions or concerns, please do not hesitate to give Allen or me a call.

Warm Regards,

LaCour Miller

Exhibit

**TR.166.**

26.     Periodically, Republic was to return the unused 10% holdback to Bailey.   The

factoring agreement had a facility limit of $2.5 million.

27.     Republic also told Buttles that the mechanics of the factoring relationship would be

the following:

- Bailey ships product, and sends its customer an invoice;
- Bailey simultaneously, or shortly thereafter, submits the receivable to Republic;
- Republic promptly examines the receivable and determines whether it is eligible for an advance;
- If eligible, Republic wires 90% of the receivable to Bailey within 24 hours;
- Republic promptly returns ineligible receivables to Bailey;
- Customer payment goes to Republic's lockbox; and
- Republic takes its fees from the customer payment and returns the balance to Bailey.

28.     Republic told Buttles that the relationship would be mutually beneficial:

- Bailey benefits from the expedited cash flow, for which it pays a reasonable fee;
- Republic benefits because it receives a premium over the rates charged for other financing arrangements; and

- Bailey continues to operate its business and achieve its goals.

29.     Based on those representations, Bailey moved forward with the transaction.

### iii.    Republic Analyzes Bailey's Receivables.

30.     Because Republic borrowed money to fund the Comerica takeout,[1] Republic had to demonstrate to *its own* lenders that Bailey would provide sufficient collateral to justify their loan to Republic.

31.     Unknown to Bailey at the time, Republic, just days prior to signing the factoring agreement, became concerned about the collectability of the United States Army receivable. (the "**Army Receivable**" or the "**Army**").  In a series of in-house emails, Republic officers debated how much credit to give it.

32.     Republic's underwriter, LaCour Miller, set out the problem.  If Republic made the entire Army Receivable ineligible, Bailey's collateral would be approximately $50,000 short of the Comerica payoff.  On the other hand, if Republic gave full credit to the Army, Republic could pay off Comerica and still have $213,067.05 available to advance to Bailey:

---

[1] Prior to the factoring agreement, Comerica had a first priority lien against Bailey's receivables.  Accordingly, Comerica's lien had to be taken out as part of the Bailey/Republic transaction.

**From: LaCour Miller [mailto:lmiller@republicbc.com]**
Sent: Monday, February 23, 2015 7:50 AM
To: Allen E. Frederic Jr.; Stewart Chesters; Melissa Baines; Diane Josephik
Subject: Bailey Tool

All,

We have received updated financials and the A/P Aging from Bailey Tool. We also received information regarding its two largest invoices which are with the Army.

I am a bit concerned about the Army invoices as they account for approximately $270K of the $1MM in A/R. These invoices are related to the BAM (bullet assembly machine) project. The project ran into issues and was delayed as a result of the Army providing Bailey Tool with lead projectiles that were not to specification. In addition, the invoices have not been provided to the Army because Bailey's attorney is working to add damages that resulted from the delays to the amount owed. I would say that we simply make these invoices ineligible until any issues are resolved, but I am not sure if we make them completely ineligible that we will have enough to make the payoff to Comerica. I spoke with the Comerica banker on Friday, and it is my expectation that we will get that payoff figure some time today. Even if we are able to make the payoff, I believe we should have a conference call with Jeff and John this afternoon to discuss the Army invoices. I think it is important that nothing related to the Army contract/invoices is getting lost in translation and that even if we have to make them ineligible, we at least hear Jeff's and John's point of view.

Please let me know if you would be available for a 2:30 conference call, and I will schedule it. Also, I am going to do a quick review of the financials and A/P provided. I will write a review and give it to you before the call. Any questions that arise during the review can also be addressed on the call.

Best Regards,

LaCour Miller

**TR 521**

TR.521.

33.     Republic's management did neither.   Instead, COO Stuart Chesters chose to

"mitigate risk:" by reducing the advance rate on the Army receivable to 65%:

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/24/2015 03:19:23 PM |
| To: | LaCour Miller <lmiller@republicbc.com> |
| Cc: | Allen E. Frederic Jr. <afrederic@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com>; Danika Louis <dlouis@republicbc.com> |
| Subject: | Re: Bailey Tool Borrowing Base |

My feeling would be to give 65% advance on Army stuff. That should give them 100-125 over and above payoff, we are mitigating risk. But in essence it is understood that we are effectively collateralizing an overadvance.

*See* **TR.524**.

34.     To that, CEO Allen Frederic added that in addition to the lower advance rate, Republic could further protect itself by making the receivables ineligible "**at a later date**:"

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/23/2015 11:49:07 AM |
| To: | Allen Frederic <afrederic@republicbc.com> |
| Cc: | LaCour Miller <lmiller@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com> |
| Subject: | Re: Bailey Tool |

I concur with Allen. When we have payoff number lets have brief meeting to look at numbers on A/R and Inventory.

On Mon, Feb 23, 2015 at 9:43 AM, Allen Frederic <afrederic@republicbc.com> wrote:

Depending on info we receive, use lower advance rate on those invoices. This is better than doing overadvance although we may make them ineligible at a later date. Let me and STEWART KNOW GAP BETWEEN REAL ELIGIBLES AND OAYOFF AMOUNT

*See* **TR.521**.

35.     No one at Republic told the Company or Buttles about the discussions and concerns regarding the Army Receivable.  More importantly, Republic did not tell Bailey or Buttles of the risk that it would deem the Army Receivable ineligible right after the deal was signed.

36.     Instead, on February 24, 2015, Republic sent the Borrowing Base Certificate to Bailey showing $124,700 of immediate availability after the takeout of Comerica, along with the transactional documents for signature.  *See, e.g.,* **TR.718** (February 25, 2015 e-mail from Miller to Worley with attached borrowing base).

37.     Based on Republic's representations and the Borrowing Base Certificate described above, on February 27, 2015, Bailey and Buttles signed the "Agreement for Purchase and Sale" (the "**Factoring Agreement**"), the Inventory Loan, and Buttles' personal guaranty, effective on February 25, 2015. (collectively, the "**Agreements**").  *See* **TR.51-53**.  At the time, Bailey understood that it had $124,700 of funds available to draw, as soon as Republic did the takeout.

38.     In late-February or early-March 2015, Republic paid Comerica the $1,257,978.66. **TR.703** (Subordination Agreement between Republic and Comerica).

39.     In mid-March 2015, Bailey made its first draw request, expecting availability in the range of the Borrowing Base Certificate received on February 25.

40.     In response (and much to Bailey's amazement), Republic Relationship Manager Vanessa Blade sent a Borrowing Base Certificate showing that Bailey's ineligible accounts had jumped from $17,000 on February 24 to $142,310.87 on March 12, greatly reducing Bailey's availability.  *See* **TR.715**.  Only then did Bailey learn that once it had signed the Factoring Agreement, Republic decreed that the Army was no longer an "eligible receivable."

41.     Bailey promptly brought the issue to Republic's attention:

| Message | |
|---|---|
| From: | Jeff Worley [jworley@baileytool.com] |
| Sent: | 3/18/2015 7:37:35 AM |
| To: | LaCour Miller [lmiller@republicbc.com] |
| CC: | John Buttles [jbuttles@baileytool.com] |
| Subject: | Re: Republic Business Credit |

Just wanted to keep you updated on a few post closing items. I have been working with Vanessa and her group on this, except the potential for additional funding on the PO piece, just want to make sure we are all on the same page.

- I am working on missing invoices and post closing recon on the borrowing base. Because the closing was delayed there are missing invoices and payments that came in prior to closing. I am through most of this now and sent over an assignment schedule yesterday for Bailey and will send over more invoices today for Hunt to Vanessa.
- One item that we are discussing with Vanessa is the Ineligible accounts, that were projected at $2k in the closing borrowing base you prepared and was at $134k in the last BB we received from Vanessa's group last week. Tenneco are largest customer who plays like clock work and the US Govt were included. I am not sure why that changed, but I may need for you to intercede in the future on this, as I don't remember these invoices being an issue. Obviously $130k+ in liquidity is a big deal to us right now.

*See* **TR.719.**

42.     Republic did not budge.  Instead, it told Bailey that although no funds were available under the formulas previously represented to it, Republic would be willing to make an "overadvance," but such funds would cost the Company a "Service Fee 2.0% of over-advance balance each 30 days or partial increment thereof Prime + 9.75% based on 360 days amortization on actual daily balance."  **TR.529**.

43.     The deal that Republic imposed in mid-March was not the one Bailey signed up for a mere three weeks before.  Nonetheless, Bailey was stuck: its old Comerica revolver no longer existed, and it had to make the best of the new situation until it could move the relationship to Regions Bank.  Accordingly, the Company moved ahead, having to deal with funds suddenly less available and costing much more.

44.     Republic's treatment of Bailey in the spring and early summer of 2015 showed that it never intended to live up to the representations made before the Agreements were signed.

### iv.     Republic Declares Default and Takes Control of Bailey's Business.

45.     The consequence of Republic's unilaterally chopping the advance rate and availability was self-evident: Bailey's ability to operate and pay its debts suffered immediate damage, just as Worley forecasted in March.

46.     Within two months, Bailey did not have the cash to meet its bills, including the full May installment of its tax payment plan with Dallas County; in June, it could not make its monthly payment on the arrearage.

47.     On June 29, 2015, Comerica sent Bailey and Buttles notice of default under its loan and guaranty agreements precisely because of those missed payments.  When Republic learned of the default, the real punishment began.

48.     Republic declared default under the Agreements on July 9, 2015 (DX.100), and swiftly changed the game even further.

49.     Under Republic's new "rules," it demanded control of Bailey's day-to-day operation as a *quid pro quo* for giving Bailey any money at all.  Moreover, **Republic completely ceased advancing funds directly to Bailey** – all funds advanced from that point forward were sent directly to Bailey's vendors, payroll company, etc. by Republic.[2]

50.     Republic also ceased to factor.  In other words, advances were not tied to the receivables purchased.  Instead, Republic required Bailey to provide a list of payables to Republic on a daily or weekly basis.  Republic's Risk Manager, Melissa Baines, would then decide which of Bailey's payables she would pay based on whether or not the payable itself would "generate new receivables."

51.     Ms. Baines summarized Republic's new view of the "factoring" arrangement in a July 10, 2015 e-mail to Buttles:

---

[2] Republic's new "rules" were outside the parties' contract – the Agreements specifically defined an "Advance" as a payment by Republic to Bailey.  *See* **TR.51** Agreement of Purchase and Sale, p. 3, paragraph 2.

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 7/10/2015 12:22:11 PM |
| **To:** | John Buttles [jbuttles@baileytool.com]; Jeff Worley [jworley@baileytool.com] |
| **CC:** | Danika louis [dlouis@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | RE: BTM |

Hi John,

Please confirm my understanding from our earlier conversation. It is expected there will be additional critical funds needed, not just the c$6,300 Fuchs payment, to generate $75,000 in receivables.

Maybe a better way to back into this is to start with the in-house orders that you could have the ability to produce and will be accepted by the customers. For example, if you have $100,000 in confirmed orders in-house that could be produced and shipped next week, how much in absolutely critical payments will be requested from Republic to generate that $100,000 in orders? The goal, of course, being a significant positive margin between receivables generated and RBC's cash outlay. And, are these orders going to be accepted by the customers without penalties or counter-claims taken against the payments if they are shipped past the need-by date?

Please let me know if you need further clarification as to the information I am requesting.

Regards,

**Melissa Baines**
**Risk Manager**

**TR. 688.**

52.     Ms. Baines had no formal education or practical experience in managing or running a manufacturing business, yet that was exactly what Republic chose to let her do. Bailey suffered immediate financial injury due to Ms. Baine's mismanagement.

