Richard A. Illmer
State Bar No. 10388350
**HUSCH BLACKWELL LLP**
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
Telephone: 214.999.6100
Facsimile: 214.999.6170


Vickie L. Driver
State Bar No. 24026886
**CROWE & DUNLEVY, P.C.**
1919 McKinney Avenue, Suite 100
Dallas, Texas  75201
Telephone: 214.420.2163
Facsimile: 214.736.1762
***Counsel for Republic Business Credit, LLC***

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-bjh7** |
| **MANUFACTURING COMPANY, et al.** | § | **Chapter 7** |
| | § | |
| **Debtors.** | § | |
| | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Adv. No. 16-03025-bjh** |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |

| | |
|---|---|
| **CAFARELLI METALS, INC.,** | § |
| | § |
| **Counter-Defendants.** | § |
| | § |
| _____ | §  _____ |
| | § |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § |
| | § |
| **Third-Party Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **JOHN BUTTLES,** | § |
| | § |
| **Third-Party Defendant.** | § |
| | § |
| | § |

## REPUBLIC BUSINESS CREDIT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW, Republic Business Credit, LLC,  and respectfully submits to the Court the following Proposed Findings of Fact and Conclusions of Law:

## I.    FINDINGS OF FACT

### A.    The Parties

1.    Bailey Tool & Manufacturing Company ("Bailey"), Hunt Hinges, Inc. ("Hunt Hinges"), and Cafarelli Metals, Inc. ("Cafarelli") (collectively "Debtors") are Texas corporations and former debtors and debtors-in-possession in the above-captioned, jointly administered bankruptcy cases.

2.    Generally, the Debtors were in the business of metal fabrication.

3.    John Buttles ("Buttles") is the owner and principal of Debtors.

4.    Bailey's 2013 federal income tax return shows it had:

      a.    gross sales of $10,500,691.00; and

      b.    a loss of $2,361,401.00 DX297

2

5.　　　Bailey's 2014 federal income tax return shows it had:

- gross sales of $10,144,154.00
- a loss of $3,735,360.00. DX298.

6.　　　Due at least in part to Debtors' lack of profitability in late 2014 through March of 2015, Debtors were unable to secure financing from a traditional lender.

7.　　　In their search for a new source of financing, Debtors were referred to Republic Business Credit, LLC ("RBC").

8.　　　RBC is a Louisiana limited liability company. RBC is a collateralized lender and factor. Like most factoring companies, RBC's customers typically are businesses in financial distress, unable to obtain financing from more traditional lenders.

**B.　　The Agreements**

9.　　　In late 2014 and early 2015, Debtors and RBC negotiated the terms of a factoring arrangement and inventory loan and security agreement using the Debtors' accounts receivable and inventory.

10.　　　As part of their application to RBC, Debtors represented that their assets exceeded their liabilities—more specifically that, as of September 30, 2014, their assets totaled $7,723,153.00, and their liabilities totaled $5,422,605.00. BBTrialEX_0509. Debtors also made representations concerning the value of their inventory. BBTrialEX_0509.

11.　　　Debtors also made representations relating to a contract between Bailey and the government for the manufacture of a bullet assembly machine ("BAM") for the U.S. Army. Debtors represented that the remaining balance on the BAM contract was $672,020.00. DX58. Debtors represented to RBC that the government had been unable to provide key materials for Bailey's completion of the BAM, which resulted in delay on the contract and caused Bailey related damages. DX26.

12.     Debtors did not have any reasonably probable business relationship with TEAM Partners, NASA, SpaceX, or Elon Musk.

13.     As of February 23, 2015, Debtors had not yet submitted to the government two invoices dated December 31, 2014 relating to the BAM (#20092 and #20093, together the "BAM Receivables") totaling $273,895.00. DX26. Debtors represented that they had not yet invoiced the BAM Receivables because they were waiting for a calculation of Bailey's damages so that this amount could be included in the invoices. DX26.

14.     Since the BAM Receivables had not yet been submitted to the government at the time the factoring arrangements were executed, RBC could have declared them ineligible for the initial funding. Instead, as an accommodation to Debtors, RBC advanced approximately 60% on the BAM Receivables as part of the initial funding. DX27, DX44, DX48.

15.     On February 27, 2015, each of Debtors and RBC entered into Agreements for Purchase and Sale dated February 25, 2015 (collectively with the Purchase Provisions and Annex A, the "Factoring Agreements"), which became effective on March 3, 2015. DX 309-311.

16.     For all practical purposes, the Factoring Agreement between RBC and each of the Debtors is identical.

17.     As set forth in the Factoring Agreements, Debtors agreed to sell RBC all of their accounts receivable and, in exchange, RBC agreed to advance up to 90% of eligible receivables. The Purchase Agreement does not require RBC to advance 90% of the amount of each Account sold to RBC. Rather, RBC has an "option to pay to [Debtors] an Advance for all Eligible Accounts…" As set forth in Annex A of the Purchase Agreement, an Account may be ineligible for an advance if, for example, it was aged beyond 90 days or due from an Account Debtor that did not pay within invoice terms.

18.     The Factoring Agreements provide that all funds collected are subject to a reserve. The Obligation, a defined term in the Factoring Agreement, includes, among other things, attorneys' fees.

19.     The Purchase Agreement also gives RBC the right to create a Reserve (defined below) for Obligations (defined below) that would otherwise be due RBC under the terms of the Purchase Agreement. RBC determines the amount and duration of the Reserve in its "sole and exclusive discretion."

20.     The Factoring Agreements entitle RBC to notify Debtors' Account Debtors that payment of accounts receivable shall be made directly to RBC.

21.     Paragraph 8.4 of the Purchase Provisions provides that upon the termination of the Purchase Agreement, the terms of the Purchase Agreement continue to be effective until all Obligations of the Debtors have been completed and satisfied in full.

22.     In Section 12.2 of the Factoring Agreements, the parties agreed that RBC did not make any representations other than those forth in the Factoring Agreements.

23.     Section 12.15 also provides that Debtors agreed they were not relying on any representation outside the Purchase Agreement.

