Jerry Kenneth (J. Ken) Johnson, II
Texas Bar No. 10746300
**MARTIN | WALTON**
699 S. Friendswood Drive, Suite 107
Houston, Texas 77546
P:713-773-2035
F: 832-559-0878
Email: kjohnson@martinwaltonlaw.com

Michael R. Rochelle, Texas Bar No.
17126700
**ROCHELLE MCCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182
F: (214) 953-0185
Emails:buzz.rochelle@romclaw.com

**COUNSEL FOR JOHN S. BUTTLES**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re:<br>BAILEY TOOL &<br>MANUFACTURING COMPANY.<br>    Debtor. | § § § § § | Case No. 16-30503-SGJ-7<br>Chapter 7 |
| | § | |
| BAILEY TOOL &<br>MANUFACTURING COMPANY,<br>HUNT HINGES, INC. and<br>CAFARELLI METALS, INC.,<br>    Plaintiffs, | § § § § § § | |
| v. | § § | Adv. No. 16-03025-SGJ |
| REPUBLIC BUSINESS CREDIT, LLC,<br>    Defendant and Counter-Plaintiff, | § § § | |
| v. | § § | |
| BAILEY TOOL &<br>MANUFACTURING COMPANY,<br>HUNT HINGES, INC. and<br>CAFARELLI METALS, INC.,<br>    Counter-Defendant. | § § § § § | |
| REPUBLIC BUSINESS CREDIT, LLC,<br>    Third-Party Plaintiff, | § § § | |
| v. | § § | |
| JOHN BUTTLES, TENNECO, INC.,<br>TRELLEBORG AUTOMOTIVE<br>USA, INC.<br>    Third-Party Defendants. | § § § § § | |

**COUNTERCLAIMANT JOHN BUTTLES' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

COMES NOW Counterclaimant John Buttles, and submits the following Proposed Findings of Fact and Conclusions of Law.

**I.
FINDINGS OF FACT**

**A.** **Procedural Background and Parties.**

1. Bailey Tool & Manufacturing Company ("Bailey") is a Texas corporation and was a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Bailey's Bankruptcy Estate.

2. Hunt Hinges, Inc. ("Hunt") is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Hunt's Bankruptcy Estate.

3. Cafarelli Metals, Inc. ("Cafarelli") is a Texas corporation and a debtor and debtor-in-possession in the above-captioned, jointly administered bankruptcy cases until the cases were converted to Chapter 7 cases and James W. Cunningham was appointed the Trustee of Cafarelli's Bankruptcy Estate.

4. Collectively, the foregoing entities may be referred to herein as "Bailey," "Debtors" or "Company."

5. John Buttles was the sole owner of the Company.

6. Republic Business Credit, LLC ("Republic") is a Louisiana limited liability company authorized and conducting business in Texas.

7.     On February 1, 2016 (the "Petition Date"), the Debtors each filed a voluntary peti-tion for relief under chapter 11 of the Bankruptcy Code, commencing their respective bankruptcy cases.

8.     The Debtors continued to operate and manage their businesses as "debtors in pos-session" pursuant to sections 1107 and 1108 of the Bankruptcy Code until January 26, 2017.

9.     On February 19, 2016, the Debtors filed an adversary proceeding against Republic, which asserted numerous claims against Republic. On March 23, 2016, Republic filed an answer to the adversary complaint.

10.     On May 31, 2016, Republic filed an Amended Answer and Counterclaim, which pleading asserted new claims against the Debtors' former owner, John Buttles ("Buttles"). A for-mal appearance, answer, and third-party counterclaim was filed on September 23, 2016.

11.     On January 26, 2017, the case was converted to a Chapter 7, and James W. Cun-ningham was appointed Chapter 7 Trustee ("Cunningham" or the "Trustee") on January 27, 2017, pursuant to 11 U.S.C. § 701(a).

**B.     General History of the Debtors.**

    **i.     The Debtors' Business.**

12.     In 1989, John Buttles bought the company that ultimately became known as Hunt Hinges Inc.  Four years later, in 1993, Buttles acquired Bailey Tool & Equipment Company, which was founded in 1969.  Approximately five years later Buttles continued to build the enterprise by acquiring Cafarelli Metals, Inc.

13.     Hunt created and manufactured metal hinges; Bailey was a metal fabrication com-pany; and Cafarelli slit metal coils to custom widths for Bailey, Hunt, and outside customers, to use in manufacturing their products.  Over time, Buttles expanded the combined companies' ca-pabilities to include not merely metal fabrication, but also product engineering and design.

14.     Historically, Bailey's core customers were Tier One and Two suppliers to automotive manufacturers in the United States and Mexico. The company operated in three locations in the Dallas area, employed as many as 130 people, and had annual revenues ranging from $7.9 million to $11.6 million in 2012-2014. *See* **TR.509, 511**

15.     In the economic downturn of 2008-9, the auto industry suffered significantly, and so did Bailey's business. In response, the Company expanded into manufacturing oilfield service equipment. It also used its engineering and design abilities to develop entirely new opportunities.

16.     One of Bailey's most promising new opportunities came in defense contracting. When Bailey entered the area, ammunition manufacture still used machines built during World War II. Under contract with the United States Army, Bailey designed and built an entirely new and more efficient machine for manufacturing bullets, using state-of-the-art technology and processes. This project created a new pair of markets for Bailey, not only designing and building the machines but also manufacturing bullets.

**ii.     The Factoring Agreement and Bailey's Early Dealings with Republic.**

17.     While the Company had made progress in developing new markets after the Great Recession, it was still in transition, revenues had not yet returned to pre-Recession levels, and its new markets continued to demand additional capital for research and development. It was in this context that its primary lender, Comerica Bank, asked the Company to move its business in 2014.

18.     Bailey found a receptive audience at Regions Bank. As part of the move, Regions suggested Bailey utilize a factoring company for a few months as a bridge from Comerica to Regions. While this factoring "cleanup" period occurred, the rest of the Bailey debt (two notes secured by the real estate and guaranteed by Buttles, where the Company's plants were located) would remain at Comerica.

19.     Bailey was not opposed to this suggestion because it had successfully used a factor some years before following another economic downturn. One of the companies Regions recommended was Republic Business Credit.

20.     In late 2014 and in early 2015, the Company discussed a factoring and inventory financing package with Republic Business Credit, LLC to meet its working capital needs. The arrangement was intended to be the short-term bridge that Regions had suggested.

21.     Republic's due diligence lasted from October 2014 through February 2015. Bailey showed Republic every document requested. LaCour Miller was responsible for the underwriting on behalf of Republic.

22.     Republic's due diligence culminated in a December 31, 2014, report and accompanying e-mail from Mr. Miller to Republic's Credit Committee. Based on Republic's due diligence, Mr. Miller assessed the proposed transaction as a "strong deal" for Republic:

| | |
|---|---|
| **From:** | LaCour Miller [lmiller@republicbc.com] |
| **Sent:** | 12/31/2014 8:00:44 AM |
| **To:** | Allen E. Frederic Jr. [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject:** | CCCA Bailey Tool and Subsidiaries |
| **Attachments:** | CCCA_Bailey Tool & Manufacturing_141231.pdf |

All,

Please see the attached CCCA for Bailey Tool. Overall, it seems to be a strong deal. Below are the known issues:

*See* **TR.169.**

23.     Mr. Miller's e-mail identified the following as the "known issues:"

*   **Issue**: Bailey had failed to pay its 2013 ad valorem taxes to Dallas County, owed $120,000 on that bill, and was engaged in a payment plan agreed to by the County of $20,000 per month; it had not paid its 2014 ad valorems, either;
    *   o  **Solution**: To deal with the tax arrearages, Miller recommended that Republic take control over tax payments from Bailey after the deal closed;

- **Issue**: Bailey's accounts payable were stretched well beyond 90 days, and half of its trade debt was more than a year old;
  - o **Solution**: Bailey acknowledged that it could probably settle its outstanding trade debt for fifty cents on the dollar, but didn't want to do so, and was making a priority for paying down old accounts payable;
- **Issue**: Bailey stood a good chance of receiving further orders from the Defense Department for its bullet machine, but payments were made on a milestone rather than progress billing basis;
  - o **Solution**: Milestone payments, being irregular, are unattractive to a factor and would need to be closely monitored, so Republic indicated a need to review future contracts and bill on progress rather than milestones.

*See* **TR.509, 511.**

24. Based on Mr. Miller's e-mail and the attached "Credit Committee Application," Republic's Credit Committee approved the deal the same day Mr. Miller submitted his report. Allen Frederic, Republic's COO, and Stewart Chesters, Republic's CEO, both expressly approved the transaction:

| Message | |
|---|---|
| **From**: | Allen Frederic [afrederic@republicbc.com] |
| **Sent**: | 12/31/2014 1:58:23 PM |
| **To**: | Stewart Chesters [schesters@republicbc.com] |
| **CC**: | LaCour Miller [lmiller@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Diane Josephik [djosephik@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| **Subject**: | Re: CCCA Bailey Tool and Subsidiaries |

I approve

Sent from my iPhone

On Dec 31, 2014, at 8:14 PM, Stewart Chesters <schesters@republicbc.com> wrote:
Approved

**Stewart Chesters | Republic Business Credit** | COO, Managing Member
t: 504.262.8602 | f: 504.262.8699 | c: 312.622.5994
www.republicbc.com

**TR.508.**

25.     Before the Credit Committee's approval, Miller sought confirmation from Bailey on how it would spend the money to be initially advanced by Republic. The Company's CFO, Jeff Worley, replied that it intended to use the money to pay off Comerica, meet immediate working capital needs, and ramp up manufacturing in the early months of the year:

The proceeds will be used for:

- Payoff of Comerica
- Working Capital
- Ramping up (equipment) for new contracts coming in the first quarter

Not knowing the functionality of the line, we need to payoff Comerica at initial funding and we have some immediate working capital needs (I am planning on having additionally borrowing capacity for working capital over the next 60 days). Since I have not been here through the Nov – Jan cycle I do not know what to anticipate during the seasonally slower time. We do expect to ramp up manufacturing in February and possibly January as well.

