Michael R. Rochelle
State Bar No. 17126700
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
(214) 953-0182
(214) 953-0185

COUNSEL FOR JOHN S. BUTTLES

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BAILEY TOOL &** | § | **Case No. 16-30503-SGJ-7** |
| **MANUFACTURING COMPANY.** | § | **Chapter 7** |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY, HUNT** | § | |
| **HINGES, INC. and CAFARELLI METALS, INC.,** | § | |
| Plaintiffs, | § | |
| **v.** | § | |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| Defendant and Counter-Plaintiff, | § | **Adv. No. 16-03025-SGJ** |
| **v.** | § | |
| | § | |
| **BAILEY TOOL &** | § | |
| **MANUFACTURING COMPANY,** | § | |
| **HUNT HINGES, INC. and** | § | |
| **CAFARELLI METALS, INC.,** | § | |
| Counter-Defendant. | § | |
| | § | |
| **REPUBLIC BUSINESS CREDIT, LLC,** | § | |
| Third-Party Plaintiff, | § | |
| v. | § | |
| **JOHN BUTTLES, TENNECO, INC.,** | § | |
| **TRELLEBORG AUTOMOTIVE** | § | |
| **USA, INC.,** | § | |
| Third-Party Defendants. | | |

**APPLICATION OF ROCHELLE MCCULLOUGH, LLP FOR ALLOWANCE OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES UNDER TBCC § 27.01**

A HEARING WILL BE CONDUCTED ON THIS MATTER ON _____ _____, 2022 AT ____ __.M. IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, EARLE CABELL BUILDING, UNITED STATES COURTHOUSE, 14TH FLOOR, 1100 COMMERCE STREET, DALLAS, TEXAS 75242.

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT BY FEBRUARY 7, 2022 WHICH IS AT LEAST TWENTY-FOUR (24) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON COUNSEL FOR THE MOVING PARTY; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

The law firm of Rochelle McCullough, LLP (the "Firm"), co-counsel for the John S. Buttles, makes its application (the "Application") for allowance of fees and reimbursement of expenses incurred as counsel for John S. Buttles ('Buttles) in the above-styled Adversary Proceeding. The Firm states as follows:

## JURISDICTION

1.      This Court has subject matter jurisdiction of this Application under 28 U.S.C. § 1334. Applicant seeks compensation as provided for by Texas Business and Commerce Code Section 27.01.

## BACKGROUND

2.    On February 1, 2016, (the "Petition Date"), the above-styled Debtors filed their petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). [Dkt. 1]

3.    On February 19, 2016, the Debtors commenced this Adversary Proceeding against Defendant Republic Business Credit. ("Republic") [Adv. Dkt. 1] On March 23, Republic filed its answer. [Adv. Dkt. 19] On May 31, 2016, Republic filed its counterclaim (sic) against Buttles. [Adv. Dkt. 36]  On September 23, 2016, Buttles filed his answer and counterclaim against Republic. [Adv Dkt. 63]

4.    On January 26, 2017, the Court transferred the Debtors' cases to proceedings under chapter 7. [Dkt. 384] The United States Trustee appointed James Cunningham to serve as Chapter 7 Trustee.

5.    This Adversary Proceeding was tried before the Court from June 14-18, June 21-22, and July 6, 2021. The Court issued its Findings of Fact and Conclusions of Law in this matter on December 23, 2021. This Application follows the Court's finding that John Buttles is entitled to an award of his attorneys' fees under Texas Business and Commerce Code Section 27.01.

## RETENTION AND COMPENSATION OF THE FIRM

6.    John Buttles was the equity owner of the Debtors Bailey Tool, Hunt Hinges, and Cafarelli Metals. He retained J. Ken Johnson of the Martin Walton firm to represent him in this matter. Soon after this time, Buttles approved Martin Walton's association of Rochelle McCullough LLP to serve as co-counsel. Buttles agreed to compensate the firms on a contingent

fee basis. As would be expected from this arrangement, the Firms have borne their own expenses during this matter and to date have received no compensation for their representation.

## SUMMARY OF FEES AND EXPENSES

7.      Over the course of this representation, to date the Firm has spent a total of 1,780.5 hours engaged in the work. A copy of its time records is attached at Exhibits A-H;[1] those records reflect that the time spent, at its normal hourly rates, as well as anticipated appellate fees allowed by statute, equal $1,212,914.76. From that amount, the Firm makes a voluntary 10% reduction of $121,291.48, for a total of **$1,101,623.28.**

8.      ” The following summary illustrates the hours spent in each task category:

| Activity | Hours | Fees |
|---|---|---|
| Legal Research, Case Analysis & Drafting | 872.4 | $479,123.75 |
| Discovery & Depositions | 269.1 | $171,529.00 |
| Court Appearances | 90.7 | $67,185.00 |
| Trial Preparation | 507.8 | $380,850.00 |
| Administrative | 30.7 | $14,227.00 |
| Estimated appellate fees | 500.0 | $100,000 |
| Voluntary Reductions |  | ($111,291.48) |
| **Total** | **2280.5** | **$1,101,623.28** |

9.      During this adversary proceeding, the Firm incurred expenses of $8,764.56. They are set by categories below, and also attached as Exhibit I.