53.     For example, Bailey needed oil to run its machines, and it owed money to its oil supplier, Fuchs. Rather than advancing funds directly to Bailey so Bailey could pay Fuchs, Republic required an explanation of "how much" in receivables would be generated if Republic paid the oil supplier:

**From:** mbaines@republicbc.com [mailto:mbaines@republicbc.com]
**Sent:** Wednesday, July 08, 2015 12:13 PM
**To:** John Buttles
**Cc:** Danika Louis; Bob McGovern; Jeff Worley; Melissa Baines
**Subject:** Re: Bailey tools press down

Hi John,

I really need an understanding of how much in $ will be generated if we wire $10,000 to the oil supplier. Can you provide me with an estimate on this?

Thank you,

Melissa Baines
Republic Business Credit, LLC

**TR.116**.

54.     Apparently, Ms. Baines did not understand that for a paltry $10,000, **all** of the machines at Bailey could operate and fill whatever orders had been placed, but without that $10,000 for oil, no production of any kind could take place because the machines could not be run without oil. They would burn up.

55.     Republic's "rules" were not limited to Bailey's suppliers. Republic (primarily through Ms. Baines) used its complete control over the Company's cash to take away from Bailey's management virtually all decisions that a company makes for itself.

56.     For example, Ms. Baines inserted herself into Bailey's personnel and human resources management, decreeing funds would only be advanced for "actively employed AND critical employees," not those who were "non-engaged (*i.e.*, not showing up on Monday.")

| Message | |
|---|---|
| **From**: | Melissa Baines [mbaines@republicbc.com] |
| **Sent**: | 7/23/2015 3:34:53 PM |
| **To**: | jbuttles@baileytool.com; Bob McGovern [rjmcgovern@msn.com] |
| **CC**: | Melissa Baines [mbaines@republicbc.com]; Marilyn Calder [mcalder@baileytool.com]; Gayla Flowers [gflowers@baileytool.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject**: | FW: |
| **Attachments**: | BAILEY CK REGISTER WE 07_12_15.xls; HUNT CK REGISTER WE 07_12_15.xls |

John,

Please confirm that all employees listed as to be paid on the attached payroll registers are actively employed AND critical employees, and please also confirm that none of these amounts are being paid to non-engaged (i.e. not showing up on Monday) or other non-critical payments.

**TR.717**.

57.    Not only did Ms. Baines refuse to "advance" funds for payroll without assurances Bailey's employees would continue to "show up," but also that any employee receiving a paycheck be "critical" and "add[] value to cash flow in the short term:"

| Message | |
|---|---|
| **From**: | Melissa Baines [mbaines@republicbc.com] |
| **Sent**: | 7/24/2015 9:40:31 AM |
| **To**: | Bob McGovern [rjmcgovern@msn.com]; John Buttles [jbuttles@baileytool.com] |
| **CC**: | Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| **Subject**: | Re: Updated Cash Flow |

Bob and John,

Bob, you and I, recently spoke about communication. We really need to limit the communication coming from your side. I cannot continue to keep up with the volume of emails and requests and comments, and I will not be putting money out the door if I cannot be firm on the cash flow position, which I'm not with the minute by minute play by play. I need one point of communication, whether that continues to be you or Jeff, so we can efficiently process information.

As previously discussed or requested, I still need:

1. An absolute confirmation that the payroll is for essential (i.e. critical) personnel that are adding and will continue adding value to the cash flow in the short term.
2. One email daily which presents a complete list of the day's requests with each line item, including personnel, stating what value it adds to the cash flow to justify each expense. This list should prioritize each line item (with "must be paid by" dates) and the necessary LOD's should be attached.

**TR.587**.

58.     On production lines, all employees are critical, otherwise they would not be on the line.  On a human level they also needed these paychecks and had and would continue to work hard for them.

59.     Not only did Republic control how many workers should be employed, it also sought to conspire with one of Bailey's managers to have him replace John Buttles as president and CEO.  This attempt began with a request from Melissa Baines and Allen Frederic to meet with Bob McGovern for a "confidential" discussion:



**TR.133**.

60.     At that meeting, which occurred not at Bailey's offices but fifteen miles away, at the Stoneleigh Hotel, Baines and Frederic suggested that McGovern should persuade Buttles to relinquish his role as president and chairman, and let McGovern fill those roles.

61.     Republic even supplied McGovern with a draft board resolution and employment agreement to carry out the plan:

| Message | |
| --- | --- |
| **From:** | R McGovern [rjmcgovern@msn.com] |
| **Sent:** | 7/31/2015 8:38:02 AM |
| **To:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Re: Update on Bailey |

Melissa

Am I mistaken, I thought Allen offered and recommended that your legal dept would draft a short agreement that met the need to transfer authority and indemnify.

On Jul 31, 2015 5:34 AM, Melissa Baines <mbaines@republicbc.com> wrote:
Hi Bob,

It was a pleasure meeting you today. I had not seen your email prior to our meeting, and I apologize for not specifically addressing these items. Though, I believe we did touch on some of this.

At this time, the tasks with the most priority are:

1. getting proper authority from John for you to act and execute on behalf of the company. This should easily be taken care of by a resolution (sample previously supplied) whereby making you CEO or President for each corporation. I understand your concern over liabilities, but I would imagine a standard consulting contract should provide you with the necessary hold harmless and indemnification language;

**TR.135, 142** (Baines e-mail McGovern transmitting draft employment agreement).

62.     In tandem with these negotiations, Allen Frederic not only approved McGovern's projected salary as president and CEO, but even opined that McGovern should be given an equity participation in the company:



On Aug 6, 2015, at 7:53 AM, Allen Frederic <afrederic@republicbc.com> wrote:

I have a breakfast, finished about 9:30, while salery is a little high, I would live with it but would like him to get piece of company

Sent from my iPad

On Aug 6, 2015, at 7:45 AM, Melissa Baines <mbaines@republicbc.com> wrote:
I have not yet received his resume, which he just promised I would have this morning.

TR 138

EXHIBIT
24
McGovern

RBC0003943

**TR.138**.

63. On the same day, to keep the ball rolling, McGovern sent Baines a copy of his resume.

| From: | Bob [rjmcgovern@msn.com] |
|---|---|
| Sent: | 8/6/2015 12:25:37 PM |
| To: | 'Melissa Baines' [mbaines@republicbc.com] |
| Subject: | resume |
| Attachments: | RJM resume - Republic.docx |

I would have like to modify to reflect the specfics of this – let me know if you want more detail info.

**TR.139.**

64. A few days later, Baines sent McGovern a draft employment contract for his new role as CEO/President. T.R.142. Realizing what thin ice she was on, she included a disclaimer for any liability by Republic if the documents were used:

| From: | Melissa Baines [mbaines@republicbc.com] |
|---|---|
| Sent: | 8/10/2015 2:41:56 PM |
| To: | Bob McGovern [rjmcgovern@msn.com] |
| CC: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | BTM Employment Agreement |
| Attachments: | Form Interim President Employment Agreement.docx; Republic Business Credit_Bailey Tool & Manufacturing Special Director Co....doc |

Bob,

In response to your request, I attach a draft form interim CEO/President Executive Services Agreement. RBC is providing this form as an accommodation to your request for a form document, and your use of the form or any provision therein constitutes your agreement that RBC will have no liability for such use and you will indemnify and hold RBC harmless for any such use. You should have your attorney review the document to draft of the specifics of your engagement.

Regards,

Melissa Baines
Risk Manager

Republic Business Credit, LLC

**TR.142.**

65.     Republic's control of Bailey's spending did not stop at vendors, personnel, and attempts at executive appointments.  It permeated every last detail of the Company's operations.  Republic even micromanaged the Company's purchase of basic office supplies.

66.     In one instance, Republic refused to allow Bailey to purchase Gatorade for the Bailey workers who worked in the un-air-conditioned shop in Texas in August!



**TR.622**.  Proper hydration on a machine shop floor in an un-air-conditioned building in Texas in August is not a luxury item.

67.     Republic also resorted to intimidation tactics.  At Bailey's Expense, Republic hired armed guards to patrol Bailey's premises:

On Sep 1, 2015 3:27 PM, Melissa Baines <mbaines@republicbc.com> wrote:

Bob,

Upon installation and DVR capability being up and running, I did replace the armed officers with guards, which is less than half the cost. I have not received confirmation that the live feed is up and running yet. Upon confirmation the live feed is working and being monitored, I will be able to back the guards off.

Regards,

Melissa Baines
Risk Manager

**TR.626.**

68.    Republic also criticized Bailey for entering into payment plans with critical suppliers, suggesting instead that finding a new supplier was more favorable than paying past due debts:

| Message | |
| --- | --- |
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 8/28/2015 9:29:09 AM |
| **To:** | Bob McGovern [rjmcgovern@msn.com] |
| **CC:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | RE: RE: RE: Samuel and Sons |

Thank you, Bob.

I understand the pressures from those critical suppliers, but I hope you understand that these need to be weeded out. All other avenues of dealing with these situations (i.e. replacing the supplier) need to be attempted before we start looking to pay past dues. I agree that the risk Comerica is going to have a large issue with paying a supplier before them is very real. And, they may not only have an issue with Bailey...chances are they'd be upset with RBC, which is not good for anyone in this situation right now.

**TR.619**.

69.    Republic's control over Bailey's business was intentional and deliberate. During the July-October 2015 time period, Republic's control over the Company exclusively benefited Republic by accelerating Republic's payoff.

70.     From July – November 2015, Republic's advance rate dropped to only 33% of the accounts assigned.  **After September 11, 2015, there were no – ZERO – advances whatsoever**.

71.     To be clear, for the last fifty-five days of the relationship (from September 12, 2015 through November 6, 2015), Bailey sent Republic $924,504.65 in receivables and received **no advances**.  Incredibly, RBC <u>collected</u> $921,100.81 of the Debtors' receivables during the last fifty-five days and gave the Debtors **no advances whatsoever**.  Republic instead gave the Debtors empty promises that if the Debtors would send in more receivables, RBC would begin "advancing" funds again.

72.     As a result, Republic's unilateral control caused Bailey catastrophic harm. Republic choked the Company's ability to serve existing customers, generate new accounts receivable, generate cash flow, and successfully transition into the Regions Bank relation. Further, that control and decision-making destroyed Bailey's relationship with its suppliers, ended its ability to expand new lines of business, and crippled its chances to continue as a going concern.

73.     Republic was, in fact, conducting an "unannounced liquidation" of Bailey beginning in early-July, 2015, when Ms. Baines believed Republic was in the "best position" it had been in with respect to collateral.  **TR.557**.

74.     In carrying out its "unannounced liquidation," Republic was careful not to alert Bailey or its customers of its plans, since doing so would have impaired Republic's ability to collect Bailey's accounts receivable and allowed Bailey and its vendors to take actions to protect themselves.  For example, Ms. Baines expressly instructed others at Republic to conceal from Bailey's customers the true status of the business, fearing Republic's ability to collect Bailey's receivables would be impaired if the customers knew the truth:

**From:** Melissa Baines [mailto:mbaines@republicbc.com]
**Sent:** Tuesday, September 29, 2015 10:32 AM
**To:** Danika Louis; vblade@republicbc.com
**Cc:** Melissa Baines
**Subject:** Bailey Tool, Cafarelli and Hunt Hinges

Danika and Vanessa,

We are nearing being in collect out status on this account, and we really need to continue hammering on collections to try and drive some cash in before the customers are aware of the status of the company, if they're not already, and we need to get an idea of what kind of offsets might be taken in the event there are damages or other claims. Please allocate the necessary resources to in the short term to try and get as much in the door as quickly as we can.

Try not get into discussions over the status of the operations. If asked about the status of the company, I would say something along the lines of "I'm not aware of any issues. I'm simply trying to get payment status on these [past due] invoices." In any event, it is John Buttles' intent to keep the business running, so beyond not wanting to tip off debtors to any issues for fear of offsets, we do not want to cause customers to cancel orders because we told them Bailey, et al, is out of business or not currently operating.