24.     Section 12.5 of the Factoring Agreements bars Debtors from recovery of consequential damages.

25.     Under Section 10.4 of the Factoring Agreements, the parties agreed that Debtors waived the right to attorneys' fees. More specifically, the Factoring Agreements provide that "Notwithstanding the existence of any law, statute or rule, in any jurisdiction that may provide [Debtor] with a right to attorney's fees or costs, [Debtor] hereby waives any and all rights to hereafter seek attorney's fees or costs thereunder".

26.     In addition, the Factoring Agreements contain the following provisions:

a.      "'Advance Rate' shall mean an amount up to Ninety Percent (90.0%) of the Aggregate Net Face Value of Accounts identified in each Assignment Schedule delivered to Purchaser." Factoring Agreement, Definitions, Section 2.2

b.      "'Obligation' shall mean all present and future obligations owing by [Debtor] to [RBC], whether or not for the payment of money and whether or not evidenced by any note or other instrument, and includes all Advances, fees, debts, liabilities and obligations due to [RBC] by [Debtor]…including but not limited to any obligations that [RBC] reasonably anticipates are likely to occur or that may adversely affect [RBC]'s ability to collect Accounts Purchased in the future." Factoring Agreement, Annex A, Standard Definitions

c.      "[RBC] shall have the option to purchase from and [Debtor] shall assign and offer for sale exclusively to [RBC] as absolute owner, all of [Debtor]'s right, title and interest in and to: (a) [Debtor]'s now existing and hereafter created Accounts together with all corresponding rights with respect thereto and proceeds thereof…" Purchase Provisions, Section 1.1

d.      "Upon [Debtor]'s submission of an Assignment Schedule, [RBC] shall be deemed to have purchased the Accounts set forth therein unless [RBC] provides written notice of its intent not to purchase such Accounts. Upon [RBC]'s purchase of the Accounts, [RBC] shall have the option to pay to [Debtor] an Advance for all Eligible Accounts based on the Advance Rate for said Accounts or any portion thereof. Thereafter, Available Funds will be distributed to [Debtor] upon request, subject to [RBC]'s right to maintain a Reserve." Factoring Agreement, Purchase Provisions, Section 2

e.      "[Debtor] specifically acknowledges and agrees that [RBC] has not made and shall not at any time be deemed to have made and hereby disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future of by [RBC] except as specifically set forth herein… There are no and [Debtor] is not relying on any written or oral representations not expressly written in this Purchase Agreement." Factoring Agreement, Purchase Provisions, Section 12.15

f.      "[Debtor] acknowledges that the relationship under the Purchase Agreement is principally that of seller and purchaser and that there is not now, and [Debtor] will at no time seek or attempt to establish, any fiduciary or confidential relationship between [RBC] and [Debtor]. [Debtor] waives any right to assert, now or in the future, the existence or creation of any fiduciary or confidential relationship between [RBC] and [Debtor] in any

action or proceeding, whether by way of claim, counterclaim, cross claim or otherwise." Factoring Agreement Purchase Provisions, Section 12.6.

g. "An Event of Default shall be deemed to have occurred hereunder upon the happening of any one or more of the following: (a) [Debtor] shall fail to pay when due any Obligation;… (e) [Debtor] shall fail to perform any duty under this Purchase Agreement; (f) [Debtor] breaches any warranty, representation or covenant set forth herein, or any warranty, representation or covenant is not true, accurate or correct;… (h) [Debtor] shall fail to pay any federal or state tax or fail to timely file any tax form as and when due; (i) a material adverse change occurs in [Debtor]'s financial condition, business or operations;… (m) an Event of Default occurs under the Inventory Loan Facility or Subordination Agreement; or (n) [RBC] deems itself insecure and has reasonable cause to believe that the prospect of [Debtor]'s performance under the Agreement appears jeopardized or if [RBC] deems itself insecure and has reasonable cause to believe that the prospect of any Guarantor's performance appears jeopardized regardless of [Debtor]'s performance." Factoring Agreement Purchase Provisions, Section 7.1.

h. "Upon the occurrence of an Event of Default: (a) all Obligations owed to [RBC] shall be immediately due and payable upon demand by [RBC]; (b) [RBC] shall have the right to charge [the 'Default Rate']…(c) [RBC] shall have the right, at its discretion, to cease further Advances and/or to terminate this Purchase Agreement, all of which may be done without notice to [Debtor] and [RBC] may immediately exercise all rights and remedies under this Purchase Agreement, the Uniform Commercial Code and applicable law…" Factoring Agreement Purchase Provisions, Section 7.2.

i. "Entire Agreement. The Purchase Agreement contains the entire understanding of the Parties hereto and relating to the subject matter hereof and is the final and complete expression of their intent. No prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing have been made by the Parties, or any of them…it being the intention of the Parties hereto that in the event of any subsequent litigation, controversy, or dispute concerning the terms or provisions of this Purchase Agreement, no party shall be permitted to offer or introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing." Factoring Agreement Purchase Provisions, Section 12.2.

j. "Merger/No Reliance. [Debtor] specifically acknowledges and agrees that [RBC] has not made and shall not at any time be deemed to have made and hereby disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future of by [RBC]

except as specifically set forth herein. This Agreement is executed freely and voluntarily and without reliance upon any statement or representation of [RBC]…There are no and [Debtor] is not relying on any written or oral representations not expressly written in this Purchasing Agreement." Factoring Agreement, Purchase Provisions, Section 12.15.

**k.** "Reserve. All Advances and distribution of Available Funds shall be subject to [RBC]'s right to maintain a Reserve. The term "Reserve" shall be designated by a ledger entry and all cash received pursuant to the Reserve shall serve as security in the event that [RBC] (i) fails to receive or anticipates failure to receive full payment for each Account Purchased for any reason; or (ii) has Obligations due and owing. [RBC] may, in its sole and exclusive discretion, increase or decrease such Reserve as [RBC] may deem necessary to protect Purchaser's interests. Purchaser may hold any payment instrument received until Purchaser can confirm the availability of good and clear funds for such payment instrument." Factoring Agreement, Purchase Provisions, Section 4.

DX 309-311.