Let me know if you need additional clarity.

Thanks, Jeff

**TR. 681 (December 31, 2014 e-mail from Worley to Miller).**

26.     In their negotiations, Republic represented Bailey's advance rate on receivables would be 90%, and Republic would take its fees and expenses out of the 10% held back. In fact, the advance rate on receivables was a focal point of negotiations:

**From:** LaCour Miller <lmiller@republicbc.com>
**Date:** Friday, December 12, 2014 at 3:20 PM
**To:** John Buttles <jbuttles@baileytool.com>, Jeff Worley <jworley@ccgpllc.net>, "Allen E. Frederic Jr." <afrederic@republicbc.com>, Underwriting <credit@republicbc.com>
**Subject:** Republic Business Credit

John and Jeff,

I am pleased to present you with the updated Republic proposal. You will note that the advance rate on the A/R has been increased to 90%. Also, we have agreed to move the funding fee down from 2.5% to 2.25%.

I hope our call today was informative and that you all have a better understanding of the proposed facility. If you have any further questions or concerns, please do not hesitate to give Allen or me a call.

Warm Regards,

LaCour Miller

Exhibit

**TR.166.**

27. Periodically, Republic was to return the unused 10% holdback to Bailey. The factoring agreement had a facility limit of $2.5 million.

28. Republic also told Buttles that the mechanics of the factoring relationship would be the following:

- Bailey ships product, and sends its customer an invoice;
- Bailey simultaneously, or shortly thereafter, submits the receivable to Republic;
- Republic promptly examines the receivable and determines whether it is eligible for an advance;
- If eligible, Republic wires 90% of the receivable to Bailey within 24 hours;
- Republic promptly returns ineligible receivables to Bailey;
- Customer payment goes to Republic's lockbox; and
- Republic takes its fees from the customer payment and returns the balance to Bailey.

29. Republic told Buttles that the relationship would be mutually beneficial:

- Bailey benefits from the expedited cash flow, for which it pays a reasonable fee;
- Republic benefits because it receives a premium over the rates charged for other financing arrangements; and
- Bailey continues to operate its business and achieve its goals.

30. Based on those representations, Bailey moved forward with the transaction.

**iii. Republic Analyzes Bailey's Receivables.**

31. Because Republic borrowed money to fund the Comerica takeout,[1] Republic had to demonstrate to *its own* lenders that Bailey would provide sufficient collateral to justify their loan to Republic.

32. Unknown to Bailey at the time, Republic, just days prior to signing the factoring agreement, became concerned about the collectability of the United States Army receivable. (the

---

[1] Prior to the factoring agreement, Comerica had a first priority lien against Bailey's receivables. Accordingly, Comerica's lien had to be taken out as part of the Bailey/Republic transaction.

"**Army Receivable**" or the "**Army**").  In a series of in-house emails, Republic officers debated how much credit to give it.

33.    Republic's underwriter, LaCour Miller, set out the problem.  If Republic made the entire Army Receivable ineligible, Bailey's collateral would be approximately $50,000 short of the Comerica payoff.  On the other hand, if Republic gave full credit to the Army, Republic could pay off Comerica and still have $213,067.05 available to advance to Bailey:



**From:** LaCour Miller [mailto:lmiller@republicbc.com]
**Sent:** Monday, February 23, 2015 7:50 AM
**To:** Allen E. Frederic Jr.; Stewart Chesters; Melissa Baines; Diane Josephik
**Subject:** Bailey Tool

All,

We have received updated financials and the A/P Aging from Bailey Tool. We also received information regarding its two largest invoices which are with the Army.

I am a bit concerned about the Army invoices as they account for approximately $270K of the $1MM in A/R. These invoices are related to the BAM (bullet assembly machine) project. The project ran into issues and was delayed as a result of the Army providing Bailey Tool with lead projectiles that were not to specification. In addition, the invoices have not been provided to the Army because Bailey's attorney is working to add damages that resulted from the delays to the amount owed. I would say that we simply make these invoices ineligible until any issues are resolved, but I am not sure if we make them completely ineligible that we will have enough to make the payoff to Comerica. I spoke with the Comerica banker on Friday, and it is my expectation that we will get that payoff figure some time today. Even if we are able to make the payoff, I believe we should have a conference call with Jeff and John this afternoon to discuss the Army invoices. I think it is important that nothing related to the Army contract/invoices is getting lost in translation and that even if we have to make them ineligible, we at least hear Jeff's and John's point of view.

Please let me know if you would be available for a 2:30 conference call, and I will schedule it. Also, I am going to do a quick review of the financials and A/P provided. I will write a review and give it you before the call. Any questions that arise during the review can also be addressed on the call.

Best Regards,

**TR 521**

LaCour Miller

TR.521.

34.     Republic's management did neither.  Instead, COO Stuart Chesters chose to "mitigate risk:" by reducing the advance rate on the Army receivable to 65%:

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/24/2015 03:19:23 PM |
| To: | LaCour Miller <lmiller@republicbc.com> |
| Cc: | Allen E. Frederic Jr. <afrederic@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com>; Danika Louis <dlouis@republicbc.com> |
| Subject: | Re: Bailey Tool Borrowing Base |

My feeling would be to give 65% advance on Army stuff. That should give them 100-125 over and above payoff, we are mitigating risk. But in essence it is understood that we are effectively collateralizing an overadvance.

*See* **TR.524**.

35.     To that, CEO Allen Frederic added that in addition to the lower advance rate, Republic could further protect itself by making the receivables ineligible "**at a later date**:"

| From: | Stewart Chesters <schesters@republicbc.com> |
|---|---|
| Sent time: | 02/23/2015 11:49:07 AM |
| To: | Allen Frederic <afrederic@republicbc.com> |
| Cc: | LaCour Miller <lmiller@republicbc.com>; Melissa Baines <mbaines@republicbc.com>; Diane Josephik <djosephik@republicbc.com> |
| Subject: | Re: Bailey Tool |

I concur with Allen. When we have payoff number lets have brief meeting to look at numbers on A/R and Inventory.

On Mon, Feb 23, 2015 at 9:43 AM, Allen Frederic <afrederic@republicbc.com> wrote:

Depending on info we receive, use lower advance rate on those invoices. This is better than doing overadvance although we may make them ineligible at a later date. Let me and STEWART KNOW GAP BETWEEN REAL ELIGIBLES AND OAYOFF AMOUNT

*See* **TR.521**.

36.     No one at Republic told the Company or Buttles about the discussions and concerns regarding the Army Receivable.  More importantly, Republic did not tell Bailey or Buttles of the risk that it would deem the Army Receivable ineligible right after the deal was signed.

37.     Instead, on February 24, 2015, Republic sent the Borrowing Base Certificate to Bailey showing $124,700 of immediate availability after the takeout of Comerica, along with the

transactional documents for signature. *See, e.g.,* **TR.718** (February 25, 2015 e-mail from Miller to Worley with attached borrowing base).

38.     Based on Republic's representations and the Borrowing Base Certificate described above, on February 27, 2015, Bailey and Buttles signed the "Agreement for Purchase and Sale" (the "**Factoring Agreement**"), the Inventory Loan, and Buttles' personal guaranty, effective on February 25, 2015. (collectively, the "**Agreements**"). *See* **TR.51-53**. At the time, Bailey under-stood that it had $124,700 of funds available to draw, as soon as Republic did the takeout.

39.     In late-February or early-March 2015, Republic paid Comerica the $1,257,978.66. **TR.703** (Subordination Agreement between Republic and Comerica).

40.     In mid-March 2015, Bailey made its first draw request, expecting availability in the range of the Borrowing Base Certificate received on February 25.

41.     In response (and much to Bailey's amazement), Republic Relationship Manager Vanessa Blade sent a Borrowing Base Certificate showing that Bailey's ineligible accounts had jumped from $17,000 on February 24 to $142,310.87 on March 12, greatly reducing Bailey's availability. *See* **TR.715**. Only then did Bailey learn that once it had signed the Factoring Agree-ment, Republic decreed that the Army was no longer an "eligible receivable."

42.     Bailey promptly brought the issue to Republic's attention:

| Message | |
|---|---|
| From: | Jeff Worley [jworley@baileytool.com] |
| Sent: | 3/18/2015 7:37:35 AM |
| To: | LaCour Miller [lmiller@republicbc.com] |
| CC: | John Buttles [jbuttles@baileytool.com] |
| Subject: | Re: Republic Business Credit |

Just wanted to keep you updated on a few post closing items. I have been working with Vanessa and her group on this, except the potential for additional funding on the PO piece, just want to make sure we are all on the same page.

- I am working on missing invoices and post closing recon on the borrowing base. Because the closing was delayed there are missing invoices and payments that came in prior to closing. I am through most of this now and sent over an assignment schedule yesterday for Bailey and will send over more invoices today for Hunt to Vanessa.
- One item that we are discussing with Vanessa is the Ineligible accounts, that were projected at $2k in the closing borrowing base you prepared and was at $134k in the last BB we received from Vanessa's group last week. Tenneco are largest customer who plays like clock work and the US Govt were included. I am not sure why that changed, but I may need for you to intercede in the future on this, as I don't remember these invoices being an issue. Obviously $130k+ in liquidity is a big deal to us right now.

*See* **TR.719.**

43.    Republic did not budge.  Instead, it told Bailey that although no funds were available under the formulas previously represented to it, Republic would be willing to make an "over-advance," but such funds would cost the Company a "Service Fee 2.0% of overadvance balance each 30 days or partial increment thereof Prime + 9.75% based on 360 days amortization on actual daily balance."  **TR.529**.

44.    The deal that Republic imposed in mid-March was not the one Bailey signed up for a mere three weeks before.  Nonetheless, Bailey was stuck: its old Comerica revolver no longer existed, and it had to make the best of the new situation until it could move the relationship to Regions Bank.  Accordingly, the Company moved ahead, having to deal with funds suddenly less available and costing much more.

45.    Republic's treatment of Bailey in the spring and early summer of 2015 showed that it never intended to live up to the representations made before the Agreements were signed.