---

[1]      Hoping that it would be some use to the Court in its analysis, the Firm has provided different breakouts of the time and rates on the Exhibits A-H (A: Chronological Time for the entire firm; B: Hours by Attorney; C: Attorney Rates and Hours, by Year; D: Administrative Time; E: Court Time; F: Legal Research, Case Analysis, and Drafting; G: Trial Preparation; H: Discovery & Deposition).

**Expenses**

| Copies | 1,707.40 |
|---|---|
| LexisNexis | 3,635.23 |
| PACER | 222.80 |
| JAMS | 2,195.00 |
| Milliorn Appraisal | 600.00 |
| Other Vendors | 404.13 |

10.     The Firm's professionals and paraprofessionals involved in this representation, and the hourly rate charged by each, are as follows:

| Professional | Status | Rates |
|---|---|---|
| Michael R. Rochelle | Partner/Counsel | $610-750 |
| Shannon Thomas | Associate | $235-350 |
| Bryan L. Rochelle | Associate | $140-195 |
| Zack Levick | Associate | $275 |
| Rosalie DeCorte | Paralegal | $150 |
| DiAnn Oler | Paralegal | $140 |

11.     During the course of this litigation, the Firm's professionals to date have spent a total of 1,780.5 hours on the case. The billing and expenses are broken down on the Application's Cover Sheet, which is attached to this Application and incorporated by reference. The time is broken into billing categories; the list of expenses is sufficiently straightforward that the Firm does not believe that they need further breakdown.

12.     This was a challenging case. The Firm served as co-counsel to John Buttles, seeking to recover from defendant Republic Business Credit ("RBC") for its tortious actions in relation to the factoring agreement and guaranty which Bailey Tool and Buttles had entered into with RBC. The facts of that relationship are fully set out in the Court's Findings of Fact and Conclusions of Law recently entered in this Adversary Proceeding, (Adv. Dkt. 369) and Applicant in-

corporates them here by reference. In its opinion, this Court found that under the provisions of Texas Business and Commerce Code § 27.01, Buttles was entitled to be awarded his attorneys' fees. This fee application, therefore, is submitted pursuant to that statute and not under the provisions of 11 U.S.C. § 330, as is typically the case in this Court.

13.     Were this a Section 330 fee application, the time spent in a single adversary proceeding would appear under one heading. This application covers four years' time; Applicant has divided that time into subparts to assist the Court in evaluating the application. The paragraphs below outline how the Firm spent its time during this Adversary Proceeding.

14.     <u>Legal Research, Case Analysis, and Drafting</u>. The Firm spent 872.4 hours in this area during the case. In this, as in any lawsuit, a large percentage of a lawyer's time goes to case analysis, *i.e.*, making sense of the undifferentiated mound of information available to him in the form of agreements, financial information, emails, and discussions with the individuals involved. That work of analysis was especially demanding in this case because the amount of material available was extensive. The Firm's most senior lawyer did most of that work. Although it could have been done by a more junior person, more experienced lawyers typically can review and synthesize factual material more efficiently than would a lawyer of less experience. Even had this work, which formed the heart of Mr. Buttles' case, been done by one more junior, the more senior lawyer would still have to do the hard work of learning it for himself. When faced with the choice, the Firm believes that document review having been done by the individual who would take the matter to the courtroom was the most efficient way to do the job.

15.     Once the analysis was largely done,[2] the work of legal research and drafting be-

gan. The Firm was the principal researcher and drafter for Buttles, generally preparing the first

draft of documents which it then revised and edited with co-counsel. In some instances, members

of the Firm and co-counsel also worked together from a clean sheet of paper, especially when

time was short. In the last two years of the representation, counsel saved considerable time and

expense by using videoconferencing and screen sharing software to allow discussion, editing,

and document draft review without the need to travel. The fees in this area also included the time

spent drafting the fee application, which took more time than typically needed in this Court,

since complying with the requirements of TBCC § 27.01 required a careful checking of the case

law and statutory requirements.

16.     <u>Discovery and Depositions</u>. The Firm spent 269.1 hours in this area during the

case. Although the Martin Walton firm took the lead in discovery and deposition matters, the

Firm spent considerable time in tandem with Martin Walton, drafting and responding to discov-

ery. Firm members also attended the more important depositions in the case as second chair.