Let me know if you have any questions.

Thank you!!

**Melissa Baines**

**TR.653**.

      v.    **Republic Demands and Gets a Lien on Buttles' Homestead.**

75.    In addition to taking control of Bailey's business, Republic forced CEO and owner John Buttles, and his wife, Jennifer, to give Republic a lien on his Texas homestead. Republic made this demand without regard to the prohibitions on such liens, which are well understood in the commercial lending world.

76.     By the middle of July, Republic's management was putting its homestead lien demands in writing.

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/20/2015 10:50:57 AM |
| To: | jbuttles@baileytool.com |
| CC: | Jeff Worley [jworley@baileytool.com]; Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| Subject: | FW: Mortgage - 600 Beltline |
| Attachments: | Untitled attachment 00695.htm; 3124_001.pdf |

John,

I am reforwarding you the mortgage sent to you Friday for Lancaster. As we discussed, we could look to take a position on the commercial properties which may decrease the exposure on the primary residence; however, we will continue to require the second position on your primary residence to collateralize any overadvances necessary to finance the continuance of operations.

Regards,

**Melissa Baines**
**Risk Manager**

**TR.721**.

77.     Republic represented that it was entitled to the mortgage and that it was necessary to permit Bailey's survival. The demands were part-carrot, part stick. On July 20, Ms. Baines was telling Buttles that the lien would both "collateralize the [claimed] overadvance" and would also "finance continued operations." **TR.721**. Buttles was understandably slow to agree to the pressure from either Baines or Allen Frederic, Republic's CEO. Seeing the carrot fail, Allen Frederic abandoned all pretense of arms'-length negotiation, or for that matter, courtesy:

> **From:** Allen Frederic [mailto:afrederic@republicbc.com]
> **Sent:** Monday, July 20, 2015 9:27 AM
> **To:** John Buttles
> **Subject:** Re: RE: Re:
>
> The residence you dummy how many times did we say this
>
> Sent from my iPad
>
> On Jul 20, 2015, at 9:13 AM, John Buttles <jbuttles@baileytool.com> wrote:
>
>> Melissa,
>>
>> I don't see one for the Lancaster building…   my assumption was that we were going to use the two industrial buildings at 906 Mercury and 600 W. Belt Line Road for the security.  I am prepared to sign them.
>>
>> John

**TR.254**.

78.    Consequently, on or about July 21, 2015, under extreme duress and the immediate threat of losing the business, Mr. and Mrs. Buttles executed and delivered to Republic a mortgage on their Dallas homestead, which is exempt from the claims of creditors under the Texas Constitution and Texas homestead law.  **TR 583**.

79.    The Mortgage was invalid from inception and constituted a fraudulent and coercive attempt by Republic to obtain rights and interests that it was never entitled.  Moreover, the dialogue to obtain the liens on the commercial buildings and Mr. and Mrs. Buttles' homestead were fraught with misrepresentations and outright fraud.  They were made to both Buttles individually to trick him into putting his and his wife's homestead up for collateral, but also to Buttles as owner and CEO of Bailey to put the commercial buildings up as additional collateral.

80.    The misrepresentations were as follows:

- There had been an over-Advance;
- The Bailey commercial buildings and Mr. and Mrs. Buttles' homestead would only be used to collateralize this over-Advance and would never be enforced;

   &#9670; This additional collateral was not intended to place RBC in an over-secured position, such that it could cash out both the old and new collateral to be paid back;

   &#9670; Once the additional collateral was secured, the 90% funding of receivables would start again.

81. All of these statements were false and sufficient to meet the burden of proof for fraud, misrepresentation or Deceptive Trade Practices.

82. First, there was no over-Advance. Next, Republic declared a default on the after the supposed over-Advance had been paid, and took the cash from the sale of the Buttles' homestead and paid itself a $75,000 Termination Fee. Bailey, based Republic's continuing misrepresentations, **kept sending all of its accounts receivable religiously every day in the hope it would get a true Advance**. Between October 2, 2016 and November 6, 2015, Bailey sent **$487,431.76** in receivables to Republic.

### vi. Republic Stops Funding Anyway.

83. After Republic seized control in early July, Bailey's long-standing, core automotive customers, such as Tenneco and Trelleborg, began to find that Bailey could not fill their orders in a timely fashion.

84. These problems appeared immediately. On July 13, John Buttles told Melissa Baines that Bailey's delays in getting a press repaired were shutting down a Trane Heating & Air Conditioning production line:

> This has stop do with the motor rewind - this press produces parts for Trane air conditioning compressor production.
>
> I emailed you the vendor invoice and the Letter of Direction on Friday.
>
> Trane will be calling us at 10am I believe - please note they say they are shutting down die to lack of parts.
>
> This invoice needs to be paid so we can pick that motor up and return to production.
>
> John Buttles

**TR.120**.

85. Ever the stickler for documentation, Baines replied:

On Jul 13, 2015, at 9:10 AM, Melissa Baines <mbaines@republicbc.com> wrote:

John,

We want to help you get up and running; however, you have not provided the necessary information for us to do this.

I must have a complete schedule of required, critical payments that need to be made in order to produce xx dollars in accounts receivable. As I understand it, it is going to cost more than just the part cost to get invoices generated. If I am mistaken about this, and all you require to start generating invoicing is $2,330 to get the machine up and running, please let me know ASAP, along with how much in billing (conservatively) will be generated by that one payment before Friday.

Have you spoken to any of the employees to gain their support to work with you, at least, through Tuesday's REA settlement conference?

Regards,

**Melissa Baines**
**Risk Manager**

Republic Business Credit, LLC

**TR.120**.

86. The problems also extended to Bailey's automotive customers ten days after the Trane difficulties. Bailey's COO, Bob McGovern, was having to deal with the displeasure of Peterbilt and Imperial, two of its largest automotive accounts:

**From:** Bob [mailto:rjmcgovern@msn.com]
**Sent:** Thursday, July 23, 2015 9:04 AM
**To:** 'Melissa Baines'
**Subject:** Morning Operational Review

AS promised – current issues we are dealing with

1) Payroll should be to you by this is for the 20 – pay per Cash flow (we have to get final # from Paycom)
2) Payroll 2 should be to you by 10 am – this is for the full week pay – approx. 43K
3) The scrap reconciliation is attached
4) Peterbilt –
      a.  The customer visit is at 9:30 am tomorrow. The concern is that they do an audit on our supplier status. This is why aluminum metal is now critical to show them we are running the product and have the inventory on hand to fill short term orders. We are 3 weeks behind, they likely will ask us to provide a catch up schedule. We do not want to damage this relationship.
      b.  Imperial (who is also a supplier Peterbilt) is also involved in the visit. They are a tier 1 supplier to Peterbilt and we supply them as well. So they will also be looking for assurances.
5) I propose we have a better document for funding/Letter of Direction control. I am working on that today and hopefully will send you something that makes both of our lives easier.
6) The 50,000 for the 556 tooling did not get into your system. We have a large backlog of invoices caused by losing one of the 2 invoicing people and the double payroll. I want to find a way to get this better under control and visible to you and ourselves.

Bob

**TR 585**

RBC0012218

**TR.585**.

87.    The problems with automotive customers were no better by August, 2015. On August 11, a Tenneco procurement officer was telling Buttles that its delivery delays were becoming critical:

```
From:        William Weaver/US/TEN
To:          Rudy Cortez <rcortez@baileytool.com
<mailto:rcortez@baileytool.com> >, Randy Burris/US/TEN@TEN, Troy
Osborne/US/TA.NA@TEN <mailto:Osborne/US/TA.NA@TEN> ,
Cc:          James Brown <JBrown3@Tenneco.com <mailto:JBrown3@Tenneco.com>
>,
John Buttles <jbuttles@baileytool.com <mailto:jbuttles@baileytool.com> >
Date:        08/11/2015 08:26 AM
Subject:     RE: 260746 Up date Status
_____

John  or Rudy,

This is unacceptable, you have been waiting on this material for almost
two weeks now. Bailey Tool needs to have material expedited in immediately
or will be shut down Tulsa plant on Monday 08/17. I need all of the 260746
in house tomorrow, Seward has to make shipment by Thursday 08/13. A plan
must be put in to place to get this material in, I will schedule a
conference call 11 AM (CT) so we can discuss a plan of action.

Thanks,

Bill Weaver
Customer Product Liaison
```

**TR. 781** (RBC0013288).

88. Two weeks later, Bailey's inability to perform threatened to shut down an entire

Tenneco factory in Mexico.

National Kwikmetal "refused" to sign the agreement when I presented it – I believe I reported that at some point.... (at least internally). They might reconsider after talking to Melissa. There are no past-due balances at NKS. Buckeye is still under discussion as we know – the Buckeye weldnut is critical to Bailey – we will shut Harley Davidson production at Tenneco down without that nut in the immediate future.

Fuchs is releasing product but wanted more paydown on old balances to secure release on the next order (critically needed) I placed with them.  Yes, we are paying old balances at Fuchs and the account remains on Net 30 terms...  the very first payment Melissa made was to Fuchs and it cleared up old balances, allowing them to ship product in and continue net 30 account status.

What else is needed??

John

**TR.622**.

89. Although Republic was aware of these problems, it did not particularly care,

because its silent liquidation and debt reduction had greatly reduced its exposure. **TR.653**

(September 29, 2015 e-mail stating "We are nearing being in collect out status on this account…").

90.     Given its success in debt reduction, by the middle of September Republic decided that it no longer made sense to allow Bailey any more money.  In fact, the last payment it made to Bailey vendors was on September 11, 2015.  **TR.752** (Frederic Exhibit 29).

**vii.     Republic takes the Homestead Proceeds and Claims No Settlement.**

91.     Also during the middle of September, 2015, Republic stepped up its campaign to get money from Buttles' homestead.  Buttles had received a purchase offer for the house, but the closing was delayed by the title company's consternation over Republic's illegal lien.  At that point, Republic understood that there would be almost $464,000 net to the Buttles family, and it demanded all of it.  **TR.745**.

92.     At the same time, Melissa Baines was telling Buttles that Republic's receiving the money would help cover the inventory loan and Army overadvance, allow Republic to start funding the business again, and Buttles to resume receiving a salary:

| Message | |
| --- | --- |
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 9/15/2015 10:14:24 AM |
| **To:** | jbuttles@baileytool.com |
| **CC:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Bailey Tool / Sale of Personal Residence |

John,

I received a message to call a Mr. Robert Blanchard late yesterday afternoon.  As he represented he is your attorney, I need to have our attorney return his call.  Please confirm he is your attorney and provide authorization to speak with him regarding the payment required for the lien release.

So you are aware, the payoff amount for the lien on the residence is $463,544.02.  This includes the inventory and DFAS invoice overadvances, as well as certain fees due to RBC.  Receipt of the payoff amount will allow for you to begin drawing a reasonable salary from the business, with the understanding that your salary will be the first payment item postponed in the event of future cash flow issues.  The payoff should also allow RBC to regain a certain level of flexibility in the funds available for the business.

Regards,

**Melissa Baines**
**Risk Manager**

**TR.745**.

93.     Republic's demand for Buttles' entire home equity was a shock to Buttles, even if softened by the enticement of further funding for Bailey and salary resumption for Buttles. Because Buttles resisted giving up all of his homestead equity, Baines and Frederic decided to add more pressure by threatening him with fraud:

| Message | |
| --- | --- |
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 9/15/2015 4:07:39 PM |
| To: | Allen Frederic [afrederic@republicbc.com] |
| Subject: | Bailey Email |

Hi Allen,

I think we need to send the email you dictated earlier today, but I don't think it needs to come from the attorney. John confirmed in an email the closing is "currently scheduled for late afternoon" tomorrow. You okay with me sending? The fact of the matter is the listing agreement we were provided shows the house was listed when they executed the RBC mortgage, which would constitute intent to defraud.