27.     The Factoring Agreements contain a choice of law clause, which provides that "[the Factoring Agreement] in all respects shall be governed by and construed in accordance with the domestic laws of [Louisiana]". Factoring Agreement, Purchase Provisions, Section 7.2.

28.     In addition to the Factoring Agreements, Debtors each entered into a Revolving Inventory Loan and Security Agreement ("Inventory Loan") with RBC, under which Debtors received a loan secured by their inventory. DX 312-314.

29.     For all practical purposes, the Inventory Loan between RBC and each of the Debtors is identical.

30.     The Factoring Agreements were secured by a personal guaranty executed by Buttles. DX30.

31.     RBC provided Debtors access to an online portal, which allowed them to view various reports. After Debtors entered into the Factoring Agreements, RBC sent Notices of Assignment ("NOA") to Debtors' Account Debtors, including Trelleborg Automotive USA, Inc.

HB: 4811-1842-6571.8

("Trelleborg").[1] The NOAs informed the Account Debtors that all payments on accounts payable to Debtors must be paid to RBC, not to Debtors. Upon receipt of the NOAs, Debtors' Account Debtors, including Trelleborg, became obligated to remit payment to RBC in accordance with § 9.406 of the Uniform Commercial Code.

### C.    March 2015 – June 2015

32.    On March 3, 2015, RBC paid Comerica $1,257,978.66 to payoff Bailey's line of credit with Comerica. Comerica retained a loan and security interest in Bailey's equipment and real estate.

33.    On March 5, 2015, Debtors submitted to the government a Request for Equitable Adjustment ("REA") in the amount of $365,743.00. DX34, DX39. The REA is the government process by which Debtors sought to recover their alleged damages from the government. DX34, DX39.

34.    On April 1, 2015, the BAM Receivables, which were dated December 31, 2014, became ineligible because they were 90 days past the invoice date. DX36, BBTrialEX_0061.

35.    By April 8, 2015, the following fourteen Tenneco invoices totaling $97,644.20 were deemed ineligible because they were at least 90 days beyond the invoice date:

| Debtor | Invoice Number | Date of Invoice | Amount |
|---|---|---|---|
| Tenneco Celaya | #20140 | 01/07/2015 | $4,814.60 |
| Tenneco Hartwell | #20072 | 12/09/2014 | $1,345.00 |
| Tenneco Hartwell | #20142 | 01/06/2015 | $1,330.00 |
| Tenneco Hartwell | #20143 | 01/07/2015 | $1,330.00 |
| Tenneco Lincoln | #20105 | 01/06/2015 | $13,398.94 |

---

[1] Trelleborg is now known as Vibracoustic USA, Inc.

HB: 4811-1842-6571.8

| Tenneco Lincoln | #20127 | 01/08/2015 | $5,219.43 |
| Tenneco Paragould | #20144 | 01/05/2015 | $33,233.20 |
| Tenneco Paragould | #20145 | 01/07/2015 | $20,848.80 |
| Tenneco Paragould | #20146 | 01/09/2015 | $4,518.00 |
| Tenneco Seward | #20107 | 01/06/2015 | $7,232.30 |
| Tenneco Seward | #20111 | 01/07/2015 | $3,044.00 |
| Tenneco Seward | #20117 | 01/08/2015 | $184.93 |
| Tenneco Smithville | #20042 | 12/01/2014 | $995.40 |
| Tenneco Smithville | #20118 | 01/08/2015 | $149.60 |

DX41, RBC0009277.

36.     By April 29, 2015, the total Tenneco invoice amount of $97,644.20 was charged back to Bailey because Tenneco paid the fourteen invoices to Bailey's previous lender, Comerica, rather than to RBC. DX48.

37.     On April 15, 2015 RBC approved an "over-advance" (payment to Debtors at an advance rate in excess of 90% of eligible receivables) in the amount of $152,814.25. DX44, DX45.

38.     The purpose of the over-advance was to provide Debtors with additional working capital while Debtors attempted to resolve the BAM Receivables payment issues with the government. DX44, DX45.

39.     On April 30, 2015, Vanessa Blade, a relationship manager for RBC, called Cape Fear Arsenal ("CFA"), a customer of Debtors, in an attempt to verify Invoice #20416 in the amount of $78,258.00 dated April 30, 2015 (the "CFA Invoice"). Because Blade was unable to

verify the CFA Invoice, the CFA Invoice was deemed ineligible on April 30, 2015, pending verification from CFA. RBC0009686-88.

40.     On May 1, 2015, a representative of CFA returned Blade's call regarding the CFA Invoice.  The CFA representative disputed the validity of the invoice. DX50, 51. As a result of this dispute, the CFA Invoice for $78,258.00 remained ineligible. RBC0009770.

41.     In June 2015, Debtors hired Robert McGovern ("McGovern") to assist in managing the finances of Debtors' business.

42.     On June 3, 2015, RBC received the results of an appraisal of Debtors' inventory performed by Hilco Valuation Services ("Hilco") a globally recognized audit, appraisal and asset liquidation company. RBC0010264. Hilco valued Debtors' inventory at far less than Debtors had represented in their application for the Inventory Loan. RBC0010264; BBTrialEX_0509. Hilco's appraisal report revealed that RBC was over-advanced on the Inventory Loan. RBC0004592.

43.     On June 29, 2015, Debtors received a Notice of Default from Comerica due to delinquent 2014 property taxes (the "Comerica Default"). DX77, DX73.

**D.     July 2015 – August 2015**

44.     On July 6, 2015, Buttles and Jeff Worley, on behalf of Debtors, and Allen Frederic, Melissa Baines, and Danika Lewis, on behalf of RBC, had a lengthy telephone call in which the parties discussed that the Debtors were over-advanced. They also discussed that Bailey Tool was delinquent on property taxes for 2013. DX86. During the telephone call, Debtors did not disclose that they had received the Comerica Default for delinquent 2014 property taxes. DX77.

45.     On July 7, 2015, RBC received notice of the Comerica Default. RBC received the Comerica Default because Comerica provided a copy to RBC's counsel, who forwarded it to RBC. (DX73). DX77.

46. On July 7, 2015, RBC notified Debtors by email that RBC would be issuing its own Notice of Default, which could be cured upon cure of the Comerica Default. (the "RBC First Default Notice"). DX86. The RBC First Default Notice was dated July 9, 2015. DX100.