### iv. Republic Declares Default and Takes Control of Bailey's Business.

46.     The consequence of Republic's unilaterally chopping the advance rate and availa-bility was self-evident: Bailey's ability to operate and pay its debts suffered immediate damage, just as Worley forecasted in March.

47.     Within two months, Bailey did not have the cash to meet its bills, including the full May installment of its tax payment plan with Dallas County; in June, it could not make its monthly payment on the arrearage.

48.     On June 29, 2015, Comerica sent Bailey and Buttles notice of default under its loan and guaranty agreements precisely because of those missed payments. When Republic learned of the default, the real punishment began.

49.     Republic declared default under the Agreements on July 9, 2015 (DX.100), and swiftly changed the game even further.

50.     Under Republic's new "rules," it demanded control of Bailey's day-to-day opera-tion as a *quid pro quo* for giving Bailey any money at all. Moreover, **Republic completely ceased advancing funds directly to Bailey** – all funds advanced from that point forward were sent di-rectly to Bailey's vendors, payroll company, etc. by Republic.[2]

51.     Republic also ceased to factor. In other words, advances were not tied to the re-ceivables purchased. Instead, Republic required Bailey to provide a list of payables to Republic on a daily or weekly basis. Republic's Risk Manager, Melissa Baines, would then decide which of Bailey's payables she would pay based on whether or not the payable itself would "generate new receivables."

---

[2] Republic's new "rules" were outside the parties' contract – the Agreements specifically defined an "Advance" as a payment by Republic to Bailey. *See* **TR.51** Agreement of Purchase and Sale, p. 3, paragraph 2.

52.     Ms. Baines summarized Republic's new view of the "factoring" arrangement in a

July 10, 2015 e-mail to Buttles:

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/10/2015 12:22:11 PM |
| To: | John Buttles [jbuttles@baileytool.com]; Jeff Worley [jworley@baileytool.com] |
| CC: | Danika louis [dlouis@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| Subject: | RE: BTM |

Hi John,

Please confirm my understanding from our earlier conversation.  It is expected there will be additional critical funds needed, not just the c$6,300 Fuchs payment, to generate $75,000 in receivables.

Maybe a better way to back into this is to start with the in-house orders that you could have the ability to produce and will be accepted by the customers.  For example, if you have $100,000 in confirmed orders in-house that could be produced and shipped next week, how much in absolutely critical payments will be requested from Republic to generate that $100,000 in orders?  The goal, of course, being a significant positive margin between receivables generated and RBC's cash outlay.  And, are these orders going to be accepted by the customers without penalties or counter-claims taken against the payments if they are shipped past the need-by date?

Please let me know if you need further clarification as to the information I am requesting.

Regards,

**Melissa Baines**
**Risk Manager**

**TR. 688.**

53.     Ms. Baines had no formal education or practical experience in managing or running

a manufacturing business, yet that was exactly what Republic chose to let her do.  Bailey suffered

immediate financial injury due to Ms. Baine's mismanagement.

54.     For example, Bailey needed oil to run its machines, and it owed money to its oil

supplier, Fuchs.  Rather than advancing funds directly to Bailey so Bailey could pay Fuchs, Re-

public required an explanation of "how much" in receivables would be generated if Republic paid

the oil supplier:

**From:** mbaines@republicbc.com [mailto:mbaines@republicbc.com]
**Sent:** Wednesday, July 08, 2015 12:13 PM
**To:** John Buttles
**Cc:** Danika Louis; Bob McGovern; Jeff Worley; Melissa Baines
**Subject:** Re: Bailey tools press down

Hi John,

I really need an understanding of how much in $ will be generated if we wire $10,000 to the oil supplier. Can you provide me with an estimate on this?

Thank you,

Melissa Baines
Republic Business Credit, LLC

**TR.116**.

55.     Apparently, Ms. Baines did not understand that for a paltry $10,000, **all** of the machines at Bailey could operate and fill whatever orders had been placed, but without that $10,000 for oil, no production of any kind could take place because the machines could not be run without oil. They would burn up.

56.     Republic's "rules" were not limited to Bailey's suppliers. Republic (primarily through Ms. Baines) used its complete control over the Company's cash to take away from Bailey's management virtually all decisions that a company makes for itself.

57.     For example, Ms. Baines inserted herself into Bailey's personnel and human resources management, decreeing funds would only be advanced for "actively employed AND critical employees," not those who were "non-engaged (*i.e.*, not showing up on Monday."):

| Message | |
| --- | --- |
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/23/2015 3:34:53 PM |
| To: | jbuttles@baileytool.com; Bob McGovern [rjmcgovern@msn.com] |
| CC: | Melissa Baines [mbaines@republicbc.com]; Marilyn Calder [mcalder@baileytool.com]; Gayla Flowers [gflowers@baileytool.com]; Danika Louis [dlouis@republicbc.com] |
| Subject: | FW: |
| Attachments: | BAILEY CK REGISTER WE 07_12_15.xls; HUNT CK REGISTER WE 07_12_15.xls |

John,

Please confirm that all employees listed as to be paid on the attached payroll registers are actively employed AND critical employees, and please also confirm that none of these amounts are being paid to non-engaged (i.e. not showing up on Monday) or other non-critical payments.

**TR.717**.

58.     Not only did Ms. Baines refuse to "advance" funds for payroll without assurances Bailey's employees would continue to "show up," but also that any employee receiving a paycheck be "critical" and "add[] value to cash flow in the short term:"

| Message | |
| --- | --- |
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/24/2015 9:40:31 AM |
| To: | Bob McGovern [rjmcgovern@msn.com]; John Buttles [jbuttles@baileytool.com] |
| CC: | Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com] |
| Subject: | Re: Updated Cash Flow |

Bob and John,

Bob, you and I, recently spoke about communication.  We really need to limit the communication coming from your side.  I cannot continue to keep up with the volume of emails and requests and comments, and I will not be putting money out the door if I cannot be firm on the cash flow position, which I'm not with the minute by minute play by play.  I need one point of communication, whether that continues to be you or Jeff, so we can efficiently process information.

As previously discussed or requested, I still need:

1. An absolute confirmation that the payroll is for essential (i.e. critical) personnel that are adding and will continue adding value to the cash flow in the short term.
2. One email daily which presents a complete list of the day's requests with each line item, including personnel, stating what value it adds to the cash flow to justify each expense.  This list should prioritize each line item (with "must be paid by" dates) and the necessary LOD's should be attached.

**TR.587**.

59.     On production lines, all employees are critical, otherwise they would not be on the line.  On a human level they also needed these paychecks and had and would continue to work hard for them.

60.     Not only did Republic control how many workers should be employed, it also sought to conspire with one of Bailey's managers to have him replace John Buttles as president and CEO.  This attempt began with a request from Melissa Baines and Allen Frederic to meet with Bob McGovern for a "confidential" discussion:



**TR.133**.

61.     At that meeting, which occurred not at Bailey's offices but fifteen miles away, at the Stoneleigh Hotel, Baines and Frederic suggested that McGovern should persuade Buttles to relinquish his role as president and chairman, and let McGovern fill those roles.

62.     Republic even supplied McGovern with a draft board resolution and employment agreement to carry out the plan:

| Message | |
|---|---|
| From: | R McGovern [rjmcgovern@msn.com] |
| Sent: | 7/31/2015 8:38:02 AM |
| To: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | Re: Update on Bailey |

Melissa
Am I mistaken, I thought ==Allen offered and recommended that your legal dept would draft a short agreement that met the need to transfer authority and indemnify==.

On Jul 31, 2015 5:34 AM, ==Melissa Baines <mbaines@republicbc.com> wrote:==
Hi Bob,

It was a pleasure meeting you today. I had not seen your email prior to our meeting, and I apologize for not specifically addressing these items. Though, I believe we did touch on some of this.

At this time, the tasks with the most priority are:

1. ==getting proper authority from John for you to act and execute on behalf of the company. This should easily be taken care of by a resolution (sample previously supplied)== whereby making you CEO or President for each corporation. I understand your concern over liabilities, but I would imagine a standard consulting contract should provide you with the necessary hold harmless and indemnification language;

**TR.135, 142** (Baines e-mail McGovern transmitting draft employment agreement).

63. In tandem with these negotiations, Allen Frederic not only approved McGovern's projected salary as president and CEO, but even opined that McGovern should be given an equity participation in the company:



**TR.138**.

64.     On the same day, to keep the ball rolling, McGovern sent Baines a copy of his resume.

| | |
|---|---|
| From: | Bob [rjmcgovern@msn.com] |
| Sent: | 8/6/2015 12:25:37 PM |
| To: | 'Melissa Baines' [mbaines@republicbc.com] |
| Subject: | resume |
| Attachments: | RJM resume - Republic.docx |

I would have like to modify to reflect the specfics of this – let me know if you want more detail info.

**TR.139.**

65.     A few days later, Baines sent McGovern a draft employment contract for his new role as CEO/President. T.R.142. Realizing what thin ice she was on, she included a disclaimer for any liability by Republic if the documents were used:

| | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 8/10/2015 2:41:56 PM |
| To: | Bob McGovern [rjmcgovern@msn.com] |
| CC: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | BTM Employment Agreement |
| Attachments: | Form Interim President Employment Agreement.docx; Republic Business Credit_Bailey Tool & Manufacturing Special Director Co....doc |

Bob,

In response to your request, I attach a draft form interim CEO/President Executive Services Agreement. RBC is providing this form as an accommodation to your request for a form document, and your use of the form or any provision therein constitutes your agreement that RBC will have no liability for such use and you will indemnify and hold RBC harmless for any such use. You should have your attorney review the document to draft of the specifics of your engagement.

Regards,

Melissa Baines
Risk Manager

Republic Business Credit, LLC

**TR.142.**

66.    Republic's control of Bailey's spending did not stop at vendors, personnel, and attempts at executive appointments.  It permeated every last detail of the Company's operations. Republic even micromanaged the Company's purchase of basic office supplies.

67.    In one instance, Republic refused to allow Bailey to purchase Gatorade for the Bailey workers who worked in the un-air-conditioned shop in Texas in August!