17.     <u>Trial Preparation</u>. The Firm spent 507.8 hours in this area. Preparation for the trial

itself started months before counsel answered ready. As the Court noted in its opinion, the exhib-

its in the record numbered in the thousands, and the parties called eleven witnesses. Buttles was

asserting a number of causes of action against RBC; proper preparation required the Firm to

build proof outlines for each cause of action, and testimony outlines for each of the witnesses

called or cross-examined on Buttles' behalf. Getting everything organized, thought through, and

---

[2]     Applicant says "largely" because in a matter such as this, the analytical work continues until the case is over, as new facts and arguments emerge.

ready to hand for trial was a very large task. That time continued during the trial itself, since time not spent in the courtroom went to updating the testimony outlines and related materials on the fly.

18.     <u>Court Time, Including Trial</u>. The Firm spent 90.7 hours in this area. As appears in the Firm's time records, this case had considerable motion practice. Defendant sought dismissal, venue change, and summary judgment, among others. Each of those motions was important for keeping Mr. Buttles' lawsuit moving forward. The trial itself took 7½ days and consumed every waking hour during that time.

19.     <u>Administrative</u>. The Firm spent 30.7 hours in this area. As in any complex piece of litigation lasting several years, simply keeping matters straight, such as deposition schedules and pleading deadlines, required attention and coordination among all the parties.

20.     <u>Fees on Appeal</u>. Texas law provides that the Court may prospectively allow for fees incurred if an appeal be taken from its judgment. After consulting with appellate counsel, the Firm estimates that its portion of appellate fees will be $100,000.

## EVALUATION STANDARDS

21.     '"State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision'…[b]ecause Texas substantive law applies to the statutory-fraud claim [Tex. Bus. & Com. Code § 27.01I] on which the award of attorney's fees was based, Texas law also governs the award of attorney's fees and reasonableness of that fee award in this case." *Gassaway v. TMGN 121, LLC*, No. 5:19-CV-082-H, 2020 U.S. Dist. LEXIS 26846, at *16 (N.D. Tex. Feb. 18, 2020), quoting *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

22.     When fee-shifting is authorized, whether by statute or contract, the party seeking

a fee award must prove the reasonableness and necessity of the requested attorney's fees."

*Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019). Texas has

embraced the well-known "lodestar method," which mandates a two-step analysis in this regard:

> [T]he lodestar method…applies for determining the reasonableness and necessity
> of attorney's fees in a fee-shifting situation: 'Under the lodestar method, the de-
> termination of what constitutes a reasonable attorney's fee involves two steps.
> First, the [fact finder] must determine the reasonable hours spent by counsel in the
> case and a reasonable hourly rate for such work. The [fact finder] then multiplies
> the number of such hours by the applicable rate, the product of which is the base
> fee or lodestar. The [fact finder] may then adjust the base lodestar up or down
> (apply a multiplier), if relevant factors indicate an adjustment is necessary to
> reach a reasonable fee in the case.'

*Id*. at 501 (quoting *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762-63 (Tex. 2012)).

23.     In *Rohrmoos*, the Texas Supreme Court emphasized that "the fee claimant bears

the burden of providing sufficient evidence on both counts [the reasonable hours spent by coun-

sel in the case and a reasonable hourly rate for such work]." *Id.* at 498 (citing *El Apple*, 370 S.W.

3d at 760). Sufficient evidence includes, "at a minimum, evidence of (1) particular services per-

formed, (2) who performed those services, (3) approximately when the services were performed,

(4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly

rate for each person performing such services." *Id.* at 501-02.

24.     The lodestar method developed as a "short-hand version of the *Arthur Andersen*

factors," which encompass the most commonly applied considerations in fee analysis. *Id*. at 490.

The *Arthur Andersen* factors include:

(i)      time and labor required,
(ii)     novelty and difficulty of the questions involved,
(iii)    skill required to perform the legal services properly;

(iv)      preclusion of other employment;
(v)      fee customarily charged in the region for similar legal services;
(vi)      amount involved and results obtained;
(vii)      time limitations imposed;
(viii)      nature and length of the professional relationship with the client;
(ix)      experience, reputation and ability of the attorneys rendering services; and
(x)      whether the fee is fixed or contingent.

*See Arthur Andersen v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary R. Prof. Conduct 1.04); *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (requiring application of these factors in case under Declaratory Judgments Act).[3] While these factors are to be considered, litigants are not required to present evidence on each of the factors. *City of Laredo v. Negrete*, No. 04-08-00737-CV, 2010 Tex. App. LEXIS 903 at *28 (Tex. App.—San Antonio Feb. 10, 2010, pet. denied) (*citing Burnside Air Conditioning & Heating, Inc. v. T. S. Young Corp.*, 113 S.W.3d 889, 897-98 (Tex. App.—Dallas 2003, no pet.)).