"RBC was induced to continue funding the companies based upon receiving a second mortgage on the personal residence and in reasonable reliance of the house being listed for sale, which proceeds of such sale would repay RBC's overadvance position. As stated, this sale transaction is scheduled to close tomorrow afternoon. Accordingly, RBC will be prepared to continue funding upon receipt of the second mortgage payoff amount of $463,544.02."

Melissa Baines
Risk Manager

**TR.753** (Frederic Exhibit 30).

94.     Thirty-four minutes after devising the language, Baines sent those very words to Buttles in an email dated 4:41 p.m. on September 15. Buttles answered the next day at 11:25 a.m., saying

It is in both of our interests to resolve this in the near term. We do not want to lose our buyer and my guess you want to have a better resolution than you currently have. Having the business operate efficiently, sell down assets, invoice and collect the REA and assure customers are willing to meet their payment obligations is in both of our interests. Therefore, I suggest we begin discussions immediately to achieve these aims.

**TR.754** (Frederic Exhibit 31).

95.     Upon receiving Buttles' reply, Frederic exploded:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 11:49:09 AM |
| To: | Melissa Baines <mbaines@republicbc.com> |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Yes tell them we will stop funding, end of game, we will wait until he can't make house payments and bid it in at auction, call our atty and confirm we can do this even with personal bankruptcy but this does not appear to be good faith on their part and there is no other good collateral that I seem accordingly I think we assume more risk by continuing to fund. Have our lawyer advise them that we will peruse foreclosure

**TR.754** (Frederic Exhibit 31).

96.     Two minutes later, Baines told Frederic there wasn't unanimity in the C-suite, because Stewart Chesters did not agree:

On Sep 16, 2015, at 11:51 AM, Melissa Baines <mbaines@republicbc.com> wrote:

> I will, as Stewart is not exactly on board with the foreclosure plan.  He's supportive of not funding until we get this worked out, but he has concerns over shutting the business down.
>
> Will you be available in 20 minutes or so?
>
> **Melissa Baines**
> **Risk Manager**

**TR.755** (Frederic Exhibit 32).

97.     Frederic responded that foreclosure was the only thing that will get movement from Buttles:

| Message | |
|---|---|
| From: | Allen Frederic [afrederic@republicbc.com] |
| Sent: | 9/16/2015 11:54:54 AM |
| To: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Yes I am available. The point is if we don't fund it shuts down by default, if we fund we are held hostage and house never sells, we don't solve overadvance position. Our threat to foreclose should get movement on his part, nothing else will work

**TR.755** (Frederic Exhibit 32).

98.     During the same conversation, Frederic told Baines to keep a guard posted at the Bailey plant until Buttles gave them his homestead equity.  **TR.756** (Frederic Exhibit 33).

99. Baines replied that while she was about to pull the guard service, upon getting Frederic's email she told the guard service to keep the guard on site, and the guard might be increased to armed status:

> On Sep 16, 2015, at 11:52 AM, Melissa Baines <mbaines@republicbc.com> wrote:
>
> Haha. I was just about to pull, but I have already emailed Mike at Hilco to leave the guard on and we may be stepping up again to armed services.
>
> **Melissa Baines**
> **Risk Manager**

**TR.756** (Frederic Exhibit 33).

100. Less than an hour later, Frederic told Baines that negotiating with Buttles was useless, and they simply had to remain firm:

> On Sep 16, 2015, at 12:01 PM, Allen Frederic <afrederic@republicbc.com> wrote:
>
> My suggestion is not to go to dallas to meet with him on his turf but to communicate our position clearly and firmly in writing. Based on his communication a meeting is a waste of time and money. We have both a trust issue and compentancy issue with management and are in the best collateral position we will ever be in at this moment

**TR.643**.

101. Barely forty-five minutes later, Frederic reiterates his position take no prisoners attitude toward Buttles:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 12:48:44 PM |
| To: | RBC <mbaines@republicbc.com> |
| Cc: | Stewart Chesters <schesters@republicbc.com>; Laurie A Martin Montplaisir <lmontplaisir@srcattorneys.com>; dhanson@srcattorneys.com |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Remember our current mortgage value is worth considerably more than the amount of our pay down. Any substitution of collateral must be cash or equivalent and get approval of our atty regards preference and other potential bankruptcy issues. However their will be no funding based on promise to substitute or any type of promise but only after our approval and his performance

**TR.643**.

102.    It was within the climate shown above that Bailey, Buttles, and Republic had settlement discussion in late September and early October 2015 to resolve the outstanding issues between them and permit Bailey to operate without interference or further demands from Republic. *See, e.g.*, **TR.79** (Hayward Exhibit 1).

103.    In the settlement correspondence, the most important portions of which occurred from September 29 through October 2, 2015, Republic officers and counsel demanded $275,000 from the imminent home sale to fund the settlement then under discussion, and contribute the remainder of the closing proceeds from the sale of the Homestead to Bailey to fund operations. *See, e.g.*, **TR.79** (Hayward Exhibit 1).  Subsequent exchanges of correspondence between the Republic representatives reduced the cash component to be funded from the sale of the Buttles Homestead to $225,000.  *See, e.g.*, **TR.79** (Hayward Exhibit 1).

104.    On September 30, 2015, Republic counsel Laurie Montplaisir wrote that the revised settlement terms were acceptable and that she would begin preparation of a forbearance agreement. *See, e.g.*, **TR.79** (Hayward Exhibit 1).

105.    The Homestead sale closed on October 2, 2015, and the title company wired $225,000 to Republic, which Republic agreed to hold in trust pending formal documentation of the settlement, both as specifically agreed and as customary.  Then, on the same day, Republic pocketed the money and subsequently repudiated the settlement:

| | |
|---|---|
| From: | Montplaisir, Laurie A. Martin <lmontplaisir@srcattorneys.com> |
| Sent: | Friday, October 2, 2015 3:31 PM |
| To: | Melissa Hayward |
| Cc: | Brown, S. Joseph; Vickie.Driver@lewisbrisbois.com; Melissa Baines |
| Subject: | RE: RE: Bailey-Confidential Settlement Communication Subject to the FRE |

Melissa: My client never agreed to hold any money in trust. The funds have been applied to the inventory over advance.
Laurie

Laurie A. Martin Montplaisir
**Schuyler, Roche & Crisham, P.C.**

**TR.780**.

106.     This was contrary to Republic's previous representations, and in breach of its express agreements to hold the funds in trust, pending formal documentation of the settlement agreement: *See, e.g.*, **TR.79**.  Republic then not only applied the funds to what it claimed was a previous overadvance, after representing since July: (1) the Buttles' residence would never be needed to service the loan; it was facial security for what turned out to be a fictitious overadvance; and (2) if this overadvance was covered, funding would start up again.  All of these statements were false.

107.     As demonstrated in email exchanges, Buttles relied on Republic's false representations that: (i) it was necessary to sell the Homestead; (ii) Republic was entitled to the net sale proceeds, $225,000 of which was necessary to conclude the settlement; (iii) Republic either intended to or had concluded the settlement agreement.

108.     Republic also interfered in the Homestead closing.   Its representatives communicated directly with the title company to obtain the $225,000 from the sale.  Republic's counsel instructed the title company that "Republic Business Credit has agreed to the $225,000 figure.  Please confirm when the wire has been sent pursuant to the wire transfer instructions previously sent to you." **TR.716**.  Because Buttles understood that a settlement had been reached and only needed to be papered, he allowed the title company to send the funds to Republic.  Then, to Buttles' amazement, he learned from Bailey's new counsel that the settlement had broken down but Republic refused to give the money back.

     **viii.     The Secret Termination Fee.**

109.     On or about October 2, 2015 – the same day as Buttles' homestead closing – Republic took a $75,000 termination fee against money collected from Bailey's accounts.  Republic gave the Company no formal notice of its taking the termination fee, but Republic told

its own employees to conceal Bailey's true condition from other creditors. Even though Republic had not funded a single dollar since September 11, 2015. Republic told Bailey to continue submitting accounts and promised it would fund operations.

110. Based on Republic's promise (and failure to disclose the termination fee), Bailey continued to submit receivables to Republic until November 5, 2015 **($487,431.76** in receivables were sent to Republic between October 2 and November 6). Although Republic continued to collect receivables, it advanced <u>no</u> additional funds to the Company. Hence, there was a continuous flow of misrepresentations and deceptive statements to Debtors that if Debtors would continue to send Republic their receivables, Republic would factor and fund them and send operating funds to the Debtors.

111. The following timeline is instructive:



Continual Misrepresentations and Deceptive Statements by Republic

**$924,504.65** in Receivables sent <u>after the last funding</u> by Republic (9/11/15)[3]

**$487,431.76** in Receivables sent <u>after Republic took the $75,000 Termination Fee (10/2/15)</u>

---

[3] From the inception of the factoring agreement through November 5, 2015, Republic purchased $5,908,183.26 of the Company's receivables.

112.    Essentially, during this phase of their "relationship" Republic acted illegally in claiming and enforcing a lien on the owner of Debtors' homestead and acted totally in breach of their Agreement in not giving Debtors money from Receivables Republic admitted it owed, holding out for a release from Debtors to which Republic was not entitled.[4]

113.    Worse yet, Republic continued to claim ownership of all Bailey's Receivables and demand a release as a condition to turning them over.  Republic continued to claim ownership of Bailey's receivables until the Court held last year that Republic had no right to such a release.

### ix.    Republic is Paid in Full, but Attempts to Extort a Release from the Debtors.

114.    After collecting Buttles' homestead equity on October 2, 2015, Republic continued to collect all the Company's accounts receivable through the lockbox arrangement created at the start of the relationship.

115.    On November 5, 2015, the Company ceased submitting receivables to Republic. *See* **Dkt. 165, p. 6** ("According to the testimony of Marylyn Calder, the Debtors ceased submitting Accounts to Republic on Assignment Schedules on November 5, 2015.").

116.    Nevertheless, having not funded since September 11, by mid-November 2015, Republic had collected more than enough to pay off its facility in full.  *See* **TR.664** (cited below). Those collections included the Army Receivable about which Republic had been so nervous that it wrongfully lowered the cash advances available to Bailey:

---

[4] *See* Adv. Dkt. 165, p. 7 ("Republic argues that § 8.1 requires that any termination of an Agreement by a Debtor requires the Debtor to sign a general release.  This court disagrees.").  That Republic was not entitled to a release is now law of the case.

| Message | |
|---|---|
| **From**: | Danika Louis [dlouis@republicbc.com] |
| **Sent**: | 11/19/2015 9:42:03 AM |
| **To**: | Melissa Baines [mbaines@republicbc.com] |
| **CC**: | Vanessa Blade [vblade@republicbc.com]; Allen Frederic [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com] |
| **Subject**: | Re: FW: W15QKN-12-C-0109 BAM REA Shipment #REA0002Z |

The REA payment was released to our account today.  We should receive the $156k tomorrow!!!!!!!

**TR.663**.

117.    Not surprisingly, the effect on Bailey of receiving no money from its factoring for two months was catastrophic.

118.    After Republic collected the Army receivable, Ms. Baines alerted her superiors that Republic was "collected out" of Bailey and that she was ready to send a General Release to Mr. Buttles.  Ms. Baines also admitted that: (1) all Default Rates and Termination Fees had been recovered; and (2) she could not find any additional significant additional fees that Republic "might be able to charge:"

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 11/20/2015 2:23:09 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| CC: | Danika Louis [dlouis@republicbc.com]; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com]; Laurie A Martin Montplaisir [lmontplaisir@srcattorneys.com] |
| Subject: | Bailey Tool, et al. |

All,

We are officially collected out of Bailey.  I am ready to send the General Release to John Buttles.  I am going to reserve for $2,500 for legal fees, but all Default Rates and Termination Fees have been recovered.  I have reviewed the contract for any additional fees which we might be due, but I do not think that any fees we might be able to charge total an amount worth risking us getting an executed General Release.  I would chalk them up to consideration in exchange for the General Release.  In the event he does not execute the Release, we are free to continue accruing the Default Rate and charging any other fees we are due under the Purchase Agreement.