47. Because Debtors were in default, RBC did not send any money to Debtors on July 7, 2015. DX78.

48. July 8, 2015, in a telephone call Bailey notified RBC that Bailey's bank account was overdrawn. RBC suggested the possibility of using "letters of direction" ("LODs") to keep from having to deposit advances into Bailey's bank account which would be "swept" to pay overdrafts rather than be available for Bailey to pay expenses which would be used to make product and produce revenue. In short, Bailey would tell RBC who to pay in order to avoid making bank deposits which would pay overdrafts. DX90.

49. On July 8, 2015, Buttles provided to RBC a "critical vendor list"; the critical vendor list did not include payroll. DX85.

50. At 6:05 p.m. on July 8, 2015, Jeff Worley notified RBC for the first time that Debtors' payroll needed to be funded on July 9, 2015. DX87.

51. On July 10, 2015, RBC sent Debtors a Notice of Default and Demand dated July 10, 2015 (the "RBC Second Default Notice"). DX104. The RBC Second Default Notice notified Debtors that Events of Default had occurred under the Purchase Agreement as follows:

> 7.1 (a) Seller [Debtor] shall fail to pay when due any Obligation;
> 7.1 (b) an Insolvency Event;
> 7.1 (e) Seller shall fail to perform any duty under this Purchase Agreement;
> 7.1 (I) Seller breaches any warranty, representation or covenant set forth herein, or any warranty, representation or covenant is not true, accurate or correct;
> 7.1 (h) Seller shall fail to pay any federal or state tax or fail to timely file any tax form as and when due;
> 7.1 (i) A material adverse change occurs in Seller's financial condition, business or operations; and

7.1 (j) an Insolvency Event … of any principal or Guarantor. DX104.

52. The RBC Second Default Notice further notified Debtors that Events of Default had occurred under the Inventory Loan as follows:

7.1 (a) There shall occur an Event of Default under the Purchase Agreement;

7.1 (b) The Purchase Agreement is terminated for any reason, or Purchaser is no longer making Advances to Seller as set forth therein;

7.1 (c) Borrower fails to observe or perform any of the covenants, conditions and

agreements on the part of Borrower contained therein or in any of the other Financing Documents;

7.1 ( d) If any representation or warranty made by Borrower to RBC contained therein or in any of the other Financing Documents proves to be untrue in any material respect;

7.1 (e) Borrower shall be in default in the payment or performance of any material obligation under any Indenture, contract, mortgage, deed of trust or other agreement or instrument to which Borrower is a party or by which it is bound;

7.1 (f) RBC reasonably and in good faith deems itself to be insecure because of any or all of the following: (i) any person fails to perform any of its obligations under the terms of any document that is part of, or is held by RBC, as Collateral; or (ii) the validity or priority of RBC 's security interest in the Collateral is impaired for any reason; or (iii) there is a Potential Default.

7.1 (g) Any deterioration or impairment of the Collateral or any decline or depreciation in the value of the Collateral (whether actual or reasonably anticipated by RBC) which, in RBC 's discretion, causes the character or value of the Collateral to become unsatisfactory to RBC;

7.1 (h) There shall occur an Event of Default under the Subordination Agreement; or

7.1 (i) RBC reasonably and in good faith believes that the Collateral is …otherwise impaired or at risk of being impaired. DX104.

53. On July 10, 2015, Debtors' payroll servicing company ("Paycom") communicated to Debtors that it intended to reverse payroll previously paid to employees because Debtors had failed to fund the payroll. DX107.

54. On July 13, 2015, RBC and Debtors participated in a telephone call to discuss the future of the business relationship in view of the events of default. DX113-115. RBC asked Buttles if he had any other assets he could provide to RBC to induce it to advance money.

55.     On July 14, 2015, Jeff Worley on behalf of Debtors participated in a call with the government regarding Debtors' claim for an equitable adjudgment for alleged damages arising from the BAM contract.  DX123.

56.     On July 15, 2015, Buttles advised Imperial Group Manufacturing ("Imperial"), a customer of Bailey, that "we are not operating." DX128. Buttles also informed Baines that he was informing his customers that "we are down and not operating." DX112.

57.     On July 15, 2015, RBC considered various options including liquidation of the Debtors, but Stewart Chesters, the CEO of RBC preferred to try to help the Debtors "turn around." *See* DX131.

58.     On July 15, 2015, Buttles listed his home for sale for $2.295 million. DX127.

59.     On July 15, 2015, Buttles proposed giving RBC a mortgage on his home to provide additional security to RBC in view of the over-advance. BBTrialEX_0389.

60.     On July 21, 2015, Buttles and his wife, Jennifer Buttles, executed a mortgage lien in favor of RBC on their personal residence located at 9995 Hollow Way Road Dallas, Texas 75220. DX127.

61.     On July 21, 2015, at 10:53 a.m., Buttles emailed a scanned copy of the mortgage lien to RBC. BTM_Buttles0070630.

62.     On July 22, 2015, RBC received the original executed mortgage lien. DX152.

63.     On July 27, 2015, RBC began emailing to Debtors ineligibility reports on a daily basis. DX 167. These reports demonstrated which accounts receivable were ineligible as of that day.  DX168.

64.     On July 28, 2015, Cape Fear Arsenal filed suit against Bailey for failure to fulfill an order relating to a manufacturing press. DX171.

65. On July 30, 2015, Melissa Baines and Allen Frederic flew to Dallas to meet with McGovern. DX172, DX175.

66. On August 4, 2015, Buttles received an offer for $2,195,000 for the sale of his personal residence. DX189.

67. On August 20, 2015, RBC contracted with a security company to install closed circuit televisions to monitor the Debtors' facilities for inventory theft. DX176, 195. [Confirm this date]

**E.    September 2015 – November 2015**

68. On September 16, 2015, Buttles advised RBC that he would "replace" the lien if he sold his home.  DX214.

69. On September 17, 2015, RBC sent the Debtors a Notice of Default and Demand for Payment letter, demanding payment in the amount of $463,544.02 by the Debtors on or before September 21, 2015 (the "Third RBC Notice of Default"). DX216.