**TR.622**.  Proper hydration on a machine shop floor in an un-air-conditioned building in Texas in August is not a luxury item.

68.    Republic also resorted to intimidation tactics.  At Bailey's Expense, Republic hired armed guards to patrol Bailey's premises:

> On Sep 1, 2015 3:27 PM, Melissa Baines <mbaines@republicbc.com> wrote:
>
> Bob,
>
> Upon installation and DVR capability being up and running, I did replace the armed officers with guards, which is less than half the cost. I have not received confirmation that the live feed is up and running yet. Upon confirmation the live feed is working and being monitored, I will be able to back the guards off.
>
> Regards,
>
> Melissa Baines
> Risk Manager

**TR.626.**

69.     Republic also criticized Bailey for entering into payment plans with critical suppliers, suggesting instead that finding a new supplier was more favorable than paying past due debts:

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 8/28/2015 9:29:09 AM |
| **To:** | Bob McGovern [rjmcgovern@msn.com] |
| **CC:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | RE: RE: RE: Samuel and Sons |

> Thank you, Bob.
>
> I understand the pressures from those critical suppliers, but I hope you understand that these need to be weeded out. All other avenues of dealing with these situations (i.e. replacing the supplier) need to be attempted before we start looking to pay past dues. I agree that the risk Comerica is going to have a large issue with paying a supplier before them is very real. And, they may not only have an issue with Bailey...chances are they'd be upset with RBC, which is not good for anyone in this situation right now.

**TR.619**.

70.     Republic's control over Bailey's business was intentional and deliberate. During the July-October 2015 time period, Republic's control over the Company exclusively benefited Republic by accelerating Republic's payoff.

71.     From July – November 2015, Republic's advance rate dropped to only 33% of the accounts assigned. After September 11, 2015, Republic made no further advances.

72.     To be clear, for the last fifty-five days of the relationship (from September 12, 2015 through November 6, 2015), Bailey sent Republic $924,504.65 in receivables and received no advances.  Incredibly, RBC collected $921,100.81 of the Debtors' receivables during the last fifty-five days and gave the Debtors no further advances.  Republic instead gave the Debtors empty promises that if the Debtors would send in more receivables, RBC would begin "advancing" funds again.

73.     As a result, Republic's unilateral control caused Bailey catastrophic harm.  Republic choked the Company's ability to serve existing customers, generate new accounts receivable, generate cash flow, and successfully transition into the Regions Bank relation. Further, that control and decision-making destroyed Bailey's relationship with its suppliers, ended its ability to expand new lines of business, and crippled its chances to continue as a going concern.

74.     Republic was, in fact, conducting an "unannounced liquidation" of Bailey beginning in early-July 2015, when Ms. Baines believed Republic was in the "best position" it had been in with respect to collateral.  **TR.557**.

75.     In carrying out its "unannounced liquidation," Republic was careful not to alert Bailey or its customers of its plans, since doing so would have impaired Republic's ability to collect Bailey's accounts receivable and allowed Bailey and its vendors to take actions to protect themselves.  For example, Ms. Baines expressly instructed others at Republic to conceal from Bailey's customers the true status of the business, fearing Republic's ability to collect Bailey's receivables would be impaired if the customers knew the truth:

From: Melissa Baines [mailto:mbaines@republicbc.com]
Sent: Tuesday, September 29, 2015 10:32 AM
To: Danika Louis; vblade@republicbc.com
Cc: Melissa Baines
Subject: Bailey Tool, Cafarelli and Hunt Hinges

Danika and Vanessa,

We are nearing being in collect out status on this account, and we really need to continue hammering on collections to try and drive some cash in before the customers are aware of the status of the company, if they're not already, and we need to get an idea of what kind of offsets might be taken in the event there are damages or other claims. Please allocate the necessary resources to in the short term to try and get as much in the door as quickly as we can.

Try not get into discussions over the status of the operations. If asked about the status of the company, I would say something along the lines of "I'm not aware of any issues. I'm simply trying to get payment status on these [past due] invoices." In any event, it is John Buttles' intent to keep the business running, so beyond not wanting to tip off debtors to any issues for fear of offsets, we do not want to cause customers to cancel orders because we told them Bailey, et al, is out of business or not currently operating.

Let me know if you have any questions.

Thank you!!

Melissa Baines

TR.653.

> ### v. Republic Demands and Gets a Lien on Buttles' Homestead.

76. In addition to taking control of Bailey's business, Republic forced CEO and owner John Buttles, and his wife, Jennifer, to give Republic a lien on his Texas homestead. Republic made this demand without regard to the prohibitions on such liens, which are well understood in the commercial lending world.

77. By the middle of July, Republic's management was putting its homestead lien demands in writing.

| Message | |
| --- | --- |
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 7/20/2015 10:50:57 AM |
| To: | jbuttles@baileytool.com |
| CC: | Jeff Worley [jworley@baileytool.com]; Allen Frederic [afrederic@republicbc.com]; Melissa Baines [mbaines@republicbc.com]; Danika Louis [dlouis@republicbc.com] |
| Subject: | FW: Mortgage - 600 Beltline |
| Attachments: | Untitled attachment 00695.htm; 3124_001.pdf |

John,

I am reforwarding you the mortgage sent to you Friday for Lancaster. As we discussed, we could look to take a position on the commercial properties which may decrease the exposure on the primary residence; however, we will continue to require the second position on your primary residence to collateralize any overadvances necessary to finance the continuance of operations.

Regards,

**Melissa Baines**
**Risk Manager**

**TR.721**.

78. Republic represented that it was entitled to the mortgage and that it was necessary to permit Bailey's survival. The demands were part-carrot, part stick. On July 20, Ms. Baines was telling Buttles that the lien would both "collateralize the [claimed] overadvance" and would also "finance continued operations." **TR.721**. Buttles was understandably slow to agree to the pressure from either Baines or Allen Frederic, Republic's CEO. Seeing the carrot fail, Allen Frederic abandoned all pretense of arms'-length negotiation, or for that matter, courtesy:

**From:** Allen Frederic [mailto:afrederic@republicbc.com]
**Sent:** Monday, July 20, 2015 9:27 AM
**To:** John Buttles
**Subject:** Re: RE: Re:

==The residence you dummy how many times did we say this==

Sent from my iPad

On Jul 20, 2015, at 9:13 AM, John Buttles <jbuttles@baileytool.com> wrote:

> Melissa,
>
> I don't see one for the Lancaster building…   my assumption was that we were going
> to use the two industrial buildings at 906 Mercury and 600 W. Belt Line Road for the
> security.  I am prepared to sign them.
>
> John

**TR.254**.

79.     Consequently, on or about July 21, 2015, under extreme duress and the immediate threat of losing the business, Mr. and Mrs. Buttles executed and delivered to Republic a mortgage on their Dallas homestead, which is exempt from the claims of creditors under the Texas Constitution and Texas homestead law.  **TR 583**.

80.     The Mortgage was invalid from inception and constituted a fraudulent and coercive attempt by Republic to obtain rights and interests that it was never entitled.  Moreover, the dialogue to obtain the liens on the commercial buildings and Mr. and Mrs. Buttles' homestead were fraught with misrepresentations and outright fraud.  They were made to both Buttles individually to trick him into putting his and his wife's homestead up for collateral, but also to Buttles as owner and CEO of Bailey to put the commercial buildings up as additional collateral.

81.     The misrepresentations were as follows:

- There had been an overadvance;
- The Bailey commercial buildings and Mr. and Mrs. Buttles' homestead would only be used to collateralize this overadvance and would never be enforced;

    &#9670;  This additional collateral was not intended to place RBC in an over-secured position, such that it could cash out both the old and new collateral to be paid back;

    &#9670;  Once the additional collateral was secured, the 90% funding of receivables would start again.

82.    All of these statements were false and sufficient to meet the burden of proof for fraud, fraud in a real estate transaction, and negligent misrepresentation.

83.    First, there was no overadvance. Next, Republic declared a default on the after the supposed overadvance had been paid, and took the cash from the sale of the Buttles' homestead and paid itself a $75,000 Termination Fee. Bailey, based Republic's continuing misrepresentations, kept sending all of its accounts receivable religiously every day in the hope it would get a true Advance. Between October 2, 2016 and November 6, 2015, Bailey sent **$487,431.76** in receivables to Republic.

### vi.    Republic Stops Funding Anyway.

84.    After Republic seized control in early July, Bailey's long-standing, core automotive customers, such as Tenneco and Trelleborg, began to find that Bailey could not fill their orders in a timely fashion.

85.    These problems appeared immediately. On July 13, John Buttles told Melissa Baines that Bailey's delays in getting a press repaired were shutting down a Trane Heating & Air Conditioning production line:

This has stop do with the motor rewind - this press produces parts for Trane air conditioning compressor production.

I emailed you the vendor invoice and the Letter of Direction on Friday.

Trane will be calling us at 10am I believe - please note they say they are shutting down die to lack of parts.

This invoice needs to be paid so we can pick that motor up and return to production.

John Buttles

TR.120.

86.    Ever the stickler for documentation, Baines replied:

On Jul 13, 2015, at 9:10 AM, Melissa Baines <mbaines@republicbc.com> wrote:

John,

We want to help you get up and running; however, you have not provided the necessary information for us to do this.

I must have a complete schedule of required, critical payments that need to be made in order to produce xx dollars in accounts receivable.  As I understand it, it is going to cost more than just the part cost to get invoices generated.  If I am mistaken about this, and all you require to start generating invoicing is $2,330 to get the machine up and running, please let me know ASAP, along with how much in billing (conservatively) will be generated by that one payment before Friday.

Have you spoken to any of the employees to gain their support to work with you, at least, through Tuesday's REA settlement conference?

Regards,

Melissa Baines
Risk Manager

Republic Business Credit, LLC

TR.120.