25.      The base lodestar calculation is presumed to account for most of the relevant *Arthur Andersen* considerations. *See Rohrmoos,* 578 S.W.3d at 500.[4]

26.      In the second step of the lodestar analysis, after determining the base fee or lodestar, the fact finder may then adjust the base lodestar up or down if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case. Considerations may not be used to enhance or reduce the base calculation to the extent they are already reflected in the reasonable hours worked and reasonable hourly rate. *Id.* at 501.

---

[3] These considerations are the same as the "Johnson Factors" adopted by the Fifth Circuit and discussed below.

[4]      "As in the federal courts, the base lodestar calculation usually includes at least the following considerations from Arthur Andersen: "the time and labor required," "the novelty and difficulty of the questions involved," "the skill required to perform the legal services properly," "the fee customarily charged in the locality for similar legal services," "the amount involved," "the experience, reputation and ability of the lawyer or lawyers performing the services," "whether the fee is fixed or contingent on results obtained," "the uncertainty of collection before the legal services have been rendered," and "results obtained." (citing *Arthur Andersen,* 945 S.W. 2d at 818).

27.     While state law is controlling, analysis under Fifth Circuit precedent is also help-ful for analyzing the fees requested here. Like the Texas Supreme Court in *Arthur Andersen*, the Fifth Circuit has ruled that many factors shall be considered by the Court in determining allow-ance of compensation.[5]

28.     Time and labor devoted is only one of many factors. According to the Bankruptcy Code and Fifth Circuit standards, the number of hours expended must be considered in light of all relevant factors, including the same ten factors set out above in *Arthur Andersen*. For purpos-es of federal law, the controlling cases in this circuit are *Johnson v. Georgia Highway Express*, 488 F. 2d at 717-19 and *In re First Colonial Corp. of America*, 544 F. 2d at 1294, which makes these factors applicable in bankruptcy cases.[6]

29.     Applying the foregoing criteria, as outlined by both the Texas Supreme Court and the Fifth Circuit, more than justifies the compensation requested here. A brief statement with re-gard to each of the elements set out in *First Colonial* is set forth below:

---

[5]     *See, e.g., In re First Colonial Corp. of America*, 544 F. 2d 1291 (5th Cir.), cert. denied, 431 U.S. 904 (1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974); *See also In re Drexel Burnham Lambert Group, Inc.*, 131 B.R. 13 (Bankr. S.D.N.Y. 1991); *In re Hutter Construction Co., Inc.*, 126 B.R. 1005 (Bankr. E.D. Wis. 1991); *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987); *In re Cuisine Maga-zine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986). As noted by the Fifth Circuit, "the guidelines we [establish] are use-ful whenever the award of reasonable attorneys' fees is authorized by statute." *First Colonial*, 544 F. 2d at 1298-1299.

[6]     The Firm recognizes that under settled law the "lodestar method," as first developed by the Third Circuit, *see Lindy Bros.Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F. 2d 161 (3d Cir. 1973), as opposed to the Johnson Factors, as set forth above, is the proper method to be used to determine a reasonable fee in all federal courts, including bankruptcy courts. *See, e.g., Pennsylvania v. Delaware Valley Citizens Council for Clean* Air, 483 U.S. 711 (1987) *("Delaware Valley II"); Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 346 (1986) ("*Delaware Valley I*"); *United States Football League v. National Football League*, 887 F. 2d 408, 413 (2d Cir. 1989), cert. denied, 110 S. Ct. 1116 (1990); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990). However, the Supreme Court has made it clear that the "lodestar method" is presumed to sub-sume the Johnson Factors. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

a.    **The time and labor required**:  To date, the Firm has spent a total of

1780.5 hours representing Mr. Buttles. In addition, state law contemplates allowance of fees on

appeal as part of an award of statutory attorneys' fees. After inquiry, the Firm estimates that it

will expend 200 hours on such appeals at a blended hourly rate of $500/hr. At its standard hourly

rates, the Firm has incurred fees to date totaling $1,112,914.75; appellate fees would add another

$100,000 to that amount. A detailed description of the services rendered in the application is at-

tached as Exhibits A through H.

What was Necessary to Prove the Compensable Claim. At the outset, the Firm acknowl-

edges that it provided legal services in support of both compensable and non-compensable

claims in this case. The "American rule," long followed by Texas courts, provides that a party

may not recover for attorney's fees unless specifically authorized by statute or contract. *See, e.g.,*

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.*, 532

U.S. 598, 602, (2001) ("In the United States, parties are ordinarily required to bear their own at-

torneys' fees-the prevailing party is not entitled to collect from the loser. Under this "American

Rule," we follow "a general practice of not awarding fees to a prevailing party absent explicit

statutory authority.") (internal citations omitted). As such, when attorney's fees are authorized

for some, but not all, of a prevailing party's claims, that party generally has a duty to segregate

the recoverable attorney's fees from the unrecoverable. *See Tony Gullo Motors I, L.P. v. Chapa*,