As a point of reference, we have collected $75,000 in Termination Fees and $284,038.13 in Default Rate, in addition to our standard factoring and line fees, to date.

Regards,

**Melissa Baines**
**Risk Manager**

**T.R. 664**.

119.    The same day, Ms. Baines sent an e-mail to John Buttles confirming the facility had been paid in full, and stating that Republic was holding over $150,000 and would turn it over to the Debtors so long as the Debtors executed full releases of any claims they had against Republic:

**From: Melissa Baines <mbaines@republicbc.com>**
**Date: November 20, 2015 at 6:09:50 PM CST**
To: jbuttles@baileytool.com
Cc: Melissa Baines <mbaines@republicbc.com>
**Subject: Bailey Tool, et al. / RBC**

John,

With the posting of today's collections, the amounts due as of today to RBC from the companies under the Purchase Agreements have been collected. Upon full execution of the attached General Release Agreement, but not before the Date of the General Release Agreement (Monday, November 23, 2015), the Obligation due and owing to RBC will be considered satisfied.

Please review the attached documents and have them executed with a notarized signature. As there are three separate clients, thereby three separate Releases, I have included a Letter of Direction for the small amount due under the Bailey Tool account, which Letter of Direction provides for RBC to reduce the amount from the total due to Hunt Hinges.

The consolidated wire amount due to the companies, effective November 23, 2015, will be $152,064.03. Please provide direction as to where you would like those funds wired. I have provided a blank Letter of Direction for you to complete with the directions for the release of funds to each of Hunt Hinges, Inc. and Cafarelli Metals, Inc. (i.e. please do a letter of direction for each of the companies). In the event they are directed to the same account, we can send as one wire, if you prefer.

Please let me know if you have any questions.

Regards,

**Melissa Baines**
**Risk Manager**

**TR.255**.

119.    The Debtors declined to execute the release. *See* **TR.777 and 775** (RBC0017598 and RBC0017607).

120.    The Court has since held Republic was never entitled to hold out for a release since it took the Termination Fee route to termination. *See* **Adv. Dkt. 165, p. 7** ("Republic argues that § 8.1 requires that *any* termination of an Agreement by a Debtor requires the Debtor to sign a general release. **This court disagrees**.") (emphasis added).

121.    The Court likewise held Republic did not own, and was not entitled to collect, Bailey receivables generated on or after November 5, 2015. Only after filing a motion to enforce the Court's turnover order in the Summer of 2020 (over four years after Bailey's bankruptcy filing)

did Republic finally return the $82,121.58 it wrongfully collected on Bailey accounts generated on or after November 5, 2015. *See* **Dkt. 297** ("Order Regarding Trustee's Motion to Enforce Order and Compel Turnover").

      **x.**    **The Debtors File Chapter 11, and Republic Sabotages the Debtors' Opportunity to Reorganize.**

122.    From mid-November through Bailey's bankruptcy filing on February 1, 2016 (the "Petition Date," Republic continued to collect Bailey's accounts receivable.

123.    In fact, as of the Petition Date, the Company and its counsel have calculated that Republic was holding at least $450,000 that it had collected from Company customers, even though its debt facility had been paid in full over three months prior.

124.    Upon learning of the bankruptcy, Republic itself admitted holding $300,000 of Bailey's money in internal e-mail correspondence:

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 2/2/2016 4:29:08 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| CC: | Danika Louis [dlouis@republicbc.com]; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com] |
| Subject: | Bailey Tool, et al. filed for Chapter 11 Bankruptcy protection yesterday |

They have made a written demand on us for the $300k we are currently holding. Joe and Laurie are all over it.

**Melissa Baines**
**Risk Manager**

**TR.701**.

125.    On and after the Petition Date, Republic continued to claim that: (i) the factoring agreement had not been terminated, which (ii) gave it title to all of Bailey's accounts receivable in perpetuity, (iii) regardless of whether Bailey had tendered those accounts to Republic. This behavior extended to Republic's contacting Bailey customers post-petition and representing that there was a "very active and non-terminated factoring agreement, which exists in place:"

I work with Laurie Montplaisir on her RBC team as her insolvency specialist. I therefore represent RBC, as does the local counsel (Vickie Driver) that we specifically hired to appear on RBC's behalf in the Bailey bankruptcy. I CC Vickie Driver above, and I also CC Melissa Hayward, Bankruptcy Counsel to Bailey. As I understand, you have called Laurie expressing frustration that the status quo leaves your client, a Bailey customer, in a bind. You need the provision of additional goods or services from Bailey, but Bailey insists that you pay Bailey first. And you claim that you cannot pay because of the continuing effect and existence of RBC's 9-406(a) claim on the funds that you hold that you might otherwise turn over to Bailey.

Here are a few observations and suggestions:

1        There is no doubt that RBC continues to assert an active claim on the funds that your client holds. Those funds belong to RBC under a very active and non-terminated factoring agreement, which exists in place. Under the status quo, your client is obliged to pay such funds only to RBC. So you are absolutely correct that your client would be exposed to potential double liability if you turn the funds over to Bailey. We will not simply waive our rights, or give you a get-out-of-jail free card on this point;

2        RBC's current claim on the funds that your client holds is a legally valid contractual claim that will withstand any future legal scrutiny. We are currently preserving a prepetition right of setoff, which controlling law gives us the right to do even after a bankruptcy. Your client has no recourse to, no privity with, and no cause of action against mine. There are no threats that you can credibly make against RBC. If anything, your continued insistence that you be given permission to release the funds indicate that there are no contractual defenses to payment.

And

3        Here is how we might help each other: If RBC can simply get a proper termination of its factoring agreement as well as fulsome releases from Bailey and its insiders and affiliates, we would be prepared to waive our claim on the funds that your client holds. That would require, however, 9019 motion practice to obtain a court approval of the arrangement before we could give you our waiver. Hence, I CC Ms. Hayward above. Everybody would win: My client could safely exit the situation in the knowledge that it would not be sued down the road; you get the product that you need; Ms. Hayward's client gains access to funds and a job to do. Indeed, such an arrangement would actually allow for a greater amount of funds than you currently hold to reach Bailey (we hold some as well, that would also be released).

THIS IS A FRE RULE-408-PROTECTED OFFER OF COMPROMISE. You will note that what RBC attempts here is merely to exit the situation, turn over excess funds to the estate, help your client out, and be left in peace. This is not an attempt to collect a prepetition debt. Please do not attach this email to any Court pleading or otherwise make its contents public.

Stephen "Joseph" Brown
Partner
SJBrown@SRCattorneys.com
312 565.8339 tel | 312 565.8300 fax

**TR. 788; TR. 238**.

126.        Republic used that position (which has since been rejected by the Bankruptcy and

District Courts) as a sword every step of the way in the bankruptcy case. For example, Republic

argued that the Company could not use cash collateral or obtain DIP financing because Bailey

didn't own its receivables but had sold them all to Republic.

127. Leaving aside Judge Dodd's determination that the factoring agreement terminated on November 5, 2015 (Adv. Dkt. 165), Republic's position was insupportable, and should never have been raised in the first place, given that (i) Republic had taken a termination fee; (ii) the facility had been paid in full, (iii) Republic was not entitled to hold out for a release; and (iv)Bailey notified Republic that Bailey considered the agreement terminated.

128. The Company's reorganization failed because Republic held most of Bailey's cash. As a manufacturing company, it required cash to acquire raw materials and inventory to create the products it sold to customers. Republic's refusal to release the cash destroyed Bailey's ability to continue in business by severely limiting its working capital. In the process of doing so and continues to wrongfully claim ownership of Bailey's Receivables, Republic's actions also destroyed customer relations, which it had taken Bailey decades to develop, irreparably damaging the Company and dooming its chapter 11 case to failure. The bankruptcy estate likewise incurred $421,193.87 in Chapter 11 administrative expenses that Republic should be required to reimburse as a result of its violations of the automatic stay and sabotage of the Debtors' reorganization.

**xi. Republic Celebrates Bailey's Demise.**

129. If any doubt remained about Republic's motives, Risk Manager, Melissa Baines put them to rest in an in-house email rejoicing at what she called Bailey's "implosion," and wishing she could be in the courtroom to see the formal transfer from chapter 11 to chapter 7:

On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:

Unofficially, Bailey Tool has imploded. The official nail is expected to hit in the next 7 to 30 days. Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week. Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more. In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week. Oh, what I wouldn't do to be there to see the walls come crashing down...

We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.


Melissa Baines
Risk Manager

Republic Business Credit, LLC
201 St. Charles Avenue, Suite 2210
New Orleans, LA 70170
t: 504.262.8604

TR.253.

130.    Ms. Baines' boss, Allen Frederic, suggested she should attend as a reward. TR.253

("Go to the hearing, you earned it.").  Ms. Baines responded:

| Message | |
|---|---|
| From: | RBC [mbaines@republicbc.com] |
| Sent: | 6/2/2016 12:09:08 AM |
| To: | afrederic@republicbc.com |
| CC: | Stewart Chesters [schesters@republicbc.com]; Robert Meyers [rmeyers@republicbc.com] |
| Subject: | Re: Bailey Tool |

Lol! I wish I could! May be sadistic, but It would really make my day. We'll see when it is, and I might take you up on that if I can work out logistics.

Melissa Baines
Republic Business Credit, LLC

TR.253.

131.    Republic's management was pleased with at the change since it expected this adversary proceeding would go away since it could not be funded and the chapter 7 trustee would be more "reasonable." *Id*.

132.    In addition to the difficulties caused Buttles by the liquidation of the Company, Comerica Bank also brought suit against him personally on his guarantee of the Comerica debt in December, 2018.    On May 12, 2020, Comerica obtained a judgment against Buttles for $1,963,482.35, plus interest and attorneys' fees.    **TR.497.**

133.    When put in a list, Republic's destructive acts clarify why it must answer for its actions.  By the time of Bailey's conversion to chapter 7, Republic had:

- Refused to advance funds under the Factoring Agreement in good faith;
- Exercised complete control over the Debtors' business causing its failure;
- Misappropriated the equity from Buttles' exempt homestead;
- Taken a secret termination fee of $75,000;
- Wrongfully held out for a release;
- Wrongfully exercised control over proceeds of Accounts created on or after November 5, 2015;
- Exercised control over funds withheld based on bogus fees, charges, penalties and fictitious "overadvances";
- Knowingly violated the automatic stay;
- Prevented the Debtors from obtaining DIP financing by maintaining the absurd (and now judicially refuted) claim that Republic owned Bailey's Accounts in perpetuity;
- Prevented the Debtors from maintaining existing customers or developing new customer and from reorganizing;
- Caused Buttles' guaranty to Comerica to be called, and a judgment taken against him personally.

134.    Republic's actions destroyed a decades-old company, put dozens of employees (many of whom lived paycheck-to-paycheck) out of work, and took away Buttles' homestead.

## II.
## CONCLUSIONS OF LAW

**A.**     **Jurisdiction and Venue.**

135.     The Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding contains some core causes of action proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O) and some non-core proceeding and causes of action.

136.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

137.     To the extent the Court determines that any of the claims asserted herein are not core, the Debtors expressly consented to the entry of final orders and judgments by the Bankruptcy Court.  All parties consented to the entry of Final Orders.

**B.**     **The Debtors' Claims.**

138.     The Debtors have asserted numerous alternate theories of relief in this adversary proceeding. Distilled to their essence, the Debtors assert claims that Republic both failed to live up to its end of the bargain captured in the Factoring Agreement and that Republic concealed its liquidation efforts in a manner that did maximum harm to the Debtors ability to weather financial storms. The Court will address the Debtors' claims below.