70. On September 22, 2015, the Director of Materials Management for Nammo Talley emailed RBC expressing concern about the financial stability of Bailey Tool. DX222. RBC did not respond; instead, RBC forwarded the communication to Buttles. DX222.

71. On September 29, 2015, Melissa Hayward ("Hayward"), counsel for Debtors, initiated discussions with RBC concerning a potential negotiated forbearance agreement that would allow Debtors and RBC to end their relationship amicably. DX226, DX229. No agreement was reached. DX238, DX241.

72. On or about October 1, 2015, Buttles directed the title company to release to RBC $225,000 from the sale of his personal residence. DX234.

73. On October 2, 2015, proceeds in the amount of $225,000 from the sale of Buttles' personal residence were released to RBC by the title company. DX238. Upon receipt, RBC applied

this $225,000 to Debtors' overadvance on the inventory loan and charged a $75,000 termination fee to Debtors. DX238, DX272. Buttles was not injured by RBC's receipt of the $225,000 in proceeds from the sale of his homestead.

74.     On October 13, 2015, Debtors and Tenneco entered into an agreement in which Tenneco would purchase material for Debtors and Debtors would credit the purchase price of the materials against the amount owed to Debtors by Tenneco.  (DX 287) As a result, rather than pay RBC, Tenneco paid Debtors by purchasing materials on their behalf. Through this arrangement, Debtors deprived RBC of payment on Tenneco invoices in the amount of $288,948.80.

75.     On November 5, 2015, Debtors submitted the last schedule of accounts receivable to RBC. DX248. RBC believed in good faith that it owned all of Debtors' accounts receivables, including those created after November 6, 2015.

76.     On November 23, 2015, RBC offered to consider Debtors' obligations to RBC satisfied in full if Debtors would execute a general release. DX253. At this time, RBC was holding $152,064.03 to be released to Debtors upon the execution of the general release. DX253.

77.     Debtors refused to execute a general release.

**F.     Debtors' Bankruptcy**

78.     On February 1, 2016, Debtors each filed a voluntary petition for relief under Chapter 11 of title 11 of the Bankruptcy Code. DX259.

79.     On February 19, 2016, Debtors filed an original complaint against RBC. DX260.

80.     On November, 17, 2016, Trelleborg was ordered by this court to deliver a check in the amount of $32,174.44 to counsel for the Debtors to be held in trust pending the outcome of trial.  The check was for pre-November 2015 receivables that Debtors and RBC each claimed.

HB: 4811-1842-6571.8

81.     On January 25, 2017, Debtors' jointly administered Chapter 11 cases were converted to Chapter 7 cases, and James W. Cunningham was appointed the Trustee of Debtors' estates.  DX271.

82.     RBC did not intend to hinder, delay, or defraud Debtors' creditors.

83.     Debtors received from RBC reasonably equivalent value for their Accounts.

84.     The Purchase Agreement specifically provides that certain Obligations survive closing.  (DX 309, ¶ 5.6). Those obligations include the "recourse" obligation to repurchase outstanding Accounts (*Id.* ¶ 9.5) RBC still has $396,534.71 in outstanding Accounts that Bailey is obligated to repurchase.  In addition, Bailey is obligated to pay the following fees:

   a)     "Over 90 day" fees

   b)     Misdirected payment fees (15% or $1,000)

   c)     Liquidation fee (5% of Accounts)

   d)     Chargeback Fee (2%)

   e)     Default Rate (3%/every 15 days)

   f)     Default Interest Rate (Revolving Inventory Loan and Security Agreement)

   g)     Prepayment Penalty (Revolving Inventory Loan and Security Agreement)

85.     In addition, RBC is entitled to recovery its attorneys' fees. The amount of damages due to RBC under the Purchase Agreement and Inventory Agreement is not less than $1,183,153.21, which was the amount as calculated as of January 31, 2019.

### G.     Additional Findings.

86.     RBC owned all Accounts generated before November 6, 2015 and, therefore, owned the proceeds of all such Accounts.

87.     Debtors did not identify a reasonably probable business relationship with which RBC interfered.

88.     RBC did not intentionally interfere with any prospective business relationships of Debtors.

89.     RBC did not publish any false or disparaging statement about Debtors.

90.     The actions of which Debtors complain were expressly permitted by the terms of the Purchasing Agreement.

91.     RBC did not make any misrepresentations of material facts to Debtors, nor did Debtors rely on any such representations.

92.     The statements that Debtors claim were misrepresentations of material fact were only vague promises of future performance and goodwill.

93.     RBC did not receive or have a right to receive a share of Debtors' profits.

94.     RBC did not express any intent to be partners with Debtors.

95.     RBC did not control Debtors' business. With respect to Debtors' allegations that RBC controlled which vendors Debtors paid, this was not possible. RBC only had control over the amount of money, if any, it advanced to debtors on Accounts.  Debtors' allegations about exercising "control" refer to RBC's unwillingness to advance funds, which RBC had no obligation to do.

96.     RBC did not make any false misrepresentations of fact to Debtors or to Buttles.

97.     In addition, RBC committed no acts that would serve as the basis for a claim that RBC violated the DTPA.

98.     RBC did not prevent Debtors from paying any vendor at any time. Debtor was free to pay any vendor at any time.

HB: 4811-1842-6571.8

99. RBC did not share, or agree to share, Debtors' losses or Debtors' liability for claims brought by third parties.

100. RBC did not enter into a partnership with Debtors.

101. RBC's statements that Debtors had sold their Accounts to RBC were true and/or true when made.

102. Debtors did not sustain damages caused by RBC. In the alternative, to the extent Debtors sustained any damages, Debtors did not sustain damages resulting from any fraud, malice, or gross negligence by RBC, nor from RBC's intentional or gross fault.

103. There was no prospective business relationship between Buttles and a third party with which RBC interfered.

104. RBC did not commit any acts with malice.

105. RBC did not commit any acts or omissions that, when viewed objectively from RBC's perspective at the time of the acts or omissions, involve an extreme degree of risk considering the probability and magnitude of the potential harm to others.