87.    The problems also extended to Bailey's automotive customers ten days after the Trane difficulties.  Bailey's COO, Bob McGovern, was having to deal with the displeasure of Peterbilt and Imperial, two of its largest automotive accounts:

From: Bob [mailto:rjmcgovern@msn.com]
Sent: Thursday, July 23, 2015 9:04 AM
To: 'Melissa Baines'
Subject: Morning Operational Review

AS promised – current issues we are dealing with

1) Payroll should be to you by this is for the 20 – pay per Cash flow (we have to get final # from Paycom)
2) Payroll 2 should be to you by 10 am – this is for the full week pay – approx. 43K
3) The scrap reconciliation is attached
4) Peterbilt –
    a. The customer visit is at 9:30 am tomorrow. The concern is that they do an audit on our supplier status. This is why aluminum metal is now critical to show them we are running the product and have the inventory on hand to fill short term orders. We are 3 weeks behind, they likely will ask us to provide a catch up schedule. We do not want to damage this relationship.
    b. Imperial (who is also a supplier Peterbilt) is also involved in the visit. They are a tier 1 supplier to Peterbilt and we supply them as well. So they will also be looking for assurances.
5) I propose we have a better document for funding/Letter of Direction control. I am working on that today and hopefully will send you something that makes both of our lives easier.
6) The 50,000 for the 556 tooling did not get into your system. We have a large backlog of invoices caused by losing one of the 2 invoicing people and the double payroll. I want to find a way to get this better under control and visible to you and ourselves.

Bob

**TR 585**

RBC0012218

**TR.585**.

88.    The problems with automotive customers were no better by August 2015. On August 11, a Tenneco procurement officer was telling Buttles that its delivery delays were becoming critical:

```
From:          William Weaver/US/TEN
To:            Rudy Cortez <rcortez@baileytool.com
<mailto:rcortez@baileytool.com> >, Randy Burris/US/TEN@TEN, Troy
Osborne/US/TA.NA@TEN <mailto:Osborne/US/TA.NA@TEN> ,
Cc:            James Brown <JBrown3@Tenneco.com <mailto:JBrown3@Tenneco.com>
>,
John Buttles <jbuttles@baileytool.com <mailto:jbuttles@baileytool.com> >
Date:          08/11/2015 08:26 AM
Subject:       RE: 260746 Up date Status
_____

John  or Rudy,

This is unacceptable, you have been waiting on this material for almost
two weeks now. Bailey Tool needs to have material expedited in immediately
or will be shut down Tulsa plant on Monday 08/17. I need all of the 260746
in house tomorrow, Seward has to make shipment by Thursday 08/13. A plan
must be put in to place to get this material in, I will schedule a
conference call 11 AM (CT) so we can discuss a plan of action.

Thanks,

Bill Weaver
Customer Product Liaison
```

**TR. 781** (RBC0013288).

89.    Two weeks later, Bailey's inability to perform threatened to shut down an entire

Tenneco factory in Mexico.

> National Kwikmetal "refused" to sign the agreement when I presented it – I believe I reported that at some point.... (at least internally). They might reconsider after talking to Melissa. There are no past-due balances at NKS. Buckeye is still under discussion as we know – the Buckeye weldnut is critical to Bailey – we will shut Harley Davidson production at Tenneco down without that nut in the immediate future.
>
> Fuchs is releasing product but wanted more paydown on old balances to secure release on the next order (critically needed) I placed with them.  Yes, we are paying old balances at Fuchs and the account remains on Net 30 terms...   the very first payment Melissa made was to Fuchs and it cleared up old balances, allowing them to ship product in and continue net 30 account status.
>
> What else is needed??
>
> John

**TR.622**.

90.    Although Republic was aware of these problems, it did not particularly care, be-

cause its silent liquidation and debt reduction had greatly reduced its exposure. **TR.653** (Septem-

ber 29, 2015 e-mail stating "We are nearing being in collect out status on this account…").

91.     Given its success in debt reduction, by the middle of September Republic decided that it no longer made sense to allow Bailey any more money.  In fact, the last payment it made to Bailey vendors was on September 11, 2015.  **TR.752** (Frederic Exhibit 29).

**vii.    Republic takes the Homestead Proceeds and Claims No Settlement.**

92.     Also during the middle of September 2015, Republic stepped up its campaign to get money from Buttles' homestead.  Buttles had received a purchase offer for the house, but the closing was delayed by the title company's consternation over Republic's illegal lien.  At that point, Republic understood that there would be almost $464,000 net to the Buttles family, and it demanded all of it.  **TR.745**.

93.     At the same time, Melissa Baines was telling Buttles that Republic's receiving the money would help cover the inventory loan and Army overadvance, allow Republic to start funding the business again, and Buttles to resume receiving a salary:

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 9/15/2015 10:14:24 AM |
| To: | jbuttles@baileytool.com |
| CC: | Melissa Baines [mbaines@republicbc.com] |
| Subject: | Bailey Tool / Sale of Personal Residence |

John,

I received a message to call a Mr. Robert Blanchard late yesterday afternoon.  As he represented he is your attorney, I need to have our attorney return his call.  Please confirm he is your attorney and provide authorization to speak with him regarding the payment required for the lien release.

So you are aware, the payoff amount for the lien on the residence is $463,544.02.  This includes the inventory and DFAS invoice overadvances, as well as certain fees due to RBC.  Receipt of the payoff amount will allow for you to begin drawing a reasonable salary from the business, with the understanding that your salary will be the first payment item postponed in the event of future cash flow issues.  The payoff should also allow RBC to regain a certain level of flexibility in the funds available for the business.

Regards,

Melissa Baines
Risk Manager

**TR.745**.

94.     Republic's demand for Buttles' entire home equity was a shock to Buttles, even if softened by the enticement of further funding for Bailey and salary resumption for Buttles.  Because Buttles resisted giving up all of his homestead equity, Baines and Frederic decided to add more pressure by threatening him with fraud:

| Message | |
|---|---|
| **From:** | Melissa Baines [mbaines@republicbc.com] |
| **Sent:** | 9/15/2015 4:07:39 PM |
| **To:** | Allen Frederic [afrederic@republicbc.com] |
| **Subject:** | Bailey Email |

Hi Allen,

I think we need to send the email you dictated earlier today, but I don't think it needs to come from the attorney.  John confirmed in an email the closing is "currently scheduled for late afternoon" tomorrow. You okay with me sending? The fact of the matter is the listing agreement we were provided shows the house was listed when they executed the RBC mortgage, which would constitute intent to defraud.

*"RBC was induced to continue funding the companies based upon receiving a second mortgage on the personal residence and in reasonable reliance of the house being listed for sale, which proceeds of such sale would repay RBC's overadvance position.  As stated, this sale transaction is scheduled to close tomorrow afternoon.  Accordingly, RBC will be prepared to continue funding upon receipt of the second mortgage payoff amount of $463,544.02."*

**Melissa Baines**
**Risk Manager**

**TR.753** (Frederic Exhibit 30).

95.     Thirty-four minutes after devising the language, Baines sent those very words to Buttles in an email dated 4:41 p.m. on September 15.  Buttles answered the next day at 11:25 a.m., saying

It is in both of our interests to resolve this in the near term.  We do not want to lose our buyer and my guess you want to have a better resolution than you currently have.  Having the business operate efficiently, sell down assets, invoice and collect the REA and assure customers are willing to meet their payment obligations is in both of our interests.   Therefore, I suggest we begin discussions immediately to achieve these aims.

**TR.754** (Frederic Exhibit 31).

96.     Upon receiving Buttles' reply, Frederic exploded:

| | |
|---|---|
| **From:** | Allen Frederic <afrederic@republicbc.com> |
| **Sent time:** | 09/16/2015 11:49:09 AM |
| **To:** | Melissa Baines <mbaines@republicbc.com> |
| **Subject:** | Re: Bailey Tool / Sale of Personal Residence |

Yes tell them we will stop funding, end of game, we will wait until he can't make house payments and bid it in at auction, call our atty and confirm we can do this even with personal bankruptcy but this does not appear to be good faith on their part and there is no other good collateral that I seem accordingly I think we assume more risk by continuing to fund. Have our lawyer advise them that we will peruse foreclosure

**TR.754** (Frederic Exhibit 31).

97.  Two minutes later, Baines told Frederic there wasn't unanimity in the C-suite, because Stewart Chesters did not agree:

On Sep 16, 2015, at 11:51 AM, Melissa Baines <mbaines@republicbc.com> wrote:

I will, as Stewart is not exactly on board with the foreclosure plan. He's supportive of not funding until we get this worked out, but he has concerns over shutting the business down.

Will you be available in 20 minutes or so?

Melissa Baines
Risk Manager

**TR.755** (Frederic Exhibit 32).

98.  Frederic responded that foreclosure was the only thing that will get movement from Buttles:

| Message | |
|---|---|
| **From:** | Allen Frederic [afrederic@republicbc.com] |
| **Sent:** | 9/16/2015 11:54:54 AM |
| **To:** | Melissa Baines [mbaines@republicbc.com] |
| **Subject:** | Re: Bailey Tool / Sale of Personal Residence |

Yes I am available. The point is if we don't fund it shuts down by default, if we fund we are held hostage and house never sells, we don't solve overadvance position. Our threat to foreclose should get movement on his part, nothing else will work

**TR.755** (Frederic Exhibit 32).

99.  During the same conversation, Frederic told Baines to keep a guard posted at the Bailey plant until Buttles gave them his homestead equity. **TR.756** (Frederic Exhibit 33).