212 S.W.3d 299, 311 (Tex. 2006); *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 10–12

(Tex. 1991). Nonetheless, the Texas Supreme Court has recognized an exception where the legal

services provided advance *both* non-recoverable and fee-recoverable claims, the critical question

being whether the particular services would have been necessary even if the non-recoverable

claims were not appended to the recoverable claims. *Tony Gullo Motors I, L.P.,* 212 S.W.3d at 313-314. Where discrete legal services advance both, the services are considered so intertwined that they need not be segregated. *Id.*

   As set out by the Texas Supreme Court in the *Tony Gullo Motors* decision, the issue is not simply that facts were intertwined, but *whether the work done was necessary to prove the statutorily compensable claim*. In this instance, the Firm believes that almost all of its work was necessary to prove Buttles' assertions that he had been defrauded in a real estate transaction. The extensive analysis of the facts of the case had to be done whether all asserted causes of action,[7] or only the fraud in a real estate count, were to go forward. There would have been some small time savings in not having to brief, document, and structure proof of the other counts, which Applicant estimates to be fifty hours.[8] The hours entirely dedicated to other causes of action are comparatively small because the facts and exhibits probative of the other counts were the same ones proving RBC's liability under TBCC Section 27.01. Further, the Section 27.01 fraud pleaded and proved by Buttles was not a simple one: the evidence at trial showed that RBC's fraudulent treatment of Buttles began long before it demanded a lien on his homestead, lasted until long after RBC took homestead proceeds, and gave nothing in return.

   b.   **The novelty and difficulty of questions**: Although invalidating a lien securing a business debt placed on the homestead is not a novel matter, obtaining an appropriate judgment for the damage caused by RBC's fraudulent actions proved both novel and difficult,

---

[7]     The other causes of action asserted include common law fraud (Count 1), tortious interference with prospective and existing contract (Count 4), breach of contract (Count 5), negligent misrepresentation (Count 6), accounting (Count 7), objection to claim (Count 8), exemplary damages (Count 9), and attorneys' fees, expenses, and costs of court (Count 10).

[8]     Applicant can only estimate the non-compensable time involved because the Firm did not separate its time

requiring a tenacious, four-year commitment by the Firm. Defendant also availed itself of the usual and customary methods of testing the quality of Buttles' counterclaims, including motions seeking dismissal, venue transfer, summary judgment, and compelling discovery. These motions took months to resolve but gained RBC no significant relief.

Leaving aside RBC's dilatory tactics, the more challenging part of the representation involved proof of RBC's fraud. Plainly put, the story Mr. Buttles told his counsel regarding the RBC relationship was a remarkable one that portrayed a lender acting so maliciously that it was outside counsel's personal experience.[9] That extreme nature of Mr. Buttles' story made it doubly necessary for the Firm to make sure that the matters it alleged were true. This Court's opinion has since determined that narrative to be entirely credible.

The Firm found two sets of documents central to proving its case: the emails the parties had exchanged, and RBC's factoring agreement and guaranty. Each group brought challenges.

The Emails. The parties exchanged thousands of emails, and the Firm received them in the usual jumble, having to be put in chronological order, and duplicates removed, before they could even be read. Once read and highlighted, their most important points had to be entered on a timeline, from which the story began to emerge. That timeline, which ultimately filled 39 single-spaced pages, contained the vast majority of the plaintiff's exhibits. It presented a remarkable story: RBC first duped Buttles and his company into entering the factoring agreement, took over

---

by cause of action in its regular recording of time.

[9]     To clarify: unhappy lenders, lenders pounding the table or shouting on the telephone, are a species native to the terrain of the Bankruptcy Court, and no surprise to anyone who has spent a professional lifetime there. This instance was different: a lender not merely unhappy with its borrower/guarantor, but constantly lying to him and misleading him about the most basic facts of the relation, as well as about its own intentions. The world of commerce depends upon at least a modicum of trust between contracting parties, but RBC's conduct showed that it simply could not be trusted.

Bailey's operation in all significant respects, and then stripped Buttles of his assets. Most notable in all of this, it was the emails from RBC officers that told the story: they are condemned out of their own mouths. Doing the work of piecing the facts together took a great deal of time: it was confusingly complex, the acts at issue were interrelated, and deciphering the chain of events continued up to and during trial. As demonstrated by the Court's opinion, extracting the story from the email string was not only necessary, it also formed the core of the Court's findings in this case.

The Contracts. RBC's factoring agreement and guaranty were the other key documents in the case. The originals appear to be in nine-point type, single-spaced. The prose had not been written with clarity in mind; the form had clearly evolved over decades, accreting definitions, qualifications, disclaimers, and duties, virtually all being burdens imposed on the borrower. No first, second, or third reading left counsel with a clear understanding. Indeed, it was sometimes necessary to diagram sentences before their meaning emerged. Taken as a whole, RBC's standard form agreements gave it not merely the upper hand, but a shocking amount of freedom. However, as the Court's opinion noted, RBC managed to step outside even its own broad contractual protections.