### 1.  Breach of Contract.

139.     Louisiana law controls the claims related to the parties' contractual relationship. The Factoring Agreement specifically requires that it "shall be governed by and construed in accordance with the domestic laws" of Louisiana. The parties agree that Louisiana law governs contract interpretation.  The parties agree Texas law applies to matters *ex contractu*.

140.     Louisiana law requires a plaintiff to establish three elements to prevail on a claim for breach of contract. A plaintiff must establish "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform

resulted in damages to the oblige." *Favrot v. Favrot*, 68 So.3d 1099, 1109-10 (La. App. 4 Cir. 2011). Plaintiff has established by a preponderance of evidence each of the elements for a breach of contract.

141.    Republic and the Debtors entered into a contract when they executed the Factoring Agreement. The Factoring Agreement obligated Republic to advance funds up to 90% of the Net Aggregate Face Value of accounts it "purchased" pursuant to the Factoring Agreement. Republic failed to advance any funds after September 11, 2015 but did not tell Bailey that was to be the case. Republic's last advances or fundings occurred on or about September 11, 2015 for the approximate amount of only $5,500.  Despite a clear obligation to advance funds for the Net Aggregate Face Value of accounts assigned up to 90% of that value, Republic collected **$968,000** from September 11, 2015 to November 5, 2015 on "purchased" invoices but advanced nothing, hence the quotation marks around the term purchased. This constitutes a failure to perform the obligations of the Factoring Agreement and is a breach of contract.  From September 12, 2015 through November 6, 2015, Debtors even sent an additional $924,504.65 to Republic for factoring and were advanced nothing ($0.00) by Republic.

142.    Republic also breached the Factoring Agreement when it applied a Termination Fee on October 2, 2015, approximately one month before the contract's actual termination on November 5, 2015. Republic breached the Factoring Agreement when it refused to turnover funds collected after the termination and in excess of its previous funding advances to the Debtors because of an improper demand that the Debtors provide a release of liability. The Factoring Agreement did not require the Debtors to provide a release upon termination. Republic further breached the Factoring Agreement by continuing to demand performance from Debtors after the contract had terminated, and by demanding Debtors continue to send their receivables to Republic

and telling the industry and Debtors' customers and potential customers and potential lenders the

Factoring Agreement was still in force and effect and that all payments should be sent to Republic.

143.    Debtors have established that the failure to perform resulted in damages in the

amount of $_____.

### 2.    Breach of the Duty of Good Faith and Fair Dealing.

144.    Under Louisiana Law, "[c]ontracts must be performed in good faith." *See* Louisiana

Civil Code Chapter 8, Section 1, Art. 1983; *Grisaffi v. Dillard Department Stores, Inc.*, 43 F.3d

982, 983 (5th Cir. 1995) ("Good faith performance is an implied requirement of every contract

under Louisiana law."). Republic did not engage in good faith performance of its contract and, as

a result, breached the duty of good faith and fair dealing.

145.    Republic's failure and breach of the duty of good faith and fair dealing resulted in

damages to the Debtors in the amount of $_____.

### 3.    Fraud.

146.    To establish a claim for fraud, the Debtors must prove by a preponderance of

evidence the following elements: (1) Republic made a representation to the Debtors; (2) the

representation was material; (3) the representation was false; (4) when Republic made the

representation, it either knew the representation was false or positively asserted the representation

recklessly and without knowledge of its truth; (5) Republic made the representation with the intent

that the Debtors act on it; (6) that the Debtors did rely on the representation; and (7) the

representation caused the Debtors injury. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d

194, 217 (Tex. 2011); *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex.

2011).

147.    Republic made numerous material representations to the Debtors related to the

Factoring Agreement and the relationship between the parties that would grow out of the execution

of the Factoring Agreement. Republic made these representations with the intent to induce the Debtors to enter into the Factoring Agreement and, more importantly, to keep the Debtors sending in their receivables for factoring after Republic had made the non-disclosed decision to end the factoring Agreement, not advance any funds to Debtors on their receivables so Republic could fully collect and liquidate its position, to the detriment of the Debtors and their creditors.

148.    Republic's numerous material and false representations included the following:

a.    Republic represented the Debtors would assign AR to Republic by submitting a schedule of such accounts to Republic via Republic's online portal, and then Republic would advance funds based on the amount of those accounts.

b.    Republic represented that Debtors would be entitled to 90% of the Accounts Receivable, and Republic would take its fees and expenses out of the 10% held back.  On a monthly basis, Republic was supposed to return any balance from the holdback to Debtors.

c.    Republic represented Debtors would have control of this 90% and decide how to and spend the 90% as they best saw fit to run and manage their businesses as would be expected.  This is what Debtors bargained for and was exactly what they needed, to continue and to succeed.

d.    Republic purposefully withheld information relating to their actual intentions, including but not limited to their intent to practice:  declaring accounts ineligible for no reason other than to place Debtors in a default position; continually threatening Debtors with either no funding or foreclosure; wrongfully reducing funding to the Debtors, thereby constricting operations and cash flow and making it impossible for the Debtors to buy materials and deliver customers' orders on time;

withholding payroll; taking over the paying of vendors and creditors and then paying vendors and creditors in arbitrary and capricious fashion; taking control of all business mail of Debtors, controlling and seizing the means of production; sending armed guards to intimidate and interfere with the duties of the employees of Debtors' business.

e.   Republic represented to Debtors it intended to help grow the Debtors' business, when in reality, Republic's only intention was to recover its principal investment and take as large a profit as possible through fees and penalties, no matter the cost to Debtors' business.

f.   Republic also represented to Debtors they would provide advances in order to pay employees, fund the business, and pay debts as they arose. Republic purposefully withheld knowledge that it would not do so, as the intent was to take all of the value of the Debtors' business for itself.

g.   Republic repeatedly misrepresented it would begin funding if Debtors would simply forward more account invoices for processing, or performed other acts harmful to Debtors but beneficial to Republic when Republic never did so and had no intention of doing so. Republic continued making these misrepresentations even after taking a Termination Fee on **October 2, 2015** until Debtors finally stopped assigning accounts receivable on **November 5, 2015**. Republic's taking the Termination Fee was not disclosed to Debtors. Debtors forwarded an additional $487,431.76 to Republic for factoring after Republic took the undisclosed Termination Fee.

149.     Republic knew the misrepresentations were false when the representations were made or Republic made the representations recklessly without the knowledge of the truth of the representations as a positive assertion. Plaintiff established that but for these representations, the Debtors would never have entered into the factoring arrangement pursuant to which Republic wrecked the Debtors' business or continued forwarding account invoices for processing on the promise of continued funding when none was forthcoming.

150.     The false representations caused significant financial injury to the Debtors, including the loss of the value of the business. Plaintiffs have established by a preponderance of the evidence that the damages sustained to the value of the business are $_____.  Plaintiffs have also established by a preponderance of the evidence that the damages sustained as a result of invoices assigned to Republic based on misrepresentations for which Debtors received no advances are the of the invoices so assigned, $_____.

### 4. Negligent Misrepresentation.

151.     The Debtors have also asserted companion claims for negligent misrepresentation. To prevail on a negligent misrepresentation claim, the Debtors must establish that Republic (1) made a representation to the Debtors in the course of their business or in a transaction in which Republic had an interest; (2) the information supplied was false and for the guidance of the Debtors; (3) that Republic did not exercise reasonable care or competence in communicating the information; (4) the Debtors justifiably relied upon the statements from Republic; and (5) the negligent misrepresentations proximately caused the Debtors' injuries. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999); RESTATEMENT (2D) OF TORTS § 552-552B (1977).

a.    Debtors have met their burden. Republic made numerous representations during the course of the relationship between the parties related to the Factoring Agreement and the performance of that agreement. Republic self-evidently had an interest in the transaction as a party to the Factoring Agreement and a financial interest in securing the most accounts receivable proceeds as possible to minimize their exposure on advances to the Debtors. Republic made at least the following misrepresentations: Republic represented the Debtors would assign AR to Republic by submitting a schedule of such accounts to Republic via Republic's online portal, and then Republic would advance funds based on the amount of those accounts.

b.    Republic represented that Debtors would be entitled to 90% of the Accounts Receivable, and Republic would take its fees and expenses out of the 10% held back.  On a monthly basis, Republic was supposed to return any balance from the holdback to Debtors.

c.    Republic represented Debtors would have control of this 90% and decide how to and spend the 90% as they best saw fit to run and manage their businesses as would be expected.  This is what Debtors bargained for and was exactly what they needed, to continue and to succeed.

d.    Republic purposefully withheld information relating to their actual intentions, including but not limited to their intent to practice:  declaring accounts ineligible for no reason other than to place Debtors in a default position; continually threatening Debtors with either no funding or foreclosure; wrongfully reducing funding to the Debtors, thereby constricting operations and cash flow and making it impossible for the Debtors to buy materials and deliver customers' orders on time;

withholding payroll; taking over the paying of vendors and creditors and then paying vendors and creditors in arbitrary and capricious fashion; taking control of all business mail of Debtors; controlling and seizing the means of production; sending armed guards to intimidate and interfere with the duties of the employees of Debtors' business.

e.     Republic represented to Debtors it intended to help grow the Debtors' business, when in reality, Republic's only intention was to recover its principal investment and take as large a profit as possible through fees and penalties, no matter the cost to Debtors' business.

f.     Republic also represented to Debtors they would provide advances in order to pay employees, fund the business, and pay debts as they arose.  Republic purposefully withheld knowledge that it would not do so, as the intent was to take all of the value of the Debtors' business for itself.

g.     Republic repeatedly misrepresented it would begin funding if Debtors would simply forward more account invoices for processing, or performed other acts harmful to Debtors but beneficial to Republic when Republic never did so and had no intention of doing so.  Republic continued making these misrepresentations even after taking a Termination Fee on **October 2, 2015** until Debtors finally stopped assigning accounts receivable on **November 5, 2015**.  Republic's taking the Termination Fee was not disclosed to Debtors.  Debtors forwarded an additional $487,431.76 to Republic for factoring after Republic took the undisclosed Termination Fee.

152.     The foregoing representations were false when made and Republic did not exercise due care in communicating them to the Debtors. In turn, the Debtors acted in justifiable reliance on the representations believing that they would receive additional funding and funding at the levels expressed in the Factoring Agreement, which would have enabled the Debtors to salvage their business at the end of 2015. As a result of Republic's statements and conduct, the Debtors were proximately caused and suffered damages relating to the loss of the value in their business in the amount of $_____.

### 5.  Deceptive Trade Practices.

153.     The Debtors were Texas businesses doing business in Texas. Texas law provides a remedy for individuals or corporations that were the victim of deceptive trade practices in the Texas Deceptive Trade Practices Act ("DTPA"). *See* Tex. Bus. & Com. Code §§ 17.41-17.63. Republic, Hunt, and Cafarelli were consumers within the meaning of the DTPA because they sought or acquired certain services in connection with the Factoring Agreement and did not have assets in excess of $25 million. *See* Tex. Bus. Com. Code § 17.45(10).

154.     Republic is a person under the DTPA and is capable of being sued for deceptive practices related to the services it provided and/or required the Debtors under the Factoring Agreement. *See* Tex. Bus. & Com. Code § 17.45(3).