106. RBC did not commit any acts or omissions of which RBC had actual or subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

107. Debtors and Buttles were able to obtain the information they sought with their request for an accounting through discovery.

## II.     CONCLUSIONS OF LAW

### A.     Governing Law

108. Issues of contract interpretation of the Factoring Agreements, Inventory Loans, and Personal Guaranty are governed by Louisiana law.

109. The remaining causes of action are governed by Texas law.

### B. Factoring Agreements

110. The Factoring Agreements are enforceable.

111. Section 12.5 of the Factoring Agreements, which bars Debtors' recovery of consequential damages, is enforceable and is compatible with Louisiana Civil Code Article 2004 where there is no "intentional or gross fault".

112. There was sufficient consideration to support the Factoring Agreements, and the consideration did not fail.

113. The Factoring Agreements are not unconscionable, nor are they illusory.

114. The Factoring Agreements are not unenforceable due to economic duress.

### C. Debtors' Causes of Action

#### 1. Count 1: Violation of the Automatic Stay / Contempt of Court

115. RBC did not violate the automatic stay.

#### 2. Count 2: Turnover of Property of the Estate

116. RBC is not holding any property of the Debtors' estate.

#### 3. Count 3: Declaratory Relief

117. Debtors are not entitled to declaratory relief.

#### 4. Count 4: Conversion

118. To establish conversion of personal property, a plaintiff must prove (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. The plaintiff must also establish he was injured by the conversion. *Wells Fargo Bank NW, N.A v. RPK Capital XVI, LLC,* 360 S.W.3d 691, 699 (Tex. App. – Dallas 2012, no pet.) (internal citations omitted).

HB: 4811-1842-6571.8

However, a qualified good faith refusal based on a reasonable requirement does not constitute conversion. *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App.—El Paso 1993, no writ) (internal citation omitted). A refusal to deliver property on request may be justified in order to investigate the rights of the parties, and no conversion results if such refusal is made in good faith to resolve a doubtful matter. *Id.*; *see also Earthman's, Inc. v. Earthman,* 526 S.W.2d 192, 204–06 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ).

119. RBC did not convert property of the Debtors.

### 5. Count 5: Texas Theft Liability Act

120. The Texas Theft Liability Act ("TTLA") provides civil liability for criminal theft. *Jones v. Patterson*, No. 11-17-00112-CV, 2019 WL 2051301, at *5 (Tex. App. May 9, 2019). To prevail on a claim under the Texas Theft Liability Act ("TTLA"), a plaintiff must prove that the defendant committed theft as defined by the Texas Penal Code. *See McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 906 (Tex.App.—Dallas, 2014, pet. denied); *see also* Tex. Penal Code Ann. § 31.03 (West) ("A person commits theft under the Texas Penal Code if he unlawfully appropriates property with intent to deprive the owner of the property."). A bona fide dispute as to rightful ownership of the property can negate the requisite criminal intent for a finding of theft. *See Bokor v. State*, 114 S.W.3d 558, 560 (Tex.App.—Fort Worth 2002, no pet.); *Jones v. Patterson,* 2019 WL 2051301, at *5. Intent is determined at the time of the alleged theft. *See McCullough*, 435 S.W.3d at 906.

121. RBC did not violate the Texas Theft Liability Act.

### 6. Count 6: Tortious Interference with Contract / Business Relations

122. Under Texas law, a party bringing suit for tortious interference with an existing contract must prove four elements: (1) a contract subject to interference exists; (2) the act of interference was willful and intentional; (3) the intentional act proximately caused the plaintiff's

damage; and (4) actual damage or loss occurred. *Cmty. Health Sys. Prof'l Services Corp. v. Hansen,* 525 S.W.3d 671, 697 (Tex. 2017). Interference with a contract is only tortious if it was intentional. *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). The intent required is the intent to interfere, not just the intent to do the particular acts that were done. *Id*. Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference. *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

123.    A defendant is justified in interfering with a plaintiff's contract if it exercises (1) its own legal rights or (2) a good-faith claim to a colorable legal right, even if that claim ultimately proves to be mistaken. *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 80 (Tex. 2000). Generally, justification is established as a matter of law when the acts that the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights. *Id.* at 81.

124.    RBC did not tortiously interfere with any contract of Debtors.

### 7.    Count 7: Tortious interference with prospective contracts and business relations.

125.    To succeed on a claim for tortious interference with a prospective contract, a Plaintiff must prove: (1) there was a reasonable probability that the Plaintiff would have entered into a business relationship with a third person; (2) the Defendant intentionally interfered with the relationship; (3) the Defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the Plaintiff's injury; (5) the Plaintiff suffered actual damage or loss. *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). While the claim doesn't require an actual business relation to have formed, a Plaintiff must establish it had: (1) a business relationship that had not yet been reduced to a contract; or (2) a continuing business relationship that was not formalized by a written contract. *Heil-Quaker Corp. v. Mischer Corp.*,

HB: 4811-1842-6571.8

863 S.W.2d 210, 214 (Tex.App.—Houston [14th Dist.] 1993), judgment set aside, 877 S.W.2d 300 (Tex. 1994).

126. RBC did not tortiously interfere with a prospective contract or business relationship of Debtors.

### 8. Count 9: Business disparagement.

127. "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *In re Lipsky,* 460 S.W.3d 579 (Tex. 2015)(quoting *Forbes*, 124 S.W.3d at 170 (citing *Hurlbut,* 749 S.W.2d at 766)). A defendant acts with malice when it makes the statement with knowledge of the falsity, with reckless disregard as to the statements' truth, or with ill will or an intent to interfere with the plaintiff's economic interest. *Fluor Enterprises, Inc. v. Conex Intern. Corp.*, 273 S.W.3d 426, 439 (Tex. App.—Beaumont 2008, pet. denied).