100.    Baines replied that while she was about to pull the guard service, upon getting Frederic's email she told the guard service to keep the guard on site, and the guard might be increased to armed status:

> On Sep 16, 2015, at 11:52 AM, Melissa Baines <mbaines@republicbc.com> wrote:
>
> Haha. I was just about to pull, but I have already emailed Mike at Hilco to leave the guard on and we may be stepping up again to armed services.
>
> **Melissa Baines**
> **Risk Manager**

**TR.756** (Frederic Exhibit 33).

101.    Less than an hour later, Frederic told Baines that negotiating with Buttles was useless, and they simply had to remain firm:

> On Sep 16, 2015, at 12:01 PM, Allen Frederic <afrederic@republicbc.com> wrote:
>
> My suggestion is not to go to dallas to meet with him on his turf but to communicate our position clearly and firmly in writing. Based on his communication a meeting is a waste of time and money. We have both a trust issue and compentancy issue with management and are in the best collateral position we will ever be in at this moment

**TR.643**.

102.    Barely forty-five minutes later, Frederic reiterates his position take no prisoners attitude toward Buttles:

| From: | Allen Frederic <afrederic@republicbc.com> |
|---|---|
| Sent time: | 09/16/2015 12:48:44 PM |
| To: | RBC <mbaines@republicbc.com> |
| Cc: | Stewart Chesters <schesters@republicbc.com>; Laurie A Martin Montplaisir <lmontplaisir@srcattorneys.com>; dhanson@srcattorneys.com |
| Subject: | Re: Bailey Tool / Sale of Personal Residence |

Remember our current mortgage value is worth considerably more than the amount of our pay down. Any substitution of collateral must be cash or equivalent and get approval of our atty regards preference and other potential bankruptcy issues. However their will be no funding based on promise to substitute or any type of promise but only after our approval and his performance

**TR.643**.

103.    It was within the climate shown above that Bailey, Buttles, and Republic had settlement discussion in late September and early October 2015 to resolve the outstanding issues between them and permit Bailey to operate without interference or further demands from Republic. *See, e.g.*, **TR.79** (Hayward Exhibit 1).

104.    In the settlement correspondence, the most important portions of which occurred from September 29 through October 2, 2015, Republic officers and counsel demanded $275,000 from the imminent home sale to fund the settlement then under discussion, and contribute the remainder of the closing proceeds from the sale of the homestead to Bailey to fund operations. *See, e.g.*, **TR.79** (Hayward Exhibit 1). Subsequent exchanges of correspondence between the Republic representatives reduced the cash component to be funded from the sale of the Buttles homestead to $225,000. *See, e.g.*, **TR.79** (Hayward Exhibit 1).

105.    On September 30, 2015, Republic counsel Laurie Montplaisir wrote that the revised settlement terms were acceptable and that she would begin preparation of a forbearance agreement. *See, e.g.*, **TR.79** (Hayward Exhibit 1).

106.    The homestead sale closed on October 2, 2015, and the title company wired $225,000 to Republic, which Republic agreed to hold in trust pending formal documentation of the settlement, both as specifically agreed and as customary. Then, on the same day, Republic pocketed the money and subsequently repudiated the settlement:

| | |
|---|---|
| From: | Montplaisir, Laurie A. Martin <lmontplaisir@srcattorneys.com> |
| Sent: | Friday, October 2, 2015 3:31 PM |
| To: | Melissa Hayward |
| Cc: | Brown, S. Joseph; Vickie.Driver@lewisbrisbois.com; Melissa Baines |
| Subject: | RE: RE: Bailey-Confidential Settlement Communication Subject to the FRE |

Melissa: My client never agreed to hold any money in trust. The funds have been applied to the inventory over advance.
Laurie

Laurie A. Martin Montplaisir
**Schuyler, Roche & Crisham, P.C.**

**TR.780**.

107.    This was contrary to Republic's previous representations, and in breach of its express agreements to hold the funds in trust, pending formal documentation of the settlement agreement: *See, e.g.*, **TR.79**. Republic then not only applied the funds to what it claimed was a previous overadvance, after representing since July: (1) the Buttles' residence would never be needed to service the loan; it was facial security for what turned out to be a fictitious overadvance; and (2) if this overadvance was covered, funding would start up again. All of these statements were false.

108.    As demonstrated in email exchanges, Buttles relied on Republic's false representations that: (i) it was necessary to sell the homestead; (ii) Republic was entitled to the net sale proceeds, $225,000 of which was necessary to conclude the settlement; (iii) Republic either intended to or had concluded the settlement agreement.

109.    Republic also interfered in the homestead closing. Its representatives communicated directly with the title company to obtain the $225,000 from the sale. Republic's counsel instructed the title company that "Republic Business Credit has agreed to the $225,000 figure. Please confirm when the wire has been sent pursuant to the wire transfer instructions previously sent to you." **TR.716**. Because Buttles understood that a settlement had been reached and only needed to be papered, he allowed the title company to send the funds to Republic. Then, to Buttles' amazement, he learned from Bailey's new counsel that the settlement had broken down but Republic refused to give the money back.

### viii.    The Secret Termination Fee.

110.    On or about October 2, 2015 – the same day as Buttles' homestead closing – Republic took a $75,000 termination fee against money collected from Bailey's accounts. Republic gave the Company no formal notice of its taking the termination fee, but Republic told its own employees to conceal Bailey's true condition from other creditors. Even though Republic had not

funded a single dollar since September 11, 2015.  Republic told Bailey to continue submitting accounts and promised it would fund operations.

111.    Based on Republic's promise (and failure to disclose the termination fee), Bailey continued to submit receivables to Republic until November 5, 2015 ($487,431.76 in receivables were sent to Republic between October 2 and November 6).  Although Republic continued to collect receivables, it advanced <u>no</u> additional funds to the Company.  Hence, there was a continuous flow of misrepresentations and deceptive statements to Debtors that if Debtors would continue to send Republic their receivables, Republic would factor and fund them and send operating funds to the Debtors.

112.    The following timeline sets out Republic's continual misrepresentations:



113.    Essentially, during this phase of their "relationship" Republic acted illegally in claiming and enforcing a lien on the owner of Debtors' homestead and acted totally in breach of

their Agreement in not giving Debtors money from Receivables Republic admitted it owed, holding out for a release from Debtors to which Republic was not entitled.[3]

114.     Worse yet, Republic continued to claim ownership of all Bailey's Receivables and demand a release as a condition to turning them over.  Republic continued to claim ownership of Bailey's receivables until the Court held last year that Republic had no right to such a release.

### ix.     Republic is Paid in Full, but Attempts to Extort a Release from the Debtors.

115.     After collecting Buttles' homestead equity on October 2, 2015, Republic continued to collect all the Company's accounts receivable through the lockbox arrangement created at the start of the relationship.

116.     On November 5, 2015, the Company ceased submitting receivables to Republic. *See* **Dkt. 165, p. 6** ("According to the testimony of Marylyn Calder, the Debtors ceased submitting Accounts to Republic on Assignment Schedules on November 5, 2015.").

117.     Nevertheless, having not funded since September 11, by mid-November 2015, Republic had collected more than enough to pay off its facility in full.  *See* **TR.664** (cited below). Those collections included the Army Receivable about which Republic had been so nervous that it wrongfully lowered the cash advances available to Bailey:

---

[3] *See* Adv. Dkt. 165, p. 7 ("Republic argues that § 8.1 requires that any termination of an Agreement by a Debtor requires the Debtor to sign a general release.  This court disagrees.").  That Republic was not entitled to a release is now law of the case.

| Message | |
|---|---|
| **From**: | Danika Louis [dlouis@republicbc.com] |
| **Sent**: | 11/19/2015 9:42:03 AM |
| **To**: | Melissa Baines [mbaines@republicbc.com] |
| **CC**: | Vanessa Blade [vblade@republicbc.com]; Allen Frederic [afrederic@republicbc.com]; Stewart Chesters [schesters@republicbc.com] |
| **Subject**: | Re: FW: W15QKN-12-C-0109 BAM REA Shipment #REA0002Z |

The REA payment was released to our account today.  We should receive the $156k tomorrow!!!!!!!

**TR.663**.

118.    Not surprisingly, the effect on Bailey of receiving no money from its factoring for two months was catastrophic.

119.    After Republic collected the Army receivable, Ms. Baines alerted her superiors that Republic was "collected out" of Bailey and that she was ready to send a General Release to Mr. Buttles.  Ms. Baines also admitted that: (1) all Default Rates and Termination Fees had been recovered; and (2) she could not find any additional significant additional fees that Republic "might be able to charge:"

| Message | |
|---|---|
| From: | Melissa Baines [mbaines@republicbc.com] |
| Sent: | 11/20/2015 2:23:09 PM |
| To: | Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| CC: | Danika Louis [dlouis@republicbc.com]; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com]; Laurie A Martin Montplaisir [lmontplaisir@srcattorneys.com] |
| Subject: | Bailey Tool, et al. |

All,

We are officially collected out of Bailey. I am ready to send the General Release to John Buttles. I am going to reserve for $2,500 for legal fees, but all Default Rates and Termination Fees have been recovered. I have reviewed the contract for any additional fees which we might be due, but I do not think that any fees we might be able to charge total an amount worth risking us getting an executed General Release. I would chalk them up to consideration in exchange for the General Release. In the event he does not execute the Release, we are free to continue accruing the Default Rate and charging any other fees we are due under the Purchase Agreement.

As a point of reference, we have collected $75,000 in Termination Fees and $284,038.13 in Default Rate, in addition to our standard factoring and line fees, to date.

Regards,

**Melissa Baines**
**Risk Manager**

**T.R. 664**.

119. The same day, Ms. Baines sent an e-mail to John Buttles confirming the facility had been paid in full, and stating that Republic was holding over $150,000 and would turn it over to the Debtors so long as the Debtors executed full releases of any claims they had against Republic:

**From: Melissa Baines <mbaines@republicbc.com>**
**Date: November 20, 2015 at 6:09:50 PM CST**
To: jbuttles@baileytool.com
Cc: Melissa Baines <mbaines@republicbc.com>
Subject: Bailey Tool, et al. / RBC

John,

With the posting of today's collections, the amounts due as of today to RBC from the companies under the Purchase Agreements have been collected. Upon full execution of the attached General Release Agreement, but not before the Date of the General Release Agreement (Monday, November 23, 2015), the Obligation due and owing to RBC will be considered satisfied.

Please review the attached documents and have them executed with a notarized signature. As there are three separate clients, thereby three separate Releases, I have included a Letter of Direction for the small amount due under the Bailey Tool account, which Letter of Direction provides for RBC to reduce the amount from the total due to Hunt Hinges.

The consolidated wire amount due to the companies, effective November 23, 2015, will be $152,064.03. Please provide direction as to where you would like those funds wired. I have provided a blank Letter of Direction for you to complete with the directions for the release of funds to each of Hunt Hinges, Inc. and Cafarelli Metals, Inc. (i.e. please do a letter of direction for each of the companies). In the event they are directed to the same account, we can send as one wire, if you prefer.