Making Sense of the Jumble. As the document review continued, the Firm came to see this matter as a latter-day *Farah* case. One would have thought that the financial community had absorbed *Farah*'s lessons decades before, but apparently RBC's senior management did not. After working through the large volume of evidence in this matter, the Firm embarked upon a novel and difficult thing: proving that a lender had acted fraudulently. They succeeded in that work.

c.  **Skill requisite to perform services properly**:  The Firm acted in a time-efficient manner, as one would expect in a contingency case. Firm members worked on the matter to accomplish the tasks required, both in preparing the case and responding to RBC's several attempts to make the case go away. The members of the Firm have many years of experience in bankruptcy litigation. They staffed this case to ensure the work was done by the individual likely to do it most efficiently. In addition, because the Firm was working in tandem with the Martin Walton firm in this matter, the allocation of much of the research and drafting work fell to Rochelle McCullough, while the more purely litigation duties fell to Martin Walton.

d.  **The preclusion of other employment**: Except for final trial preparation, the time demands were not so extensive as to preclude other employment.

e.  **Customary fees**:  The rates charged by the Firm were its customary charges for work of this nature and are the same as those charged to the Firm's usual and regular bankruptcy and commercial clients. According to the best information available to the Firm, the rates sought for approval here are generally below those sought in comparably sized cases, both in this district and around the country, from counsel of similar experience.

f.  **Whether the fee is fixed or contingent**: The Firm accepted this case as a contingency matter after preliminarily concluding that significant wrong had been done to Mr. Buttles. Although it recognized that the facts and statutes involved created a *possible* award of statutory attorneys' fees, securing that relief was another matter entirely.

When determining the amount of attorney's fees to be awarded, the Court may consider the contingency fee agreement between the Firm and Mr. Buttles; however, that agreement is not controlling. Rather, the award must be based on the evidence of a reasonable fee for services ac-

tually rendered. Recognizing this, Texas courts have held that the award may be more or less than what the attorney's fees would have been under the contingency agreement between the parties. *See U.S.A. Precision Machining Co. v. Marshall*, 95 S.W.3d 407, 412–413 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (upholding award that was more than what were fees under agreement).

The Firm believes that the evidence in this case demonstrates that a fee larger than the amount under the contingency agreement is more than justified. Winning an award of attorneys' fees required proving not only that RBC extracted an improper lien on Buttles' homestead, but also that RBC obtained that lien through fraud, a much tougher assignment that required most of the work. Claiming that RBC misled Buttles into giving it a lien on his homestead was one thing; showing that RBC's fraud permeated the relationship to the point of malice raised the bar much higher. As the Court's opinion demonstrates, the Firm met that higher standard.

g. **Time limitations**: Other than during trial preparation and trial itself, the time limitations here were those involved in normal bankruptcy litigation. For the several months before trial, there were not enough hours in the day; again, however, there is nothing unusual in that.

h. **Amounts involved and results obtained**: This litigation involved a lender's destruction of an established manufacturing business and its owner's career, along with the malicious taking of the owner's exempt property, all intertwined in RBC's consistently fraudulent acts. The court found $16.96 million in damages to the estate and $1.16 million in damages to Buttles individually. These amounts reflect that the Court accepted the upper end of plaintiffs'

valuation and damage testimony. In Applicant's experience, such success in proving a hotly disputed case is rare.

Assisting the Trustee's Recovery. The Firm would also note that its work obtained results not only for John Buttles but also assisted the Trustee in his recovery. For example, when the Firm made its examination and markup of the thousands of emails in the case, it shared that work with the Trustee, whose counsel did not have to repeat the process. The material shared included not merely the chronologically organized emails but also the Firm's extensive commentary, on a by-email basis, on their significance and relation to claims made both by Buttles and the Trustee. In the same way, the Firm shared its timeline and proof charts with the Trustee. While there was not a complete overlap of facts and exhibits, the Firm nonetheless believes that its sharing saved Trustee's counsel many hours of work, and allowed them to focus their efforts on other areas.