155.     Republic made numerous misrepresentations regarding its services and the Factoring Agreement that qualify as false, misleading, or deceptive, including:

a.     Republic represented the Debtors would assign AR to Republic by submitting a schedule of such accounts to Republic via Republic's online portal, and then Republic would advance funds based on the amount of those accounts.

b.     Republic represented that Debtors would be entitled to 90% of the Accounts Receivable, and Republic would take its fees and expenses out of the 10% held

back.  On a monthly basis, Republic was supposed to return any balance from the holdback to Debtors.

c.  Republic represented Debtors would have control of this 90% and decide how to and spend the 90% as they best saw fit to run and manage their businesses as would be expected.  This is what Debtors bargained for and was exactly what they needed, to continue and to succeed.

d.  Republic purposefully withheld information relating to their actual intentions, including but not limited to their intent to practice:  declaring accounts ineligible for no reason other than to place Debtors in a default position; continually threatening Debtors with either no funding or foreclosure; wrongfully reducing funding to the Debtors, thereby constricting operations and cash flow and making it impossible for the Debtors to buy materials and deliver customers' orders on time; withholding payroll; taking over the paying of vendors and creditors and then paying vendors and creditors in arbitrary and capricious fashion; taking control of all business mail of Debtors; controlling and seizing the means of production; sending armed guards to intimidate and interfere with the duties of the employees of Debtors' business.

e.  Republic represented to Debtors it intended to help grow the Debtors' business, when in reality, Republic's only intention was to recover its principal investment and take as large a profit as possible through fees and penalties, no matter the cost to Debtors' business.

f.  Republic also represented to Debtors they would provide advances in order to pay employees, fund the business, and pay debts as they arose.  Republic purposefully

withheld knowledge that it would not do so, as the intent was to take all of the value of the Debtors' business for itself.

g.    Republic repeatedly misrepresented it would begin funding if Debtors would simply forward more account invoices for processing, or performed other acts harmful to Debtors but beneficial to Republic when Republic never did so and had no intention of doing so. Republic continued making these misrepresentations even after taking a Termination Fee on **October 2, 2015** until Debtors finally stopped assigning accounts receivable on **November 5, 2015**. Republic's taking the Termination Fee was not disclosed to Debtors. Debtors forwarded an additional $487,431.76 to Republic for factoring after Republic took the undisclosed Termination Fee.

156.    Republic's conduct with respect to the Debtors constituted an unconscionable course of action and was commercially unreasonable. *See* Tex. Bus. & Com. Code § 17.50(a)(3). An unconscionable act is one that, to a consumer's detriment, takes advantage of the consumer's ability or lack of knowledge to a grossly unfair degree. *See* Tex. Bus. & Com. Code § 17.45(5). To prove an unconscionable action or course of action, the plaintiff must show the resulting unfairness was "glaringly noticeable, flagrant, complete and unmitigated." *Bradford v. Vento*, 48 S.W.3d 749, 706 (Tex. 2001).

157.    Republic's conduct was a producing cause of the Debtors' damages. A producing cause requires that the act be both a cause-in-fact and a substantial factor in causing the Debtors' injuries. *See Brown v. Bank of Galveston*, 963 S.W.2d 511, 514 (Tex. 1998). Republic's conduct and deceptive practices caused the Debtors to lose basically their entire cashflow at precisely the moment the plaintiffs needed it the most. Republic's actions were a cause in the natural sequence

of events that led to both the direct loss of funds related to accounts, but also to the ultimate demise of the business itself. As a result, Plaintiffs were damaged and should be awarded $_____.

158.    Republic committed the foregoing acts knowingly and intentionally. *See* Tex. Bus. & Com. Code § 17.45(9) and (13). Republic was aware of the unfairness of its actions and specifically intended to deprive the Debtors of the ability to collect accounts that it otherwise should have been able to collect. Based on Republic's conduct, the Debtors are entitled to treble economic damages in the amount of three times the actual damages found in paragraph 91, plus the Trustee Plaintiff's attorneys' fees in paragraph 93.

159.    The DTPA permits a prevailing plaintiff to be awarded reasonable and necessary fees. Plaintiffs are the prevailing parties and, as such, are entitled to attorneys' fees in the amount of $_____.

160.    The legal analysis and result would not be dissimilar under the Louisiana Deceptive Trade Practices Act, La. Rev. Statues §1:1401 et seq.

### 6. Business Disparagement.

161.    The Debtors have asserted business disparagement claims. A business disparagement claim requires a plaintiff to establish that (1) the defendant published disparaging words about the plaintiff's economic interests; (2) the words were false; (3) the defendant acted with malice; (4) the defendant acted without privilege; and (5) the publication caused special damages. *See Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003); *Hurlbut v. Gulf Atl. Life Ins.*, 749 S.W.2d 762, 766 (Tex. 1997). A defendant acts with malice when it (1) knows the statement in question is false; (2) acts with reckless disregard for whether the statement is true; (3) acts with ill will; *or* (4) intends to interfere with the plaintiff's economic

interest. *Hurlbut*, 749 S.W.2d at 766. Special damages include losses the plaintiff has suffered or liquidated (e.g., loss of specific sales or accounts). *Id.*

162. In late 2015, Republic continued to tell third party vendors that it owned the Debtors' accounts receivable and that all payments on the accounts should be made directly to Republic, despite the fact that (a) Republic had long since stopped advancing funds under the Factoring Agreement, (b) had taken a $75,000 Termination Fee it was entitled to only if the contract was terminated, and (c) determined to begin maximizing collection efforts at the expense of the Debtors' business interests. After the termination of the agreement on November 5, 2015, Republic did not "own" any rights to proceeds that were generated after November 5, 2015 and, as a result, its statements to third parties were both false and without any privilege. The statements impacted with the economic interests of the Debtors. Republic acted with malice in that they intended to interfere with the Debtors' economic interest in the receivables and made a concerted, intentional effort to divert those funds to itself.

163. The Debtors suffered special damages in the loss of direct proceeds related to receivables that Republic no longer had any rights to collect from in the amount of approximately $_____, and damages of lost orders and future business which was part of the overall demise of the business and loss of a business value.

### 7. Fraudulent transfers.

164. The Debtors may avoid any transfer of an interest of the Debtors in property that was made within four years before the Petition Date in exchange for less than reasonably equivalent value because the Debtors were insolvent at the time. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I); Tex. Bus. & Comm. Code § 24.006(a).

165. Republic's conduct rendered the Debtors insolvent by no later than September 11, 2015, so the Debtors were engaging in a business or transactions, or were about to engage in a

business or transactions, for which their capital was unreasonably small. *See* 11 U.S.C. 548(a)(1)(B)(ii)(II); Tex. Bus. & Comm. Code § 24.005(a).

166.     Under the terms of the Factoring Agreement, Republic would "purchase" accounts receivable based on an assignment schedule provided by the Debtors. The so-called consideration for the "purchase" of these accounts was an obligation to advance funds up to 90% of the Net Aggregate Face Value. Republic ceased advancing funds on September 11, 2015 and, as a result, stopped providing any consideration, much less reasonably equivalent value to the Debtors in exchange for their accounts receivable. Republic continued to collect funds, however, after September 11, 2015 on accounts it had already "purchased" and continued to do so, despite becoming over-collected within a few weeks.

167.     The transfer of accounts after September 11, 2015 to Republic for which the Debtors received no further funding advances or any consideration whatsoever constitute voidable fraudulent transfers. The collection of proceeds in excess of funds advanced or loaned to Republic also constitute avoidable fraudulent transfers in property in which the Debtors have an interest. A plaintiff is entitled to recover the value of the fraudulent transfer if it is avoided under Sections 544 and 548 of the Bankruptcy Code. *See* 11 U.S.C. § 550. The value of the avoidable transfers Republic owes the Debtors and, thus, the Debtors' damages with respect to the fraudulent transfers is $_____. This also entitles Trustee to recover his attorney's fees under the Texas Fraudulent Conveyance Statute, Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 24.005 et seq.

### 8. Conversion

168.     The Debtors may recover for monies that Republic unlawfully converted through their abuse of the Factoring Agreement. In Texas, conversion occurs when (a) the plaintiff owned, possessed, or had the right to immediate possession of property; (b) the property was personal

property; (c) the defendant wrongfully exercised dominion or control over the property; and (d) the plaintiff suffered injury. *See Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997); *Dolenz v. Continental Nat'l Bank*, 620 S.W.2d 572, 576 n.2 (Tex. 1981).

169.    Debtors owned, continue to own, and had and have a right to immediate possession of the monies and accounts taken after the termination of the contract on November 5, 2015. The Funds and the Debtors' accounts are personal property. Republic wrongfully exercised and continues to wrongfully exercise control over the Funds and the Debtors' accounts. The Debtors suffered injury as a result of Republic's wrongful actions in the amount of the funds wrongfully possessed. The Court previously ruled that $82,121.58 in funds were improperly withheld or possessed by Republic and these amounts are determined to be converted funds. *See Order Regarding Trustee's Motion to Enforce Order and Compel Turnover*, dated June 25, 2020 (ECF # 298).    Additionally there were funds wrongfully taken and withheld for bogus fees, charges, penalties, and payments charged that were not owed.  There were also converted by Republic.

### 9.  Theft

170.    Based on this same conduct, Republic has committed theft within the meaning of Tex. Penal Code § 31.03 because it unlawfully appropriated the Funds and the Debtors' accounts with the intent to deprive the Debtors of the funds. Republic therefore committed theft within the meaning of Tex. Civ. Prac. & Rem. Code § 134.002. Republic is liable for damages and penalties resulting from such theft. *See* Tex. Civ. Prac. & Rem. Code § 134.003.

171.    The Debtors are entitled to damages related to the civil theft in the amount of at least $_____. The Debtors are also entitled to a $1000 penalty payment for each account that was taken unlawfully. *See* Tex. Civ. Prac. & Rem. Code § 134.005(a)(1). Republic unlawfully took ____ accounts receivable and is assessed a penalty of $_____ to be paid to the Debtors.  This also entitles the Trustee to recover his attorneys fees.

### 10. Tortious Interference with Contractual Relationships

172.     In Texas, a party bringing suit for tortious interference with a contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's damage; and (4) actual damage or loss occurred. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

173.     The Debtors had valid contracts with their customers and vendors, including Trelleborg. Republic willfully and intentionally interfered with those contracts by, for example, claiming that Trelleborg should not pay the Debtors; threatening Trelleborg with litigation if Trelleborg were to pay the Debtors; and intentionally and wrongfully withholding funds from the Debtors, thereby causing the Debtors to be unable to fulfill orders. Republic also interfered with Debtors' relationship with its vendors by not allowing Debtors to pay them in a manner to keep them supplying Debtors.

174.     As the conclusions of law and findings of fact above demonstrate, Republic's conduct is independently tortious because it constituted conversion, business disparagement, fraud and deceptive trade practices.

175.     Republic's interference caused significant financial injury to the Debtors. For example, Republic's ongoing interference drove away large customers like Trelleborg and made it impossible for the Debtors to fill orders from customers large and small because of interference with its vendors and thereby stay in business. Republic's actions directly and proximately caused the failure of Debtors' business resulting in damages in the amount of $_____.

### 11. Tortious Interference with Prospective Business Relations

176.     To succeed on a claim for tortious interference with a prospective contract, the Debtors must prove: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third person; (2) the Defendant intentionally interfered with the

relationship; (3) the Defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the Plaintiff's injury; (5) the Plaintiff suffered actual damage or loss. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). While the claim doesn't require an actual business relation to have formed, a Plaintiff must establish it had: (1) a business relationship that had not yet been reduced to a contract; or (2) a continuing business relationship that was not formalized by a written contract. *Heil-Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex.App.—Houston [14th Dist.] 1993).

177.    Republic's wrongful exercise of control over the Debtors and their capital likewise prevented the Debtors from having access to cash and took away the Debtors' ability to manage their own business. Republic's efforts continued after the Debtors filed bankruptcy through their wrongful and bad faith claim that the factoring agreement was still in effect and that Republic owned all of the Debtors' receivables (long after Republic had been paid in full). Republic's conduct prevented the Debtors from entering into future contracts or continued relationships with its vendors and customers. The Debtors were damaged in the amount of $_____ due to Republic's tortious interference with prospective relations.