128. RBC did not commit business disparagement

### 9. Count 10: Fraudulent Transfer under 11 U.S.C. §§ 544, 548, and 550 and Tex. Bus. & Comm. Code §§ 24.001 *et seq.*

129. Elements of an actual fraudulent transfer claim under the Texas Uniform Fraudulent Transfer Act are (1) a creditor, (2) a debtor, (3) a transfer of debtor's assets shortly before or after the creditor's claim arose, and (4) an actual intent to hinder, delay, or defraud any of debtor's creditors. *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 721 (Bankr. S.D. Tex. 2020); Tex. Bus. & Com. Code § 24.005(a)(1). Elements of constructive fraudulent transfer claim under the Texas Uniform Fraudulent Transfer Act are the same as those of actual fraudulent transfer claim, except that, instead of pleading fraudulent intent, plaintiff must plead facts demonstrating (1) a lack of reasonably equivalent value for the transfer, and (2) that transferor was financially

vulnerable or insolvent at time of the transaction. *In re Northstar Offshore Group*, 616 B.R. at 721; Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a).

130.    RBC's purchase of Debtors' Accounts was not an actual or constructive fraudulent transfer.

### 10.    Count 11: Fraud/Fraud in the Inducement/Promises Made With No Intent to Perform

131.    A common-law fraud claim requires a material misrepresentation of fact, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury. *Zorrilla v. Aypco Constr. II, LLC,* 469 S.W.3d 143, 153 (Tex. 2015) (internal citations omitted). Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance made with no intention of performing at the time it was made. *Id*.

132.    Contractual provisions negating reliance are enforceable under Texas law. Parties may negate fraudulent inducement claims based upon contractual disclaimers where the parties' intent is clear and specific. *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997). As the Supreme Court noted in *Forest Oil*:

> After the fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra contractual statements – more than that, promise that they have not relied upon such statements – should be held to their word.  Parties should not sign contracts while crossing their fingers behind their backs…If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised by their most knowledgeable legal counsel, is grievously impaired.

*Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 62 (Tex. 2008).

HB: 4811-1842-6571.8

133. RBC did not commit fraud against Debtors. RBC did not commit fraud in the inducement against Debtors, nor did RBC make any promises to Debtors without the intent of performing.

### 11. Count 12: Negligent Misrepresentation

134. To succeed on a claim for negligent misrepresentation, a Plaintiff must prove: (1) the Defendant made a representation to the Plaintiff in the course of the Defendant's business or in a transaction in which the Defendant had an interest; (2) the Defendant supplied false information for the guidance of others; (3) the Defendant did not exercise reasonable care or competence in obtaining or communicating the information; (4) the Plaintiff justifiably relied on the representation; and (5) the Defendant's negligent misrepresentation proximately caused the Plaintiff's injury. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999).

135. RBC did not make any negligent misrepresentation to Debtors.

### 12. Count 13: Texas Deceptive Trade Practices Act ("DTPA")

136. The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (internal citations omitted). The DTPA defines a "consumer" as "an individual ... who seeks or acquires by purchase or lease, any goods or services." *Id.* A consumer must, in order to prevail on a DTPA claim, also establish that each defendant violated a specific provision of the DTPA, and that the violation was a producing cause of the claimant's injury. *Id.*

137. RBC did not violate the DTPA.

### 13. Count 14: Breach of Contract

138. The elements of a breach of contract claim are (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff

was damaged as a result of the breach. *Brooks v. Excellence Mortgage, Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. denied) (internal citations omitted); *see also Jackson Joint Venture v. World Constr. Co., Inc.*, 499 So.2d 426, 427 (La.App. 4th Cir.1986) (reciting the elements under Louisiana law).

139.    RBC did not breach any contract with Debtors.

### 14.    Count 15: Breach of Duty of Good Faith and Fair Dealing

140.    "Breach of Duty of Good Faith and Fair Dealing" is a tort under Texas law. *See Saucedo v. Horner*, 329 S.W.3d 825, 831 (Tex. App.—El Paso 2010, no pet.) ("A claim for breach of duty of good faith and fair dealing is a tort action that arises from an underlying contract.")(internal citation omitted); *see also Hux v. S. Methodist Univ.,* 819 F.3d 776, 781 (5th Cir. 2016) ("Under Texas law, the question of whether there is a tort duty of good faith and fair dealing in a particular circumstance is initially a question of law.").

141.    Texas law does not impose a generalized contractual duty of good faith and fair dealing and, in fact, rejects it in almost all circumstances. *Hux*, 819 F.3d at 781 (5th Cir. 2016) (citing *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983)). There are two exceptions to this general rule: (1) when the parties are in a formal fiduciary relationship (e.g., trustee-beneficiary); and (2) when there is a special or confidential relationship between the parties (e.g., insurer-insured). *Id.*

142.    Section 12.6 of the Factoring Agreements—the disclaimer of fiduciary duty and confidential relationship—is enforceable.

143.    Section 12.6 of the Factoring Agreements does not conflict with Article 2004 of the Louisiana Civil Code. Section 12.6 does not exclude or limit liability for intentional or gross fault; rather, it makes clear that there is no fiduciary duty on which such liability can be based.

144.    RBC did not owe Debtors a duty of good faith and fair dealing.

26

### 15. Count 16: Liability to Creditors as Partner

145.    With respect to the formation of a partnership, Section 152.052 of the Texas Business Organizations Code provides as follows:

    a.   Factors indicating that persons have created a partnership include the person's:
      1.   receipt or right to receive a share of profits of the business;
      2.   expression of an intent to be partners in the business;
      3.   participation or right to participate in control of the business;
      4.   agreement to share or sharing:
        A.   Losses of the business; or
        B.   liability for claims by third parties against the business; and
      5.   agreement to contribute or contributing money or property to the business.

146.    Under Section 152.304(a) of the Texas Business Organizations Code, generally speaking, "all partners are jointly and severally liable for all obligations of the partnership …."

147.    RBC is not liable to Debtors as a partner, nor is RBC liable to Debtors' creditors for the obligations of Debtors.

### 16. Count 17: Breach of Fiduciary Duty

148.    Under Texas law, a partner in a partnership owes the partnership and other partners a fiduciary duty. Tex. Bus. Org. Code 152.204.

149.    Section 12.6 of the Factoring Agreements is enforceable.

150.    Section 12.6 of the Factoring Agreements does not conflict with Article 2004 of the Louisiana Civil Code.

151.    RBC did not owe Debtors a fiduciary duty.

### 17. Count 18: Exemplary Damages

152.    Texas Civil Practice and Remedies Code § 41.003 provides as follows:

    (a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:

    (1) fraud;

(2) malice; or

(3) gross negligence.