Please let me know if you have any questions.

Regards,

**Melissa Baines**
**Risk Manager**

**TR.255**.

120.    The Debtors declined to execute the release. *See* **TR.777 and 775** (RBC0017598 and RBC0017607).

121.    The Court has since held Republic was never entitled to hold out for a release since it took the Termination Fee route to termination. *See* **Adv. Dkt. 165, p. 7** ("Republic argues that § 8.1 requires that *any* termination of an Agreement by a Debtor requires the Debtor to sign a general release. This court disagrees.")

122.    The Court likewise held Republic did not own, and was not entitled to collect, Bailey receivables generated on or after November 5, 2015. Only after filing a motion to enforce the Court's turnover order in the Summer of 2020 (over four years after Bailey's bankruptcy filing)

did Republic finally return the $82,121.58 it wrongfully collected on Bailey accounts generated on or after November 5, 2015. *See* **Dkt. 297** ("Order Regarding Trustee's Motion to Enforce Order and Compel Turnover").

> x. **The Debtors File Chapter 11, and Republic Sabotages the Debtors' Opportunity to Reorganize.**

123.     From mid-November through Bailey's bankruptcy filing on February 1, 2016 (the "Petition Date," Republic continued to collect Bailey's accounts receivable.

124.     In fact, as of the Petition Date, the Company and its counsel have calculated that Republic was holding at least $450,000 that it had collected from Company customers, even though its debt facility had been paid in full over three months prior.

125.     Upon learning of the bankruptcy, Republic itself admitted holding $300,000 of Bailey's money in internal e-mail correspondence:

| Message |
| --- |
| **From:** Melissa Baines [mbaines@republicbc.com] |
| **Sent:** 2/2/2016 4:29:08 PM |
| **To:** Stewart Chesters [schesters@republicbc.com]; Allen Frederic [afrederic@republicbc.com] |
| **CC:** Danika Louis [dlouis@republicbc.com]; vblade@republicbc.com; Melissa Baines [mbaines@republicbc.com] |
| **Subject:** Bailey Tool, et al. filed for Chapter 11 Bankruptcy protection yesterday |
| |
| They have made a written demand on us for the $300k we are currently holding. Joe and Laurie are all over it. |
| |
| **Melissa Baines** |
| **Risk Manager** |

**TR.701**.

126.     On and after the Petition Date, Republic continued to claim that: (i) the factoring agreement had not been terminated, which (ii) gave it title to all of Bailey's accounts receivable in perpetuity, (iii) regardless of whether Bailey had tendered those accounts to Republic. This behavior extended to Republic's contacting Bailey customers post-petition and representing that there was a "very active and non-terminated factoring agreement, which exists in place:"

I work with Laurie Montplaisir on her RBC team as her insolvency specialist.  ==I therefore represent RBC, as does the local counsel (Vickie Driver) that we specifically hired to appear on RBC's behalf in the Bailey bankruptcy.==  I CC Vickie Driver above, and I also CC Melissa Hayward, Bankruptcy Counsel to Bailey.  As I understand, you have called Laurie expressing frustration that the status quo leaves your client, a Bailey customer, in a bind.   You need the provision of additional goods or services from Bailey, but Bailey insists that you pay Bailey first.  And you claim that you cannot pay because of the continuing effect and existence of RBC's 9-406(a) claim on the funds that you hold that you might otherwise turn over to Bailey.

Here are a few observations and suggestions:

1        There is no doubt that RBC continues to assert an active claim on the funds that your client holds.  ==Those funds belong to RBC under a very active and non-terminated factoring agreement, which exists in place.==  Under the status quo, your client is obliged to pay such funds only to RBC.   So you are absolutely correct that ==your client would be exposed to potential double liability if you turn the funds over to Bailey.==  We will not simply waive our rights, or give you a get-out-of-jail free card on this point;

2        RBC's current claim on the funds that your client holds is a legally valid contractual claim that will withstand any future legal scrutiny.  We are currently preserving a prepetition right of setoff, which controlling law gives us the right to do even after a bankruptcy.  Your client has no recourse to, no privity with, and no cause of action against mine.  There are no threats that you can credibly make against RBC.  If anything, your continued insistence that you be given permission to release the funds indicate that there are no contractual defenses to payment.

And

3        Here is how we might help each other:  ==If RBC can simply get a proper termination of its factoring agreement as well as fulsome releases from Bailey and its insiders and affiliates, we would be prepared to waive our claim on the funds that your client holds.==  That would require, however, 9019 motion practice to obtain a court approval of the arrangement before we could give you our waiver.   Hence, I CC Ms. Hayward above.  Everybody would win: My client could safely exit the situation in the knowledge that it would not be sued down the road; you get the product that you need; Ms. Hayward's client gains access to funds and a job to do.  Indeed, such an arrangement would actually allow for a greater amount of funds than you currently hold to reach Bailey (we hold some as well, that would also be released).

THIS IS A FRE RULE-408-PROTECTED OFFER OF COMPROMISE.    You will note that what RBC attempts here is merely to exit the situation, turn over excess funds to the estate, help your client out, and be left in peace.   This is not an attempt to collect a prepetition debt.   Please do not attach this email to any Court pleading or otherwise make its contents public.

Stephen "Joseph" Brown
Partner
SJBrown@SRCattorneys.com
312 565.8339 tel | 312 565.8300 fax

**TR. 788; TR. 238**.

127.    Republic used that position (which has since been rejected by the Bankruptcy and

District Courts) as a sword every step of the way in the bankruptcy case.  For example, Republic

argued that the Company could not use cash collateral or obtain DIP financing because Bailey

didn't own its receivables but had sold them all to Republic.

128.    Leaving aside Judge Dodd's determination that the factoring agreement terminated on November 5, 2015 (Adv. Dkt. 165), Republic's position was insupportable, and should never have been raised in the first place, given that (i) Republic had taken a termination fee; (ii) the facility had been paid in full, (iii) Republic was not entitled to hold out for a release; and (iv)Bailey notified Republic that Bailey considered the agreement terminated.

129.    The Company's reorganization failed because Republic held most of Bailey's cash. As a manufacturing company, it required cash to acquire raw materials and inventory to create the products it sold to customers.  Republic's refusal to release the cash destroyed Bailey's ability to continue in business by severely limiting its working capital.  In the process of doing so and continues to wrongfully claim ownership of Bailey's Receivables, Republic's actions also destroyed customer relations, which it had taken Bailey decades to develop, irreparably damaging the Company and dooming its chapter 11 case to failure.  The bankruptcy estate likewise incurred $421,193.87 in Chapter 11 administrative expenses that Republic should be required to reimburse as a result of its violations of the automatic stay and sabotage of the Debtors' reorganization.

**xi.    Republic Celebrates Bailey's Demise.**

130.    If any doubt remained about Republic's motives, Risk Manager, Melissa Baines put them to rest in an in-house email rejoicing at what she called Bailey's "implosion," and wishing she could be in the courtroom to see the formal transfer from chapter 11 to chapter 7:

On Jun 1, 2016, at 4:09 PM, Melissa Baines <mbaines@republicbc.com> wrote:

Unofficially, Bailey Tool has imploded. The official nail is expected to hit in the next 7 to 30 days. Comerica has pulled their consent to the cash collateral order, and they have given Debtors 30 days to COMPLETE a 363 sale, but only to the extent they can pull together a cash flow by early next week, which shows the Debtors making it to the sale and which CANNOT include any expenses to fight this adversary proceeding, AND Debtors must get the APA in place before the cash collateral hearing, which is not yet scheduled but expected to be next week. Also, Comerica will let this crash a burn before they agree to take a haircut on any 363 sale Buttles thinks he can pull together, so the APA must be for Comerica's nut or more. In all likelihood (and then some), these are all unattainable benchmarks, and time of death will be officially called at the cash collateral hearing next week. Oh, what I wouldn't do to be there to see the walls come crashing down…

We will still have to settle this adversary proceeding at some point, but we will be dealing with the trustee or Comerica, either of which parties will be more rational to deal with than John Buttles.

Melissa Baines
Risk Manager

Republic Business Credit, LLC
201 St. Charles Avenue, Suite 2210
New Orleans, LA 70170
t: 504.262.8604

**TR.253**.

131.     Ms. Baines' boss, Allen Frederic, suggested she should attend as a reward. TR.253

("Go to the hearing, you earned it.").  Ms. Baines responded:

| Message | |
|---|---|
| From: | RBC [mbaines@republicbc.com] |
| Sent: | 6/2/2016 12:09:08 AM |
| To: | afrederic@republicbc.com |
| CC: | Stewart Chesters [schesters@republicbc.com]; Robert Meyers [rmeyers@republicbc.com] |
| Subject: | Re: Bailey Tool |

Lol! I wish I could! May be sadistic, but it would really make my day. We'll see when it is, and I might take you up on that if I can work out logistics.

Melissa Baines
Republic Business Credit, LLC

**TR.253**.

132. Republic's management was pleased with at the change since it expected this adversary proceeding would go away since it could not be funded and the chapter 7 trustee would be more "reasonable." *Id.*

133. In addition to the difficulties caused Buttles by the liquidation of the Company, Comerica Bank also brought suit against him personally on his guarantee of the Comerica debt in December 2018. On May 12, 2020, Comerica obtained a judgment against Buttles for $1,963,482.35, plus interest and attorneys' fees. **TR.497.**

134. When put in a list, Republic's destructive acts clarify why it must answer for its actions. By the time of Bailey's conversion to chapter 7, Republic had:

- Refused to advance funds under the Factoring Agreement in good faith;
- Exercised complete control over the Debtors' business causing its failure;
- Misappropriated the equity from Buttles' exempt homestead;
- Taken a secret termination fee of $75,000;
- Wrongfully held out for a release;
- Wrongfully exercised control over proceeds of Accounts created on or after November 5, 2015;
- Exercised control over funds withheld based on bogus fees, charges, penalties and fictitious "overadvances";
- Knowingly violated the automatic stay;
- Prevented the Debtors from obtaining DIP financing by maintaining the absurd (and now judicially refuted) claim that Republic owned Bailey's Accounts in perpetuity;
- Prevented the Debtors from maintaining existing customers or developing new customer and from reorganizing;
- Caused Buttles' guaranty to Comerica to be called, and a judgment taken against him personally.