Fees Greater than Damages? The Firm would be remiss if it failed to acknowledge what may be considered the "elephant in the room," namely, that the fee award requested exceeds the amount of damages awarded to Mr. Buttles. However, as discussed below, the amount of damages is only one factor to be considered in analyzing the fee request. Texas courts have held that an award may be reasonable even if the attorney's fees greatly exceeds the actual damages. *See Metroplex Mailing Servs. v. RR Donnelley & Sons Co*., 410 S.W.3d 889, 900–901 (Tex. App.—Dallas 2013, no pet.); *Bundren v. Holly Oaks Townhomes Ass'n*, 347 S.W.3d 421, 441 (Tex. App.—Dallas 2011, pet. denied) ("[T]here is no rule that **fees** cannot be more than actual damages"). In one instance, citing the complexity of the case and the amount of work involved, the Corpus Christi Court of Appeals determined a jury award of $2.9 million to be reasonable, even though actual damages were only $584,517.26. *See Rio Grande Valley Gas v. City of Edinburg*,

59 S.W.3d 199, 224 (Tex. App.—Corpus Christi 2000, *rev'd on other grounds sub nom.* In so holding, the appeals court expressly noted the complex nature of the case and the extraordinary work involved in preparing and trying it, including a clerk's record of over 8,000 pages, a seven-week trial and the employment of 33 lawyers from 10 different law firms. *Id.*; *see also Stuckey v. White*, 647 S.W.2d 35, 38–39 (Tex. App.—Houston [1st Dist.] 1982, no writ) (award of $33,000 plus $5,000 for each appeal was not excessive, when damage recovery was $14,339, due to complexity of case, number of hours expended, and reasonableness of hourly fee).

 <u>Much of the Estate's Award should go to Buttles</u>. Further, while the Trustee's damage claims belong to the estate, the $16.9 million in damages awarded to the Trustee far outstrip the amount of allowed claims in the case. Accordingly, Buttles' equity interest is entitled to a large distribution, at least on paper.[10] The Firm believes that its work significantly contributed to that result. If this were a case under chapter 9 or chapter 11, the Firm would be seeking a fee award for "substantial contribution" to the case's success under 11 U.S.C. § 503 (b)(3)(D).[11] In this

---

[10]     As this Application was being drafted, the Firm received the Trustee's motion to compromise controversy. [Adv. Dkt. 594] In that motion, counsel understands that the Trustee wants to make a cash settlement with RBC representatives which will be insufficient to pay more than a 50% dividend to general unsecured creditors. This settlement therefore deprives Mr. Buttles of any recovery for his equity interest.

[11]     Some Circuits have construed the statute to extend to chapter 7. See, e.g. *Mediofactoring v. McDermott (In re Connolly N. Am., LLC),* 802 F.3d 810, 816–17 (6th Cir. 2015*)* (over dissent, noting that section 102(3) "encourages an expansive reading of § 503(b)," and even the specific mention of chapters 9 and 11 in the statute does not necessarily preclude its application in chapter 7); *In re S & Y Enters.,* 480 B.R. 452, 461 (Bankr. E.D.N.Y. 2012*)* (although ultimately denying the claim, the court found that noncreditor unsuccessful bidder had standing to assert a substantial contribution claim concluding that "section 503(b)'s enumeration of prospective applicants for a substantial contribution administrative expense is illustrative, not exclusive"), *aff'd,* 2013 U.S. Dist. LEXIS 125965 (E.D.N.Y. Sept. 3, 2013); *In re Zedda,* 169 B.R. 605, 607 *(*Bankr. E.D. La. 1994*)* (allowing substantial contribution fees in a chapter 7 case, citing cases coming out both ways). Other circuits have determined that the specific statutory language, which includes only chapters 9 and 11, cannot be expanded. *See, e.g.,* In re Nilhan Developers, LLC., 620 B.R. 385, 406–10 (Bankr. N.D. Ga. 2020) (insider who was not a creditor or equity security holder lacked standing to assert a substantial contribution claim under section 503(b)(3)(D)); *In re Mountain Creek Resort, Inc.*, 616 B.R. 45 (Bankr. D.N.J. 2020) (denying substantial contribution claim by county because the county was not a creditor and lacked statutory standing under section 503(b)(3)(D)); *In re First Baldwin Bancshares, Inc.*, 2013 Bankr. LEXIS 2200 (Bankr. S.D. Ala. May 30, 2013); *In re Engler*, 70 C.B.C.2d 781, 500 B.R. 163, 174 (Bankr.

case, the Firm refers to the statutory provision as a useful parallel and support to justify the award in an amount greater than the damages awarded.

      i.  **The experience, reputation and abilities of the attorneys**:  The members of the Firm have spent their entire professional careers as bankruptcy reorganization and litigation counsel. The case law standard requires reference to counsel's reputation; they hope that reputation is a good one,[12] and believe their abilities fully met the challenges posed by the case.

      j.  **Undesirability of the case**: This case was undesirable. It required the Firm to endure both a proud lender's contumely and the law's delay, while still working to prove the damages from a man's life's work destroyed and his personal finances ruined. RBC was willing to fund five years of work by very capable counsel to delay the day of reckoning; perhaps it also expected Mr. Buttles' counsel to lose interest. In addition, the vagaries of judicial assignment left the case effectively an orphan for most of its existence, further adding to delay. This case reduced the Firm's income for four years because of the time resources it demanded. The one desirable factor was the conviction that the Firm was doing right by its client and the judicial process. Even so, getting to trial was no fun.

      k.  **The nature and length of the professional relationship with the client**: The Firm did not represent Buttles before this matter arose, and it does not anticipate that he will remain a client after it concludes.