### 12. Violation of the Automatic Stay

178.    A party violates the automatic stay by undertaking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A party violates the automatic stay by undertaking "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). A party violates the automatic stay by undertaking "any act to collect, assess, or recover a claim agains the debtor that arose before the commencement of the [bankruptcy case]." 11 U.S.C. § 362(a)(6). A party violates the stay by attempting "the setoff of any debt owing to the debtor that arose before the commencement of the case . . . against any claim against the debtor." 11 U.S.C. § 362(a)(7).

Finally, a party violates the stay if they exercise control over property to which the debtor has even an arguable claim of right. *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005) ("Here, we face the question whether the creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right …. We answer in the affirmative ….").

179.     Willful violations of the automatic stay are punishable by the Court's inherent contempt power and the authority vested in the Bankruptcy Court under Section 105(a) of the Bankruptcy Code. *See In re MD Promenade, Inc.*, 2009 WL 80203, at *12 (Bankr. N.D. Tex. 2008) (unpublished) ("However, this court may award damages to a corporate debtor (or, in this case, the trustee of the estate of a corporate debtor) *in the form of contempt sanctions in order to enforce this court's civil contempt power pursuant to this court's equitable authority under* section 105(a)." (emphasis in orig)). An individual debtor may recover actual damages, including costs and attorneys' fees, and potentially exemplary damages for willful violations of the automatic stay. 11 U.S.C. § 362(k).

180.     Republic acted willfully in its efforts to ensure collections were prioritized for its benefit to the detriment of the Debtors and the bankruptcy estate in violation of Republic's agreements and representations. Republic violated the automatic stay by demanding post-petition that certain vendors (e.g., Trelleborg) not pay the Debtors but pay Republic directly instead. The Debtors clearly owned those receivables and had more than an arguable claim of right to the proceeds from Trelleborg and other accounts receivable vendors generated after the November 5, 2015 termination date of the Factoring Agreement. Republic's efforts to direct these proceeds be paid directly to it instead of the Debtor or the bankruptcy estate was a willful violation of the automatic stay.

181. Republic also willfully violated the automatic stay by refusing to turn over cash it held after the bankruptcy cases were commenced, which cash the Court has already ordered be turned over to the Debtors pursuant to a turnover motion in the bankruptcy case and by continuing to insist the Agreement was still in effect after it had taken a Termination Fee and had no intention of advancing any more funds, even after Debtors had filed for Chapter 11, and telling existing customers, future customers and potential lenders and investors that.

182. The Debtors were damaged as follows: One element of the Debtors' damage is the $88,000, which represents the amount of money that is known to have been wrongfully collected and withheld from the Debtors by Republic. The second element of damages comes from the effect the lack of these funds had on the Debtors' ability to continue in business, as previously found, and the failure of the Debtors to successfully reorganize under Chapter 11. It is appropriate that all of the administrative expenses in the amount of $_____ be charged as damages for breach of the automatic stay against Republic. Because of Republic's willful conduct, punitive damages in the amount of three times that amount ($_____) are justified and awarded in the Court's discretion. The Court also awards costs and attorneys' fees in the amount of Two Hundred Fifty Thousand Dollars ($250,000) related to the Plaintiffs' efforts to enforce the automatic stay.

### 13. Partnership Liability.

182. Under section 152.051(b) of the Texas Business Organizations Code, "an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." Section 152.052 of the Texas Business Organizations Code provides as follows:

(a)   Factors indicating that persons have created a partnership include the persons':

> (1)   receipt or right to receive a share of profits of the business;
>
> (2)  expression of an intent to be partners in the business;
>
> (3)   participation or right to participate in control of the business;
>
> (4)  agreement to share or sharing:
>
>> (A)  losses of the business; or
>>
>> (B)  liability for claims by third parties against the business; and
>
> (5)   agreement to contribute or contributing money or property to the business.

(b)  One of the following circumstances, by itself, does not indicate that a person is a partner in the business;

> (1)   the receipt or right to receive a share of profits as payment:
>
>> (A)  of a debt, including repayment by installments;
>>
>> (B)  of wages or other compensation to an employee or independent contractor;
>>
>> (C)  of rent;
>>
>> (D)   to a former partner, surviving spouse or representative of a deceased or disabled partner, or transferee of a partnership interest;
>>
>> (E)  of interest or other charge on a loan, regardless of whether the amount varies with the profits of the business, including a direct or indirect present or future ownership interest in collateral or rights to income, proceeds, or increase in value derived from collateral; or
>>
>> (F)   of consideration for the sale of a business or other property, including payment by installments;
>
> (2)  co-ownership of property, regardless of whether the co-ownership:
>
>> (A)  is a joint tenancy, tenancy in common, tenancy by the entirety, joint property, community property, or part ownership; or
>>
>> (B)  is combined with sharing of profits from the property;
>
> (3)  the right to share or sharing gross returns or revenues, regardless of whether the persons sharing the gross returns or revenues have a common or joint interest in the property from which the returns or revenues are derived; or
>
> (4)  ownership of mineral property under a joint operating agreement.

(c) An agreement by the owners of a business to share losses is not necessary to create a partnership.

183.    Under section 152.304(a) of the Texas Business Organizations Code, generally speaking, "all partners are jointly and severally liable for all obligations of the partnership …."

184.    Republic received a share of the Debtors' profits by charging various fees and expenses to the Debtors' account, and, in fact, Republic claims it is entitled to receive and retain all the Debtors revenue into perpetuity until the Debtors sign a general release satisfactory to Republic. Through threats, intimidation, breaches of duties and purported contractual terms and misrepresentations, Republic did, in fact, illegally exercise excessive control over the Debtors' business and caused the Debtors not to be able to pay many of their creditors, ultimately resulting in these bankruptcy cases, by, inter alia, controlling the Debtors' accounts payable and vendor payments, refusing to make or fund the Debtors' payroll, refusing to permit certain employees to draw a salary, installing armed security guards and cameras at the Debtors' facility, fabricating alleged "thefts" of materials and sending police to the Debtors' facility in an effort to manipulate and intimidate the Debtors' employees and management, paying the Debtors' utilities and vendors directly, and otherwise dealing directly with the Debtors' customers and vendors.

185.    From early-July 2015 through mid-September 2015, Republic controlled virtually every major component of the Debtors' business:

- ◆    Republic paid the Debtors' employees directly;

- ◆    Republic decided which employees would be paid;

- ◆    Republic decided which employees were "absolutely necessary;"

- ◆    Republic ordered layoff of employees;

- ◆    Republic hired security personnel and installed cameras at the Debtors' facility;

- ◆    Republic required the Debtors' vendors to enter into "Three Party Payment Agreements," under which Republic imposed terms on the vendors;

◆ Republic paid the Debtors' vendors directly;

◆ Republic determined when and what raw materials the Debtors purchased; and

◆ Republic controlled the Debtors' purchase of basic business supplies.

186. As a result of Republic directly causing damage to the Debtors' creditors through its control of the Debtors, its receipt of profits, and its contribution of money or property to the Debtors' business, Republic is directly liable to the Debtors' creditors for any such damages as a *de facto* partner. Because Republic is a *de facto* partner of the Debtors, it is jointly and severally liable for the debts of the bankrupt entities, including the administrative costs associated with the bankruptcy filing for the benefit of the creditors. Republic is jointly and severally liable for $_____ in unpaid creditor claims and $_____ in administrative expenses allowable pursuant to the Bankruptcy Code.

### 14. Breach of Fiduciary Duty

187. To establish a claim for breach of fiduciary duty, the Debtors must prove by a preponderance of evidence that (1) the parties were in a fiduciary relationship; (2) that Republic breached its fiduciary duty to the Debtors; and (3) the breach resulted in injury to the plaintiff *or* benefit to the defendant. *See Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999).

188. A court may find a fiduciary duty as a matter of law or fact based on the formal or informal relationships of the parties. Under section 152.204 of the Texas Business Organizations Code, a partner in a partnership owes the partnership and the other partners a duty of loyalty and a duty of care. A partner must exercise these duties "(1) in good faith; and (2) in a manner the partner reasonably believes to be in the best interest of the partnership." The Court has already determined that Republic was a *de facto* partner of the Debtors and, as a result, owed fiduciary duties to its partner.

189.     To the extent that ¶ 12.6 of the Factoring Agreement purports to limit Republic's liability in advance for intentional or gross fault, it is null under La. Civ. Code ann. ¶ 2004. As a result of being a *de facto* partner in the Debtors' business, Republic owed fiduciary duties to the Debtors, including the duty of care, the duty of loyalty, the duty to act fairly, and the duty of good faith and fair dealing. Republic breached these duties by using its control over the Debtors' business to steal from the Debtors. Republic's breaches of fiduciary duty and the resulting theft have significantly damaged the Debtors' business because the breaches resulted in the loss of the business value of the Debtors. Republic is liable for damages related to the loss in value of the Debtors in the amount $_____.

### 15. Equitable Subordination

190.     Equitable subordination, first recognized at common law, is codified in Section 510(c) of the Bankruptcy Code and provides, in relevant part:

> after notice and a hearing, the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest ...

191.     The elements of equitable subordination in the Fifth Circuit as follows: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008). Further, "[e]quitable subordination is remedial, not penal, in nature, and in the absence of actual harm, equitable subordination is inappropriate." *Id.* at 361. Equitable subordination does require some level of actual harm to the Debtors and its unsecured creditors. *See id.* at 361-62.

192. Republic's conduct satisfies the elements of equitable subordination and the claims of Republic are deemed subordinated to all other classes of creditors and interests. Republic's conduct related to the Debtors was inequitable. Republic took advantage of its financial relationship with the Debtors so as to ensure that it was over-collected and during a time of financial distress or crisis at the Debtors. Republic's charging of a secret termination fee, refusal to advance funds on invoices assigned to it while simultaneously collecting proceeds to repay itself for advances to the Debtors caused actual harm to the Debtors and the trade creditors of the Debtors. Subordinating Republic's claims is consistent with the purposes of the Bankruptcy Code.

### 16. Attorneys' Fees

193. Trustee has shown himself entitled to recover his attorneys' fees under:

a. TEXAS BUSINESS AND COMMERCE CODE § 24.013 in the amount of _____.

b. TEXAS CIVIL PRACTICE AND REMEDIES CODE §§ 38.001 and 134.005(b) in the amount of _____.

c. the Court's contempt power in the amount of _____.

d. under the TEXAS DECEPTIVE TRADE PRACTICES ACT on any other Deceptive Trade Practices Act that applies in the amount of _____.

### 17. Exemplary Damages

194. By clear and convincing evidence, the Trustee has shown himself entitled to exemplary damages under Texas Civil Practice and Remedies Code § 41.003 because Republic acted with fraud, malice, and gross negligence in causing the Debtors damages as set forth above.

Respectfully submitted,

By: /s/ Jerry C. Alexander                            /s/ Andrew B. Sommerman

| | |
|---|---|
| Jerry C. Alexander | Andrew B. Sommerman |
| Texas Bar No. 00993500 | Texas Bar No. 18842150 |
| Christopher A. Robison | Sean J. McCaffity |
| Texas Bar No. 24035720 | Texas Bar No. 24013122 |
| **PASSMAN & JONES, P.C.** | **SOMMERMAN, MCCAFFITY, QUESADA & GEISLER, L.L.P.** |
| 1201 Elm Street, Suite 2500 | |
| Dallas, Texas 75270-2599 | 3811 Turtle Creek Blvd., Suite 1400 |
| Tel: (214) 742-2121 | Dallas, Texas 75219 |
| Fax: (214) 748-7949 | Tel: (214) 720-0720 |
| alexanderj@passmanjones.com | Fax: (214) 720-0184 |
| robisonc@passmanjones.com | andrew@textrial.com |
| | smccaffity@textrial.com |

*Special Litigation Counsel for James W. Cunningham, Chapter 7 Trustee*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 17th day of December 2020, a true and correct copy of the foregoing was served on counsel of record via e-mail.

/s/ Jerry C. Alexander                   

Jerry C. Alexander