(b) The claimant must prove by clear and convincing evidence the elements of exemplary damages as provided by this section. This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice.

(c) If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages result from the specified circumstances or culpable mental state.

(d) Exemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages.

153.     Section 12.5 of the Factoring Agreements is compatible with Louisiana Civil Code Article 2004 where there is no "intentional or gross fault".

154.     Debtors are not entitled to recover exemplary damages from RBC.

## 18.     Equitable Subordination/Denial of Claim

155.     RBC's claim in Debtors' bankruptcy is not subject to equitable subordination or denial.

## 19.     Attorneys' Fees and Costs

156.     Debtors waived the right to recover attorneys' fees from RBC. Debtors are not entitled to recover attorneys' fees from RBC.

## 20.     Accounting

157.     Under Texas law, an action for accounting may be either a suit in equity or a particular remedy sought in conjunction with another cause of action. *In re ACM-Tex., Inc.*, 430 B.R. 371, 413 (Bankr. W.D. Tex. 2010) (internal citation omitted). A claim for accounting can be found in equity, under a contractual arrangement, or a fiduciary relationship. *Id.* Under Texas law,

HB: 4811-1842-6571.8

an accounting is proper under equity if the facts presented are so complex that adequate relief is not available at law. *Id.* When the use of regular discovery allows for adequate relief, an accounting is not required. *Id*.

158. Debtors are not entitled to an accounting from RBC.

**D.** **Buttles Causes of Action**

**1.** **Count 1: Fraud**

159. RBC did not commit fraud against Buttles.

**2.** **Count 2: Fraud in a real estate transaction**

160. To succeed on a claim under Texas Business & Commerce Code § 27.01, a Plaintiff must prove: (1) there was a transaction involving real estate or stock; (2) during the transaction, the defendant: (i) made a false representation of fact; (ii) made a false promise; or (iii) benefited by not disclosing that third party's representation or promise was false; (3) the false representation or promise was made for the purpose of inducing the Plaintiff to enter into a contract; (4) the Plaintiff relied on the false representation or promise by entering into the contract; and (5) the reliance caused the Plaintiff injury. Tex. Bus. & Com. Code §27.01; *Ginn v. NCI Bldg. Sys*., 472 S.W.3d 802, 823 (Tex. App.—Houston [1st Dist.] 2015).

161. RBC did not commit fraud in a real estate transaction.

**3.** **Count 3: Tortious interference with a prospective contract**

162. There was no independently tortious or unlawful action on the part of RBC.

163. RBC did not tortiously interfere with any prospective contract between Buttles and a third party.

**4.** **Count 4: Tortious interference with existing contract**

164. RBC neither willfully nor intentionally interfered with any contact to which Buttles was a party.

HB: 4811-1842-6571.8

### 5. Count 5: Breach of Contract

165.     RBC did not breach any contract with Buttles.

### 6. Count 6: Negligent Misrepresentation

166.     RBC did not make any negligent misrepresentations of fact to Buttles

### 7. Count 7: Accounting

167.     Buttles is not entitled to an accounting from RBC

### 8. Count 8: Objection to Claim

168.     Buttles' objection to RBC's claim in Debtors' bankruptcy is without merit. RBC's claim in Debtors' bankruptcy is not subject to equitable subordination or denial.

### 9. Count 9: Exemplary damages

169.     RBC is not liable for exemplary damages to Buttles.

### 10. Count 10: Attorneys' fees and expenses and costs of court

170.     Buttles is not entitled to recover his attorneys' fees, expenses, or costs of court from RBC.

## E. RBC's Causes of Action

### 1. Count 1: Breach of Contract (Against Debtors)

171.     Debtors breached the Purchase Agreements in bad faith.

172.     Debtors are liable for consequential and compensatory damages under La. Civil Code Art. 1997.

### 2. Count 2: Tortious Interference with Contract (Against Buttles)

173.     Buttles tortiously interfered with the Purchase Agreements by causing Trelleborg and Tenneco to remit payment to Debtors rather than to RBC.

HB: 4811-1842-6571.8

### 3. Attorneys' fees

174.   RBC is entitled to recover its reasonable and necessary attorneys' fees from Debtors and Buttles.

Dated: December 17, 2020

Respectfully submitted,

By: */s/ Richard A. Illmer*
    Richard A. Illmer
    Texas Bar No. 10388350
    Rick.Illmer@huchblackwell.com
**HUSCH BLACKWELL LLP**
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
(214) 999-6100
(214) 999-6170 (facsimile)

    Vickie L. Driver
    State Bar No. 24026886
    Vickie.Driver@crowedunlevy.com
**CROWE & DUNLEVY, P.C.**
2525 McKinnon Street, Suite 425
Dallas, TX 75201
(214) 420-2142
(214) 736-1747 (facsimile)

***Attorneys for Republic Business Credit, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the parties receiving notice via the Court's electronic filing transmission and on counsel for the Chapter 7 Trustee and Buttles via email on December 17, 2020.

| | |
|---|---|
| Jerry Kenneth Johnson, II | Michael R. Rochelle |
| kjohnson@martinwaltonlaw.com | buzz.rochelle@romclaw.com |
| MARTIN WALTON LLP | ROCHELLE McCULLOUGH LLP |
| 1335 Space Park Dr., Ste. C | 325 N. St. Paul St., Ste. 4500 |
| Houston, Texas 77058 | Dallas, Texas 75201 |
| *Attorney for John Buttles* | *Attorney for John Buttles* |

| | |
|---|---|
| Jerry C. Alexander | Daniel J. Sherman |
| alexanderj@passmanjones.com | djsherman@syllp.com |
| PASSMAN & JONES, PC | SHERMAN & YAQUINTO |
| 1201 Elm Street, Suite 2500 | 509 N. Montclair Ave. |
| Dallas, Texas 75270 | Dallas, TX 75208-5498 |
| *Attorney for Trustee James W. Cunningham* | *Attorney for Trustee James W. Cunningham* |

*/s/ Richard A. Illmer*
Richard A. Illmer

HB: 4811-1842-6571.8