135. Republic's actions destroyed a decades-old company, put dozens of employees (many of whom lived paycheck-to-paycheck) out of work, and took away Buttles' homestead.

## II.
## CONCLUSIONS OF LAW

**A.**     **Jurisdiction and Venue.**

136.     The Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding contains some core causes of action proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O) and some non-core proceeding and causes of action.

137.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

138.     To the extent the Court determines that any of the claims asserted herein are not core, the Debtors expressly consented to the entry of final orders and judgments by the Bankruptcy Court.  All parties consented to the entry of Final Orders.

**B.**     **Buttles' Claims**

139.     Buttles has asserted numerous alternate theories of relief in this adversary proceeding. Distilled to their essence, Buttles claims that Republic repeatedly misled him regarding its actual intentions both in the carrying out of the Agreement as well as in extracting additional collateral from Buttles personally.  The combined effect of these actions was to entirely destroy the Company, wrongly take property from Buttles, destroy his life's work and livelihood, and cause him to be liable for guaranty obligations to lenders other than Republic.

140.     Count 1 – Fraud

Buttles has demonstrated that Republic's actions satisfy the element of common law fraud under Texas law are, in that as shown above in the Findings of Fact, Republic made repeated representations to Buttles regarding both its intentions in carrying out the Agreement as well as in extracting additional collateral from him personally.  Those representations were false, and at the time Republic made them it knew them to be so; alternatively, the Court finds that Republic made the representations recklessly, as a positive assertion and without knowledge of the truth.  The

representations Republic made to Buttles were material, and it did so with the intention that Buttles act upon them, which he did, to his injury. Those injuries include: (i) Republic's initial improper obtaining of a mortgage on Buttles' homestead; (ii) taking $225,000 in proceeds from the sale; (iii) forcing Buttles to sell at a below-market price; (iv) seeking Buttles' guaranty of obligations under the Agreement; (v) foreseeably causing Comerica Bank to be able to obtain a judgment against Buttles for his guaranty in the amount of $1.9 million; (vi) foreseeably causing Buttles to be liable to lenders other than Comerica for his guaranty of obligations; (vii) causing Buttles to lose his employment and its attendant benefits; and (viii) foreseeably destroying Bailey's entire enterprise value, which was 100%-owned by Buttles.

Together, these actions by Republic damaged Buttles in the amount of $_____.

141. Count 2 – Fraud in a Real Estate Transaction (Tex. Bus. & Com. Code §27.01(a).)

Buttles has demonstrated that Republic's actions satisfy the elements of fraud in a real estate transaction under Texas law. More specifically, Buttles has demonstrated that there was a transaction involving real estate between Republic and Buttles wherein Buttles granted liens to Republic for his homestead. In that transaction Republic made false representations of fact, false promises, and/or benefited by not disclosing that its promises and representations were false, in that Republic represented to Buttles to giving it a mortgage on his homestead would allow Republic to resume, or to continue to advance monies to the Company, when in fact it had no intention of doing so, but instead was simply seeking to enhance its collateral position during the time which it was conducting an unannounced liquidation of the Company. Republic intended its representations and promise to induce Buttles into giving the mortgage, and Buttles relied on those false representations when he did so. As a result, Buttles' actions in reliance on Republic's representations injured Buttles. Accordingly, Buttles is entitled to the remedies provided in Chapter 27 Texas

Business and Commerce Code, which include: the damages provided by Tex. Bus. & Com. Code §§27.01(b)-(e), being recovery of all damages he suffered, including but not limited to (i) the $225,000 cash fraudulently extracted from him and (ii) the loss of additional value in his homestead.

Together, these actions by Republic damaged Buttles in the amount of $_____.

142.     Count 4 – Tortious Interference with Contract (Both in Homestead Sale and with Existing Client Relations)

Buttles has demonstrated that Republic's actions satisfy the elements of tortious interference with contract, both as to the sale of Buttles' homestead as well as in its repeated and destructive interference with Buttles' longstanding customer and vendor relations.  As applied to this case, Buttles has demonstrated the factual elements required under Texas law.  Both with regard to his homestead sale and with his customer and vendor relations, Buttles had valid contracts with which Republic willfully and intentionally interfered, as is demonstrated above in the Findings of Fact. Those many interferences proximately caused Buttles' injury, and by those actions Buttles incurred actual damage and loss.

Republic's actions on its interference with the sale of Buttles' homestead damaged him in the amount of $ _____ .

Republic's actions on its interference with Buttles customer and vendor relations damaged him in the amount of $_____ .

143.     Count 5 - Breach of Settlement Contract (Homestead)

Buttles has demonstrated that Republic's actions satisfy the elements of breach of contract in connection with the settlement agreement reached between Republic, the Company, and Buttles. As applied to this case, Buttles has demonstrated the factual elements of breach of contract under

Texas law, in that (i) Buttles, Republic, and the Company had reached a valid and enforceable settlement contract between Buttles and Republic; (ii) Buttles is a proper party to sue for breach of the contract because he individually was harmed by it in that(iii) he gave consideration by providing a mortgage on his homestead and later allowed Republic to receive $225,000 of the homestead sale proceeds, but received none in return; (iv) Republic, in contrast, breached the contract by taking the consideration Buttles provided and giving none of the promise consideration (*i.e.*, resuming funding of the Company's operations); (v) Republic's breach has caused injury to Buttles, and (vi) Buttles is therefore entitled to recover the actual and consequential damages which he suffered as a result of Republic's actions.

Republic's actions on its interference with Buttles customer and vendor relations damaged him in the amount of $_____

144.    <u>Count 6 – Negligent Misrepresentation</u>

Buttles has demonstrated that Republic's actions satisfy the elements of negligent misrepresentation.  The evidence adduced at trial show the factual elements of negligent misrepresentation under Texas law, in that: (i) Republic made representations to Buttles in the course of its business dealings with him that (a) it was entitled to a mortgage on his homestead and (b) if he did so, Republic would continue to fund the Company and he would be able to receive a salary; (ii) that in making those representations, Republic supplied false information by which it intended to guide Buttles' actions; (iii) in doing so Republic did not exercise reasonable care or competence in obtaining or communicating that information; (iv) Buttles justifiably relied on them; (v) Republic's negligent misrepresentation proximately caused Buttles' injury, in that (a) he was forced to sell his homestead at a price below market and give Republic a portion of the proceeds to which it had no right under Texas law; and (b) Republic's failure to fund caused Buttles not only the loss

of his homestead equity but also subjected him to judgment being obtained against him by Comerica in the amount of $1.9 million, vulnerability to other judgments being obtained by other lenders holding his personal guaranty of Company obligations, the loss of the entire value of his equity ownership in the company, as well as continued employment and related benefits.

Republic's negligent misrepresentations to Buttles have damaged him in the amount of $_____.

145.    Count 7 – Accounting

Buttles has demonstrated that Republic's actions satisfy the requirements needed to demonstrate entitlement to an accounting under Texas law.  Buttles has shown that the facts and accounts sought from Republic in the normal course of discovery were either so complex or so badly and capriciously kept by Republic that the information necessary cannot be obtained through the use of standard discovery procedures.  It is necessary to conduct and accounting in order to effect justice, because Buttles has no other adequate remedy at law.  Accordingly Buttles is entitled to an accounting of all of Republic's transactions with Buttles for: (i) all funds and property received by Republic; (ii) all funds and transfers expended by Republic; (iii) all property sold by Republic; and (iv) all funds and property remaining in Republic's possession.

Republic's actions therefore cause the Court to direct that an accounting occur which fully address the four categories set out above by a time to be later set by the Court.

146.    Count 8 – Objection to Claim

By demonstrating his entitlement to relief under Counts 1, 2, 4, 5, 6, and 7, Buttles has provided ample grounds to disallow all claims filed by Republic in the cases from which this Adversary Proceeding originates.

Each of Republic's claims filed in these bankruptcy cases are therefore disallowed entirely.

147. <u>Count 9 – Exemplary Damages</u>

Buttles has demonstrated that Republic's actions satisfy the requirements needed to entitled him to an award of exemplary damages under Texas law, in that he has shown that (i) he was injured through conduct by Republic which amounted to gross negligence, malice, or actual fraud; (ii) he has shown a right to recover damages on the causes of action set out in his Counts 1,2,4,5, and 6; (iii) he is therefore entitled to an award of exemplary damages.

Republic's conduct, as demonstrated above in the Court's Finding of Fact, entitles Buttles to exemplary damages in the amount of $_____.

148. <u>Count 10 – Attorneys' Fees and Expenses, and Costs of Court</u>

Buttles has demonstrated that Republic's actions satisfy the requirements for awarding attorneys' fees and expenses, and costs of court under Texas law, in that such award is provided for by statute as it applies to Count 2 (Texas Business and Commerce Code Sec. Tex. Bus. & Com. Code §27.01(a) *et seq*.) and Count 5 (Texas Civil Practice and Remedies Code Sec. 38.001).

Republic's conduct, as demonstrated above in the Court's Finding of Fact, entitles Buttles to attorneys' fees and expenses, and costs of court, in the amount of $_____.

Dated:  December 17, 2020

Respectfully submitted,

/s/ J Ken Johnson

Jerry Kenneth (J. Ken) Johnson, II
Texas Bar No. 10746300
**MARTIN | WALTON**
699 S. Friendswood Drive, Suite 107
Houston, Texas 77546
P:713-773-2035
F: 832-559-0878
kjohnson@martinwaltonlaw.com

/s/ Michael R. Rochelle

Michael R. Rochelle,
Texas Bar. No. 17126700
**ROCHELLE MCCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182   F: (214) 953-0185
buzz.rochelle@romclaw.com

**Counsel for John Buttles**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of December 2020, a true and correct

copy of the foregoing was served on counsel of record via e-mail.

*/s/ Michael R. Rochelle*
Michael R. Rochelle