---

M.D. Fla. 2013) (while recognizing that the list of administrative expenses is not limiting, the specifics of subsection 503(b)(3) overcome the general), appeal dismissed, 2014 U.S. Dist. LEXIS 38412 (M.D. Fla. Mar. 24, 2014); *In re Watson*, 495 B.R. 88, 93 (Bankr. D. Colo. 2013) (reference to chapters 9 and 11 in the statute preclude its application to chapter 7).

[12]     The Oxford English Diction defines "reputation" as "the relative estimation or esteem in which a person is held." Applicant Firm thinks it presumptuous to tell this Court how others regard the Firm, but hopes others' estimation would make the Firm's grandmothers proud.

    **l.** <u>**Awards in similar cases**</u>: This Court hears fee applications on an almost-daily basis and is therefore entirely conversant with the range of fees charged in litigation such as this. The Firm believes that the compensation it seeks is consistent with or below fees being awarded in other cases of similar size in this and other districts.

**COSTS**

    30.    During the Application Period, the Firm incurred actual disbursements on Buttles' behalf of $8,764.56., attached to this Application as Exhibit I.

    31.    With respect to in-house photocopying charges, the Firm's general policy is to charge its clients the rate of 20¢ per page. However, the Firm typically sends large copying and mailing work to outside services which charge less than the Firm charges, thereby realizing savings for the estate. Only clients who actually use photocopying or other office services of the types set forth in the Application's cover sheet are separately charged for such service. These charges are intended to cover the Firm's costs for the services; the Firm does not believe that the charges constitute a profit.

    32.    To the best of the Firm's knowledge, all expenses sought to be allowed and reimbursed comply with the U.S. Trustee's Guidelines.

    33.    Because the Firm files this fee application under the provisions of the Texas Business and Commerce Code, and not under the requirements of the Bankruptcy Code, it believes that the requirements of 11 U.S.C. § 504 and Fed.R.Bankr.P. 2016(a) are inapplicable. Applicants do not seek payment from the Debtor's estate, but from RBC.

    34.    No agreement or understanding prohibited by Section 155 of Title 18, United States Code has been or will be made by the Firm.

Application of Rochelle McCullough, LLP for Allowance
of Compensation and Reimbursement of Expenses        Page 21 of 23

## VOLUNTARY REDUCTIONS

35.    The Firm recognizes that any hourly billing formula will include time not effi-

ciently spent: promising research trails can turn out unproductive, and attractive causes of action

can sometimes wilt when tested in discovery. The greatest encourager of inefficiency, however,

is a deep-pocketed client who unquestioningly pays the monthly bill: Mr. Buttles did not fit that

description, since he had no ability to pay. The Firm had every incentive to run as lean as it could

on this matter. Nevertheless, the Firm recognizes that some time could be considered either un-

productive, or might have been done by a person more senior than necessary for the job at hand.

Recognizing those possibilities, the Firm voluntarily reduces the gross fees of $1,212,914.76

sought by 10%, or $111,291.48, thereby reducing the net fees sought to $1,101,623.28.

WHEREFORE, premises considered, the Firm respectfully requests this Court to grant

allowance of compensation for professional services rendered as counsel for John Buttles in the

amount of $1,101,623.28 and reimbursement of actual and necessary disbursements incurred by

the Firm in the amount of $8,764.56, and for such other and further relief as this Court deems

just and proper.

Dated: January 13, 2022.

Respectfully submitted,
 /s/ Michael R. Rochelle
Michael R. Rochelle
State Bar No. 17126700
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
(214) 953-0182
(214) 953-0185

COUNSEL FOR JOHN S. BUTTLES

## STATEMENT OF CERTIFYING PROFESSIONAL

The undersigned hereby certifies that he prepared the foregoing Application for Allowance of Compensation and Reimbursement of Expenses. Although he is not seeking reimbursement from the Debtors' estates, and therefore does not believe that the Application is subject to the provisions governing such fee requests, he nonetheless certifies that, to the best of his knowledge, information and belief, formed after reasonable inquiry, the compensation and expense reimbursement sought is (a) in conformity with the Guidelines for Compensation and Expense Reimbursement of Professionals for the United States Bankruptcy Court, Northern District of Texas, effective February 1, 1994, and (b) are billed at rates, in accordance with practices, no less favorable than those customarily employed by Rochelle McCullough, LLP in similar matters and generally accepted by Rochelle McCullough, LLP's clients.

*/s/ Michael R. Rochelle*
Michael R. Rochelle

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was served via ECF on all parties registered to receive service via the ECF system and upon the parties listed on the attached service list by First Class United States Mail, postage prepaid, this 13th day of January 2022.

/s/ Michael R. Rochelle
Michael R. Rochelle